# Exhibit 8

# In The Matter Of:

*Santiago Rojas, et al. v.*
*marko Zaninovich, Inc., et al.*

*Peter Nickerson, PhD.*
*June 10, 2011*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94105*
*(415) 597-5600*
*Fax: (415) 597-5606*

Original File 18080Nickerson.txt

Case 1:09-cv-00705-AWI-JLT   Document 69-7   Filed 06/13/11   Page 3 of 9

Santiago Rojas, et al. v.                                                   Peter Nickerson, PhD,
marko Zaninovich, Inc., et al.                                              June 10, 2011

**Page 1**

1                 UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                     FRESNO DIVISION

4    - - - - - - - - - - - - - - - -

5    SANTIAGO ROJAS, ET AL., ON   )

6    BEHALF OF THEMSELVES AND A    )

7    CLASS OF OTHERS SIMILARLY     )

8    SITUATED,                     )

9            PLAINTIFFS,           )

10       v.                        ) CASE NO. 1:09-CV-00705

11   MARKO ZANINOVICH, INC., ET    )

12   AL.,                          )

13           DEFENDANTS.           )

14   - - - - - - - - - - - - - - -

15

16

17           DEPOSITION OF PETER NICKERSON, PhD

18               FRIDAY, JUNE 10, 2011

19

20

21       BEHMKE REPORTING AND VIDEO SERVICES, INC.

22          BY:  CYNTHIA F. DAMMANN, CSR NO. 10610

23                160 SPEAR STREET, SUITE 300

24               SAN FRANCISCO, CALIFORNIA 94105

25                                    (415) 597-5600

**Page 2**

1

2

3

4

5

6

7

8            Deposition of PETER NICKERSON, PhD,

9    taken on behalf of PLAINTIFFS, at 1939 Harrison

10   Street, Suite 730, Oakland, California, commencing

11   at 1:10 P.M., FRIDAY, JUNE 10, 2011, before Cynthia

12   F. Dammann, Certified Shorthand Reporter No. 10610,

13   pursuant to Notice.

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFF:

3        MALLISON & MARTINEZ

4        BY:  STAN S. MALLISON, ATTORNEY AT LAW

5             JESSICA JUAREZ, ATTORNEY AT LAW

6        1939 Harrison Street

7        Suite 730

8        Oakland, California 94612

9        Telephone:  (510) 832-9999

10       Email:  Stanm@thommlawfirm.com

11

12   FOR DEFENDANT:

13       MORGAN, LEWIS & BOCKIUS, LLP

14       BY:  ERICK MECKLEY, ATTORNEY AT LAW

15       One Market, Spear Street Tower

16       San Francisco, California  94105

17       Telephone:  (415) 442-1013

18       Email:  Emeckley@morganlewis.com

19

20   ALSO PRESENT:

21       KENT H. STEPHENS, MARKO ZANINOVICH, INC.

22       AARON WOOLFSON

23

24

25

**Page 4**

1                    INDEX

2    FRIDAY, JUNE 10, 2011

3    PETER NICKERSON, PhD                        PAGE

4        Examination by MR. MALLISON                7

5        Examination by MR. MECKLEY                83

6        Further Examination by MR. MALLISON       84

7

8                     -oOo-

9

10       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

11               PAGE     LINE

12                 None.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 13

1   if that's helpful for you.  I don't care which way
2   you do it or not.  Or you can write it down on a
3   piece of paper if you'd rather.
4       MR. MECKLEY: Here's a sticky if you want a
5   sticky.
6   BY MR. MALLISON:
7    Q. Page 6, from line 22, to page 7, at line 2,
8   page 8 -- sorry -- page 8, from lines 9 to 25, and
9   page 11 from lines 20 to 25.  If I'm not mistaken,
10  this is where you describe the formula or the
11  analysis that's done by Sunview to correct or make
12  sure that people are paid minimum wage.  Is that
13  correct?
14   A. That's correct.
15   Q. Okay.  Could you generally explain to me the
16  process and the formula?  I'll ask you for more
17  precise definition after we go through it.
18       MR. MECKLEY: Let me object as vague and
19  ambiguous, overbroad.
20       THE WITNESS: Sunview's detailed data system
21  includes records for individuals on a daily basis by
22  type of pay they might receive in a particular day.
23  So they might receive hourly pay, some incentive
24  pay, equipment pay.  So they have the daily records.
25  So in order to figure out the weekly amount of pay,

