1  JAMES N. PENROD, State Bar No. 43030
2  MICHAEL MOLLAND, State Bar No. 111830
   ERIC MECKLEY, State Bar No. 168181
   SHANNON B. NAKABAYASHI, State Bar No. 215469
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, California  94105
   Telephone:    415.442.1000
5  Facsimile:    415.442.1001
   jpenrod@morganlewis.com
6  mmolland@morganlewis.com
   emeckley@morganlewis.com
7  snakabayashi@morganlewis.com

8  Attorneys for Defendant
   SUNVIEW VINEYARDS OF CALIFORNIA, INC.
9

                    **UNITED STATES DISTRICT COURT**

10                  **EASTERN DISTRICT OF CALIFORNIA**

11                          **FRESNO DIVISION**

12

13  SANTIAGO ROJAS, JOSEPHINO            Case No. 1:09-CV-00705-AWI-JLT
    RAMIREZ, CATALINA ROBLES, JUAN
14  MONTES, BENITO ESPINO, and          **DEFENDANTS' OPPOSITION TO**
    GUILLERMINA PEREZ, on behalf of     **PLAINTIFFS' MOTION FOR CLASS**
15  themselves and a class of others similarly  **CERTIFICATION**
    situated,
16                                       Judge:      Hon. Jennifer L. Thurston
                   Plaintiffs,           Courtroom: 1300 18th Street, Bakersfield
17                                       Date:       September 1, 2011
              v.                         Time:       9:30 a.m.
18
    MARKO ZANINOVICH, INC.,
19  SUNVIEW VINEYARDS OF
    CALIFORNIA, INC., a California
20  corporation; and DOES 1 to 20, inclusive,

21                 Defendants.

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................1

II.   SUMMARY OF RELEVANT FACTS ...................................................6

    A.   Sunview Vineyards of California, Inc. ...........................................6

    B.   The Putative Class - Sunview's Field Hand Laborers .....................7

    C.   Sunview's Employment Policies For Field Hand Laborers For The Past Ten Years..............................................................................7

        1.   Sunview's Wage and Hour Policies and Procedures...............8

        2.   Sunview Trained Its Supervisory Employees About Its Wage and Hour Policies and Required Compliance from Supervisors ..................9

        3.   Sunview's "Open Door" and Complaint Policies ..................10

    D.   Field Hand Laborer's Work Schedules, and Sunview's Prohibition On Pre- or Post-Shift Off-The-Clock Work .....................................11

        1.   Start of the Work Day.........................................................11

        2.   End of the Work Day...........................................................13

        3.   Recording of Field Hand Laborer's Hours Worked...............14

        4.   Financial Incentives Given by Sunveiw to Crew Bosses to Record all Hours Worked by Their Crew ..................................14

        5.   Picking Trays ......................................................................15

    E.   Field Hand Laborer Pay Rates......................................................15

    F.   Sunview's Tool Policies and Practices .........................................16

        1.   Scissors ...............................................................................16

        2.   Gloves.................................................................................17

        3.   Shears, Goggles, and Other Tools and Equipment.................18

III.  LEGAL ARGUMENT.........................................................................18

    A.   Plaintiffs Cannot Meet the Rigorous Burden for Class Certification. .................18

    B.   Plaintiffs Cannot Satisfy Rule 23(a)'s Requirements ...................20

        1.   Plaintiff Has Failed to Prove the Existence of Common Questions of Law or Fact ......................20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2. Plaintiffs Have Failed to Prove that Their Claims Are Typical of the Class...................................................................................23

C. Plaintiffs Cannot Demonstrate that Certification of a Rule 23(b)(2) Class Would Be Appropriate In Light of the Supreme Court's Holding in Dukes ........24

D. Plaintiffs Cannot Satisfy the Requirements of Rule 23(b)(3) .............................25

1. Individual Issues Predominate for Plaintiffs' Off the Clock Claims.........26

a. It Is Undisputed that Sunview Had a Lawful Policy That Prohibited Off-the-Clock Work...................................................27

b. The Evidence Submitted by Sunview Demonstrates That Sunview Followed Its Policies In Practice...................................28

(1) No Work Prior to Start Time ............................................28

(2) No Work After Stop Time ................................................30

(3) No Uniformity Exists As To Tray Washing ....................32

c. Plaintiffs' Own Evidence Is Internally Inconsistent and, In Any Event, Directly Conflicts with the Evidence Submitted by Defendant ..........................................................................33

2. Individual Issues Predominate for Plaintiffs' Plaintiffs' Tool Reimbursement Claim ....................................................................35

3. Individual Factual Issues Predominate and Preclude Class Certification of Plaintiffs' Paid Rest Break Claim...............................39

a. Sunview's Pay Practices Fully Comply with California Law .......39

b. Even Under Plaintiffs' Theory, Their Rest Break Claim Cannot Be Proven Using Common Evidence ..............................43

4. A Class Action Is Not the Superior Method of Adjudication. .................43

a. A Class Action Trial of This Case Would Be Completely Unmanageable. ......................................................................44

b. Other Accessible, Fair, and Expeditious Alternatives Exist .........44

IV. CONCLUSION ...........................................................................................................45

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DB2/ 22460546.3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Aguirre v. Bustos*
89 F.R.D. 645 (D. N. M. 1981)..................................................................................22

*Allison v. Citgo Petroleum Corp.*
151 F. 3d 402 (5th Cir. 1998) ...................................................................................25

*Alonzo v. Maximus, Inc.*
2011 WL 2437444 *7 (C.D. Cal. June 17, 2011) ...........................................21, 22

*Amchem Prods. Inc. v. Windsor*
521 U.S. 591 (1997)............................................................................................26, 43

*Amchem Products, Inc. v. Windsor*
521, U.S. 591, 117 S.Ct. 2231 (1997) .....................................................................25

*Arredondo v. Delano Farms Company*
2011 WL 1486612 (E. D. Cal. April 19, 2011) .........................................................6

*Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*
238 F.R.D. 82 (S.D.N.Y. 2006) ...............................................................................25

*Bishop v. Petro Chemical Transport LLC*
582 F. Supp. 2d 1290 (E.D. Cal. 2008) ...................................................................22

*Castano v. Am. Tobacco Co.*
84 F.3d 734 (5th Cir. 1996) .....................................................................................44

*Darrikhuma v. Southland Corp.*
975 F. Supp. 778 (D. Md. 1997) aff'd, 129 F.3d 1258 (4th Cir. 1997)...................27

*De Asencio v. Tyson Foods, Inc.*
500 F.3d 361 (3d Cir. 2007) cert. denied, 128 S. Ct. 2902 (2008) .........................33

*Desimone v. Allstate Ins. Co.*
No. 96-03606, 1999 WL 33226248 (N.D. Cal. Sept. 14, 1999)...............................36

*Diaz v. Elec. Boutique of Am., Inc.*
No. 04-CV-0840FC, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005)........................27

*Eisen v. Carlisle & Jacquelin*
417 U.S. 156, 177, 94 S.Ct. 2140 (1974) ..........................................................19, 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Garcia* v. *Sun Pacific Farming Cooperative, Inc.*
2008 WL 2073979 (E.D. Cal. May 14, 2008) (affirmed, 359 Fed. Appx. 724, 2009
WL 4912213 (9th Cir. 2009)) ............................................................................................................passim

*Gen. Tel. Co. of Sw. v. Falcon*
457 U.S. 147, 160-611 (1982) ................................................................................................20, 23

*Greisz v. Household Bank (Illinois), N.A.*
176 F.3d 1012 (7th Cir. 1999) ..............................................................................................20

*Hanon v. Dataproducts Corp.*
976 F.2d 497 (9th Cir. 1992) ................................................................................................23

*Hinojos v. The Home Depot, Inc.*
No. 2-06-CV-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ..............................................26

*In re Visa Check/MasterMoney Antitrust Litig.*
280 F.3d 124 (2d Cir. 2001) ................................................................................................25

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*
571 F.3d 953 (9th Cir. 2009) ................................................................................................25

*Jimenez v. Domino's Pizza, Inc.*
238 F.R.D. 241 (C.D. Cal. 2006) ....................................................................................23, 44

*Kamm v. Cal. City Dev. Co.*
509 F.2d 205 (9th Cir. 1975) ................................................................................................44

*Koike v. Starbucks Corp.*
No. C 06-3215 VRW, 2008 WL 7796650 (N.D. Cal. June 20, 2008) ......................................26

*Leviton Mfg. Co., Inc. v. Nicor, Inc.*
2007 U.S. Dist. LEXIS 35225 (D. N.M. 2007) ......................................................................42

*Leyva v. Burley*
125 F.R.D. 512 (E.D. Wash 1989) ........................................................................................22

*Lindow v. United States*
738 F. 2d 1057 (9th Cir. 1984) ............................................................................................27

*Marlo v. United Parcel Serv.*
251 F.R.D. 476 (C.D. Cal. 2008) ..........................................................................................44

*Martinez v. Mecca Farms, Inc.*
213 F.R.D. 601 (S.D. Fla 2002) ............................................................................................22

*Medrano v. D'Arrigo Bros. Co. of Cal.*
336 F. Supp. 2d 1053 (N.D. Cal. 2004) ................................................................................42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

ii

*Montelongo v. Meese*
803 F.2d 1341 (2d Cir. 1986)........................................................................23

*Norris-Wilson v. Delta-T Group, Inc.*
270 F.R.D. 596 (S.D. Cal. Sept. 30, 2010) .......................................................36

*Reed v. County of Orange*
266 F.R.D. 446 (C.D. Cal. 2010) .....................................................................26

*Ruiz v. Affinity Logistics Corp.*
No. 05CV2125JLS, 2009 WL 648973 (S.D. Cal. Jan. 29, 2009) ...........................36

*Rutledge v. Electric Hose & Rubber Co.*
511 F.2d 668 (9th Cir.1975) ............................................................................19

*Rutti v.Lojack Corp., Inc.*
596 F.3d 1046 (9th Cir. 2010) ........................................................................33

*Schwartz v. Upper Deck Co.*
183 F.R.D. 672 (S.D.Cal.1999)........................................................................22

*Sheffield v. Orius Corp.*
211 F.R.D. 411 (D. Or. 2002) .........................................................................26

*Simmons v. T-Mobile USA, Inc.*
No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007) ...............................26

*Ticor Title Ins. v. Brown*
511 U.S. 117, 114 S. Ct. 1359 (1994) (*per curiam*)...........................................25

*Tracy v. Dean Witter Reynolds, Inc.*
185 F.R.D. 303 (D. Colo. 1998)........................................................................27

*Valentino v. Carter-Wallace, Inc.*
97 F.3d 1227 (9th Cir. 1996) ..........................................................................43

*Vinole v. Countrywide Home Loans, Inc.*
571 F.3d 935 (9th Cir. 2009) ..........................................................................26

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. ___, 2011 WL 2437013 (June 20, 2011) ......................................passim

*Washington v. Joe's Crab Shack*
271 F.R.D. 629 (N.D. Cal. 2010).......................................................................26

*White v. Starbucks Corp.*
497 F. Supp. 2d 1080 (N.D. Cal. 2007)...............................................................27

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DB2/ 22460546.3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

*Wong v. Regents of the Univ. of Cal.*
    410 F. 3d 1052 (9th Cir. 2005) ........................................................................42

*Zinser v. Accufix Research Inst., Inc.*
    253 F.3d 1180 (9th Cir. 2001) ...................................................................19, 44

**CALIFORNIA CASES**

*Armenta v. Osmose, Inc.*
    135 Cal. App. 4th 314 (2005) .................................................................41, 42

*Gattuso v. Harte-Hanks Shoppers, Inc.*
    42 Cal.4th 554 (2007)........................................................................................35

*Grissom v. Vons Cos., Inc.*
    1 Cal.App.4th 52 (1991) ..................................................................................36

*Ramirez v. Labor Ready, Inc.*
    No. 836186-2, 2002 WL 1997037 (Cal. Sup. Ct. July 12, 2002) ...................36, 37

**OTHER CASES**

*Ontiveros v. Zamora*
    CIV S-08-567.............................................................................................41, 42

*Smith v. T-Mobile USA, Inc.*
    No. CV 05-5274 ABC, 2007 WL 2385131 ......................................................27

**CALIFORNIA STATUTES**

Cal. Lab. Code §§ 98-98.2...............................................................................44, 45

Cal. Lab. Code §§ 203, 226.7, 1194 ......................................................................45

Labor Code § 2802.....................................................................................passim

Labor Code § 2802(a) .............................................................................................35

**OTHER AUTHORITIES**

California Labor Code..............................................................................................25

E.D. Cal. Feb. 20, 2009 ..........................................................................................41

Federal Rule of Civil Procedure 23(a) ............................................................passim

Federal Rule of Civil Procedure 37........................................................................42

Rule 12(b)(6) .....................................................................................................41, 42

iv

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

1

Rule 23 ................................................................................................................. passim

Rule 23(a)(1) ............................................................................................................... 20

Rule 23(a)(2) ......................................................................................................... 20, 21

Rule 23(a)(4) ............................................................................................................... 20

Rule 23(a)'s ................................................................................................................. 20

Rule 23(b) .............................................................................................................. 18, 43

Rule 23(b)(2) ............................................................................................ 1, 19, 24, 25

Rule 23(b)(2) and (b)(3) ............................................................................................. 18

Rule 23(b)(3) ..................................................................................................... 19, 25, 43

Rule 23(c)…To ........................................................................................................... 20

Rule 23's ...................................................................................................................... 19

Rule 26(a) .................................................................................................................... 42

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

I.   **INTRODUCTION**

Plaintiffs Santiago Rojas, Josephino Ramirez, Catalina Robles, Juan Montes, Benito Espino (aka Gomez), and Guillermina Perez ("Plaintiffs") seek to certify three subclasses of current and former Field Hand Laborer employees employed from November 9, 2001 to the present by Defendant Sunview Vineyards of California, Inc. ("Sunview" or "Defendant").[1] Specifically, Plaintiffs' Motion for Class Certification (the "Motion") asks this Court to certify a "Harvest Class", an "Off-Season Class" and a "Piece-Rate Class".  Within these alleged subclasses, Plaintiffs claim three allegedly unlawful employment polices/practices exist at Sunview:  (1) the putative class is required and/or permitted to work without pay both before the start of their shift during harvest and non-harvest seasons and after their shift ends during harvest ("off-the-clock claim"), (2) Sunview fails to provide the putative class with tools (primarily scissors and gloves) and workers have to buy them ("tool claim"), and (3) the putative class is not paid at least minimum wage for rest breaks when class members were paid on a purely piece-rate basis, or during a limited period between January 2002 and July 2003 ("rest break pay claim").

This Court should deny Plaintiffs' Motion in its entirety.  Plaintiffs have failed to meet their burden of proving that all of the required elements of Federal Rule of Civil Procedure 23(a) have been met and that their proposed subclasses satisfy the requirements of either Rule 23(b)(2) or (b)(3).  Plaintiffs have failed to show the existence of common questions of law and fact and failed to prove that their off-the-clock, expense reimbursement, and rest period claims may be tried using common evidence and that liability may be established on a class-wide basis. Contrary to the arguments in Plaintiffs' Motion, the evidence before the Court demonstrates that *individual*, as opposed to common, factual and legal issues predominate in this case and, as a result, a class action is *not* a superior method for adjudicating these claims.  The United States Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ____, 131 S. Ct. 2541, 2011 WL 2437013 *7 (June 20, 2011), recently and clearly stated the law that this Court must apply in resolving Plaintiffs' Motion.  The Court in *Dukes* held that the requirement of "commonality"

---

[1]  Defendant Marko Zaninovich, Inc. was dismissed from this action without prejudice on July 8, 2011 and is no longer a defendant in this case (See Docket #95).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

1  means that a plaintiff's claims "must depend upon a common contention … that is capable of

2  classwide resolution -- which means that determination of its truth or falsity will resolve an issue

3  that is central to the validity of each one of the claims in one stroke." *Id.* at *7.