Page 14

1   you take all of the daily records, you sum them, and
2   then Sunview system has a checking system in it that
3   by pay period checks to see -- once you sum all
4   those, you divide it by the number of hours worked
5   and you have to look at work hours, non-incentive
6   hours and things like that.  You don't want to be
7   double counting or missing hours, but it works that
8   way.
9       The system looks to see if a minimum wage
10  has been paid, which is the statutory minimum wage
11  at that time.  If you average that gross pay, and if
12  it hasn't, it invokes the Code 31 and puts in a
13  dollar amount per hour for those -- for that week to
14  get it up to the minimum wage.
15  BY MR. MALLISON:
16   Q. Okay.  And by averages, you mean averages
17  over the day, averages over the week, averages over
18  the year?
19   A. It's over the pay period.
20   Q. What components -- pay codes go in to
21  totaling -- actually, let me back up a little bit.
22       Did you actually do the SQL database
23  analysis yourself or did you have someone assist
24  you?
25   A. Nobody did any SQL database analysis.

Page 15

1    Q. And what type of database analysis did you
2   do?
3    A. SAS.
4    Q. And did you do the SAS analysis yourself, or
5   did you have an assistant?
6    A. Two other people did the analysis.
7    Q. Okay.  Who are those people?
8    A. Christina Tapia, T-a-p-i-a.
9    Q. Okay.
10   A. And Amy Purdie, P-u-r-d-i-e.
11   Q. And did you review their work?
12   A. I did.
13   Q. And you are competent at SAS?
14   A. Relatively competent.
15   Q. So you could tell me about the -- what shall
16  we call them, queries?  Is that the parlance we
17  should use?
18   A. SAS the not a database language.  It's a
19  computer language that allows you to make --
20   Q. I'm familiar with it.
21   A. It has code to it.  We make the same -- you
22  know, you make the same basing statements and if
23  statements and that sort of thing.  It's done in a
24  different way.
25   Q. Would you prefer to refer to them as queries

Page 16

1   or statements or --
2    A. They're probably statements.  They're not
3   queries in the database.  They're certainly not
4   queries in the database sense.
5    Q. What's the difference?
6    A. In a database sense, you have some sort of
7   structure to your data and your system is set up so
8   that you make a -- the structured query that says
9   take these, leave these out, exclude, include,
10  however the database manipulation tool works, and it
11  just goes in and does that.  In SAS, we write code
12  that says, well, if the job code is this, include
13  it; if the job code is this, include it.  It's a
14  similar sort of thing, but we're writing out the
15  code.  We use SAS because we produce all the code
16  for you so you can follow what we did.
17   Q. Right.  Speaking of which, with regards to
18  the documents, are these them?
19   A. These are they.
20   Q. Can I have them?  Is there data in here?
21       MR. MECKLEY: There is data.
22       MR. MALLISON: Spectacular.
23       THE WITNESS: And I think --
24       MR. MECKLEY: And that's for reviewing
25  today.  That's not a copy.

Page 17

1      MR. MALLISON: You want me to scan it and
2  copy it?
3      MR. MECKLEY: That's just not a copy.
4      THE WITNESS: That's my only copy.
5      MR. MALLISON: Okay. That's fine. We can
6  get it copied right now. I will have it scanned and
7  copied.
8      MR. MECKLEY: Much of that is what you
9  already have. I think the biggest chunk is
10 Woolfson's report.
11     THE WITNESS: So you may not want to do the
12 middle of it. It's his stuff. It's up to you.
13 Most of it's --
14 BY MR. MALLISON:
15  Q. I've got a rapid scanner. I put it in
16 there, and it takes a couple minutes. Okay. I'm
17 going to give you a couple examples just to make
18 sure I understand how the minimum wage adjustment
19 takes place, and that's what we're going to call it,
20 right, minimum wage adjustment? Is that an
21 appropriate term?
22  A. Sure.
23  Q. That minimum wage adjustment comes in
24 through which codes, which pay codes?
25  A. You mean the actual adjustment? It's 031.