> "What matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. *Dissimilarities within the proposed class* are what have the potential to impede the generation of common answers."

8  *Id.* (emphasis added) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.

9  Y. U. L. Rev. 97, 132 (2009)).

10      Here, the relevant deposition testimony and declarations before the Court demonstrate the

11  extensive and materially significant dissimilarities between the Plaintiffs and the putative class

12  members with respect to (a) if and when they worked off the clock, (b) whether they were

13  provided with necessary tools, and (c) whether and, if so, which class members are entitled to

14  receive extra rest break pay.  Accordingly, under Dukes Plaintiffs' alleged claims cannot be

15  resolved on a class-wide basis.

16      1. <u>Off-the-Clock Claims</u>:  Here there is absolutely no commonality.  To begin with there

17  is no dispute that Sunview's written employment policy is in fact to prohibit of-the-clock work

18  and to pay employees for all hours worked.  Sunview's Employee Handbook, training documents

19  and workplace postings make this clear.  The putative class representatives themselves *concede*

20  they understood this and that it was in fact the Company's stated policy.  Plaintiffs' theory of

21  liability for their off-the-clock claim therefore rests on their contention that, despite the

22  undisputed documented evidence of this policy, the Crew Bosses in the field ignored Sunview's

23  policy and forced the putative class to work off-the-clock on a classwide basis.  Plaintiffs'

24  purported proof of this supposed practice is *completely anecdotal*; indeed, no declarant or

25  Plaintiff has provided *any* written documentation or evidence showing that he or she ever actually

26  worked more hours than were recorded by his or her Crew Boss.  Moreover, Plaintiffs' anecdotal

27  declaration evidence comes from only 14 of Sunview's 26 crews (i.e., only about 54% of the

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

2

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    crews).[2]  Moreover, the majority (30 out of 47 – more than 60%) of Plaintiffs' declarations come

2    from just 5 of Sunview's 26 crews (crew numbers 100, 150, 240, 550, and 600).  In contrast,

3    Defendant has submitted more than sixty (60) declarations from workers *in each of Sunview's 26*

4    *crews*[3], all of whom state that they were *not* required to, and did *not*, work off-the-clock, and

5    twenty-nine (29) declarations from Crew Bosses and Supervisors, who attest that they prohibited

6    employees from working off-the-clock and recorded all their crew's work hours.  For every

7    instance of alleged off-the-clock work claimed by one of Plaintiffs' declarants in a given crew, at

8    least one declarant *who worked in the same crew and during the same time period* declared under

9    penalty of perjury that they were neither required nor allowed to perform any work prior to start

10   time or after the stop time for their shift.[4]

11          The evidence regarding the alleged off-the-clock claim (particularly Plaintiffs' supposed

12   evidence) is itself directly contradictory and demonstrates the complete lack of commonality.  For

13   example, some employees stated that their crew boss required them to arrive a certain period of

14   time before the start time; other employees, however, arrived only at the start time or voluntarily

15   chose to arrive early solely to avoid traffic and obtain better parking.  As another example, some

16   of Plaintiffs' declarants stated that in the early 2000's they washed their picking trays at home.

17   Other declarants, however, stated that they left their trays at work, did not wash the trays, had

18   non-employee relatives wash the trays for them, or took other actions, all of which directly

19

20   [2] Plaintiffs either did not submit declarations, or the declarations they submitted were stricken and/or withdrawn, for
     crews 110, 120, 250, 300, 340, 350, 370, 380, 390, 710, 830, and 840.  *See* Court Docket #s 64, 65, 80, 89 and 94,
21   and July 21, 2011 e-mail from Plaintiffs' counsel confirming voluntary withdrawal of declaration of Anna Julia
     Sarabie as a result of her inability to attend her deposition (attached as Exhibit 45 to the Molland Decl.). *See also*
22   Exhibit 21 to the Molland Declaration, which describes in chart format the number of declarations (from which crew
     numbers) that were submitted by Plaintiffs to those submitted by Defendant.  Along with this Opposition, Defendant
     provides to the Court several Exhibits (attached to the Molland Declaration) that describe, summarize and compare
23   the contradictory and conflicting statements in Plaintiffs' anecdotal evidence with the evidence submitted by
     Defendant regarding the conduct and actions at issue here.  In addition to the Exhibit 21 chart identified above,
24   Exhibit 23 compares the testimony of the Plaintiffs with their alleged claims.  Exhibit 25 compares the testimony of
     putative class member Bautista with that of Nunez, both of whom worked in Crew 240 at the same time. Exhibit 27
25   compares the testimony of putative class member Reynaga with that of his parents, who worked in the same crew at
     the same time. Exhibit 26 compares the testimony of declarant Ruiz with his wife declarant Esparza, who worked in
     the same crew and traveled to work and from together.  Exhibit 24 contrasts the deposition testimony of the sole
26   Crew Boss offered by the Plaintiffs, Mr. Rivera, with the statements in his declaration and the other evidence and
     claims presented by Plaintiffs.

27   [3] Two form crews no longer exist at Sunview (Crews 430 and 490) and thus there are no declarants for these crews.

28   [4] *See* Exhibit 22 to the Molland Declaration,, which presents, in a side-by-side comparison, how the statements from
     each of Plaintiffs' declarants is directly contradicted by fellow crew members.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    conflict with Plaintiffs' claim that Sunview required employees to wash trays off-the-clock.

2    Simply put (and as explained in greater detail below and evidenced in the summary comparison

3    Exhibits attached to the Molland Declaration), even as to employees who shared the same work

4    location, crew or crew boss, vast differences existed as to whether they allegedly performed work

5    off-the-clock.

6         Most telling, the testimony of the named Plaintiffs often *contradicts* the declarations from

7    putative class members submitted by Plaintiffs.  One or more putative class representatives

8    testified that (a) one or more Crew Bosses *never* allowed them to work off-the-clock, and they did

9    not do so, (b) some employees worked before their shift even when the Crew Bosses told them

10   not to do so, and (c) some crew members worked off-the-clock while, at the same time period,

11   some crew members did not.

12        When the Court conducts the "rigorous analysis" of the evidence (as required by *Dukes*),

13   it becomes readily apparent that the validity of Plaintiffs' off-the clock claims cannot be resolved

14   "in one stroke", as required by the Supreme Court in *Dukes*.  This Court should follow the vast

15   majority of courts that have found off-the-clock claims inherently unsuitable for class treatment

16   and deny certification here.

17        2.  <u>Tool Claim</u>:  The same conclusion must be reached for Plaintiffs' expense

18   reimbursement claim.  As described more fully below, an employer need only reimburse

19   "reasonable" and "necessary" expenditures under Labor Code section 2802.  Resolution of any

20   individual employee's Section 2802 reimbursement claim requires an examination of a number of

21   individualized questions, including: (a) whether he or she received any tools/equipment from

22   Sunview, (b) the suitability/functioning of the tools provided, (c) whether additional tools were

23   necessary, (d) whether any replacement tools were requested, were provided, and their

24   functionality, and (e) whether the any purchase by the employee of additional tools was a matter

25   of preference as opposed to necessity.

26        None of the Plaintiffs or their declarants has presented any documentation supporting their

27   supposed purchase of scissors or gloves; while in contrast, Sunview has submitted documentary

28   evidence showing the purchase of thousands of pairs of scissors and gloves.  Plaintiffs' theory of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

4

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   liability rests on their contention they were never given scissors or, if they were, that when their

2   original scissors broke or "wore out", Sunview "universally rejected" employees' requests for

3   replacement scissors.  Motion 10:7-11  Numerous Sunview employees, however, *including many*

4   *of Plaintiffs' own declarants*, directly refute this claim and have testified and/or declared under

5   oath that Sunview *always* provided them with working replacement scissors if they lost or broke

6   their originally issued pair of scissors.  As a result, liability on this claim would turn on whether

7   any replacement scissors provided were not functional.  This cannot be determined on a class-

8   wide basis under Section 2802.  The same analysis is true and applies equally to the other

9   tools/equipment that Plaintiffs claim they purchased and Sunview allegedly failed to provide.

10          3.  Additional Pay for Rest Periods:  Sunview's express written policy authorizes and

11   permitted employees to take rest breaks, as required by and consistent with California law.

12   Plaintiffs do not dispute this fact.  Plaintiffs' theory of liability rests on their argument that piece-

13   rate workers needed to receive a separate, additional payment for the 10 minutes when they took

14   their rest breaks in order for the break to be "paid".  Defendant disputes that Plaintiffs' theory is

15   an accurate statement of an employer's legal obligation under Wage Order 14.  However, the

16   Court need not address whether Plaintiffs' theory is correct in order to deny class certification.

17   Liability (not to mention damages) cannot be proven on a class-wide basis because a trier of fact

18   would need to determine first whether a worker either took or worked through his or her rest

19   break.  Plaintiffs' testimony assures this cannot be determined or a class wide basis.  If a "strict"

20   or "modified" piece-rate worker chose to work through his or her rest break, then he or she *was*

21   *paid* for this time as a result of the additional grapes picked (i.e., the "pieces generated").  An

22   employer is not required under the law to record rest breaks, and there is no data to show whether

23   any Sunview worker did or did not take a rest break on any particular day.  Thus, determining

24   whether or not an employee chose to work through his or her rest break is an inherently

25   individualized question.  Plaintiffs uniformly testified that some employees took their authorized

26   rest breaks, but that some employees did not.[5]  As a result, there is similarly no way of

27   determining this issue on a class-wide basis.

28   ─────────────────
[5] *See* Molland Decl. Ex.23.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

1    Not surprisingly, Plaintiffs attempt to analogize this case to the decision by Judge O'Neil

2    in *Arredondo v. Delano Farms Company,* 2011 WL 1486612 (E. D. Cal. April 19, 2011).  This

3    case, however, is clearly distinguishable from *Arredondo*, especially in light of Dukes.[6]  Unlike in

4    *Arredondo,* the evidence here demonstrates that Sunview (1) at all times had lawful policies and

5    procedures in place to ensure that employees were compensated for all hours worked,

6    (2) communicated these policies to its employees in English and Spanish, (3) trained its managers

7    on these policies, and (4) consistently enforced these policies.  Also, unlike in *Arredondo*, in the

8    present case there are directly contradictory statements, *from employees in the same crews and*

9    *during the same periods of time*, regarding the alleged work practices at issue and these conflicts

10   preclude certification.  If anything, this case is more analogous to Judge O'Neil's decision in

11   *Garcia* v. *Sun Pacific Farming Cooperative*, 2008 WL 2073979 (E.D. Cal. May 14, 2008)

12   (affirmed, 359 Fed. Appx. 724, 2009 WL 4912213 (9th Cir. 2009)), in which the Court *denied*

13   class certification based upon numerous conflicting employee declarations, which taken together

14   demonstrated that common issues of law and fact neither existed nor predominated and thus class

15   certification was not appropriate under Rule 23.  The analysis in *Garcia* is directly applicable

16   here.  For these reasons, and as explained in greater detail below, Plaintiffs have failed to meet

17   their burden under Rule 23, and this Court should deny their Motion for class certification.

18   ## II.    SUMMARY OF RELEVANT FACTS[7]

19        ### A.    Sunview Vineyards of California, Inc.

20        Sunview Vineyards of California, Inc. ("Sunview") is headquartered in McFarland,

21   California, and is a family-owned and operated farming business, engaged primarily in the

22   growing, harvesting and packaging of table grapes.  Gallegos Decl. ¶¶2-4.  Sunview has business

23   offices in Bakersfield, McFarland and Delano, California and ranches throughout Tulare County

24   ("Sunview North") and Kern County ("Sunview South") in the San Joaquin Valley.  Gallegos

25   Decl. ¶¶4-5; Gallegos Depo. 99:25-101:4; 114:1-11.

26

27   [6] *Arredondo* was decided prior to the United States Supreme Court decision in *Wal-Mart Stores, Inc. v. Dukes.*

28   [7] The deposition testimony cited herein is in the format "[deponent's last name] Depo. [page]:[line]"; declarations are cited in the format "[declarant's last name] Decl. ¶ [paragraph number]".

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

6

### B.      The Putative Class - Sunview's Field Hand Laborers

All six named Plaintiffs – as well as the majority of Sunview's employees – are or were "Field Hand Laborers."  Gallegos Decl. ¶7.  These employees work on a seasonal basis performing work relating to the vineyards: picking and packing table grapes, (harvest work) and non-harvest work such as pruning and tying vines, and pulling leaves from vines.  *Id* ; Beagle Decl. ¶3.  Harvest work begins in late June or July when the first quantities of table grapes are ready to pick and continues until November or December.  Beagle Decl., ¶ 6.  Non-harvest work is done before harvest season starts but continues throughout the year, even during harvest season.  *Id*.  At the peak of the grape harvest, Sunview may employ more than 2,000 Field Hand Laborers.  Gallegos Depo. 102:14-104:23. Sunview also employs a significant amount of Field Hand Laborers during non-harvest.  *Id*. at 134:16-137:21.  After pruning and tying is complete in February, Field Hand Laborers typically are laid off until approximately April when they begin to perform other hand labor work related to preparing the vines and grape clusters for harvest.  *Id*. at 140:1-141:13.

Field Hand Laborers work in "Crews," that range in size from less than ten or more than one hundred workers.  Gallegos Depo. 141:14-142:2; 226:9-227:17.  Each Crew is supervised by a Crew Boss and an Assistant Crew Boss.  *Id*. at 236:20-237:6; Gallegos Decl. ¶9.  Crew Bosses are supervised by Supervisors.  Beagle Decl.¶2.  Sunview North and Sunview South each have two Managers who oversee all Supervisors and their respective Crew Bosses.  *Id*.

### C.      Sunview's Employment Policies For Field Hand Laborers For The Past Ten Years.

For the past ten years, Sunview has provided all employees upon hire with a copy of Sunview's Employee Handbook, which is written both in English *and* Spanish.  Gallegos Depo. 107:14-108:13, Exh. 9.  Before beginning work, employees must acknowledge receipt of the Employee Handbook and agree to be bound by its contents.  Gallegos Depo. 107:14-108:13, Exh. 9. Each of the named Plaintiffs signed a verification stating:  "I acknowledge that I have received and agree to be bound by the employee handbook."  *Id*.; *see also* Rojas Depo. 46:15-20 and Exh. 4; Ramirez Depo. 34:6-23 and Exh. 3; Robles Depo 56:12-24 and Exh. 3; Espino Depo. 87:16-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

7

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

88:5 and Exh. 3.  Also, every one of the Plaintiffs' declarants also received the Employee

Handbook and agreed to be bound by its contents.  Gallegos Decl. .¶ 20, Exh. 5.

### 1.    Sunview's Wage and Hour Policies and Procedures

The Employee Handbook contained the following pertinent wage and hour provisions:

> 1.  **Company wages:**  The company has two basic methods of pay.
> The first is a rate per hour which may be combined with a piece rate
> for units produced, this is called "by the hour."  The company can
> also pay strictly piece rate for units produced which is called "piece
> rate. … "
>
> 2.  **Laws**:  There are several State and Federal Laws which regulate
> minimum wages.  The Company will strictly adhere to all of these
> laws. …"

Gallegos Depo. 107:14-108:13, Exh. 9 (Handbook p. 2, part IV.B.).