Page 18

1  Q. Okay. Is there any other codes that fulfill
2  the function of a minimum wage adjustment?
3  A. I don't believe so.
4  Q. Okay. So here's my first example, and we're
5  going to probably quibble about the parlance but
6  hopefully we'll work it out.
7      If a worker is working in some fashion,
8  piece rate or minimum wage or hourly rate, and at
9  the end of a day would otherwise be short $1,
10 according to Code 10, Code 11, Code 21, whatever,
11 how would -- if that's the only day they worked in
12 the week, how would Code 31 adjust for that
13 shortfall?
14  A. So that's --
15     MR. MECKLEY: Let me just object, incomplete
16 hypothetical, lacks foundation, calls for
17 speculation.
18 BY MR. MALLISON:
19  Q. Best ones are.
20  A. He only worked -- or she only worked one day
21 and he's short a dollar and take the number of
22 hours, I believe -- I have to look at the code just
23 to make sure, but I believe Code 31 -- how many
24 hours did he work, eight hours?
25  Q. Eight hours.

Page 19

1  A. Let's say he worked eight hours and is short
2  a dollar, Code 31, 12 cents in there. I believe
3  it's by the hour. I have to look.
4  Q. And for units you'd put in 8?
5  A. Yes.
6  Q. So that 8 times 5 would get us to the dollar
7  that's missing, right?
8  A. Yes.
9  Q. Okay. Let's take a different example. A
10 worker is -- works five days, same exact situation,
11 short a dollar each day.
12     How does Code 31 resolve that eight-hour
13 shifts again?
14  A. 40 hours, 12 cents.
15  Q. Okay. Second -- third example. A worker
16 makes $1 over minimum wage, he's very quick on his
17 piece rate, for whatever reason, for four days, he's
18 working eight hours a day, on the fifth day he
19 works -- he's short $4, he's very slow that day.
20 How much is owed under Code 031?
21     MR. MECKLEY: Object, incomplete
22 hypothetical, lacks foundation, calls for
23 speculation.
24     THE WITNESS: Would you do the whole thing
25 again? I'm sorry.

Page 20

1  BY MR. MALLISON:
2  Q. Sure. You work five days, eight hours a
3  day.
4  A. Right.
5  Q. Need some paper?
6  A. No.
7  Q. Okay. For four days, he actually exceeds
8  minimum wage for those days by a dollar total in the
9  day.
10  A. Total?
11  Q. So $4 over those four days.
12  A. Total is $4, $1 per day. Okay.
13  Q. On the last day he works slowly, and he's
14 short by $4 for that day. How would the system --
15 Sunview system handle that with Code 31?
16     MR. MECKLEY: Same objections.
17     THE WITNESS: When you say short, if you
18 calculate minimum wage on a daily basis --
19 BY MR. MALLISON:
20  Q. Yes.
21  A. -- he'd be short $4? There would be no Code
22 31.
23  Q. Okay. That's because the Code 31 operates
24 over a weekly basis?
25  A. Yes.