> **C. Hours**
>
> 1.     Reporting time and daily hours:  Crew Bosses will advise
> crews daily of the reporting time and location of work the following
> day. …  Reporting time is the beginning of work and an employee
> should be prepared to begin work at that time.  The daily work
> hours vary with the season … .
>
> 2.     It is required that employees take an unpaid half hour lunch
> break each day.
>
> 3.     The company will authorize and permit all employees to
> take rest periods, which insofar as practical shall be in the middle of
> each work period… .  Authorized rest period time shall be counted
> as hours worked for which there shall be no deduction from wages.
> …

Gallegos Depo. 107:14-108:13, Exh. 9 (Handbook p. 4, part IV.C.)

> ***
>
> 5.     Attendance and Being Late:  Regular attendance and
> punctuality are expected of all employees.  Employees are expected
> to be present promptly at the beginning of their shift and continue
> to work until the scheduled quitting time or release by their Crew
> Boss.

Gallegos Depo. 107:14-108:13, Exh. 9. (Handbook p. 12, part IV.A.).

The Handbook also directed Field Hand Laborers where to find additional information

regarding their employment, including wages and work hours.  Specifically, the Handbook stated:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DB2/ 22460546.3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

A.    Bulletin Boards

Employees are encouraged to read the bulletin boards located in the company's offices, shops, and ranch locations.  The bulletin boards contain information pertaining to your employment.  Ask your supervisor for the location of the nearest bulletin board.

Gallegos Depo. 107:14-108:13, Exh. 9 (Handbook p.2, part IV.A.).

Sunview posted copies of Industrial Welfare Commission ("IWC") Wage Order 14-2001 (the applicable Wage Order for agricultural operations) in English and Spanish at each of the approximately thirty (30) bulletin boards location throughout Sunview's North and South locations and maintained them at every Field Hand Laborer worksite.  Gallegos Decl. ¶15.

**2.    Sunview Trained Its Supervisory Employees About Its Wage and Hour Policies and Required Compliance from Supervisors**

Throughout the putative class period, Crew Bosses, Supervisors and Managers attended an annual mandatory, day-long training session.  Gallegos Decl. ¶33.  The training covered various Human Resources topics and policies, including specifically wage and hour issues, policies and practices.  *Id.*  Crew Bosses and Supervisors were trained regarding: (a) capturing and recording all time worked by Field Hand Laborers; (b) capturing and recording all of the work performed by employees who were compensated on a piece-rate basis; (c) ensuring that employees were not working off-the-clock; and (d) providing employees with required meal and rest periods, among other things.  Gallegos Decl. ¶¶33, 35, 37; Exh. 6.  Sunview required Crew Bosses, Supervisors and Managers to sign an attendance sheet in order to track and confirm attendance at the annual training.  Gallegos Decl. ¶¶37, 38, Exh. 9.

Shortly after the annual training meeting, Crew Bosses and Supervisors received additional training and follow-up individualized instruction in their region (North or South) on wage and hour compliance.  Gallegos Decl. ¶34.  During the annual meetings and throughout the year, all supervisory employees, including Crew Bosses and Assistant Crew Bosses, were trained and instructed that employees must be paid for all hours worked.  Beagle Decl. ¶16.  Plaintiffs agree.  Plaintiff Espino Gomez testified under oath that he attended this training in 2005 and was instructed to follow <u>all</u> of Sunview's employment policies, including its policy to pay employees

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

9

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1  for all hours worked and <u>not</u> to permit any employee to work before the start or after stop of their

2  scheduled shift.  Gallegos Decl. ¶38, Exh. 9; Espino Gomez Depo. 131:3-133:8. [8]

3         Sunview also provided supervisory employees with a Supervisor's binder that included,

4  among other things, a copy of Wage Order 14-2001, a copy of the Employee Handbook and a

5  copy of a sample/template wage statement/check stub along with an explanation of what each

6  entry on the wage statement meant to explain to their crew.  Gallegos Decl. ¶18, Exh. 4.  The

7  Supervisor's binder also included a New Employee Orientation Checklist that required the

8  supervisor to explain to all new employees Sunview's policies regarding "work hours (starting

9  and stopping times", "overtime", "lunch and break periods" and "timecard procedures", among

10  other things.  *Id.*  The Supervisor's binder also included a list (with addresses) of all the locations

11  where Company bulletin boards were located, along with copies of the posters that were posted at

12  each location, including California Wage Order 14-2001 and the federal "Employee Rights under

13  the Fair Labor Standards Act".  *Id.*

14         Sunview then monitored its supervisory employees and, when appropriate, disciplined

15  them if they for failed to follow Company policies.  Gallegos Decl. ¶40.  If a Crew Boss

16  disregarded the policies, he or she was subject to discipline, including discharge.  *Id.*  For

17  example, Jose Rivera, who was the Crew Boss for Crew 240 (and one of Plaintiffs' declarants),

18  was disciplined in 2001 for not performing his job satisfactorily and failing to follow work rules

19  and instructions.  In August 2005, Sunview learned that Mr. Rivera had instructed his Assistant

20  Crew Boss, Ms. Barajas, to inaccurately record their work hours, a violation that, along with his

21  other performance problems, led Sunview to discharge Mr. Rivera.  *Id.*; Exh. 11,.

22               **3.     Sunview's "Open Door" and Complaint Policies**

23         The Employee Handbook also informed employees that they could make any complaints

24  or raise any concerns about their working conditions:

25               4.     **Ideas and Complaints:**  The company encourages
               employees to communicate ideas and to talk things over when
26               problems occur with job conditions or other employees.  The
               company wants to solve problems quickly.  Discuss the problem or
27               complaint with your crew boss or supervisor first.  If you feel that

28  ───────────────
[8] *See also* Molland Ex. 23 for testimony of other Plaintiffs stating they understood this was Sunview's policy.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

10

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

your crew boss or supervisor's response does not solve the problem then request a meeting to discuss the problem with the Manager-Human Resources.  It is expected that upon hearing a complaint a crew boss, supervisor or manager-human resources will solve the problem or relay it to higher manager.

Gallegos Depo. 107:14-108:13, Exh. 9 (Handbook p. 7, part IV.E.) (emphasis in original).[9]

Sunview also had a toll-free anonymous complaint hotline for employees to call if they had any concerns or complaints.  Gallegos Decl. ¶45.

Despite this variety of mechanisms for raising complaints or concerns, during the entire putative class period in this case, Sunview *never* received any complaints from any Field Hand Laborers regarding allegedly being required to work off-the-clock, not being provided with or reimbursed for tools or equipment necessary to perform their jobs, or not receiving paid rest breaks. Gallegos Decl. ¶46.   Some Sunview employees, such as plaintiff Robles and declarant Hector Reynaga, raised complaints internally or went so far as to file formal complaints with administrative agencies – but their complaints related to other issues, and none of them ever raised any issues concerning any of the allegedly unlawful wage and hour practices complained about in this lawsuit.  Gallegos Decl. ¶¶64, 66; Exhs. 18, 20.

**D.** **Field Hand Laborer's Work Schedules, and Sunview's Prohibition On Pre- or Post-Shift Off-The-Clock Work**

**1.** **Start of the Work Day**

For the past ten years, Sunview's Field Hand Laborer Crews have been and are scheduled to work in shifts, which usually start and end at predetermined times each day.  Beagle Decl. ¶17. The lengths of these shifts have been and are set by Sunview's Farm Manager Chris Beagle and other management employees on either a weekly or sometimes daily basis.[10]   Start times range between 6:00 a.m. and 7:00 a.m. in the morning, depending upon the time of sunrise.  Beagle Decl. ¶19.  Typically in July, the start time is 6:00 a.m.  *Id.*  As the sunrise becomes later, start time will move forward in half hour intervals, from 6:30 or 7:00 a.m.  *Id.*  Management

---

[9] Employees were also encouraged to bring any concerns or questions to the attention of the Employee Relations Supervisor (Jesus Velazquez), the Safety Manager (Isabel Bravo), or the Director of Human Resources Dan Gallegos. Gallegos Decl. ¶44

[10] The length of the daily shift for each Crew is based upon the amount of work that Sunview believes will be necessary to complete that particular day.  Generally, Sunview tries to make the shift eight hours long, but shifts can and do vary in length.  Beagle Decl. ¶18.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

11

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   communicates the scheduled start time and quitting time for each shift to the Crew Bosses who

2   communicate it to the members of the crew.  Beagle Decl. ¶ 18.  The start of each shift is the

3   official reporting time for each employee.  Since at least November 1, 2001, Crew Bosses and

4   Assistant Crew Bosses have been and are now instructed that all Field Hand Laborers in their

5   crews must not begin work before the start time for the beginning of their shift and must not do

6   any work after the scheduled quitting time of the shift.  Beagle Decl. ¶17.  If there is an

7   exception, Sunview's policy and instructions to Crew Bosses and Assistant Crew Bosses are that

8   the worker is to be paid for any such hours worked before or after the scheduled start or quitting

9   time of the shift.  *Id.*

10   Because of the many agricultural operations surrounding the Bakersfield area, which all

11   start early in the morning, traffic congestion has been and is a problem especially during harvest

12   season.  Beagle Decl. ¶20.  Many workers are traveling to the fields at or about sunrise or shortly

13   thereafter.  As a result, during the putative class period, the Crew Bosses and Assistant Crew

14   Bosses have been instructed to tell their crews to take precautions and try to allow for traffic so

15   they can be present at the beginning of their shift.  *Id.*  Crew Bosses and Assistant Crew Bosses

16   have been and are instructed, however, that no Field Hand Laborer is to be reprimanded or

17   penalized in any way as long as they arrive at the beginning of their scheduled shift in the

18   morning.  *Id.*

19   During harvest season, Crew Bosses and Supervisors typically conduct a mandatory

20   meeting or "school" (*escuela*) at the beginning of each shift.  Gallegos Depo. 155:4-25; Beagle

21   Decl. ¶ 21.  All Crew Bosses are instructed that school is to take place only *after* the start of the

22   shift.  Beagle Decl. ¶21.  Contrary to Plaintiffs' unfounded assertions, during the entire putative

23   class period Field Hand Laborers are and were "on-the-clock" for this morning meeting – the time

24   spent in "escuela" was included as part of the employees' hours worked and workers are paid for

25   the time spent during the morning "school" meeting.  *Id.*

26   During the putative class period Field Hand Laborers were not required, or allowed, to

27   set-up materials or equipment or perform any work prior to the official "start time".  During the

28   harvest season, crews are typically divided up into "teams" of two to four people (Gallegos Depo.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

12

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

143:16-144:7), with the typical team being three employees: one packer and two pickers. Beagle Decl. ¶23. It is *only after* the morning "escuela" meeting that the team member assigned to handle packing is allowed to set up the team's packing table while the other team members take their picking trays and go into the rows to start picking.[11] Gallegos Depo. 143:16-144:7. Supervisory employees were and are trained and instructed that if they observe a Field Hand Laborer performing work prior to start time (including setting up tables or gathering trays), they must tell the employee to stop immediately. Beagle Decl. ¶22; Gomez Depo. 132:7-12. Failing to stop the employee could result in discipline to the supervisor. Beagle Decl. ¶22.

### 2.   End of the Work Day

In general, scheduled stop times are based on start times and typically fall between 2:30 p.m. and 4:30 p.m. in the evening.[12] Beagle Decl. ¶19. During harvest season, the Crew Bosses and Assistant Crew Bosses are instructed to call out "stop picking" or "bring out the grape" to their crew generally about fifteen minutes before the scheduled quitting time for their shift, so that the pickers will cease picking grapes and return any unpacked grapes to the packing station and perform any necessary clean-up so they can stop all work at the scheduled quitting time. Beagle Decl. ¶24. The packer will then pack the remaining picked grapes before the end of the shift. *Id*. This actual call-out time will vary depending on how much fruit is left to pack in the interval between the call out and the scheduled quitting time. *Id*. During the harvest, before the end of the shift, one picker from each team will take the picking trays and clippers for their team to a trailer that moves the trays to the washing area. *Id*. Also before the end of the shift, pickers and packers may clean the avenue and packing area and straighten up boxes or packing materials while the packer finishes packing the fruit. *Id*. *It is and was Sunview's policy and practice that all of this time spent cleaning and packing up after the Crew Boss calls out to stop picking is and was counted as time on-the-clock and recorded as work hours for the crew. Id*. Crew Bosses are instructed that no worker in the crew should be permitted to work after the scheduled quitting

---

[11] While performing non-harvest work, Field Hand Laborers typically work on an individual basis. Beagle Decl. ¶23.

[12] Sunview would sometimes stagger the stop times of different crews to help reduce traffic congestion leaving the fields. Beagle Decl. ¶24. Also, during the summer months the work day might be cut short if the temperature becomes extreme (i.e. 100 degrees Fahrenheit or higher).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DB2/ 22460546.3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    time for their shifts.[13]

2              **3.    Recording of Field Hand Laborer's Hours Worked**

3         Since at least November, 2001, all supervisory employees, including Crew Bosses and

4    Assistant Crew Bosses have been and are repeatedly trained and instructed that employees must

5    be paid for all hours worked.  Beagle Decl. ¶16; *see, e.g.,* Crew Boss declarations:  S. Bravo Decl.

6    ¶2 (attended a training every year in which Crew Bosses were reminded of the importance that

7    workers not work off-the-clock); T. Cruz Decl. ¶5 (as an Assistant Crew Boss and Crew Boss,

8    has attended a training at least two times per year and was instructed to pay workers for all time

9    worked); F. Martinez Decl. ¶2 ("Every year, at the beginning of the pruning and at the beginning

10   of the picking, the managers and other officers of the company give training to all of us

11   supervisors, foremen, and second ones to remind us about the rules.").  Crew Bosses and

12   Assistant Crew Bosses have been and are trained and instructed that they must write down all the

13   hours that Field Hand Laborers work, including any employees who do not start or end their shift

14   or take breaks at the same times as the rest of the Crew, and send them to Sunview's payroll

15   department so all Field Hand Laborers can be paid for such hours.  Beagle Decl. ¶16.  The hours

16   worked by each crew member are recorded by the Crew Boss (not the Field Hand Laborer) on a

17   document called a "Daily Sheet", which is form prepared by the payroll office that includes the

18   names and employee identification numbers of all employees assigned to the Crew for that

19   particular day.  Gallegos Decl. ¶¶ 22, 24.

20              **4.    Financial Incentives Given by Sunveiw to Crew Bosses to Record all**
                        **Hours Worked by Their Crew**

21

22        Sunview gives the Crew Boss and Assistant Crew Boss  a strong financial incentive to

23   ensure that each and every minute of the crew's working time is recorded.  Gallegos Decl. ¶41.