Page 25

1   MR. MECKLEY: Object.
2   BY MR. MALLISON:
3   Q. -- averaging method?
4       MR. MECKLEY: I'll object, mischaracterizes
5   his testimony, vague and ambiguous, lacks
6   foundation.
7       MR. MALLISON: I'm not asking about his
8   testimony. I'm asking if he actually analyzed the
9   data on the other than weekly basis for purposes of
10  determining minimum wage violation.
11      MR. MECKLEY: It misstates his testimony
12  because he said he didn't analyze the data for that
13  purpose. But same objections, lacks foundation.
14      THE WITNESS: You asked me a different
15  question to start with in reference to this.
16  BY MR. MALLISON:
17  Q. Sure. Which one --
18  A. I don't exactly know how to interpret this.
19  Q. Okay.
20  A. And the answer to whatever else is floating
21  out there should probably have a question asked
22  again.
23  Q. Sure. I will venture to say that under the
24  California standard that what is required is that
25  the minimum wage be paid for every hour and every

Page 26

1   day, not just every week under "Armenta," which is
2   what I just handed you.
3       MR. MECKLEY: That's the statement.
4   BY MR. MALLISON:
5   Q. If this is true, does that alter your
6   analysis?
7       MR. MECKLEY: Object, lacks foundation,
8   calls for speculation.
9       THE WITNESS: If you were to do it on an
10  hourly basis or a daily basis, you would get
11  different answers.
12  BY MR. MALLISON:
13  Q. Okay. Do you know how Mr. Woolfson did his
14  analysis?
15  A. I believe I do, yes.
16  Q. What's that?
17  A. I believe he attempted to do it on a daily
18  basis.
19  Q. Okay. How did you do it?
20  A. I take that back. He attempted to do
21  something like that on a daily basis.
22  Q. And how did you do your analysis?
23  A. We tried to replicate his analysis, which we
24  got pretty close to, and we looked at the system,
25  the way it works on a weekly basis.

Page 27

1   Q. Okay. So for purposes of the paragraph on
2   page 11, from lines 20 to 25, your analysis is based
3   upon a weekly averaging method. Is that correct?
4   A. That's correct, yes.
5   Q. Did you run it -- run the analysis on a
6   daily basis to determine whether it was minimum wage
7   violations?
8   A. I did not.
9   Q. So do you have a basis to say that "A
10  correct analysis of the payroll data on a pay period
11  basis finds that out of 606,352 employee system date
12  observations evaluated, the average weekly pay rate
13  for 606,274 or 99.99 percent meet or exceed
14  prevailing minimum wage rate" under California law?
15  A. That's a correct statement. It has nothing
16  to do with California law.
17  Q. What is the prevailing minimum wage rate?
18  A. The average weekly pay rate --
19  Q. I believe we discussed this.
20  A. -- meets the -- or exceeds the prevailing
21  minimum wage rate. The average weekly pay rate is
22  exactly what that system calculates.
23  Q. Yes, it does. But what's the standard for
24  determining what the prevailing minimum wage rate is
25  under California law?

Page 28

1       MR. MECKLEY: Well, let me object. It's
2   asking for a legal conclusion.
3   BY MR. MALLISON:
4   Q. I'm asking how you did this calculation,
5   whether it's accurate or not.
6   A. My --
7       MR. MECKLEY: There's no question pending,
8   just a statement.
9   BY MR. MALLISON:
10  Q. Did you do your analysis incorrect in light
11  of "Armenta," that is, Exhibit 5?
12      MR. MECKLEY: Let me object,
13  mischaracterizes his testimony, lacks foundation.
14  BY MR. MALLISON:
15  Q. I'll just make this simpler.
16      Is Sunview's data payroll system in
17  compliance with "Armenta"?
18  A. I have --
19      MR. MECKLEY: Let me object that's a legal
20  conclusion.
21      THE WITNESS: I have no idea.
22  BY MR. MALLISON:
23  Q. Okay. I'll ask it a little more directly.
24      Does Sunview's payroll system use weekly
25  averaging?