24   Specifically, the Crew Boss and Assistant Crew Boss receive a monetary incentive payment that

25   is directly based upon the number of work hours recorded for their crew – the greater number of

26   hours the crew works, the more money the Crew Boss and Assistant Crew Boss get paid.  *Id.*

27   _____

[13] In contrast to this process, during non-harvest work, Crew Bosses will tell their crews when quitting time occurs at
28   the end of their shifts, generally by yelling out the words "stop time" or "quit time."  All workers are expected to
     cease their work at that time.  Beagle Decl. ¶24.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

14

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   Indeed, from 2002 through 2010, Sunview paid Crew Bosses and Assistant Crew Bosses more

2   than $1.7 million dollars in incentive pay based directly upon the number of hours their crews

3   worked.  *See* Gallegos Decl. ¶42, Exh. 12 (which sets forth the amount of the incentive paid by

4   Crew for each year from 2002-2010).

5                  **5.      Picking Trays**

6            Field Hand Laborers take large, Company-supplied plastic trays into the vineyard rows

7   and place the grapes that they pick on the trays.  Beagle Decl. ¶12.  These "picking trays" are and

8   were used only for harvest work.  Prior to the 2003 harvest season, many Field Hand Laborers

9   took their picking trays home with them at the end of the work day and returned with them the

10  following day, however, many Field Hand Laborers did not take their trays home every day.  *Id*;

11  *see, e.g.,* L. Alvallar Decl. ¶9 ("I took [trays] to my house three to four days per week.  The other

12  days, I left them hiding in the vines to use them the next day.") A. Hernandez Decl. ¶11 ("Many

13  years ago, one or two days a week, I took to my house fifteen trays . . . ."); D. Moreno ¶11

14  ("Many years ago, one or two days per week I took home five trays . . . .").  Contrary to

15  Plaintiffs' assertion, Sunview *did not* have a policy in 2001 and 2002 of requiring employees to

16  *wash* picking trays at home.  Beagle Decl. ¶12.  Beginning in 2003, Sunview instituted a policy

17  that employees were *not* allowed to take any trays home and since that time has not permitted any

18  Field Hand Laborer to take trays from Sunview's fields or off Company property.[14]  Beagle Decl.

19  ¶13; Gallegos Decl. ¶53.  Consistent with this policy, at the beginning of 2003 harvest, Farm

20  Manager Chris Beagle read a statement to all of the Managers, Supervisors and Crew-Bosses

21  during the 2003 pre-harvest meeting instructing them that Field Hand Laborers were not

22  permitted to take trays home.  Beagle Decl. ¶14, Exh. 1.  This statement was also read to many

23  crews.  *Id.*;  *see also* Gallego Decl. ¶54; Exh. 15.

24

25

---

26  [14] Prior to and during the 2003 harvest season, Sunview commissioned and then built special picking tray trailers to house and move all trays to and from the field on a daily basis.  Sunview also used its existing bin trailers to move all
27  trays to and from the field on a daily basis.  In 2003, Sunview also built a tray washing machine to wash all trays and began the practice of washing all trays 2 to 3 times each week at Sunview North.  The building of additional tray
28  storage trailers and compartments continued in subsequent years.  By at least 2003, Sunview South had implemented a practice to wash trays in the field during working hours.  Beagle Decl. ¶13.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

15

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

### E.   Field Hand Laborer Pay Rates

Field Hand Laborers always receive at least minimum wage for all hours worked, based upon their regular hourly rate of pay and the incentive pay they earn.  Gallegos Depo. 137:22-140:20. Sunview pays all Field Hand Laborers the same hourly rate.  *Id.* at 172:12-15.  For some tasks, Field Hand Laborers earn a straight hourly rate with no incentive pay.  *Id.* at 135:8-24. During the harvest, employees receive incentive pay based on the total number of boxes the team picked and packed that day.  *Id.*  For non-harvest work, Field Hand Laborers may earn incentive pay based on their individual productivity (for example, individual employees are paid an incentive for every vine pruned).  *Id.* at 135:8-24.  The rate of the incentive pay varies based not only on the task being performed but the variety of grape being tended.  *Id.* 137:22-140:20. On limited occasions during the non-harvest season, Field Hand Laborers have been paid on a pure piece rate basis.  Even when employees are paid on a pure piece rate basis, Crew Bosses and Supervisors still record the employee's hours on the Daily Sheet.  Sunview reviews the earnings for each employee during each payroll period to confirm that employees, including piece rate workers, are paid at least the applicable minimum wage for all hours worked during the payroll period.  Gallegos Decl. ¶31.

### F.   Sunview's Tool Policies and Practices

During the entire putative class period, Sunview provided Field Hand Laborers with all tools necessary to do their job for both harvest and non-harvest work.  Beagle Decl. ¶4.  Sunview has never asked or required Field Hand Laborers to purchase tools necessary to perform their assigned jobs.  *Id.*

#### 1.   Scissors

Each year for at least the past ten years, Sunview has generally purchased thousands of new scissors for use in both harvest and non-harvest work.  Beagle Decl. ¶5, Gallegos Decl.¶ 56. The computer records documenting in itemized format Sunview's purchase of scissors and gloves for the past ten years is attached as Exh. 16 to the Gallegos declaration .  At the start of each harvest season every Field Hand Laborer receives a new pair of hand scissors purchased by Sunview.  Beagle Decl. ¶5.  During harvest, these scissors are used to cut grapes off the vines and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

1    to trim undesirable berries from clusters.  In non-harvest periods, they are used for tipping.  *Id.*

2    The scissors Sunview purchases are high quality and last for many years.  *Id.*  At the end of

3    harvest season, Field Hand Laborers return the scissors so supplied by Sunview.  *Id.*  Sunview

4    reconditions these used scissors, and they then become part of Sunview's supply of reconditioned

5    scissors.  *Id.*  These reconditioned scissors are fully capable of performing all necessary clipping

6    work.  *Id.*  When scissors are required for work the next Spring, Field Hand Laborers are issued

7    scissors that have been used in prior years during harvest season.  *Id.*  If an employee's scissors,

8    whether new or reconditioned, break or are lost at any time, Sunview provides the employee with

9    a new or reconditioned pair.  *Id.*  If a Crew Boss refused to supply an employee with company-

10   provided scissors or instructed an employee to purchase their own scissors, it would be a violation

11   of Company policy and the Crew Boss would be subject to discipline.  Gallegos Decl. ¶56.

12        Scissors are the only tool necessary for harvesting grapes.  During the harvest season

13   Sunview also provides scales, trays, hooks for baggies, and any other equipment necessary for

14   packing the grapes.  Beagle Decl. ¶6.  Although some employees buy holsters or leather holders

15   for their scissors, a holster is not necessary and is not required, and many employees do not use

16   holsters.  *Id*; *see, e.g.*, J. Grajeda Decl. ¶2 ("The only thing that I have purchased for my personal

17   use, but it is not required for work, is the sheath for the picking scissors.").

18            **2.    Gloves**

19        It is rarely necessary or required for Field Hand Laborers to use gloves to perform their

20   tasks.  Beagle Decl. ¶ 9.  Workers are asked to wear special cotton gloves during a short period of

21   spring time work with a grape varietal called "Red Globe."  *Id.*  These gloves prevent employees

22   from "scarring" the grapes with their bare hands.  *Id.*  Sunview provides each employee who

23   works with Red Globe grapes with a pair of these gloves and will provide replacement gloves as

24   necessary.  *Id.*

25        Gloves are not a necessary piece of equipment for harvesting grapes.  Beagle Decl. ¶10.

26   During the harvest, it is actually counter-productive for employees to wear gloves because they

27   cannot feel the appropriate place on the vine to cut the grapes, and Sunview discourages their use.

28   *Id.*  For the past ten years, Sunview has not, and does not now, permit workers to use full gloves

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

17

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1  during the harvest season.  *Id.*  However, workers are allowed to use their own gloves if the

2  gloves are modified by cutting the fingers off them so workers can touch and feel the grapes

3  appropriately.  *Id.*  During harvest season some Field Hand Laborers wear gloves modified in this

4  way; but most do not.  *Id*; *see e.g.,* Bautista Depo. 31:10-24; Nunez Depo. 78:20-79:18; Ruiz

5  Depo. 74:10-17.  Most of the plaintiffs concede many Field Hand Laborers do not wear gloves at

6  all for harvest work.[15]

7  **3.  Shears, Goggles, and Other Tools and Equipment**

8  Employees are also given appropriate tools for other special assignments throughout the

9  year as needed.  When doing non-harvest work, such as pruning, Field Hand Laborers are issued

10  loppers or large pruning shears.  Beagle Decl. ¶7.  They are also given folding saws, if needed.

11  *Id.*  Whetstones are provided to sharpen the cutting blade of the pruning shears.  *Id.*  Along with

12  protective glasses (which are also provided to all employees during the pruning season) these are

13  the only tools necessary for pruning.  *Id.*  As another example, employees are provided with

14  girdling knives or curved parallel knives to carve rings around the trunk of the vines during the

15  non-harvest work.[16]  Beagle Decl. ¶8.

16  **III.  LEGAL ARGUMENT**

17  **A.  Plaintiffs Cannot Meet the Rigorous Burden for Class Certification.**

18  Class certification is governed by Federal Rule of Civil Procedure 23.  Under Rule 23(a),

19  a party seeking certification must demonstrate, first, that:

20  (1) the class is no numerous that joinder of all members is impracticable;

21  (2) there are questions of law or fact common to the class;

22  (3) the claims or defenses of the representative parties are typical of the class; and

23  (4) the representative parties will fairly and adequately protect the interests of the class.

24  In addition, the proposed class must satisfy at least one of the three requirements listed in

25  Rule 23(b).  Plaintiffs here contend that certification is appropriate under Rule 23(b)(2) and

26  [15] *See* Exh. 23 to Molland Declaration.

27  [16] Field Hand Laborers are also given proper safety equipment for their assigned tasks.  For example, employees who
are tasked with pruning are issued protective eye glasses or goggles.  Beagle Decl. ¶11.  Any employee may ask for

28  protective glasses and will be provided the glasses if he or she would like to use them but they are not necessary for
most tasks.  Sunview's policy is to not turn down any request for such equipment.  *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

18

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1  (b)(3), which provide, respectively, that "the party opposing class certification has acted or

2  refused to act on grounds that apply generally to the class, so that final injunctive relief or

3  corresponding declaratory relief is appropriate respecting the class as a whole" (Rule 23(b)(2)) or

4  "questions of law or fact common to the class members predominate over any questions affecting

5  only individual members" and a class action would be "superior to other available methods for

6  fairly and efficiently adjudicating the controversy" (Rule 23(b)(3)).

7       The plaintiff bears the heavy burden *to prove* that each element of Rule 23 is established.

8  *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186 (9th Cir. 2001).  Failure to prove any

9  one of Rule 23's requirements destroys the alleged class action. *Rutledge v. Electric Hose &*

10  *Rubber Co.*, 511 F.2d 668, 673 (9th Cir.1975).  Proof must be based upon evidence.  "Rule 23

11  does not set forth a mere pleading standard.  A party seeking class certification must affirmatively

12  demonstrate his compliance with the Rule – that is, he must be prepared to provide that there are

13  in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 2011 WL

14  2437013 at *7 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-611 (1982)). "Actual, not

15  presumed conformance … remains indispensable." *Dukes,* 2011 WL 2437013 *7 (citations

16  omitted).  "District Courts must perform a '***rigorous analysis***' to ensure the Rule 23 requirements

17  satisfied." *Id.*; *see also Zinser*, 253 F.3d at 1186.

18       The Supreme Court in *Dukes* found that this "'rigorous analysis' will entail some overlap

19  with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class

20  determination generally involves considerations that are enmeshed in the factual and legal issues

21  comprising the plaintiff's cause of action." *Id.* at *7 (citations omitted).

22       In their Motion, however, Plaintiffs argue simply that "the Court is bound to take the

23  substantive allegations of the complaint as true", citing *Eisen v. Carlisle & Jacquelin*, 417 U.S.

24  156, 177, 94 S.Ct. 2140 (1974).  The Supreme Court in *Dukes* clarified, however, that *Eisen* is

25  often "mistakenly cited to the contrary" by parties seeking class certification.  2011 WL 2437013

26  *7.  The language from *Eisen* on which Plaintiffs rely (i.e., "Nothing in either 'the language or

27  history of Rule 23 … gives a court any authority to conduct a preliminary inquiry into the merits

28  of a suit in order to determine whether it may be maintained as a class action.") (Motion 13:12-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

19

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

14), was rejected by the Court in *Dukes*; specifically, the Court stated: "[I]n that case [*Eisen*], the judge had conducted a preliminary inquiry into the merits of a suit not in order to determine the propriety of certification … but in order to shift the cost of notice required by Rule 23(c)…To the extent the quoted statement goes beyond the permissibility of a merits based inquiry for any other pretrial purpose, it is the purest dictum and is contradicted by our other cases." Dukes 2011 WL 2437013 *7, fn.6.

In the present case, the requisite "rigorous analysis" of the evidence makes clear that Plaintiffs have failed to meet their burden of proving each and every element under Rule 23 has been satisfied.  Accordingly, class certification should be denied.

### B.   Plaintiffs Cannot Satisfy Rule 23(a)'s Requirements[17]

#### 1.   Plaintiff Has Failed to Prove the Existence of Common Questions of Law or Fact

In *Dukes,* the Supreme Court stated that the language of Rule 23(a)(2) "is easy to misread, since, [a]ny competently drafted class complaint literally raises common 'questions'" 2001 WL 2437013 at *7 (citations omitted).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.*, citing *Falcon*, at 157.

> Quite obviously, the mere claim by employees of the same company that they have suffered [an injury] … gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention … of such a nature that it is capable of classwide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

---

[17] Defendant does not dispute the Rule 23(a)(1) requirement of numerosity is satisfied here.  Defendant does not, however, concede that Plaintiffs have satisfied Rule 23(a)(4), which requires that the proposed class representatives and their class counsel adequately and fairly represent the interests of the class.  Falcon, 457 U.S. at 157.  Class actions are "pregnant with well-documented possibilities for abuse."  *Greisz v. Household Bank (Illinois), N.A.*, 176 F.3d 1012, 1013 (7th Cir. 1999) (upholding the denial of class certification based on a finding that class counsel was inadequate).  Here, Plaintiffs' counsel presented this Court with declarations from persons who did not work during the class period or otherwise incorrectly stated the dates of their employment (despite Plaintiffs' counsel having the relevant records to confirm when persons were employed) and from at least one person who Defendant demonstrated never even worked at Sunview.  Also, at least one of Plaintiffs' declarants testified in her deposition essentially that her entire declaration was false.  *Compare* Bautista Decl. ¶¶5, 6 (washed trays at home "until like three years ago") with Bautista Depo. 18:4-10 (has not washed any trays after 2003); *compare* Bautista Decl. ¶9 (bought 1 or 2 scissors per year) with Bautista Depo. 25:8-26 (only time she purchased scissors was when she lost the pair Sunview provided); *see also* Bautista Decl. 14:2-16:24 (acknowledging payment for all work performed).  This conduct by the Mallison & Martinez firm is not unlike their conduct in *Hurtado-Lopez v. Armadillo Bay, Inc. d/b/a Texas Roadhouse*, Alameda County Superior Court Case No. RG08-390556, in which the Superior Court denied class certification, in part, because of the inadequacy of counsel and their lack of diligence in presenting evidence to the Court.  *See* Judge Brick Order denying class cert. pp. 12-13, attached to Sunview's Request for Judicial Notice.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

20

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    *Id.*

2          The supposed "common questions" Plaintiffs set forth on page 16 of the Motion are

3    essentially no different than the supposed "common questions" that the Supreme Court found

4    insufficient under Rule 23(a) and rejected in *Dukes*.  For example, Plaintiffs assert that a common

5    question exists as to "whether employees should be reimbursed for Sunview's failure to provide

6    required tools that Class members were forced to purchase because they were necessary for the

7    job." Motion 16:14-16.  Yet, as demonstrated by the evidence presented by Defendant,

8    Sunview's policy was to provide Field Laborers with all the tools necessary to perform their work

9    and, to the extent any individual employee chose to purchase his or her own tools, there is no way

10   to resolve on a class-wide basis whether these individual employees' tool purchases were

11   reasonable and necessary under the circumstances.  Similarly, Plaintiffs argue that a common

12   question exists as to "whether the time employees spent performing required or knowingly

13   permitted pre and post-shift activities is compensable".  Motion 16:9-10.  Once again, however,

14   the evidence presented by Sunview demonstrates both that the Company's policy prohibited

15   employees from working prior to start time or after stop time and that numerous employees who

16   worked in the same crews and at the same time periods as Plaintiffs' declarants never worked

17   before start time or after stop time.  As a result, it is impossible to frame a common question that

18   may be *answered on a class-side basis* as to whether and, if so, why any individual employee

19   actually worked without being paid for this time.