Page 33

1  me ask you about piece rates for a second.
2      Do you know what a piece rate is?
3  A. I do.
4  Q. Tell me what a piece rate is.
5  A. It is a way of paying individuals for
6  particular objectives being completed.
7  Q. Would it be safe to call it work completed?
8  A. We can.
9  Q. Okay. So you don't get piece rate if you're
10  home sleeping?
11  A. No.
12  Q. Unless you happen to have a piece rate
13  that's constructed that way, right?
14  A. Right.
15  Q. Okay. Do you know what the piece rates are
16  here?
17  A. I think they vary.
18  Q. Okay. Can you tell me the nature of it?
19  A. They're on a per unit basis. I'd have to
20  look at the actual data. I don't recall exact
21  numbers, but some people -- I think Sunview calls
22  some of them an incentive pay and some of it piece
23  rate pay, and you have to distinguish between units
24  of each of them that they're paying on a unit basis.
25  Some of them are pennies, and some of them are more

Page 34

1  than that.
2  Q. Is there any difference between incentive
3  pay and piece rate pay for purposes of your
4  analysis?
5  A. No. There isn't really.
6  Q. Okay. Is there any difference between piece
7  rate and bonus pay for purposes of your analysis?
8  A. Yes.
9  Q. How so?
10  A. The bonus pay refers to two job codes or two
11  pay codes, and those were paid to crew chiefs. I
12  think that's the term they use, crew chiefs or crew
13  supervisors, and are -- have to do with bonuses paid
14  for an entire crew but they're only paid to crew
15  chiefs.
16  Q. Okay. And how are they different from piece
17  rate?
18  A. I believe the other piece rates are paid to
19  field workers for -- I don't know the exact.
20  Q. Fair enough. But don't they operate
21  identically to piece rates in the sense that they're
22  an amount of money paid for a production done by
23  these crew chiefs?
24      MR. MECKLEY: Let me object,
25  mischaracterizes witness's testimony, lacks

Page 35

1  foundation.
2  BY MR. MALLISON:
3  Q. I'll make it simpler.
4      If I'm not mistaken, these bonuses are paid
5  for a number of hours that are worked by employees.
6  I believe that's what you said in your declaration.
7  A. I believe that's correct.
8  Q. The underlying employees.
9      Isn't that just like a piece rate?
10      MR. MECKLEY: Object as vague and ambiguous,
11  lacks foundation.
12      THE WITNESS: I think it is what it is. I
13  wouldn't put it in a piece rate, but you could, I
14  guess.
15  BY MR. MALLISON:
16  Q. Okay. What functional difference would it
17  have between that and a piece rate for purposes of
18  this analysis?
19  A. I guess the problem I was having was it
20  makes no difference that way than it does hours
21  worked. So --
22  Q. Okay.
23  A. -- they all get mushed together then.
24  Q. You only get paid a piece rate when you're
25  working, is that correct, under the piece rates used

Page 36

1  by Sunview?
2  A. If I understand your question correctly,
3  yes.
4  Q. Okay. Do you get paid any piece rates when
5  you are off the clock, not working?
6  A. If you're not -- I think we're -- I don't
7  know how to answer that question. Piece rates are
8  paid for output.
9  Q. For work completed. Is that correct?
10  A. Yeah. They're paid for a box of something
11  being produced or something like that. So you're
12  not paid if you don't -- for anything but that.
13  Q. Did you discover any pure piece rate shifts
14  in your analysis of the data, that is, employees who
15  were being paid for a day or a shift were paid only
16  at the piece rate?
17  A. Yes.
18  Q. And what were those employees paid? Were
19  they paid any hourly supplements?
20  A. They were not.
21  Q. Okay. When a -- we'll call them pure piece
22  rate worker?
23  A. Well, they would have been paid hourly
24  supplements if you took the amount of time recorded,
25  that they were recorded at the workplace. I'm not