20          The failure to prove commonality was at the core of the Court's decision to deny the

21   plaintiff farm workers' motion for class certification in *Garcia v. Sun Pacific*.  2008 WL 2073979

22   **1-2.  The Court in *Garcia* stated:  "Plaintiffs do not point to a companywide policy in violation

23   of labor and wage laws…. [Additionally], the evidence of the policies in practice is strongly in

24   conflict.  Some evidence before the Court indicated the polices are in violation of wage and hour

25   laws.  Other evidence, equally compelling, before the Court indicates that the policies in practice

26   are not in violation." *Id.* at 11.  "The Court finds that due to the conflicting evidence on the very

27   wage and hour violations alleged in the complaint, within and among the various crews, the

28   plaintiffs have not shown commonality." More recently, in *Alonzo v. Maximus, Inc.*, 2011 WL

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DB2/ 22460546.3

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    2437444 *7 (C.D. Cal June 17, 2011), the Court denied the plaintiffs' motion to certify an off-

2    the-clock class action on the grounds that the plaintiffs "failed to demonstrate commonality"

3    under Rule 23(a) because the plaintiffs did not prove "any common practice or policy" with

4    regard to off-the-clock work.  In denying certification, the Court in *Alonzo* focused on the

5    contradictory testimony about whether employees worked off-the-clock.  *Id*.  Similarly, Judge

6    O'Neill of this Court denied certification of an alleged overtime class action in *Bishop v. Petro*

7    *Chemical Transport LLC,* 582 F. Supp. 2d 1290, 1307 (E.D. Cal. 2008) on the grounds that

8    commonality had not been shown, stating:  "There is no evidence before the Court that there is a

9    company wide policy to deny, improperly, overtime to those who are entitled to overtime

10   compensation.  The evidence does not suggest anything other than an isolated instance as to

11   plaintiff. … [T]here is no strong evidence of company wide policies and corporate structure.

12   Therefore the Court does not find commonality of facts or the law as between plaintiff and

13   potential class members.").  *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 682-83 (S.D.Cal.1999)

14   (commonality not met where plaintiff alleged only "broad outlines" of illegal and improper

15   conduct by the defendant)

16        Here, as in *Garcia*, *Alonzo* and *Bishop*, Plaintiffs have failed prove that Sunview had a

17   common policy or practice of (1) requiring employees to work off-the-clock, (2) purchasing their

18   own tools or (3) failing to pay for rest periods.  None of the supposed "common questions"

19   Plaintiffs have identified may be answered "true or false" on a class-wide basis and thus are

20   incapable of resolving any of Plaintiffs' claims "in one stroke", as required by the Supreme Court

21   holding in *Dukes*.

22        Each of the cases Plaintiffs cite in support of their commonality argument is inapposite or

23   distinguishable.  First, each was decided prior to the rigorous standard for proving commonality

24   established by the Supreme Court in *Dukes*.  Second, several of these cases primarily address the

25   more lenient standard for certification of a FLSA "collective action" as opposed to a Rule 23

26   class action.  *See Aguirre v. Bustos*, 89 F.R.D. 645 (D. N. M. 1981); *Leyva v. Burley*, 125 F.R.D.

27   512 (E.D. Wash 1989).  Third, in *Martinez v. Mecca Farms, Inc.*, 213 F.R.D. 601 (S.D. Fla

28   2002), the defendant had not raised individual factual issues (as are raised here), and the case

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

22

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   involved admittedly common legal questions such whether the defendant was the plaintiffs

2   "employer" and whether the defendant failed to pay social security taxes. *Montelongo v. Meese*,

3   803 F.2d 1341 (2d Cir. 1986), involved breach of contract claims on behalf of a class of workers

4   who all received the same job offers at issue, a scenario clearly inapposite to the case before this

5   Court. *Id.* at 1351. Finally, *Gutierrez v. Kovacevich "5" Farms*, 2004 WL 3745224 (E.D.Cal.

6   Dec. 4, 2004), is completely inapposite to the present case because it does not appear from the

7   decision (or from a review of the Court's docket) that the defendant in *Kovacevich* presented any

8   declarations or deposition testimony from putative class members to contradict the evidence

9   presented by the plaintiff in that case – a fact that stands in stark contrast to the present case,

10  wherein Sunview has presented substantial and compelling evidence from both the named

11  Plaintiffs and the putative class that negates any finding of comonality.

### 2.   Plaintiffs Have Failed to Prove that Their Claims Are Typical of the Class

12
13          Plaintiffs must prove they are "part of the class and 'possess the same interest and

14  suffer[ed] the same injury' as the class members." *Falcon*, 457 U.S. at 156. Plaintiffs also must

15  prove their "claims do not differ significantly from the claims or defenses of the class as whole."

16  *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 248 (C.D. Cal. 2006) (citations and quotation

17  marks omitted). "Typicality refers to the nature of the claim or defense of the class

18  representative, and not to the specific facts from which it arose." *Hanon v. Dataproducts Corp.*,

19  976 F.2d 497, 508 (9th Cir. 1992) (citations and quotation marks omitted).

20          In *Garcia v. Sun Pacific,* this Court held:

21
22              [T]he representatives' claims are typical of some of the proposed
                class members but *atypical* of other of the proposed class members.
23              Each of the proposed representatives claims that he/she were denied
                full compensation in violation of labor laws. … Other proposed
24              class members, however, submitted declarations that state their
                rights were not denied by SunPacific. For these and possible other
25              proposed members, they were paid for their work and given breaks.
                Thus, the representatives' claims are not typical of all of the
26              proposed class members.

27              A preliminary inquiry in to the merits is sometimes necessary to
                make a meaningful determination of class certification issues. **The
28              representative's claims are not typical of the class members
                because violations did not occur as to some class members.**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

23

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    2008 WL 2073979 at *13 (emphasis added).

2    　　　Here, Sunview has submitted declarations from more than sixty (60) putative class

3    members that state they did not experience the unlawful conduct and were not injured in the

4    manner alleged by the proposed class representatives.  It is important for the Court to note that

5    Defendant has submitted declarations from workers *in each of Sunview's 26 crews*, including

6    declarations from more than twenty-nine (29) Crew Bosses and Supervisors.[18]  In contrast,

7    Plaintiffs' declarations come from only 14 of Sunview's 26 crews (i.e., only about 54% of the

8    crews) and <u>a single</u> Crew Boss, Mr. Rivera (who disavowed much of his declaration when

9    questioned at deposition).[19] Moreover, more than 60% (30 out of 47) of Plaintiffs' declarations

10   come from just five crews (crew numbers 240, 600, 150, 550, and 100).  This evidence

11   demonstrates that the named Plaintiffs' claims are simply not typical of the proposed class

12   members.

13   **C.    　Plaintiffs Cannot Demonstrate that Certification of a Rule 23(b)(2) Class**
**Would Be Appropriate In Light of the Supreme Court's Holding in *Dukes***

14

15   　　　The Supreme Court unanimously ruled in *Dukes,* 2011 WL 2437013 *12 that a Rule

16   23(b)(2) class cannot be certified where the plaintiffs seek monetary relief.

17   　　　　　Our opinion in *Ticor Title Ins. v. Brown* [citation omitted]
expressed serious doubt about whether claims for monetary relief

18   may be certified under [Rule 23(b)(2)].  **We now hold that they**
**may not, at least where (as here) the monetary relief is not**
**incidental to the injunctive or declaratory relief.**

19

20   *Id.* (emphasis added).

21   　　　"Rule 23(b)(2) apples only when a single injunction or declaratory judgment would

22   provide relief to each member of the class … [I]t does not authorize class certification where each

23   class member would be entitled to an individualized award of monetary damages." *Id.* (emphasis

24   added).  In *Dukes,* the Court held that Wal-Mart was "entitled to individualized determinations of

25   each employee's eligibility for back pay." *Id.* at *15.  "[B]ecause the necessity of that litigation

26   will prevent back pay from being "incidental" to the classwide injunction, respondents' class

27   ──────────────────────
[18] See Exhibits 21 and 22 to the Molland Declaration.

28   [19] *See* Exhibit 24 to Molland Decl. for contrasts between Rivera's testimony and his declaration.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    could not be certified….” *Id.*

2         Relying on authority that has now been overturned in whole or in part by *Dukes,* Plaintiffs

3    argue: “Plaintiff [*sic*] has requested injunctive relief in his [*sic*] Complaint.  If Plaintiff [*sic*], is

4    meritorious, Plaintiff [*sic*] will request that Defendant be required to pay its employees in

5    compliance with the California Labor Code and Wage Orders.  Therefore, the injunctive relief

6    would be necessary were Plaintiffs to succeed on the merits.”  Motion 23:28-24:3.  This circular

7    argument (“if we win, we will get injunctive relief, therefore is it appropriate to certify a class for

8    injunctive relief”) is contrary to federal precedent – even prior to *Dukes.  See Amchem Products,*

9    *Inc. v. Windsor,* 521, U.S. 591, 613, 117 S.Ct. 2231 (1997) (stating that Rule 23(b)(2) is meant to

10   capture claims for purely injunctive relief, the classic example being “challenges to racial

11   segregation.”  Subsection (b)(2) is not meant to address claims for individualized relief that have

12   been combined with a classwide injunction.  *Ticor Title Ins. v. Brown,* 511 U.S. 117, 121, 114 S.

13   Ct. 1359 (1994) (*per curiam*); *Allison v. Citgo Petroleum Corp.,* 151 F. 3d 402, 415 (5th Cir.

14   1998) (holding that if damages must be determined on a individual basis, a Rule 23(b)(2) class is

15   improper).

16        Here, Plaintiffs seek unpaid wages and penalties pursuant to the California Labor Code

17   and Wage Order 14.  Their injunctive relief claim is simply incidental to their claims for

18   monetary relief – not the other way around.  Accordingly, their request to certify a Rule 23(b)(2)

19   class should be denied.[20]

20        **D.    Plaintiffs Cannot Satisfy the Requirements of Rule 23(b)(3)**

21        Rule 23(b)(3) permits a class action only if “the court finds that the questions of law or

22   fact common to class members predominate over any questions affecting only individual

23   members . . .”  As the Ninth Circuit recently explained, “the predominance inquiry focuses on

24   ‘the relationship between the common and individual issues’ and ‘tests whether proposed classes

25   are sufficiently cohesive to warrant adjudication by representation.’”  *In re Wells Fargo Home*

26

27   [20] The Supreme Court also rejected the argument (made by Plaintiffs in their Motion 24:4-9) that former employees
     have standing to bring a claim for injunctive relief.  *Dukes,* 2011 WL 2437013 at *14 (criticizing the District Court
     and Ninth Circuit for including former employees in the 23(b)(2) class and noting that the notice procedures required

28   by Rule 23(b)(3) are the only method of adequately protecting such employees’ due process rights.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

25

DEFENDANTS’ OPPOSITION TO PLAINTIFFS’
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    *Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009).  "[P]laintiff must establish that the

2    issues in the class action that are subject to generalized proof, and thus applicable to the class as a

3    whole . . . predominate over those issues that are subject only to individualized proof."  *In re Visa*

4    *Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (superseded by statute on

5    other grounds as stated in *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D.

6    82 (S.D.N.Y. 2006)).  Certification must be denied if the court determines that "Plaintiffs' claims

7    require a fact-intensive, individual analysis" in order to be resolved.  *Vinole v. Countrywide Home*

8    *Loans, Inc.,* 571 F.3d 935, 947 (9th Cir. 2009).  The predominance criterion is far more

9    demanding than the Rule 23(a) commonality requirement and is often the principal obstacle to

10   certification.  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).

11                **1.      Individual Issues Predominate for Plaintiffs' Off the Clock Claims**

12                Off-the-clock claims are inherently unsuitable for class treatment.  *See Garcia v. Sun Pac.*

13   *Farming Cooperative*, No. CVF06-0871, 2008 WL 2073979 (E.D. Cal. May 14, 2008) aff'd No.

14   08-16815, 2009 WL 4912213 (9th Cir. Nov. 13, 2009) (denying motion for class certification of

15   state wage and hour claims allegedly resulting from off-the-clock work).  *See also Washington v.*

16   *Joe's Crab Shack*, 271 F.R.D. 629, 643 (N.D. Cal. 2010) (denying certification where the

17   employer established it had a lawful policy prohibits off-the-clock work and individualized

18   inquiries were required to determine liability regarding off-the-clock claims); *Reed v. County of*

19   *Orange*, 266 F.R.D. 446, 452-53 (C.D. Cal. 2010) (holding that the "wide variation" in the

20   plaintiffs' job duties and assignments made the plaintiffs' off-the-clock claims ill-suited for class

21   treatment); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (court declined to certify

22   off the clock class action where affidavits submitted "suggest that each claim would require

23   extensive consideration of individualized issues of liability and damages"); *Koike v. Starbucks*

24   *Corp.*, No. C 06-3215 VRW, 2008 WL 7796650, at *8 (N.D. Cal. June 20, 2008) (denying

25   certification due to the significant individual fact determinations that would be required to

26   establish that the putative plaintiffs had actually worked off the clock and finding class treatment

27   was not a superior method for resolution);  *Simmons v. T-Mobile USA, Inc.,* No. H-06-1820, 2007

28   WL 210008, at *6 (S.D. Tex. Jan. 24, 2007) (denying certification because "this is a case

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

26

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

involving claims of 'off the clock' unpaid overtime, where allegedly dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate Defendant's clear lawful written policies at some or many of Defendant's more than one hundred different retail locations"); *Hinojos v. The Home Depot, Inc.,* No. 2-06-CV-00108, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006) (denying certification of FLSA class alleging unpaid overtime hours and alteration of time cards because the plaintiffs did "not point to a common policy or practice on nationwide or statewide basis" and individualized determinations were required to resolve the claims of each plaintiff).