Page 37

1  exactly sure -- it's not a punch clock system.  So
2  the amount recorded.  And you don't get a minimum
3  wage out of that piece rate.  Then they would have
4  an 031 code attached to them on a weekly basis
5  again.
6      Q.  So it's only for purposes of making up a
7  minimum wage shortfall, if you will?
8      A.  Correct.
9      Q.  How much does a pure piece rate worker make
10 when they're on a rest break?
11         MR. MECKLEY: Let me object, calls for a
12 legal conclusion.
13 BY MR. MALLISON:
14     Q.  I'm asking empirically, from your study,
15 what were they making when they were on a pure piece
16 rate basis and they were on a rest break?
17         MR. MECKLEY: Objection, calls for a legal
18 conclusion and lacks foundation.
19         THE WITNESS: I don't know how to answer
20 that.  They're paid by piece rate.  So they're paid
21 for producing an output.
22 BY MR. MALLISON:
23     Q.  All right.
24     A.  I don't know how else they're paid.
25     Q.  Okay.  So if they're not producing, they're

Page 38

1  not being paid.  Is that correct?
2          MR. MECKLEY: Let me object,
3  mischaracterizes the witness's testimony, lacks
4  foundation, and calls for a legal conclusion.
5          THE WITNESS: They're being paid for piece
6  of output.  They're not ever being paid for inputs.
7  BY MR. MALLISON:
8      Q.  By inputs, you mean?
9      A.  How much time they spend, how they spend it,
10 whether they're -- what they're doing or anything
11 else.
12     Q.  Let's take another hypothetical example
13 here.
14         There are also people who are paid both a
15 piece rate and hourly rate.  Is that correct?
16     A.  Yes.
17     Q.  In fact, it's almost the predominate pay
18 system during the major part of the harvest season.
19 Is that correct?
20     A.  It is the predominate basis.
21     Q.  Okay.  And am I correct in that in your
22 analysis you -- well, actually, am I correct in
23 stating that often times during the time --
24 particular time period they paid below the minimum
25 wage on hourly basis?

Page 39

1          MR. MECKLEY: I'm sorry.  I didn't get that.
2  Could you read it back.
3  BY MR. MALLISON:
4      Q.  I haven't finished yet.  With the notion
5  that the piece rate, and maybe an 031 code, would
6  get them up to minimum wage or above, is that
7  correct?
8      A.  I'm not sure what the notion was, but your
9  general description is correct for a certain period
10 of time.
11     Q.  Okay.  And did you recognize what the pay
12 rate was, the hourly component of that pay rate was?
13 Did you recognize anything about it?  I can be less
14 vague.  If you look --
15     A.  Yeah.
16     Q.  Did you notice it was below minimum wage?
17     A.  I think you already stated that.
18     Q.  Yes.  Did you notice that?
19     A.  Yes.
20     Q.  Did you notice how much typically it was
21 below minimum wage?
22     A.  I don't recall.  I mean, I saw them in the
23 data, but I didn't have the other rates sitting next
24 to it.
25     Q.  And for an employee who's working in that

Page 40

1  system when they're on a rest break, how much are
2  they being paid?
3          MR. MECKLEY: Objection, vague and
4  ambiguous, calls for a legal conclusion, lack of
5  foundation.
6          THE WITNESS: I don't quite know the answer
7  to it because if --
8  BY MR. MALLISON:
9      Q.  I'll make it simpler because I know where
10 you're caught up.
11     A.  Go ahead because I'm not sure where I am,
12 but I know it's there somewhere.
13     Q.  I'll help you.  Let's assume there's no 031
14 code adjustments because they're really fast in the
15 field, they make $10 an hour on average.  Okay?
16 When they're on rest break, what's their pay rate?
17         MR. MECKLEY: Object, calls for a legal
18 conclusion, lacks foundation, vague and ambiguous.
19         THE WITNESS: And is the $10 an hour based
20 on their 40 hours that's in the time record?
21 BY MR. MALLISON:
22     Q.  Yes.
23     A.  Ten bucks.
24     Q.  When they're on a rest break?
25     A.  If they're taking the rest break during that

Case 1:09-cv-00705-AWI-JLT   Document 69-7   Filed 06/13/11   Page 9 of 9

Santiago Rojas, et al. v.                                                    Peter Nickerson, PhD.
marko Zaninovich, Inc., et al.                                                     June 10, 2011