The primary difficulty with certifying off-the-clock claims is that, by definition, no records exist to demonstrate the occurrence or extent of any off-the-clock work.  That is true here, as Plaintiffs and their declarants have offered none.  The evidence consists only of: (1) individualized proof in the form of employee testimony regarding (a) whether they worked of the clock and (b) whether the employee knew they worked off the clock; and (2) the employer's policies.  *Lindow v. United States*, 738 F. 2d 1057, 1060-62 (9th Cir. 1984).  *See also White v. Starbucks Corp.,* 497 F. Supp. 2d 1080, 1083 (N.D. Cal. 2007) (stating the elements of an "off-the-clock" claim)) (citing *Morillion v. Royal Packing Co*., 22 Cal. 4th 575, 585 (2000)).  Where, as here, the employer has clearly lawful policies (as Plaintiffs' concede) and, as here, the individual employees' testimony varies wildly regarding those "policies in practice", class certification is clearly not appropriate. *Garcia,* 2008 WL 2073979 *11.[21]

    **a.**    **It Is Undisputed that Sunview Had a Lawful Policy That Prohibited Off-the-Clock Work**

Sunview's policy, as reflected in its Employee Handbook and training materials, is and

---

[21] In the absence of proof of a centralized policy, courts have routinely rejected certification of wage and hour claims such as these. *See e.g. Darrikhuma v. Southland Corp.*, 975 F. Supp. 778, 783-84 (D. Md. 1997) aff'd, 129 F.3d 1258 (4th Cir. 1997) (dismissing off-the-clock claim where the plaintiff's supervisor did not know the plaintiff performed off-the-clock work).  *See also Tracy v. Dean Witter Reynolds, Inc.*, 185 F.R.D. 303, 311 (D. Colo. 1998) ("Plaintiffs presented no evidence of any [unlawful] national policy, and they presented no evidence from which I may conclude that their failure to receive overtime was prompted or caused, even in part, by the implementation . . . of any national policy to deny overtime compensation…Absent some causal link between a common and identifiable wrongful act on the part of Dean Witter and the denial of overtime compensation in separate offices, plaintiffs cannot demonstrate the 'commonality' which is required by Rule 23."); *Smith v. T-Mobile USA, Inc.*, No. CV 05-5274 ABC (SSx), 2007 WL 2385131, at **6-7 (C.D. Cal. Aug. 15, 2007); *Diaz v. Elec. Boutique of Am., Inc.*, No. 04-CV-0840FC, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

27

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

has been throughout the putative class period to pay employees for all hours work and prohibit employees from working "off-the-clock". Gallegos Decl. ¶12, Exh 2; ¶ 18, Exh. 4, ¶ 33, Exh. 6; Beagle Decl. ¶15, Exh. 1; ¶16. Plaintiffs concede this. Robles Depo. 124:4-7. Plaintiff Espino Gomez testified that he was trained on this policy and promised to implement it. Espino Gomez Depo. 58:23-59:8, 132:1-133:8. All of the named Plaintiffs and every one of Plaintiffs' declarants signed an acknowledgement confirming that they had received Sunview's Employee Handbook. Montes Depo. 31:20-32:8; *see also* Gallegos Decl. ¶20, Exh. 5, Molland Decl. Exh. 23.

### b. The Evidence Submitted by Sunview Demonstrates That Sunview Followed Its Policies In Practice

Employees from each of Sunview's 26 active crews have declared that Sunview strictly adhered to its policy of prohibiting work prior to start time and after stop time for their shifts. *See* Exhibit 22 to Molland's declaration submitted by Sunview, which displays clearly and in detail each of the declarant's statements. We highlight portions of some of these declarations below.

### (1)   No Work Prior to Start Time

Many declarants confirmed that working before the start time is prohibited by the crew bosses. *See, e.g.*, A. Campos Decl. ¶5 ("The forepersons do not allow us to work before the start time."); N. Gomez Decl. ¶5 ("I have never had to work . . . before work time because it is not permitted by the forepersons."); M. Carranza Decl. ¶4-5 ("For those who arrive at the field before the start time, the foreman does not allow us to pick up not even one tray, move a table, nor to pick up any tools before the time for the school. … School never starts before start time, and we are always paid for all time spent at school."); A. Palomino Decl. ¶5 ("The forepersons do not allow us to work before the start time, neither to get material nor move tables."); A. Leon Decl. ¶4 ("In the mornings, my forepersons have never permitted us to do any work before the scheduled work time."); Augustin Sachez Campos ¶5 ("We cannot even pick up our tools on the way to the field. This rule has been told to me by all of my crew bosses. I have never worked before start time."); *see also* Silvia Feliz de Betancourt ¶6; Maria Luisa Madrigal de Valladolid ¶6; Maria de Lourdes Mariscal ¶5.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

In addition, those declarants who did work before start time admit being paid for it.  J. Guadalupe Carillo ¶4 ("A couple of times the crew boss has asked me to move some tables before the meeting, but I was paid for this time.").[22]

Sunview's declarants also confirm that, although they sometimes tried to arrive to work early to avoid traffic congestion, they were not required to arrive early and they never worked before starting time.  Instead, they opted to rest in their cars, drink coffee, or chat with co-workers until the scheduled start time.  For example, Erika Velazquez Sabore attempts to arrive about 10 minutes before the start of the day in order to be ready at start time.  Sabore Decl. ¶3.  Sometimes, however, she does not arrive until a few minutes before the shift.  *Id*.  After arriving at the field, she waits in her car or uses the restroom until the start time.  *Id*.  She has never worked before start time because "the foremen do not permit it."  *Id*.  Other putative class members have similar experiences.  *See, e.g.*, F. Mendez Decl. ¶4 ("If I arrive before the start time, I stay in my car waiting and resting."); Alvallar Decl. ¶5 ("During these minutes of waiting, I sit in my car with my coworkers and we talk and laugh.").[23]

Moreover, none of these putative class members stated that the company or their Crew Bosses required them to arrive to work early.  *See, e.g.*, Amado Decl. ¶4; Avila Decl. ¶4 ("Nobody demands that I arrive that early."); B. Ayon Decl. ¶5 ("I arrive early by choice so that I could arrive on time to the place of work."); J. Ayon Decl. ¶5 ("I arrive early in order to have less pressure in the morning, and to have no problems on the way."); Carranza Decl. ¶4 ("Sometimes I arrive only two minutes before the hour, and sometimes even late, when there is traffic."); de Haro Decl. ¶5 ("None of my forepersons have told me it is necessary to arrive before the start

---

[22] Some declarants claim they performed pre-shift work, but only prior to the putative class period, not after. Hilario Gonzalez ¶6 (pre- 2000, his Crew Boss allowed the crew to move tables and pick up tools, but since 2000, with the Crew Boss Miguel Ontiveros, it has been prohibited to do any work, including moving tables or gathering tools, before the start time).

[23] *See also* L. Lopez Decl. ¶3 ("In all the years that I have worked for Sunview, I have never done any type of work before the official start time. Once in a while, I arrive at the field about 10 to 15 minutes before the start time. Other times, I almost arrive exactly at starting time. It all depends on the traffic that there is, and the time that I woke up."); R. Pompa Decl. ¶ 4 (generally arrives 10-15 minutes early of his own volition; does not do any work until scheduled time and has always been told he is not permitted to work before shift starts); E. Ruiz Decl. ¶4 (he tries to arrive at work 20 minutes early because he prefers to take his time on the road, but it has never been required of him); Y. Duran Decl. ¶3 (usually arrives twenty minutes early to work but no one requires it. Her brother takes her to work and they go early to avoid traffic); L. Martinez Decl. ¶ 3 (sometimes arrives 10, 20 or 30 minutes early depending on traffic. About two minutes before start time, he and his wife get out of the car and wait for class to start. They have never been called in not one minute before the start time).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

29

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   time."); R. Marin Decl. ¶5 ("I chose to arrive early because in the mornings there is a lot of

2   traffic on the highways and I prefer to arrive early in order to not risk an accident."); R. Martinez

3   Decl. ¶4 (he tries to arrive 5-15 min. ahead of shift to avoid traffic; but has never been told arrive

4   early, only to arrive "on time"); A. Esparza Decl. ¶ 5.

5                               (2)      **No Work After Stop Time**

6          Sunview's sixty-one (61) putative class member declarants have universally stated that

7   Sunview does not permit them to work past the stop time in any season without permission from

8   a Crew Boss.  Crew Bosses ensure workers are able to leave on time by "calling out" to the crew

9   prior to the end of the shift to let them know they should begin to wrap up their tasks.  Beagle

10   Decl. ¶24.  On the rare occasions when the workers are asked to keep working by a crew boss, or

11   cannot finish their work prior to the shift's end, these additional hours are recorded and they are

12   paid for their time.  For example, one Crew Boss, Angelica Farias, explained that during the

13   picking season, she gives her workers 15 to 20 minutes to pack the grapes and clean the avenues

14   before the shift stop time.  Farias Decl. ¶8.  When workers are unable to finish packing all of their

15   grapes before the scheduled end time, she will sometimes ask another group of employees who

16   have finished early to help others who are still packing so that everyone can leave on time.  *Id.* at

17   ¶9.  She records any extra time in the Daily Sheets so that her Crew is paid for their time worked.

18   *Id.* at ¶8.  She also records extra time if she asks for a group of volunteers to help move tables

19   when the crew has finished working a certain block.  *Id.* at ¶10.

20          Sunview's policy to ensure that workers do not work beyond stop time by providing a

21   cushion between calling out to stop picking and the end of a shift (*see* Beagle Decl. ¶ 24) is

22   confirmed by the twenty-nine (29) declarations from Crew Bosses and Supervisors explaining in

23   detail the policies Sunview set forth and the actions the crew bosses and supervisors undertook to

24   enforce these policies.  *See, e.g.,* C. Guzman Decl. ¶6 ("About fifteen or twenty minutes before

25   quitting time, I always yell out to my workers to stop so that they can have time to organize their

26   things and finish with their tasks before quitting time."); Tinoco Decl. ¶6 ("If a group had picked

27   a lot of fruit and the packing could not be completed before the end, I asked another group to help

28   them so that everyone can leave at quitting time.") A. Cruz Decl. ¶7 ("If the workers remain

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

30

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    working after the scheduled time – for any reason – I have always written it down on the sheets

2    the time when they left, not the scheduled time.").

3         In contrast, Plaintiffs submitted only a single declaration from a Crew Boss, Jose Rivera,

4    who explicitly disavowed much of his declaration in his deposition testimony, or had other

5    portions of his testimony contradicted by members of his own Crew.  For example, Rivera

6    claimed that workers in his crew performed work such as preparing materials and moving tables

7    before the official start time, but his Assistant Crew Boss, Maria Barajas, contradicted these

8    claims and stated that workers in Rivera's crew did not begin work before the start time, but

9    rather waited in their cars and chatted with their co-workers before the start time.  Barajas Decl.

10   ¶7.  In fact, Barajas was the one who recorded the crew's work hours, a point that Rivera

11   confirmed.  Barajas Decl. ¶5; Rivera Depo. 28:10-14.  Barajas further attested that she recorded

12   every minute that each worker worked, even if it occurred after the scheduled stop time.  Barajas

13   Decl. ¶5.  At least some of Plaintiffs' own declarants who worked in Rivera's Crew (240) confirm

14   they were paid for all hours worked.  For example, Plaintiffs' declarant Bautista worked in Crew

15   240 under Rivera and admits that she was paid for all hours worked from the beginning of 2003

16   forward up to 2010.  Bautista Depo. 14:3-16:24; *see also* Exhibit 25 to Molland Declaration for a

17   contrast of Bautista's testimony with another of Plaintiffs' declarants, Ms. Nunez, who worked in

18   Crew 240 *and in the very same team* and commuted to and from work with Ms. Bautista.

19        Sunview's workers corroborate these Crew Boss declarations.  Angel Vargas, for

20   example, was able to finish his tasks in the 15 to 20 minutes after his Crew Boss called out for the

21   workers to stop working at the end of the shift.  Vargas Decl. ¶6.  He also observed his co-

22   workers finish their tasks early and stand around doing nothing until the shift's end.  *Id*.  He also

23   has volunteered to perform work after the stop time of his shift, and he reviewed his pay checks

24   and knew that he was paid for this time.  *Id*. at ¶8.  Other declarants confirmed that they were able

25   to complete their work before the scheduled quitting time, and were paid for all the time they

26   worked.  *See, e.g.,* F. Mendez Decl. ¶5 ("At the end of the day, I have always been able to leave at

27   quitting time or, if the foreman needs help after quitting time, he has always paid me for the time

28   that I have worked."); R. Pompa Decl. ¶5 ("I have never done any type of work after quitting

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

31

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   time, because the company does not permit it either."); E. Ruiz Decl. ¶8 ("The 10 to 15 minutes

2   that the foreperson gives us is enough to finish the work, and I have never had to stay after the

3   end of a shift in order to finish my task."); M. Sierra Decl. ¶6 ("It is prohibited to work after

4   quitting time without permission from the foreman.").

5                              (3)      **No Uniformity Exists As To Tray Washing**

6              Sunview's evidence established that employees were not supposed to be taking trays

7   home to wash them.  Prior to 2002, employees were asked to take trays home and bring them

8   back the next day – although not all employees did so.  Beagle Decl. ¶12.  During this time, Crew

9   Bosses in the North and South did not direct employees to wash trays at home.  *Id.* Beginning in

10  2003, Sunview instituted a policy that employees were not allowed to take any trays home.

11  Gallegos Decl. ¶54; Beagle Decl. ¶13.  In fact, Sunview built tray washing machines housed in

12  trailers where trays were washed during working hours.  Beagle Decl. ¶13; Gallegos Decl. ¶53,

13  Exh. 14.  From 2003 to the present, no Field Hand Laborer has been authorized or knowingly

14  allowed take trays from off Company property.  Beagle Decl. ¶13.

15             Many putative class members attest that they have *never* had to take home any tools, trays,

16  or scales, or wash them at home during the class period.  *See, e.g.,* J. Ayon Decl. ¶11 ("I never

17  have had to take the trays home or wash them."); J. Madrigal Decl. ¶7 ("Since almost 10 years

18  ago, I have not had to take [trays] home."); D. Mancillas Decl. ¶6 ("Since I started working at

19  Sunview, I have never been asked to take any type of material to my house to clean it, such as

20  platters, trays or weighs (scales)."); A. Quinteno Decl. ¶6 ("I do not remember me having to take

21  anything home, like pans, trays, or weights (scales) to wash them at home.").  Other Sunview

22  declarants claim that, although they took trays home, they were not required to wash them.  *See,*

23  *e.g.,* S. de Betancourt Decl. ¶9 ("I never washed [the trays] because I have always worked with

24  my husband, and he washed mine and his."); L. Alvallar Decl. ¶9 ("The forepersons did not

25  demand that we wash [the trays]."). Still other declarants state that although they previously took

26  trays home simply to store them overnight, that practice ended in approximately 2003, and they

27  have not had to bring home or wash trays ever since.  *See e.g.,* J. Maciel Decl. ¶8 ("I have not had

28  to take the trays home to wash them since more than 8 years ago."); J. Sosa Decl. ¶6 ("Since

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

32

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    approximately 2003, the company stores the trays and washes them at the ranch.  I have not had

2    to take the trays home nor wash them since them.").

3         Further complicating Plaintiffs' tray washing claim is the fact that the Court will have to

4    determine whether the time allegedly spent washing trays was so *de minimis* that it was not

5    compensable.  This requires an individual examination of (1) the practical administrative

6    difficulty of recording additional time, (2) the aggregate of amount of compensable time, and (3)

7    the regularity of the additional activity.  *Rutti v.Lojack Corp., Inc.*, 596 F.3d 1046, 1057 (9th Cir.