Page 49

1  produce the conclusions that you stated. Is that
2  correct?
3       MR. MECKLEY: Let me object it
4  mischaracterizes the witness's testimony, lacks
5  foundation, calls for speculation.
6       THE WITNESS: I don't have any conclusions
7  regarding this or opinions regarding this. The math
8  is the same. If you calculate exactly the way your
9  hypothetical is, that's the way the numbers turn
10 out.
11 BY MR. MALLISON:
12     Q. Based upon the way that the formulas work
13 that you've been working with. Is that correct?
14     A. Based upon how you put the hypothetical.
15     Q. And the hypothetical included the assumption
16 that we're going to calculate on a weekly basis
17 using Sunview's piece rate, hourly rate, and 031
18 corrections?
19     MR. MECKLEY: Let me object that misstates
20 the testimony. Hypotheticals weren't calculated on
21 a weekly basis.
22     THE WITNESS: And there weren't any 031s in
23 that.
24 BY MR. MALLISON:
25     Q. That's right. We excluded it. Okay. We'll

Page 50

1  go through them again then.
2       Under Sunview's payroll system, if a worker
3  works four days very productively, he's on a
4  combined piece rate and hourly basis, so productive
5  that he averages over the week $10 an hour but on
6  the fifth day he has no piece rate production and
7  his hourly wage is 7.75, what is he paid by Sunview
8  per hour for the fifth day?
9       MR. MECKLEY: Object, calls for a legal
10 conclusion, lacks foundation.
11 BY MR. MALLISON:
12     Q. It's the exact same hypothetical. I just
13 added the word "Sunview."
14     A. I think on all the days he's paid 7.75 an
15 hour. That's his hourly rate.
16     Q. Correct. By assumption. On the fifth day,
17 he's not added any piece rate to his wage. Is that
18 correct?
19     A. That's correct.
20     Q. And the same analysis about his first hour
21 is still the same when we add the word "Sunview" to
22 the hypothetical. Is that correct?
23     MR. MECKLEY: Object as vague and ambiguous.
24 BY MR. MALLISON:
25     Q. In other words, Sunview would pay him the

Page 51

1  first hour on that fifth day at 7.75 an hour. Is
2  that correct?
3       MR. MECKLEY: Let me object that
4  mischaracterizes the testimony.
5       THE WITNESS: Do it again. I'm starting to
6  get lost.
7  BY MR. MALLISON:
8       Q. Sure.
9       A. My eyes are starting to glaze over as well.
10      Q. No problem. Four days, he's very
11 productive. He's paid 7.75 which is, by assumption
12 sub-minimum wage, but he's a piece rate worker.
13 He's also getting piece rate on top of this 7.75
14 hourly rate. As a result for the week, he averages
15 $10 an hour combined hourly piece rate work, but on
16 the fifth day, amidst all this, his piece rate
17 production is zero.
18      What is his average hourly wage on the fifth
19 day using the formulas and the systems that Sunview
20 has as part of its payroll database?
21      A. His contribution to the total for the fifth
22 day would be 7.75 an hour.
23      Q. And that's the same for the first hour,
24 second, third, fourth, fifth, sixth, seventh or
25 eighth hour, is that correct, on the fifth day?

Page 52

1       A. Yes.
2       Q. It's the same for every ten-minute segment
3  of that day, is that correct, that he's working on
4  the clock?
5       MR. MECKLEY: Well, let me object that
6  mischaracterizes the witness's testimony, lacks
7  foundation, calls for speculation.
8  BY MR. MALLISON:
9       Q. Is that correct?
10      A. Do it again.
11      Q. Every hour on the fifth day, he's paid 7.75
12 by Sunview under this hypothetical. Is that
13 correct?
14      A. Correct.
15      Q. And that's the same for every half hour?
16      A. He's paid half of that, but yes.
17      Q. Per hour basis?
18      A. Right.
19      Q. For every 15 minutes, right, and every ten
20 minutes, right, same rate?
21      A. Correct.
22      Q. And every minute?
23      A. Correct.
24      Q. And every second?
25      A. Correct.