8    2010) (citing *Lindow*, 738 F.2d at 1062-63); *see also De Asencio v. Tyson Foods, Inc.*, 500 F.3d

9    361, 373-74 (3d Cir. 2007) cert. denied, 128 S. Ct. 2902 (2008) (discussing application of *de*

10   *minimus* doctrine).  The testimony will differ widely regarding the amount of time and regularity

11   of tray cleaning.  For example, Sunview's Farm Manager stated that the actual time it takes to

12   wash a tray is negligible; a tray can be cleaned in a minute or less by hosing it down and wiping it

13   off.  Beagle Decl. ¶15.  Some declarants, however, stated that they spent 10 to 15 minutes

14   washing them, while others stated that they took trays home once a week and spent less than 5

15   minutes cleaning them.  *See, e.g.*, L. Alvallar Decl. ¶9 ("When they were dirty, I washed them

16   with a hose.  It took me approximately one or two minutes to clean them."); J. Amado Decl. ¶10

17   ("It took me approximately five to eight minutes to clean [the trays].  I used a hose to wash them,

18   and I left them outside my house to dry."); M. Barraza Decl. ¶11 ("It took me approximately two

19   to three minutes to clean each [tray].  I used a hose to wash them, and a brush so that they stayed

20   clean."); V. Garcia Decl. ¶7 ("I only washed [the trays] with a hose.  It took me approximately 5

21   minutes total to wash them."); B. Moreno Decl. ¶5 ("I washed [the trays] with soap, broom, and a

22   water hose.  It took me approximately one to two minutes total to wash them."); M. Sierra Decl.

23   ¶9 ("If [the trays] were dirty – about two or three times a week – I washed them with water.  It

24   took me approximately three minutes to clean them each time.").

25             c.      **Plaintiffs' Own Evidence Is Internally Inconsistent and, In Any**
                       **Event, Directly Conflicts with the Evidence Submitted by**
26                     **Defendant**

27        While Sunview has multiple writings that demonstrate its policy to pay its employees for

28   all of the hours they work and that such policies were adhered to, Plaintiffs' evidence regarding

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

33

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    off the clock work is entirely anecdotal.  Indeed, no declarant or putative class representative has

2    any written record that suggests, let alone proves, that they performed work that was not recorded

3    by the Crew Boss and for which they were not compensated.  *See e.g.,* Espino Gomez Depo.

4    104:2-4, 101:13-15 ("Q.  Did you keep track of the time that you spent before start time working?

5    A.  No."); Arreola Perez Depo. 85:5-15 (claiming that she wrote down her hours but she "would

6    throw them away, throw them in the trash."); *see also* Robles Depo. 96:5-22; Mojarro Depo.

7    46:2-15; Reynaga 26:11-13; Ruiz Depo. 41:3-6; Nunez Depo. 25:18-26:4; Bautista Depo. 36:4-6;

8    Gonzalez Depo. 35:9-12; Esparza Depo. 56:4-6.

9         Not only does Plaintiffs' supposed anecdotal proof of off-the-clock work directly conflict

10   with Sunview's evidence, Plaintiffs' own evidence is internally inconsistent, and all by itself

11   demonstrates the predominance of individualized issues.[24]  For example, most of the named

12   Plaintiffs (unlike many of Plaintiffs' declarants) testified that they did <u>not</u> perform off-the-clock

13   work during the non-harvest season.  For instance, Montes specifically testified that, over a period

14   of ten years, no one from his crew arrived before the scheduled start time during the non-harvest

15   season.  Montes Depo. 78:23-79:20 ("Q.  Did anybody in Crew 150 for the past ten years show up

16   and work before start time during the budding and tipping season?  A.  No."); *see also* Perez

17   Depo. 140:9-141:19; Espino Gomez Depo. 111:25-112:14; Rojas Depo. 119:14-22.  Also, several

18   of the named Plaintiffs admitted in their depositions that some of their Crew Bosses never told

19   them to work off the clock.  Rojas Depo. 148:16-24 ("Q.  Did Sergio [Crew Boss] ever tell you to

20   do any work before start time?...A.  No.") ,166:4-9 ("Q.  Did Eduardo ever tell you to do any

21   work before start time?...A.  No."), 166:20-24; Montes Depo. 49:15-50:21, 51:22-52:22; Perez

22   Depo. 96:25-97:3, 116:2-16,119:8-21; Ruiz Depo. 67:2-21.  Montes also testified that one of his

23   crew bosses, Nicolasa, (as well as others) specifically instructed the workers not to do any pre-

24   shift work, but that some of them chose to work despite such instruction.  Montes Depo. 54:11-

25   20; 54:21-55:2;51:13-52:22.  Plaintiffs' declararnt Ruiz testified that his current Crew Boss does

26   not permit any of his crew to perform any work before the shift start time or after stop time.  Ruiz

27

28   [24] *See* Exh. 23 to Molland Declaration, which provides a detailed comparison of the internal inconsistencies in the named Plaintiffs' stories.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

34

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    Depo. 67:2-18.  Montez (who worked at Sunview through the entire putative class period) said he
2    never did any work after stop time (except supposedly to take home trays in the early 2000's).

3           Some Plaintiffs testified that their Crew Bosses instructed them to arrive to work prior to
4    the start of their shifts – not to perform any work, but rather only to ensure that they would be on
5    time for the start of the work day.  *See* Montes Depo. 47:8-13; *see also* Reynaga Depo. 67:10-17
6    (crew boss advised him to arrive before the shift "to be sure that [he] would be on time for start
7    time.").

8           While some Plaintiffs claim in their Motion that every worker attended a pre-shift, off-
9    the-clock "school" meeting, several of Plaintiffs' own declarants testified that in their crews
10   "school" was held *after* the scheduled start time.  Bautista Depo. 43:10-44:9; Ruiz Depo. 67:11-
11   18; Esparza Depo. 69:8-19. Some Plaintiffs and declarants testified that some Crew Bosses
12   refused to permit employees to perform pre- or post-shift work.  Montes Depo. 50:17-21 (in
13   2005-2007 work before start time was "strictly prohibited at Sunview"); Ruiz Depo. 67:2-21.
14   Other Plaintiffs testified that even if some workers worked before the start time or after the stop
15   time, some workers in the same Crews during the same time periods did not.  Espino Gomez
16   Depo. 135:2-136:11 (the crew boss's relatives were exempted from pre-shift work); Mojarro
17   Depo. 56:20-57:3; Rojas Depo. 58:6-17, 116:8-20; Ruiz Depo. 65:2-11.

18          A trial on the question of Sunview's alleged practice of ignoring its policy to pay for all
19   hours work could not occur on a class-wide bases.  As the evidence demonstrates, a trier of fact
20   would have to first determine the identity of the fraction of persons who claimed to work off the
21   clock, during which periods of time, and in which crews, based on evidence that is in dispute not
22   only between Plaintiffs' and Sunview's declarants but also between Plaintiffs' and their own
23   declarants.

                    **2.      Individual Issues Predominate for Plaintiffs' Plaintiffs' Tool
                              Reimbursement Claim**

26          Labor Code Section 2802(a) provides that "[a]n employer shall indemnify his or her
27   employee for all *necessary* expenditures or losses incurred by the employee in direct consequence
28   of the discharge of his or her duties . . . ."  (emphasis added).  Section 2802(c) dictates that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

35

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1  "necessary expenditures" must be "reasonable."  Interpreting Section 2802 in its entirety, Courts

2  have held the definition of "necessary" depends on the "reasonableness" of the *individual*

3  employee's choices – an examination that cannot be done on a classwide basis.  *Gattuso v. Harte-*

4  *Hanks Shoppers, Inc.,* 42 Cal.4th 554, 568 (2007); *Grissom v. Vons Cos., Inc.,* 1 Cal.App.4th 52,

5  58 (1991) ("Necessity is by nature a question of fact…accordingly, ascertaining what was a

6  necessary expenditure will require an inquiry into what was reasonable under the

7  circumstances."); *Ramirez v. Labor Ready, Inc.*, No. 836186-2, 2002 WL 1997037, at *4 (Cal.

8  Sup. Ct. July 12, 2002) (denying certification because too many individualized inquiries required

9  to determine the existence and extent of necessary expenses incurred by each putative class

10  member).

11       In *Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 610 (S.D. Cal. Sept. 30, 2010),

12  the Court denied certification of Labor Code Section 2802 claims, finding that such claims

13  necessarily require a "worker-by-worker, highly individual analysis" because mileage and "other

14  costs incurred in obedience to Defendants' and their clients' duties" was such an expansive and

15  varied list that the matter was unsuitable for class treatment.  *See also Ruiz v. Affinity Logistics*

16  *Corp.,* No. 05CV2125JLS, 2009 WL 648973, at *7 (S.D. Cal. Jan. 29, 2009) (class certification

17  denied because the reasonableness and necessity of expenses required a "case-by-case analysis

18  where common questions do not predominate over individual questions."); *Desimone v. Allstate*

19  *Ins. Co.*, No. 96-03606, 1999 WL 33226248 at *7 (N.D. Cal. Sept. 14, 1999) (to demonstrate a

20  violation of section 2802, plaintiffs "must introduce specific evidence of actual and necessary

21  expenditures," that they incurred necessary expenses in the discharge of their duties and that the

22  employer failed to reimburse for such expenses).

23       Here, there is no uniform policy or practice Plaintiffs can point to in support of their

24  argument that they were not provided all necessary tools.  The dispute – which is impossible to

25  resolve on a class wide basis – is whether additional tools such as new scissors or other items

26  such as "holsters" were "necessary" under the circumstances.  Specifically, the Court would have

27  to examine: (1) the adequacy of the scissors (and all other equipment) given to employees and

28  whether it was suitable for the tasks at hand (picking, cleaning, pruning, girdling, etc.) (*see*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

36

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    Beagle Decl. ¶8); (2) the alternative equipment or tools available; *id* (3) whether an individual

2    employees voluntarily chose to use their own scissors or tools because they liked their personal

3    tools better (*see, e.g.,* A. Leon Decl. ¶7); (4) whether individual employees ever asked for new or

4    different tools (*see, e.g.,* M. Carranza Decl. ¶ 9; N. Gomez Decl. ¶ 3); (5) whether those requests

5    were denied (*compare* E. Catalan Decl. ¶3 *with* A. Esparza Decl. ¶6); and (6) the reasons

6    Sunview allegedly denied the requests.  In order to state a claim under Labor Code Section 2802,

7    each *individual* class member would have to prove that (1) he or she actually purchased necessary

8    tools, (2) he or she notified Sunview of his or her purchase of the tools; and (3) Sunview did not

9    pay them. *Ramirez* 2002 WL 1997037, *4.  Thus, in this case, the Court would have to examine

10   the individual experiences of over 8,000 putative class members to determine if any of them were

11   entitled to unpaid expenses.  That type of individual inquiry is simply not feasible in the class

12   action context.

13        For example, between 2002 and 2010, Sunview purchased over 24,000 pairs of scissors.

14   Gallegos Decl. ¶57, Exh. 16.  Sunview's practice was to always provide Field Hand Laborers

15   with new scissors or useable replacement.  Gallegos Decl. ¶56; ¶57, Exh. 16; Beagle Decl. ¶5

16   ("At the start of each harvest season … every Field Hand Laborer receives a new pair of hand

17   scissors purchased by Sunview ….  In my experience, the scissors Sunview purchases are high

18   quality and last for many years.").  If an employee needs a new pair of scissors for whatever

19   reason, Sunview will provide them with a new pair.  Beagle Decl. ¶5 ("If an employee's scissors,

20   whether new or reconditioned, break or are lost at any time, Sunview provides the employee with

21   a new or reconditioned pair.").

22        Sunview also purchases gloves to distribute to employees when they are *necessary* for

23   particular tasks.  Beagle Decl. ¶9; Gallegos Decl. ¶58, Exh. 17.  For example, workers are asked

24   to wear cotton gloves during a short period of spring time work with a grape varietal called "Red

25   Globe."  Beagle Decl. ¶9; Gallegos Decl. ¶58. These gloves prevent employees from "scarring"

26   the grapes with their bare hands.  Beagle Decl. ¶9.  However, gloves are not necessary and in fact

27   detrimental for harvesting grapes.  Beagle Decl. ¶10 ("[P]ickers cannot feel berries that are too

28   soft or remove berries from within the cluster of grapes. Packers cannot wear gloves because they

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

37

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

DB2/ 22460546.3

1   also need to feel for soft berries and must grab packing materials including paper, adhesive labels,

2   plastic bubble wrap, and other packing supplies.")  As a result, Sunview does not permit workers

3   to use full gloves during the harvest season.  *Id*

4           Defendant's declarants in every active Sunview crew have described the tools that

5   Sunview has provided to them and have denied ever having to purchase any tool or item in order

6   to do their work.  Every Sunview declarant has agreed that Sunview provided scissors, and those

7   who have requested replacement scissors if they have lost or broken their initial pair, have been

8   given replacements.  N. Gomez Decl. ¶3 ("If any tool stops working, I tell the forepersons, and I

9   receive a new one."); R. Marin Decl. ¶8 ("Sometimes during harvest season, I have asked for new

10  scissors because mine were missing.  My foreman has always given me new ones if I ask for

11  them."); R. Martinez Decl. ¶3 (Sometimes, in the picking season, I have asked for new scissors

12  because mine no longer worked.  My foreman has always given me new ones if I asked for

13  them."); Prestegui Decl. ¶4 ("About one time every harvest, I have asked my foreman for new

14  scissors because mine no longer worked.  My foreman has always given me new ones whenever I

15  have asked for them."); M. Ramirez Decl. ¶3 ("Sometimes the scissors do not work, and I have

16  asked the foreman for others.  Each time that I have needed new scissors, I have asked my

17  foreman for it, and he has always given them to me.").

18          Not all workers use scissors often enough to require replacements.  In fact, approximately

19  one third of the workers during the harvest engage in packing the grapes that their two group

20  members pick, and therefore may hardly use their scissors at all.  *See* Beagle Decl. ¶23.  Because

21  these packers use their scissors less than other workers, their scissors are less likely to wear out or

22  need replacing.  *See, i.e.*, Sabore Decl. ¶7 ("I have never had to ask for new scissors because I

23  take good care of them and also because I work as a packer, and I do not use them much.").

24          Some Sunview declarants claimed that they used gloves during portions of their

25  employment with Sunview – when it was cold outside or to protect their hands from dirt or sun –

26  but none believed that the gloves were necessary to perform their work.  *See, e.g.*, L. Alvallar

27  Decl. ¶3 ("The gloves are not necessary to do my work. Sometimes I wear them, sometimes I do

28  not.  Usually I wear them when it is cold, but the rest of the time they are not used."); M. Barraza

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

38

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   Decl. ¶10 ("Because of the work that I do, gloves are not necessary. I like using them in the

2   morning only when it is cold. I do not use them except during the cold because they are not

3   necessary for my work."); D. Mancillas Decl. ¶8 ("For the tasks that require gloves, the company

4   gives us gloves. For the other tasks, the gloves are not necessary, but I like wearing gloves to

5   protect my hands from the dirt and the sun . . . .").

6        Despite claiming to have spent their own money to purchase tools, Plaintiffs have not

7   produced a single scrap of paper to corroborate their claim. *See* Gomez Depo. 46:25-47:6; Perez

8   Depo. 45:5-14; Robles Depo. 142:21-143:1. Plaintiff Montes is particularly notable in this regard

9   because he did not retain any supposed tool purchase receipts *even after filing this lawsuit* in

10  which he claims that he was forced to purchase this equipment. Montes Depo. 89:12-22.

11       Individual issues clearly predominate as to Plaintiffs' claim that employees were forced to

12  purchase gloves because the evidence from Plaintiffs' own witnesses demonstrates irrefutably

13  that many workers did not wear gloves while working. Montes Depo. 121:24-122:25; Ruiz Depo.

14  75:5-10, 76:12-17; Bautista Depo. 30:6-31:3; Nunez 79:19-80:1; Rivera 88:12-19, 89:2-8.

15  Moreover, Reynaga testified that he was aware that Sunview did not want employees to wear

16  gloves. Reynaga Depo. 65:7-19.[25]

17           **3.    Individual Factual Issues Predominate and Preclude Class Certification
18                   of Plaintiffs' Paid Rest Break Claim**

19                 **a.    Sunview's Pay Practices Fully Comply with California Law**

20       Plaintiffs' claim that Sunview was required to authorize and permit rest periods and to pay

21  employees at least minimum wage for all hours worked. Sunview did exactly that.

22       First, Sunview's express written policy authorized and permitted employees to take rest

23  breaks consistent with and as required by California law. *See* Gallegos Decl. ¶ 12, Exh. 2 -

24  Sunview Employee Handbook, p. 3, part IV.C.3; Gallegos Depo. 107:14-108:13. Also, the

25  Plaintiffs who were deposed acknowledged that Sunview had a policy of authorizing and

26  permitting rest breaks and that crew bosses announced when the employees were supposed to

27  take their rest break. Robles Depo. 68:10-13; Perez Depo. 41:20-24; Gomez Depo. 56:3-7, 65:2-

28  _____

[25] Exhibits 23 to Molland's declaration summarizes the concessions made by Plaintiffs regarding the actual availability of scissors and gloves over the past ten years.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

39

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   15, 91:10-15; Rojas 74:21-75:7, 77:14-78:5.

2   Second, Sunview guaranteed that all employees – whether paid purely piece rate or hourly

3   plus piece rate – would be paid at least minimum wage for all hours worked.  Gallegos Decl. ¶30-

4   31.  At all times during the putative class period, Sunview's payroll system tracked the hours

5   worked and the pay for each employee for each work week.  If an employee's compensation at

6   the end of the work week (hourly and/or piece rate) was not sufficient to result in the payment of

7   at least minimum wage for all hours worked, the employee received an additional "true-up"

8   payment to ensure that minimum wage was paid for all work hours.[26]  Gallegos Decl. ¶¶ 14, 31.

9   Sunview's practice fully complied with California law.  Specifically, Wage Order 14

10  states rather unambiguously in Section 4(b) "Minimum Wages" that:

11  "Every employer shall pay to each employee, on the established payday for the
    period involved, not less than the applicable minimum wage for all hours worked
12  in the payroll period, whether the remuneration is measured by time, piece,
13  commission, or otherwise."

14  Wage Order 14 also states in Section 12 "Rest Periods":  "Authorized rest period time

15  shall be counted as hours worked for which there shall be no deduction from wages."  Here, there

16  is no evidence that Sunview ever deducted from any employee's hourly and/or piece rate wages

17  based upon any rest period taken by the employee.

18  The California Division of Labor Standards Enforcement ("DLSE") has issued an Opinion

19  Letter regarding "how piece rate is to be calculated … in relation to the responsibility of an

20  employer to pay minimum wage for all hours worked by employees".  *See* DLSE Opinion Letter

21  1998-08-12, attached to Sunview's Request for Judicial Notice.  The Opinion Letter stated that

22  "an employer's obligation to pay the applicable minimum wage to his or her employees for all

23  hours worked arises at the conclusion of the pay period. … Each pay period must stand alone to

24  insure that the employee receives the minimum wage for all hours worked."  *Id.*  Sunview's

25  payroll policy and practice did exactly what was required under the law – guaranteed the payment

26  [26] The specific process for this true-up payment was as follows:  when the payroll system detected that the employee
    would be paid less than minimum wage for all work hours during the work week, the system automatically generated
27  an additional record (known as pay code "031") that contained hours equal to the sum of the total hours worked by
    the employee in the work week, and a corresponding rate equal to the amount necessary (multiplied by total hours) to
28  bring the employee's compensation up to minimum wage level.  Gallegos Decl. ¶14.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

40

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   of minimum wage for all hours worked during a work week.

2          Plaintiffs' argument that Sunview had an obligation to make an additional payment for

3   rest periods when workers were paid purely piece rate and/or worked between January 2002 and

4   July 2003 is inconsistent with the obligations imposed by the Wage Order and without merit.

5   Plaintiffs erroneously rely on *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314 (2005) and

6   *Ontiveros v. Zamora*, CIV S-08-567 LKK/DAD, 2009 WL 425962 (E.D. Cal. Feb. 20, 2009), as

7   both of those cases are easily distinguishable from the present case.  In *Armenta*, the employees

8   were paid on *an hourly basis only*, which is a critical distinction from the piece rate pay structure

9   at issue in the present case.  135 Cal. App. 4th at 317.  The employer in *Armenta* concededly did

10  not pay employees for all hours worked – rather, the employer considered certain job duties

11  (which were clearly compensable work hours) to be "non-productive" time and did not record any

12  of this "non-productive" time as hours worked in its payroll records and never paid employees for

13  these work hours.  *Id.* at 326.  The employer attempted to argue, however, that because the total

14  amount of money paid to employees for *some, but not all, of their work hours* exceeded the

15  minimum wage, it should not liable for failing to pay minimum wage for all hours worked.  The

16  court rejected that argument.  It is obvious that the employer's conduct in *Armenta* is entirely

17  different from Sunview's policy and practice, which is to record and pay for all hours worked.

18         *Ontiveros* is also inapposite for several reasons.  First, there was no indication in

19  *Ontiveros* that the employer had a system in place, such as Sunview has here, that examines

20  employees' hours worked and provides a true-up payment to ensure minimum wage is paid for

21  each and every hour worked.  Second, the Court provided no discussion or analysis specific to the

22  unique requirement that an employer need only make "no deduction from wages" (as opposed to

23  affirmatively ensuring some additional payment) for rest periods taken by an employee.  Third,

24  the Court in *Ontiveros* was ruling on defendants' motion for judgment on the pleadings, which

25  involves the very lenient standard under Rule 12(b)(6).  The defendants had argued (based upon

26  section 47.7 of the DLSE Policies and Procedures Manual) that so long as they did not preclude

27  employees from earning piece rate compensation, their method of compensation was permissible.

28  The *Ontiveros* ruling did not decide one way or another whether the defendants' argument was

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

41

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1   correct, but merely found that plaintiff should be given the opportunity to conduct discovery, as

2   the Court could not state that there were no possible set of facts consistent with plaintiff's

3   allegations that would permit his recovery.  *Id.*, 2009 WL 425962 at *14. [27]

4          Plaintiffs also cannot rely on the Declaration of Aaron Woolfson to support their argument

5   that Sunview pays sub-minimum wage pay for non-piece rate time.  *See e.g.* Motion 1:12-18.  As

6   set forth in Sunview's contemporaneously filed Motion to Strike, Woolfson's declaration is an

7   untimely and improper supplemental expert report that should be stricken and disregarded.[28]

8   Woolfson's declaration was submitted on May 16, 2011, almost one month after the expert

9   discovery cut-off.  Because Plaintiffs cannot proffer a "substantial justification" for their delay in

10  producing the Declaration, it must be stricken.[29]  Even if it was admissible, Woolfson's

11  declaration is filled with errors and worthless.  As explained by Sunview's expert, Peter

12  Nickeson, PhD, (*see* Nickerson Declaration attached as Exhibit 44 to the Molland Decl.),

13  Woolfson began his analysis by *deleting* an entire category of vital payroll information – the pay

14  code "031" data used by Sunview to ensure that employees' compensation satisfies the minimum

15  wage requirement for each work-week.  In doing so, Woolfson deleted evidence proving that

16  Sunview was paid all employees minimum wage for all hours worked.  The deletions affected

17  more than half of the 8,005 employees who appear in the data set.  Nickerson Decl. 3:17-23.

18  Even after being made aware of this fundamental error at his deposition, Woolfson continued to

19  omit the relevant "031" records.[30]  Nickerson Decl. 7:8-15.

20  [27] In addition, *Armenta* fails to address and *Ontiveros* inadequately distinguishes the ruling in *Medrano v. D'Arrigo*

21  *Bros. Co. of Cal.*, 336 F. Supp. 2d 1053, (N.D. Cal. 2004), which held that California law allows agricultural
    employers to pay a piece rate that is intended to compensate workers for all of their work-related activities.  *Id.* at

22  1057 n.4 & n.5.
    [28] Defendant has timely filed its Motion to Strike as a related motion or counter-motion under Local Rule 230(e).

23  [29] *See* FRCP 37 ("[a] party that without substantial justification fails to disclose information required by Rule 26(a) or
    26(e)(1) … is not … permitted to use as evidence at a trial, at a hearing or on a motion any witness or information not

24  so disclosed).  *Wong v. Regents of the Univ. of Cal.*, 410 F. 3d 1052, 1062 (9th Cir. 2005) (affirming order excluding
    expert witness testimony offered in support of summary judgment where witness was not timely disclosed); *Leviton*

25  *Mfg. Co., Inc. v. Nicor, Inc.*, 2007 U.S. Dist. LEXIS 35225 (D. N.M. 2007) (striking untimely supplemental expert
    report).

26  [30] Another example of the unreliability of his Declaration: Woolfson failed to review all of the explanatory
    information provided by Sunview regarding the company's databases prior to performing his calculations.  Rather

27  than reviewing the documents Sunview produced to explain the payroll system or even reviewing the deposition
    transcript of Sunview's corporate representative, Woolfson relied on the "recollection" of Plaintiffs' counsel as to

28  how Sunview's payroll systems worked.  Woolfson Decl. ¶22 (relied on information "related to [him] by Tom
    Lynch"); Woolfson Depo. 184-185.  It is not surprising, therefore, that many of the errors in his Declaration result
    from reliance the incorrect legal theories advanced by his counsel – for example, that minimum wage should be

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

42

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

### b. Even Under Plaintiffs' Theory, Their Rest Break Claim Cannot Be Proven Using Common Evidence

The Court need not decide whether Plaintiffs' or Defendant's theory of the law is correct in order to deny Plaintiffs' Motion.  That is because, even assuming Plaintiff's theory is accurate, employees who chose to work through their rest breaks *were paid* for such time as a result of the greater incentive/piece-rate pay they received as a result of the additional grapes they were able to pick during their foregone rest break.  Under Plaintiffs' theory, liability for a minimum wage violation exists if the employee took his or her rest break, but no minimum wage violation exists if the employee chose to keep picking grapes through his or her rest break.[31]  However, there are no records or data that show whether rest breaks were actually taken.  As a result, liability cannot be determined on a class-wide basis because there is simply no way of determining, absent individualized inquiries, whether any specific employee did or did not work through a rest break.  Plaintiffs' own evidence bears this out.  The named Plaintiffs testified that some employees took rest breaks when authorized, while others did not.  Robles Depo. 107:7-15, 108:16-109:9; Perez Depo. 41:16-42:11; Gomez Depo. 65:5-19.  Based upon Plaintiffs' theory of liability, individual questions clearly predominate over any common questions.

### 4. A Class Action Is Not the Superior Method of Adjudication.

In addition to "predominance," Rule 23(b)(3) requires Plaintiffs to prove that a class action is superior to any other method of adjudication.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231-32 (9th Cir. 1996).  Superiority is a critical requirement of Federal Rule 23(b), designed to ensure that a class action does not "sacrific[e] procedural fairness or bring[ ] about other undesirable results."  *Amchem*, 521 U.S. at 615.  In evaluating superiority, the Court must examine whether "another method for handling the litigious situation" is available that has "greater practical advantages."  Fed. R. Civ. P. 23, Advisory Comm. Notes 1966 Amendment.  Plaintiffs bear the burden of showing that there are no superior alternatives to a class action.  *Valentino*, 97 F.3d 1227 at 1234.

---

calculated per day instead of the "per pay period" as required by law.

[31] And, even if the employed alleged Sunview forced him or her to pick grapes through the rest break, the employee would still not have a minimum wage claim, but instead would have a rest period premium claim – but Plaintiffs do not seek to certify any class based upon missed rest periods.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

43

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1

### a.     A Class Action Trial of This Case Would Be Completely Unmanageable.

2

3    In evaluating class certification, the Court must consider "how a trial on the merits would

4    be conducted." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). Where

5    "individual rather than common issues predominate, the economy and efficiency of class action

6    treatment are lost and the need for judicial supervision and the risk of confusion are magnified."

7    *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2000). A class action here

8    would be unmanageable because it would require literally thousands mini-trials because a finding

9    regarding one individual would not be determine as to any other putative class member. If this

10   Court spent only 30 minutes adjudicating the off-the-clock, tool reimbursement and rest period

11   pay claims of each of the more than 8,000 putative class members, it would still require more than

12   100 full-weeks of trial time before the Court. The greater the number of individualized issues to

13   be litigated (as is the case here) the more difficult it will be for the court to manage the class

14   action. *Marlo v. United Parcel Serv.*, 251 F.R.D. 476, 486 (C.D. Cal. 2008).

### b.     Other Accessible, Fair, and Expeditious Alternatives Exist

15

16   In assessing superiority, the Court should consider "whether any administrative method of

17   settling the dispute exists." *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 211 (9th Cir. 1975). A

18   class action is not the superior method when other efficient and economical methods for

19   adjudication exist. *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253-54 (C.D. Cal. 2006)

20   (finding class action not superior because "viable alternatives," such as individual suits and

21   administrative hearings, existed).

22   Here, two viable alternatives exists for putative class members who wish to pursue their

23   own claims. First, in California, the Department of Labor Standards Enforcement provides a

24   streamlined administrative hearing process for employees wanting to bring wage claims against

25   employers and no filing fee is required. Cal. Lab. Code §§ 98-98.2. If a claim is not resolved at a

26   supervised settlement conference, a hearing officer conducts an evidentiary hearing and promptly

27   issues a ruling. Cal. Lab. Code §§ 98-98.2. The remedies available in these actions, including

28   unpaid wages, interest, and penalties, are virtually identical to those available in a civil action. *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

44

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705

1    § 98.2(e).  Any party may appeal to the Superior Court for a *de novo* review, during which

2    interest accrues on the award.  *Id.* § 98.2(a),(c).  If the employer appeals and the claimant cannot

3    afford counsel, the administrative agency will represent the claimant for free.  *Id.* § 98.4.

4    Moreover, should the employer's appeal fail, the employer must pay the claimant's attorneys'

5    fees.  *Id.* § 98.2(c).  Second, a putative class member may file an individual civil action to recover

6    any wages or penalties due, which is superior to a complex and time-consuming class action.  Cal.

7    Lab. Code §§ 203, 226.7, 1194.  Because individual civil claims do not require certification, such

8    claims will be resolved much more quickly than a class action.  The Labor Code provides

9    sufficient incentives for individual employees to file individual civil actions because they may be

10   entitled to recover damages, interest, attorneys' fees and costs if they prevail, as well as statutory

11   waiting time penalties under certain circumstances.  *Id.* §§ 203, 218.5, 1194.

12   **IV.    CONCLUSION**

13          Plaintiffs have failed to meet their heavy burden of proving that each of the requisite

14   elements for certification of a class action under Rule 23 have been met in this case.  Individual

15   factual and legal issues clearly predominate and make it impossible for Plaintiffs' claims to be

16   tried on a class-wide basis.  For all of the foregoing reasons, Defendant respectfully requests that

17   the Court deny Plaintiffs' Motion for Class Certification in its entirety; and for all other relief in

18   favor of Defendant that the Court finds appropriate.

19   Dated:  August 18, 2011                    MORGAN, LEWIS & BOCKIUS LLP

20

21                                              By:    /S/ Eric Meckley_____
                                                     James N. Penrod
22                                                   Michael Molland
                                                     Eric Meckley
23                                                   Shannon B. Nakabayashi
                                                     Attorneys for Defendant
24                                                   SUNVIEW VINEYARDS OF
                                                     CALIFORNIA, INC.

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 22460546.3

45

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
Case No. 1:09-CV-00705