1              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF CALIFORNIA
2                  FRESNO DIVISION

3

4   SANTIAGO ROJAS, JOSEPHINO
    RAMIREZ, CATALINA ROBLES;
5   JUAN MONTES; BENITO ESPINO;
    GUILLERMINA PEREZ; on behalf
6   of themselves and a class of      Case No.
    others similarly situated,        1:09-CV-00705-A WI-SMS
7
        Plaintiffs,
8
            vs.
9
    MARKO ZANINOVICH, INC.,
10  SUNVIEW VINEYARDS OF
    CALIFORNIA, INC., a
11  California corporation; and
    DOES 1 to 20, inclusive,
12
        Defendants.
13  _____

14
15       VIDEOTAPED DEPOSITION OF AARON WOOLFSON
16             San Francisco, California
17               Tuesday, May 3, 2011
18
19
20
21  Reported by:
    ELAINE A. DELLINGES, RPR
22  CSR No. 5049
23
24
25

5/3/2011 Woolfson, Aaron

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF CALIFORNIA
2                FRESNO DIVISION

3

4   SANTIAGO ROJAS, JOSEPHINO
    RAMIREZ, CATALINA ROBLES;
5   JUAN MONTES; BENITO ESPINO;
    GUILLERMINA PEREZ; on behalf
6   of themselves and a class of      Case No.
    others similarly situated,        1:09-CV-00705-A WI-SMS
7
           Plaintiffs,
8
              vs.
9
    MARKO ZANINOVICH, INC.,
10  SUNVIEW VINEYARDS OF
    CALIFORNIA, INC., a
11  California corporation; and
    DOES 1 to 20, inclusive,
12
           Defendants.
13  _____

14

15

16      Videotaped Deposition of AARON WOOLFSON, taken
17  on behalf of Defendants, at One Market Street, Spear
18  Tower, 28th Floor, San Francisco, California,
19  beginning at 10:21 a.m. and ending at 5:37 p.m., on
20  Tuesday, May 3, 2011, before ELAINE A. DELLINGES,
21  Certified Shorthand Reporter No. 5049.

22

23

24

25

```
1       APPEARANCES:

2

3       For Plaintiffs:

4               LAW OFFICES OF MALLISON & MARTINEZ
                BY:   MR. STAN S. MALLISON

5               Attorney at Law
                1939 Harrison Street, Suite 730

6               Oakland, California 94612
                (510) 832-9999

7               stanm@themmlawfirm.com

8       For Defendants:

9               MORGAN, LEWIS & BOCKIUS LLP
                BY:   MR. MICHAEL E. MOLLAND

10              Attorney at Law
                One Market, Spear Street Tower

11              San Francisco, California 94105
                (415) 442-1000

12              mmolland@morganlewis.com

13      Also Present:

14              AMY BROCKMAN (Present telephonically)
                DAN GALLEGOS

15              KENT STEPHENS
                DALE SWANSON

16

        Videographer:

17
                BART REIS

18

19

20

21

22

23

24

25
```

```
1                            INDEX
2  WITNESS:                          EXAMINATIONS
3  AARON WOOLFSON
4
5        MR. MOLLAND                        7
6
7                          EXHIBITS
8
9  DEPOSITION                              PAGE
10
11     Exhibit 1   Notice of Taking Deposition    19
                   of Aaron Woolfson and Request
12                 to Produce Documents at
                   Deposition
13
       Exhibit 2   A list of codes stamped        21
14                 Confidential
15     Exhibit 3   Five invoices to Mallison &    23
                   Martinez (Sunview) from
16                 TelSwitchInc.
17     Exhibit 4   Expert Report of Aaron         38
                   Woolfson
18
       Exhibit 5   A spreadsheet titled Example  109
19                 1
20     Exhibit 6   A spreadsheet titled Example  113
                   2
21
       Exhibit 7   A spreadsheet titled Example  122
22                 3 Part II
23     Exhibit 8   A list handwritten by the     175
                   witness on a green Starbucks
24                 paper
25
```

```
1    INDEX (Continued):

2

3                        EXHIBITS

4

5    DEPOSITION                              PAGE

6

7    Exhibit 9   An exhibit which was marked    178
                 as Exhibit 27 in the
8                deposition of Mr. Dan
                 Gallegos on behalf of Sunview
9                Vineyards
10   Exhibit 10  Handwritten notes made by the  211
                 witness
11
     Exhibit 11  A list for the SQL             212
12   **          implementation (to be sent to
                 the court reporter.)
13

14

15                REQUEST TO MARK THE RECORD
16                     Page      Line
17                     163       20
18
     ** Exhibit retained by the witness and to be marked
19   when it is sent to the court reporter.
20

21

22

23

24

25
```

5/3/2011 Woolfson, Aaron

```
 1          San Francisco, California, Tuesday, May 3, 2011

 2                     10:21 a.m. - 5:37 p.m.

 3          THE VIDEOGRAPHER:  Good morning.  Here begins

 4     media No. 1 of the deposition of Aaron Woolfson in the

 5     matter of Santiago Rojas versus Marko Zaninovich, et

 6     al.  This case is in the U.S. District Court, Eastern

 7     District of California, Fresno Division, and the case

 8     number is 1189077.  Today's date is May 3, 2011, and

 9     the time is 10:21 a.m.

10          This deposition is taking place at One Market

11     Street, Spear Tower, 28th Floor, in San Francisco,

12     California, and it's being taken on behalf of the

13     plaintiffs.  The videographer is Bart Reis appearing

14     on behalf of Wood & Randall.

15          All present, take notice that as a part of

16     the videotaping of this deposition very sensitive

17     high-quality microphones are being used.  If anyone

18     present wishes to make a statement or have a

19     conversation off the record, they should state that

20     they are going off the record and gain concurrence

21     from all parties.  The videographer will then stop

22     recording.  All recorded comments made by anyone

23     present during this deposition will be assumed on the

24     record and will be transcribed.

25          Would counsel please identify yourself and
```

5/3/2011 Woolfson, Aaron

```
 1    state whom you represent.
 2              MR. MOLLAND:  Michael Molland for defendants.
 3              MR. MALLISON:  Stan Mallison on behalf of
 4    plaintiffs.
 5              MR. MOLLAND:  And with me in the room there
 6    are some representatives of my client.  Would you
 7    identify yourselves, please.
 8              MR. SWANSON:  I'm Dale Swanson from Sunview
 9    Vineyards.
10              MR. STEPHENS:  Kent Stephens; Marko
11    Zaninovich, Incorporated.
12              MR. GALLEGOS:  Dan Gallegos; Sunview
13    Vineyards.
14              MR. MOLLAND:  Okay.  Swear the witness and
15    we'll get rolling.
16                        AARON WOOLFSON,
17    having been first duly affirmed, was examined and
18    testified as follows:
19                         EXAMINATION
20    BY MR. MOLLAND:
21        Q   Please state your full name and place of
22    business for the record, please.
23        A   My name is Aaron Woolfson, A-a-r-o-n
24    W-o-o-l-f-s-o-n.  I'm with TelSwitch, Inc.  My
25    principal location of business is at 343 East Main
```

1    Street, Suite 319, Stockton, California 95202.

2        Q    Okay.  What's your business that you do

3    there?  You said you have a principal place of

4    business.  What do you do in your business?

5        A    That's a pretty broad question.

6        Q    Okay.  Do the best you can.

7        A    Okay.  TelSwitch, Inc. primarily builds,

8    designs and develops large-scale databases for the

9    collection and dissemination and analysis of huge sets

10   of data.  I've been doing this for 20 years of which

11   16 years of those have been under the auspices of

12   TelSwitch, Inc., which is my company.

13       Q    What do you do for TelSwitch?

14       A    I am the founder and chief data architect.

15       Q    Is your title Founder and Chief Data

16   Architect?

17       A    I don't have a title imprinted on my business

18   card, but I have always expressed myself to be founder

19   and chief data architect.

20       Q    Okay.

21            How many people work for TelSwitch, the

22   company you founded?

23       A    We have four contractors and three employees,

24   including myself.

25       Q    Okay.  Who are the employees?

5/3/2011 Woolfson, Aaron

```
 1        A    My mother, Betty Woolfson, is my cash flow

 2   manager; Michael Foster, who is a electronic design

 3   extraordinaire; and myself.

 4        Q    Okay.  So basically you've got three

 5   employees including you, and one's your mom; right?

 6        A    Yes.

 7        Q    Has TelSwitch ever had any other employees

 8   besides you, your mom, and Mr. Foerster -- or Foster?

 9        A    We've had several employees over the years.

10   I'm not -- I'm not sure they're relevant in any manner

11   to what I've been retained as an expert to do.

12        Q    They may or may not be.

13        A    We've had other employees, yes.

14        Q    I don't know.  That's why I'm asking the

15   questions.

16             Who has worked for you besides those two

17   people?

18        A    There has been a gentleman named Chris Hall.

19        Q    Okay.  What's Chris done?

20        A    Chris has done SQL database implementations

21   with me.

22        Q    Anybody else?

23        A    There's been a gentleman named Chris Searls.

24        Q    Okay.  What's he done?

25        A    Chris Searls is just a general administrative
```

```
1    individual with no particular title.
2         Q    Okay.  Anybody else?
3         A    Laurie Minouei, L-a-u-r-i-e M-i-n-o-u-e-i.
4    She was my assistant, clerical.
5         Q    Anybody else?
6         A    Jerry Merkt.
7         Q    What did Jerry do?
8         A    Jerry was a business strategist.
9         Q    Okay.
10             And all these people were employees of
11   TelSwitch?
12        A    In some form as I would consider employees,
13   yes.
14        Q    Okay.  Anybody else you can recall?
15        A    There were a couple of people that I just I
16   don't remember over the years that have worked for us.
17   I don't remember their last names.
18        Q    Okay.
19        A    Kendra, and I don't remember the other two or
20   three people's names.
21        Q    Okay.  So you worked or founded and your
22   chief business is at TelSwitch.  Do you have any other
23   businesses, anything else you do to make some money
24   besides testify as an expert witness or consultant in
25   litigation?
```

1        A    My full or fairly full and extensive

2    experiences in both consulting and private industry

3    and software development is as listed on my CV, which

4    is on the USB stick that I provided you today.

5        Q    Okay.  So basically you do some consulting

6    work with lawyers in litigation; right?

7        A    I'm hired as an expert frequently by

8    attorneys in the area of database analysis, yes,

9    among other things.

10       Q    You work at TelSwitch also; --

11       A    Yes.

12       Q    -- right?

13            And You do some consulting outside of

14   TelSwitch, is that right, for nonlawyers and --

15       A    All of my business experiences as far as the

16   relationship formalities fall under the auspices of

17   TelSwitch Inc.  So whether I'm working with SAIC or

18   I'm working with Experion or some other large company

19   or whether I'm working for the attorneys it's always

20   been under the auspices of TelSwitch.

21       Q    Fair enough.  So you make your money through

22   TelSwitch --

23       A    Yes.

24       Q    -- in doing consulting; right?

25       A    Yes.

1      Q   Some of the consulting is with attorneys,

2   some of it is with other people; right?

3      A   Yes.

4      Q   How much is with other people and how much

5   with attorneys in the past couple of years, can you

6   estimate?

7      A   I would say 20 percent of my revenue for the

8   last 2-and-a-half years has been from attorneys and

9   80 percent has been from other endeavors.

10     Q   Perfect.  Thank you.

11         Of the 20 percent that's with attorneys how

12   much is from the Mallison & Martinez firm in the last

13   couple of years?

14     A   30 percent.

15     Q   Do you have any other law firm that has

16   retained you as much as Mallison & Martinez in the

17   last two or three years?

18     A   Rastegar & Matern in Los Angeles.  Altshuler

19   Berzon, San Francisco.  Those are the firms that come

20   to mind primarily.

21     Q   Okay.  Thank you.

22         And you said in your report, which we'll get

23   to, I promise --

24     A   That's fine.

25     Q   -- that you've worked at much of what you

```
1    call, quote, meal and break class action lawsuits?
2         A    Yes.
3         Q    Do you recall that?  Okay.
4              How much of your work in the last 2 or
5    3 years comprises work that you have done consulting
6    for attorneys in meal and break class action lawsuits,
7    if you can estimate, as opposed to doing some other
8    kind of work?
9              MR. MALLISON:  I'm going to object on
10   vagueness grounds.  Are you talking of the percentage?
11             MR. MOLLAND:  Yeah.
12        Q    How much of your time, how much of your
13   revenue?  I mean, that's a good way to do it.
14             MR. MALLISON:  Of the time doing wage an hour
15   class action cases or of the time of his total time?
16             MR. MOLLAND:  Let me rephrase the question --
17             MR. MALLISON:  Yeah, that would be good.
18             MR. MOLLAND:  Since you have a problem with
19   it.
20        Q    You've said about 20 percent of your time --
21   20 percent of your income actually -- is derived from
22   working consulting with attorneys, and now I'm going
23   to ask you how much of that time of your income for
24   that 20 percent is derived from working on what you
25   referred to as meal and break class action lawsuits in
```

```
1    your report?

2         A    90 percent.

3         Q    So I mean it would be fair to say that the

4    predominant amount of your consulting work is as an

5    expert in meal and class -- excuse me -- in meal and

6    break class action lawsuits; correct?

7         A    The predominant amount of time that I'm

8    spending with attorneys is being retained as an

9    expert, a database analysis expert in class actions

10   related to meal and break.

11        Q    Perfect.  And I may follow up on that.  But

12   I'm just trying to get the landscape here to begin

13   with.

14        A    All right.  Not specifically and exclusively

15   related to meal and break, but as a category.  If

16   somebody were to ask me what type of cases these are,

17   I would say meal and breaks.

18        Q    Good.  We can follow up on that.

19             Now, and that's been over the last what, what

20   period of time, two or three years or longer?

21        A    Two-and-a-half years.

22        Q    Okay.

23             Now, I've he gone through your report.  I'm

24   going to ask you lots of questions about it, but I'm

25   just trying to get the parameters right now.
```

```
 1          A    That's fine.  Sure.

 2          Q    You referred to a particular software or tool

 3     that you used to analyze data here.  And I'm just

 4     going to ask you whether you have a name for it.  You

 5     used a couple of letters like SQL.  My guess is

 6     that -- it's kind of a long question -- but my guess

 7     is that you have some software that you use to analyze

 8     data that you get from defendants in meal and break

 9     class action lawsuits that you use in your consulting

10     practice.  Would that be fair to say?

11          A    Microsoft produces a piece of software called

12     SQL Query Analyzer.  It's a piece of software that

13     comes packaged with their Microsoft SQL server CD ROM.

14     One of the components is called a SQL Analyzer.

15               And just for the -- for your benefit, when I

16     say SQL it's SQL upper case.

17               And that is the primary tool that I used in

18     the development of my findings in my report.

19          Q    Okay.  And I kind of -- that's sort of the

20     way I read that is that you have a tool that you use,

21     and it's probably called the SQL tool, which I wasn't

22     familiar with, but I'm sure you know a heck of a lot

23     about it.  Would it be fair to say in the last

24     2-and-a-half years when you've been doing this work

25     consulting for attorneys in meal and break class
```

```
1     actions that what you do or try to do at least is to
2     get a bunch of electronic data from the defendants and
3     then use the CQL tool to analyze it in one form or
4     another?
5          A   SQL tool.
6          Q   S -- is that correct, though?  Is that
7     essentially what you do?  Is that the process and
8     procedure that you follow?
9          A   Well, the process is -- I mean, there is a
10    very long process and set of procedures.
11         Q   I'm not really trying -- we'll get into all
12    those.
13         A   But if you --
14         Q   -- can I interrupt you just a second? --
15         A   Sure.
16         Q   -- because I really, I don't mean to pin you
17    down with this.  I'm just trying to figure out what
18    the parameters are of the software tool that you've
19    used, okay.  And --
20              (Interruption)
21              MR. MOLLAND:  This is your money.  We have to
22    take time off for that.
23              THE WITNESS:  Well, welcome.
24              MR. MOLLAND:  It's the first smile he's had
25    on his face since he's sat down.
```

1          OFFICE ASSISTANT:  Do you have a business

2     card?

3          THE WITNESS:  I do.  I'll just write my tax

4     ID number on the back of it for you.

5          OFFICE ASSISTANT:  Thank you, sir.

6          THE WITNESS:  I try to do my best.

7          MR. MOLLAND:  We have a -- by the way, Mr.

8     Mallison, we have a dial-in number for other people

9     who want to participate.  I forgot.  I didn't -- I

10    think I told you that or told somebody at your office.

11         MR. MALLISON:  You have somebody coming in?

12         MR. MOLLAND:  Yeah, we have another person --

13    and you can certainly use it to.  I'm not sure my

14    secretary forwarded it around.  I just got it, so I'm

15    going to --

16         MR. MALLISON:  Who is going to be on the

17    line?

18         MR. MOLLAND:  Let me give you the number

19    here.

20         MR. MALLISON:  I assume 415, start there.

21         MR. MOLLAND:  No, 866.  It's toll free.

22    (866) 963-7123, and when you get in to that the

23    participant code is 4740, 4740.

24         MR. MALLISON:  All right.  Who do you have

25    calling in?

1          MR. MOLLAND:  We'll find out.  I don't know I

2     have anybody calling in, but I forgot to -- I have to

3     go call them myself to see whether we have anybody who

4     is going to be on the line.

5          Can you read that back to me?  My BlackBerry

6     got completely fried.

7          MR. MALLISON:  Sure.  (866) 963-7123 and

8     then --

9          MR. MOLLAND:  4740.

10          Hello?  Hello?

11          MS. BROCKMAN:  Hello.

12          MR. MOLLAND:  Hi.  Who is on, please?

13          MS. BROCKMAN:  This is Amy Brockman at ARPC.

14          MR. MOLLAND:  Thank you.

15          And she's with us.  And if you want to

16     distribute that, that's -- I'm sorry.  I didn't --

17          MR. MALLISON:  Oh, you didn't?

18          MR. MOLLAND:  -- get it until this morning.

19          MR. MALLISON:  Okay.

20     BY MR. MOLLAND:

21      Q   So I was asking you about the SQL tool.  And

22     is there any other description you can give me of it

23     other than what you've already testified to that would

24     explain what it is?

25      A   The exact name of the tool is SQL Query,

1    Q-u-e-r-y, Analyzer.

2         Q    Okay.

3         A    And it comes prepackaged with the client

4    tools of Microsoft SQL server.

5         Q    And do you use that tool at least in part in

6    your analysis in this case?

7         A    Right, this is the primary tool I use in the

8    analysis in all of the cases that I've worked on.

9         Q    Okay.

10        A    It's the same tool I use universally.

11        Q    Okay.  And that really was my question

12   whether in every meal and break class action lawsuit

13   that you're involved in as a consultant for a lawyer

14   this is the tool that you use to come up with your

15   analysis.  Would that be fair to say?

16        A    Right, as an expert that is hired to do

17   database analysis.

18        Q    Okay.

19             I'll mark as the first exhibit the notice of

20   taking your deposition.

21             (Deposition Exhibit 1 marked by the

22             court reporter.)

23   BY MR. MOLLAND:

24        Q    Have you seen this deposition notice,

25   Mr. Woolfson?

```
1           A    I have.

2           Q    The deposition notice requires or --

3    requires -- I'm sorry -- requests you bring certain

4    documents that are listed in 16 requests that follow.

5    Did you bring all those documents to the deposition?

6           A    I did.  The documents are primarily on the

7    USB stick and then -- well, let's go through the list

8    and I'll tell you where each one of these documents

9    is.

10          MR. MALLISON:  Why don't you do that.

11   BY MR. MOLLAND:

12          Q    To save time, you know, you can just go

13   through the request and apparently you are going to

14   tell me which ones you have on the stick that you

15   brought and which others you brought in some other

16   form.  So go right ahead.  Start with request 1 and

17   work your way down the line --

18          A    Okay.

19          Q    -- and tell me where the documents now

20   reside.

21          A    Okay.  All documents reviewed by

22   deponent -- Stan, may I have the list of codes?

23          MR. MALLISON:  Yeah.

24          THE WITNESS:  That's the only --

25          MR. MALLISON:  It might be helpful if you
```

1   introduce that as an exhibit the document he gave you

2   on codes.

3           THE WITNESS:  I didn't give -- this is the

4   only.

5           MR. MOLLAND:  I don't think I got anything.

6           THE WITNESS:  This is the document.

7           MR. MALLISON:  That's a document for you

8   guys.

9           MR. MOLLAND:  Okay.

10          THE WITNESS:  This is your document, a list

11  of codes that were used in your data.

12           MR. MOLLAND:  Okay.  Exhibit 2.  We'll mark

13  it as Exhibit 2.

14          (Deposition Exhibit 2 marked by the

15           court reporter.)

16  BY MR. MOLLAND:

17      Q   All the documents you reviewed are on Exhibit

18  2 or are there others?

19      A   Well, this is the only paper document.  The

20  other documents are on the USB drive.

21      Q   Perfectly well stated.  Okay.  So the only

22  paper documents you looked at to form your opinions in

23  this case are on Exhibit 2.

24      A   The only paper version of a document that was

25  used in part to -- in conjunction with the other

5/3/2011  Woolfson, Aaron

1    documents that are in their entirety on the USB stick,

2    those are what I relied upon for the -- to conduct my

3    analysis.

4            (Interruption.)

5            MR. MOLLAND:  We can get both of those.

6            THE WITNESS:  This is your copy.  I actually

7    produced that for you, if you'd like that.

8            MR. MOLLAND:  Thank you very much, Pearl.

9        Q   Okay.  So we have all the paper documents you

10   reviewed either in whole or in part to form your

11   opinion.  They are on Exhibit 2.

12           Let's go to Request 2.  Did you bring all the

13   documents relied upon by you to -- that relate to your

14   opinions?

15       A   Yes, those are on the USB stick.

16       Q   And you produced to us a 8 gigabyte Toshiba

17   2.0 flash drive; right?

18       A   Yes, sir.

19       Q   I'm going to trust you that everything is on

20   there.  We'll probably go through it later on today,

21   but I appreciate that and thank you for it.

22       A   Yeah.

23       Q   Request No. 3 are all documents considered by

24   deponent.  Are there any additional documents you

25   considered other than the Exhibit 2 and the 8 gigabyte

1    flash drive?

2        A    There's a -- there's some notes that I used

3    or I took.

4        Q    Okay.  May I see those, please?

5        A    Just a second, please.  Make sure -- yeah,

6    here they are.  These are the four invoices that I

7    produced toward Mallison & Martinez.

8            MR. MOLLAND:  Okay.

9            THE WITNESS:  And those, there's --

10           MR. MALLISON:  Could you make some copies of

11   those?

12           MR. MOLLAND:  Sure.  We can do it during the

13   break.  I'm just going to mark them now.  We'll call

14   that Exhibit 3.

15           THE WITNESS:  And those are the only notes

16   that are outside of the notes that would be on that

17   USB stick.

18           MR. MOLLAND:  So that will be Exhibit 3.

19           (Deposition Exhibit 3 marked by the

20           court reporter.)

21   BY MR. MOLLAND:

22       Q    Request 4 is for all documents that

23   constitute or comprise any opinions or conclusions.  I

24   assume that that would include the expert report

25   that's been produced to us.  Anything else?

1      A    Which?  I'm sorry.  Which request?

2      Q    Request No. 4.

3      A    Okay.  Sorry.

4           Yes, that includes the printed expert report

5    which is also included on that USB drive.

6      Q    Request No. 5 are for all communications by

7    you with any person.  I suppose those would be e-mails

8    with lawyers and stuff like that.  Did you produce any

9    of that or does any of that exist?

10     A    All of it --

11     Q    Okay.

12     A    -- is included on the USB stick under a

13   folder called E-Mails.

14     Q    Under a folder called ES?

15     A    E-Mails.

16     Q    E-Mails.  Okay.

17          Request No. 6 is for deponent's complete

18   file.  Is that also on the memory stick that you

19   produced?

20     A    That is included on the memory stick.

21     Q    Did you have -- was there anybody who

22   assisted you in any way in compiling your expert

23   opinion, doing analysis that is reflected in your

24   expert opinion report in this case?

25     A    I was the sole analyst and author of my work

```
 1    product.
 2        Q    Did you get help from anybody who was to give
 3    you any advice when you did your work?
 4        A    Well, that's a pretty broad question.
 5        Q    It is, but --
 6        A    But if --
 7        Q    -- if your answer is yes, then I can drill
 8    down.
 9        A    Yeah.  All right.  There was nobody that I
10    relied upon to conduct or to create the conclusions in
11    my expert report.
12        Q    Okay.  A little different question, though.
13    The question is whether you had the help or got the
14    assistance of anybody in doing anything that led you
15    to write the expert report, like, you know, to convert
16    the database to a different format or figure out how
17    to use your SQL tool --
18        A    I understand.
19        Q    -- to look at the database, you know, any
20    stuff like that.
21        A    I understand your question.
22        Q    Yeah.
23        A    There is one gentleman named Brad who is with
24    BVS, and he was retained by plaintiff counsel to
25    convert your client's production of RAM disk to an IBM
```

1    compatible format that from what I understand just

2    simply was an output of registers from your

3    production.

4        Q    What was his name?

5        A    Brad.

6        Q    Does he have a last name?

7        A    I believe it's Stone.

8        Q    Brad Stone.  Okay.

9        A    Yes.  And the correspondence in its entirety

10   is on that flash disk under the E-Mails folder.

11       Q    Essentially is the way it worked that the

12   defendants or Sunview produced some electronic data.

13   Brad Stone got the electronic data, did something to

14   it so you could use your SQL tool on it, and gave you

15   whatever he did so you could use your SQL tool on it,

16   and that's what you did.  Is that the sequence of

17   events?

18       A    No.  The sequence of events is that your

19   client uses a computer system I believe called an I

20   Systems AS-400 IBM type of system.  I'm hired as a

21   database analysis expert.  An AS-400 is not a typical

22   type of data that I run into because most clients will

23   output a format that is a little more completely file

24   type consistent with, with modern Windows systems.

25       Q    Okay.  So essentially --

1        A    So --

2        Q    -- to cut to the chase here, what you got

3    from our client for electronic data wasn't something

4    you could run a Windows system based SQL tool on;

5    right?

6        A    Right.

7        Q    So you had to do something on it to run your

8    SQL tool on it through Windows; right?

9        A    Right.  And my understanding is he took

10   100 percent of your registers.  They are called

11   registers for whatever reason.  I don't -- I'm not

12   hired to be an AS-400 expert.

13       Q    Right.

14       A    But in the AS-400 world there is something

15   called registers, and those registers were output to

16   comma separated value export per Sunview's specific

17   instructions and directions to Brad, who then provided

18   Mr. Mallison's office with the completed export.

19       Q    Okay.  And so --

20       A    And that's what I worked on.

21       Q    Okay.  So you referred to -- what you worked

22   on was what you say was export given to you by Brad

23   Stone through Mr. Mallison's office; right?

24       A    I worked on export -- I worked -- I worked on

25   data provided by defendant that had been converted in

1    its entirety by Brad Stone so that I could utilize my

2    SQL Query Analyzer on that data.

3        Q    Okay.  Did you try to use your SQL analyzer

4    data tool on the original data that Sunview gave you

5    or did you ever get the original Sunview data?  That's

6    two questions, and it's a bad -- so that's pretty bad.

7        A    Yeah, that's pretty compound.

8        Q    Did you ever get --

9        A    Let's break that up into two separate

10   questions.

11       Q    Did you ever get the original data that was

12   supplied to the plaintiffs' attorneys in this case,

13   the original data?

14       A    Yes.  I did review it with Mr. Mallison

15   present and stated that it seemed like it was in a

16   format that could be only read by an AS-400.

17       Q    Got you.  So would it be fair to say that you

18   did not analyze the original data Sunview produced in

19   this case, but you analyzed converted data given to

20   you by Mr. Mallison's office that you understand was

21   converted by Mr. Stone, and you think Mr. Stone did it

22   right?

23       A    Well, I'm not opining as to whether or not

24   Mr. Stone did one thing or another.  The data as

25   represented by Sunview was on a DVD RAM disk which I

1     do not have the facilities to read.  I'm a SQL expert.

2     I'm not a DVD RAM expert.

3         Q    Right.

4              So what did do you when you figured that out?

5         A    I was specifically asked for that data to be

6     converted to a CSV format.

7         Q    A CSE format?

8         A    CSV.

9         Q    CSV.

10        A    Comma separated value format so that I could

11    use my SQL analyzer on that.

12        Q    Okay.  And were you -- it's not your job and

13    you are not expert in analyzing that data to a CSV

14    format, so you had somebody else do it; is that

15    accurate?

16        A    No, that's misstating my testimony.

17        Q    Okay.  State it correctly.  I don't want

18    to --

19        A    So I was very specifically given a DVD RAM by

20    your client, Sunview.  I asked Mr. Palau, who works

21    for Mr. Mallison, Mr. Mallison's office, to ask

22    Sunview to output the data in a CSV format so that it

23    was it's called cross-platform compatible.  Your

24    client said that we -- and I mean that by saying

25    plaintiffs' counsel needed to find somebody to conduct

```
 1      that activity on their behalf.  For whatever reason,

 2      that's what your -- that's what my understanding is of

 3      what was told to plaintiffs' counsel.

 4           Q   All right.  You know that because that's what

 5      Plaintiffs' counsel told you; right?

 6           A   That is what plaintiffs' counsel told me is

 7      that we would need to find someone to convert that

 8      data.

 9           Q   Okay.  So what's your understanding of how

10      that conversion got done?  How did it get done?

11           A   Well, I -- a disk was mailed, overnighted to

12      BVS.

13           Q   What's BVS?

14           A   I'm sorry.  Brad Stone's company.

15           Q   Okay.

16           A   And that converted -- pardon me.  The

17      cross-platform compatible data extraction was made

18      available via a zip file that Mr. Stone had extracted

19      from the original disk that was provided.

20           Q   Okay.  And then that's what you used.  You

21      used that which you got from Mr. Stone to do your

22      work; right?

23                THE WITNESS:  Do we need to wait for tape?

24                THE VIDEOGRAPHER:  No.

25                THE WITNESS:  Okay.  That is what I used.
```

1      The comma separated value register extraction from

2      Mr. Stone's company was what I used to import into

3      Microsoft SQL.

4      BY MR. MOLLAND:

5          Q    Okay.  It doesn't sound very complicated.

6      You got the data from Sunview, it was in a format that

7      your SQL tool wouldn't work in, couldn't analyze;

8      right?  Isn't that correct?

9          A    Well, you say it doesn't sound very

10     complicated.  I don't know what's involved in that

11     process.

12         Q    I'll withdraw the question.

13         A    But it's --

14         Q    I'll withdraw the question.

15         A    It's --

16         Q    These are the steps.  It doesn't seem to --

17     the steps don't seem very complicated, although it was

18     a long story.  But anyway, step one, you get some data

19     from Sunview; right?  You got some data from Sunview

20     that pertained to --

21         A    Plaintiffs' counsel did, yes.

22         Q    They then hired you as an expert in meal and

23     rest break litigation to analyze it with your SQL

24     tool; right?

25         A    They hired me to conduct an analysis prior to

```
 1    receiving this.  But I understand your -- I understand
 2    what you're saying, and I think the answer is yes.
 3         Q    Look, I don't think it's complicated.  But
 4    maybe if it is more complicated than this I need to
 5    ask you more questions about it.
 6         A    Sure, that's fine.  I don't mind answering.
 7    I'm just trying to be helpful and answer the questions
 8    and as explicitly as possible.
 9         Q    Plaintiffs' counsel got some employment data
10    or payroll data from Sunview at some point in this
11    litigation; right?
12         A    Yes.
13         Q    All right.  You had worked for them before in
14    meal and rest break litigation, right, as an expert?
15         A    Yes.
16         Q    All the time you that did that before you
17    used an SQL tool to do your analysis; right?
18         A    Yes.
19         Q    They hired you in this case; right?
20         A    Yes.
21         Q    You looked at the data that Sunview sent you
22    through plaintiffs' lawyer; right?
23         A    Through plaintiffs' counsel, yes.
24         Q    You determined you couldn't use your SQL tool
25    on the data; right?
```

```
1          A    I determined that the format that your
2    clients produced was not IBM ASCII compatible to be
3    able to import into SQL as it was on that DVD RAM.
4          Q    So you asked either -- somebody arranged it,
5    your plaintiffs' counsel, for somebody else to convert
6    the data into a format that could be read with your
7    tool; right?
8          A    With Microsoft's tool, yes.
9          Q    And that's what they did.  And they sent you
10   the data when it was converted, and you used your tool
11   to come up with your opinions; right?
12         A    I used the Microsoft SQL tool to run queries
13   against the data that was converted to establish my
14   opinions which are outlined in my expert report.
15         Q    Perfect.
16         A    Yeah.
17         Q    And you don't know what process somebody went
18   through to convert the data to the readable form for
19   your SQL tool.  You just know that data arrived, your
20   SQL tool worked, and you did your analysis; right?
21         A    I'm not able to really opine as to what
22   Mr. Stone did to convert the data and how that worked.
23         Q    Right.  You don't know what Mr. Stone did to
24   the data to make it convertible to your tool, right,
25   the SQL tool?
```

1           A    It is my understanding that the data was

2    simply converted in its entirety from AS-400 to an

3    ASCII, A-S-C-I-I, style output and that those

4    instructions were provided to him by your client.

5           Q    Do you know -- did you know whether or not

6    the data produced by Sunview came in two files, ten

7    files, one file?  Do you have any idea what format the

8    original data took that you saw?

9           A    It was a 900 and -- I want to say 993

10   megabyte file called Production.  That was it.

11          Q    Did you ever see a file called Registers?

12          A    There are several Register files that I was

13   provided by BVS, but those files -- those files we

14   were -- I was told through plaintiffs' counsel that

15   those files were all within the file called Production

16   on that DVD RAM, but I was not -- I am not able to

17   read AS-400 native file format on a standard PC

18   running Windows.

19          Q    Okay.  There are a number of other requests

20   for documents in Exhibit 1.  All the other requests

21   from Request 7, Request 8, are all those other

22   documents or electronic data on the memory stick, the

23   flash drive produced by you at this deposition?

24          A    Well, you said all those --

25               MR. MALLISON:  I'm going to object.  Vague.

```
1    He has got a lot of stuff here.
2           THE WITNESS:  Mr. Molland, you said are all
3    those other requests.  Which numbers do you want to
4    refer to?  No. 7?
5    BY MR. MOLLAND:
6       Q   Well, let's go through here.  We're taking a
7    lot of time with this.  I'm just trying to figure out
8    what's in the --
9       A   We have 7 hours.
10      Q   Well, who knows, we may have to pay you more
11   money.
12          Request No. 8 is that on the stick?
13      A   Request No. 7 is on the stick.  Request No.
14   8 is on the stick.  Request No. 9 is on the stick.
15   And I just want to note that when you discuss the
16   charts, the set of charts contained within deponent's
17   report, these charts are just generated from SQL Query
18   Analyzer and cut and paste into Microsoft Word, so
19   there's not a separate file --
20      Q   Got you.
21      A   -- containing charts.  It's just cut and
22   paste based upon the SQL.  So the underlying SQL is
23   there.  And so the answer to that is yes, it's there,
24   but not in the manner that you think of a separate set
25   of charts.
```

```
 1        Q    Understood.

 2             Request No. 10?

 3        A    Well, request No. 10 is a -- it's a licensed

 4   Microsoft product.  So the best way to answer No. 10

 5   is -- well, this is really awkwardly worded.

 6             MR. MALLISON:  It is.

 7             THE WITNESS:  (Reading) The database querying

 8   language called SQL.

 9             I put an entire Microsoft SQL backup set on

10   this stick in its own folder so that your client, your

11   expert, whoever you have hired can reconstitute that

12   database in its entirety.  That's how I believe that

13   you were ask -- what you were asking for in request

14   No. 10 was the entire SQL database set containing all

15   the data and all the structures as I used the SQL to

16   conduct my analysis and produce my results that I put

17   in my expert report.

18   BY MR. MOLLAND:

19        Q    Okay.  With that statement, why don't we go

20   to request No. 11.

21        A    Okay.  Request No. 11.  (Reading) The tools

22   deponent used in tallying of events.

23        Q    This comes straight out of your report.  You

24   say:  These are the same tools which I have used in

25   tallying of events --
```

```
1       A    Right.

2       Q    -- in approximately 48 meal and break class

3   action lawsuits.

4       A    Yes.

5       Q    That's in your report.  That's what your

6   report says.

7       A    Right.  I understand that.  It's just that

8   the tools Microsoft SQL Query Analyzer is a product

9   that's licensed that Microsoft makes available to

10  licensees.  It is a tool that is very universally

11  available on the Internet and other places.  The

12  version I use is the Microsoft official program

13  itself.  And so I -- I didn't provide that, but I

14  provided all the SQL and all the statements that

15  somebody could use to get the same results that I did.

16      Q    Okay.  And basically it's the same tool you

17  used in all these class action lawsuits?

18      A    Every case that I've worked on.

19      Q    Okay.  Fine.

20           Request No. 12.

21      A    I've been working with that tool for 20 years

22  since it first came out in Microsoft SQL 4.2B.  So

23  it's been a long time.

24      Q    Request No. 12, the time clock files.  Are

25  all the what you refer to as time clock files
```

```
1    contained on the flash drive, the memory stick you've
2    produced?
3        A    They are.
4        Q    Okay.
5             Request No. 13, the particular query written
6    to exclude shifts referred to in your report, is
7    that -- and request No. 13 -- is that in the
8    electronic data you produced?
9        A    It is.
10       Q    Request No. 14, is that in the electronic
11   data you produced?
12       A    Yes.
13            MR. MOLLAND:  Okay.  The next exhibit will be
14   4.
15            (Deposition Exhibit 4 marked by the
16            court reporter.)
17   BY MR. MOLLAND:
18       Q    Before we go on to that.  We are trying --
19   I'm trying to open up the electronic data you
20   provided, and apparently we're having some problems.
21       A    Okay.
22       Q    Is there a -- if we wanted to open that up,
23   how would we do that?
24       A    That's the -- that production file, that's
25   the same problem that I had.  That's why I had BVS ask
```

 1    plaintiff to convert that file.  That's the original

 2    file that's produced by Sunview that was on that RAM

 3    drive.  My computer won't open that file either.

 4        Q    Okay.  Well, is there anything that you

 5    produced to us that the computer can open up?

 6        A    This is the -- these are the files -- these

 7    files.  If you go to the file called -- go to the

 8    folder there called Unzipped, please, if I may.

 9        Q    So what you're saying is is all the files

10    in -- below the desktop, all the files that you

11    reviewed are in one of these different folders; is

12    that right?

13        A    Yeah, let's open up -- double click on E

14    right there.  See if we can -- yeah, let's -- this is

15    a little bit of a different view than I'm used to

16    using.  But yes.  Data from Sunview, what you were

17    specifically asking me -- if you could do me a favor

18    and click on Data From Sunview on the top there,

19    Mr. Molland.

20             Yeah, so if you see there something called

21    Original Production Raw.

22        Q    Right.

23        A    Click on that.  I think that's the

24    original -- yeah, so do Unzipped.  There you go.  So

25    that's the file you were just asking me about.

1        Q    Yeah.  Okay.

2        A    Now hit the back -- yeah, okay, back button a

3    few times.

4        Q    Well, let's go to the file -- for instance,

5    let's just start with the file that Mr. Stone sent you

6    that you used the SQL tool on.  How do I find that?

7        A    Let's go back.  Click on "Back" there.

8    That's fine.

9        Q    Keep going?

10        A    No.  You went back too far.  There you go.

11    Registers and Decoded.  Do you see where it says

12    PR55DLR.zip?

13        Q    Um-hm.

14        A    Double click that.  There's your CSV file.

15        Q    Right here?

16        A    Yes, that's an -- I'm sorry.  This is a field

17    description list.  Go down -- I'm sorry.  Mr. Molland,

18    let's close this document.

19             Yeah, that's going to take a long time to

20    open.

21        Q    Is that what Mr. Stone sent you, this CSV

22    file?

23        A    That is a full extraction of the registers

24    that were contained within the Production file, which

25    you couldn't open either.

```
 1        Q    True.  But is that file that we're opening
 2   now, the CSV file, is that the file you got from
 3   Mr. Stone?
 4        A    Yes.
 5        Q    Okay.  That's good.  That's all I want to
 6   know.
 7        A    Click on OK there.
 8        Q    Okay.
 9        A    So --
10        Q    All right.  We'll play around with this a
11   little bit, and we'll ask you more questions in the
12   afternoon once we feel comfortable with it.
13        A    Sure, that's fine.
14        Q    Thank you.
15             MR. MALLISON:  You might want to get a copy
16   of SQL.
17   BY MR. MOLLAND:
18        Q    Did you look at any paper documents other
19   than what is -- what are represented on Exhibit 2?
20        A    No.
21        Q    And just so I'm really sure, Sunview has
22   something called daily sheets or daily timesheets,
23   some of which I think are in the possession of
24   plaintiffs' counsel.  Did they show you any of those?
25        A    If -- let's look in this -- I want to answer
```

1      your question very specifically.  If you could be so

2      kind as to open up that file, the file folder explorer

3      again.  Was it Dale?

4              MR. SWANSON:  Yeah.

5              THE WITNESS:  Okay.  If you could open that,

6      and go to the root level which should just be under E,

7      just right there.  And there is one file there

8      called -- let's scroll down a little bit.  I'm just

9      curious if there is anything here that -- no, that's

10     it.  Yeah, I don't -- these are all the PDFs of

11     everything that I looked at.

12     BY MR. MOLLAND:

13       Q   Okay.  So anyway, you don't recall anything

14     that would be called the daily sheet or timesheet that

15     was produced by Sunview to plaintiffs' counsel in this

16     case; would that be fair to say?  If you recall.

17       A   I believe that I saw one sheet that had some

18     handwritten timesheet notations on it.  And I believe

19     it -- the answer is most likely I did not see

20     anything.  I'm just thinking about if I saw this

21     in -- let's see here.  Did I -- let's go back to that

22     folder again.  If I saw something and I received

23     something, it would be in here.

24       Q   Okay.  Well, let's --

25       A   So the answer is --

```
1        Q    You can't recall right now?

2        A    Yeah, I don't think I did.  I may have --

3   just the fact that you say that makes me think maybe I

4   did, but I don't think that I saw any time log

5   reports.

6        Q    Do you have any understanding -- well, did

7   you review any transcripts of depositions in this

8   case?

9        A    I have not seen any transcripts of anything

10  in this case.

11       Q    In the past meal and break class action

12  lawsuits you've looked in, have any, to your

13  understanding, been class action lawsuits involving

14  farm workers?

15       A    Yes.

16       Q    Okay.  How many?  And maybe I could ask the

17  question -- I don't want to -- give me your best

18  estimate how many.

19       A    Well, I don't -- I'm not hired to estimate.

20       Q    Well, give me your best guess, then.

21       A    Sorry.  I want to be very careful here.  It's

22  amazing how things read in a transcript post

23  deposition, so --

24       Q    To your best recollection, do you think

25  you've been involved in more than five farm worker
```

```
 1   cases?
 2        A    Yes.
 3        Q    That's all I really need to know.
 4             And you understand this is a farm worker
 5   case, or do you?
 6        A    I understand that it involves farm workers.
 7        Q    Have you read the Complaint in this case?
 8        A    I have not.
 9        Q    Do you know what the claims are in this case
10   outside of that they involve meal and break claims?
11        A    I'm typically just hired to analyze sets of
12   data and then asked a series of questions and whether
13   or not I see certain things in the data and to provide
14   a report.  So I don't know the specific issues in this
15   case, and I prefer not to.
16        Q    Yeah.  Now, but you made certain queries and
17   you wrote a report in this case which is Exhibit 4
18   that you have in front of you; right?
19        A    Well, the results of the queries are
20   contained within my report of which Exhibit 4 contains
21   the sum of -- the sum of my work product.
22        Q    Okay.  How did you determine to do the
23   queries that you did that are reported in your expert
24   report?  Are they the same queries that you do in all
25   the farm work cases or were there different queries
```

1    that you did?

2        A    Well, let's break that down.  There's three

3    different questions there.

4        Q    Let's ask the first one.

5        A    Okay.

6        Q    Have you done the same queries that you did

7    in this case and all the farm worker cases that you've

8    had where you've worked for Mallison & Martinez or did

9    you do different ones?

10       A    The items that I'm asked to analyze are

11   uniform in both their approach and methods.  The

12   queries that I ran here are no different in the

13   underlying timings of shifts than any other farm

14   worker case that I've worked on.  There are specific

15   things that I was asked to conduct SQL queries or

16   tallies of.

17       Q    Who asked you?

18       A    There is an attorney named Mr. -- is it Tom

19   Lynch?  Is that one of the attorneys?

20       Q    Anybody else ask you to do something?

21       A    There is a Mr. Steve Hernandez.  Mr. Marco,

22   M-a-r-c-o, Palau, P-a-l-a-u.  P-a-l-a- -- yeah.  And

23   there is a Mr. Stan Nelson.

24       Q    Okay.  What did they ask you to do?

25       A    Well, they asked me to conduct tallies of

1    events that are evident in defendant's data and the

2    daily work time and piece-rate reports per specific

3    pay codes and pay types.

4        Q   When you worked for Mallinson & Martinez, had

5    you done the same analysis of the record that you've

6    received from them in preparing your expert reports in

7    other meal and break class action cases?

8        A   Let's ask that again to make it a little more

9    clear.  I'm sorry.  I want to be really --

10       Q   In other cases where you've been retained by

11   Mallison & Martinez have you done the same analysis of

12   the data that you did here?

13           MR. MALLISON:  I'm going to object on work

14   product grounds based on to the extent that he served

15   as a consultant and not a testifying expert.  But you

16   can answer with regards to testifying expert.

17           MR. MOLLAND:  Fair enough.

18           MR. MALLISON:  Okay.

19           THE WITNESS:  The structure of the queries,

20   the methods, the procedures are uniformly applied in

21   all cases.

22   BY MR. MOLLAND:

23       Q   All right.  That was my question.

24       A   There's -- I just want to say one thing,

25   though, about that, that there is data specifically

5/3/2011 Woolfson, Aaron

1    and uniquely structured in your data.  For instance,

2    your pay code 630 or 631 for vacation may not be the

3    same pay code that's used in another case, so

4    accommodations and in SQL structure may be applied

5    using different pay codes and pay types.  But the

6    underlying principles, the overall structure of the

7    queries is the same in every case.

8         Q    Let's turn to your report, to Exhibit 4.

9    First you determined the number of shifts for all

10   employees; right?

11        A    Are you looking at a specific paragraph?

12        Q    Yeah, paragraph 16 where you start discussing

13   your -- you say:  My findings are as follows.  I'm

14   just picking the first one.  Your first finding was

15   the number of shifts that you analyzed from the

16   records, right, the data?

17        A    Yes.

18        Q    Is that something you do in all your meal and

19   break class actions you analyze, you first determine

20   the number of shifts?

21        A    Yes.

22        Q    Okay.  Then you determine the number of

23   employees that appeared.  Is that something you do in

24   all your meal and break class actions?

25        A    Yes.

1        Q   Then you determine the length of the shifts.

2   Is that something you do in all your meal and break

3   class actions?

4        A   Yes.

5        Q   Then you determine the number of employees

6   experiencing shifts of a certain length.  Is that

7   something you do in all your meal and class actions --

8   all your meal and rest break class actions?

9        A   Yes.

10       Q   And then you went through in sections D, E

11  and F and determined the number of shifts that were

12  over five, six and ten hours; right?

13       A   Yes.

14       Q   Is that something you do in all your meal and

15  break class actions?

16       A   It is.

17       Q   On page 5, then you report your other

18  findings.  Do you see that?

19       A   Yes, sir.

20       Q   You determine the number of shifts that

21  occurred within a work day when the number of hours

22  were worked less than 2 hours in a work day.  Is that

23  something you do in all your meal and class -- excuse

24  me -- meal and rest break class actions?

25       A   Yes.

```
 1        Q   And then you determined how many employee
 2   shifts numbered less than 4 hours in a work day.  Is
 3   that something you do in all your meal and rest break
 4   class actions?
 5        A   Yes.
 6        Q   Then you determined the number of shifts
 7   where employees were paid exclusively piece-rate work
 8   during the time they work.  Is that something you do
 9   in all your meal and rest break class actions that are
10   farm worker actions?
11            MR. MALLISON:  I'm going to object on the
12   same grounds of work product based on that he's
13   talking about consulting.  So if we can limit it to
14   testifying expert.
15            MR. MOLLAND:  I do.  I will.
16            THE WITNESS:  If there is a piece-rate only
17   shift that is self-evident in data, I will analyze
18   that and create a chart for that.
19   BY MR. MOLLAND:
20        Q   And then you went on to determine how many
21   employees were not paid minimum wage; right?
22        A   Which paragraph are we talking about here,
23   Mr. Molland?
24        Q   Well, certainly 20.  It looks 21.
25        A   Okay.
```

```
1          Q    Right?

2          A    Yes.

3          Q    All right.  Is that something you do in all

4     your other cases in which you are a testifying expert

5     for meal and rest break class actions?

6          A    That involve piece-rate work?

7          Q    That involve anything.

8          A    Well, the minimum -- 20 and 21 talk about two

9     different things.  I mean, you look at straight pay,

10    you look at -- you look at -- I mean, minimum wage is

11    something that I analyze in every case I've ever

12    worked on.

13         Q    Good.  That's all I'm asking.

14              And then you determined the number of shifts

15    where Sunview reported over 10 hours.  Do you see

16    that?

17         A    On paragraph --

18         Q    24.

19         A    Okay.

20         Q    Right?

21         A    Yes.

22         Q    Why did you do -- why did you do that, do you

23    know?

24         A    The query in 24 was specifically asked for by

25    Mr. Mallison.
```

1      Q   I understand that.  But why did you -- do you
2   understand why you did it?  And you may or may not.
3      A   Well, I am -- I am not hired as an expert in
4   what is classified as what should be at paid overtime
5   or not.  So the area that you're asking me to opine in
6   is -- mine it's more of a anecdotal than fact stating.
7   I don't know why in a farm worker case overtime is
8   more than 10 hours versus in a restaurant where it's
9   more than 8 hours.  I just -- I don't know why the
10  laws are or the rules are the way they are.
11     Q   Okay.
12     A   But I'm just simply running a query that I'm
13  asked to do in every farm worker case.
14     Q   Right.
15     A   Every one.
16     Q   And it's your understanding that anecdotally
17  this relates to overtime, but you don't really
18  understand why; fair?
19     A   I don't know why the rules for farm workers
20  are a certain thing versus retail establishments.  If
21  that's what you're asking me --
22     Q   No, I'm not --
23     A   -- I don't know why.
24     Q   But all I'm saying is in Category 24 you
25  understand generally this analysis you were doing was

1   relating to overtime, but you don't understand why it

2   was relating to overtime; correct?

3       A   Well, I assume it was because overtime wasn't

4   paid.

5       Q   Fine.  And that's your understanding of the

6   work you were doing under paragraph 24; right?

7       A   I understand that when I'm asking to look at

8   amount of hours worked where there is no overtime

9   evident that that's overtime that's not paid, and

10  attorneys want to know that.

11          MR. MALLISON:  Can we take a break in a few

12  minutes when it's convenient?

13          MR. MOLLAND:  Sure.  Of course.  Absolutely.

14  Any time you want to take a break, let me know that.

15          MR. MALLISON:  Too much coffee.

16  BY MR. MOLLAND:

17      Q   Since you have generated your report -- and I

18  can't remember now.  I have to look at this.  I think

19  it was April 23rd, but I'm not sure.  April 18th.

20  Since your report on April 18, 2011, have you done any

21  work in this case?

22      A   May I see my billing timesheets?

23      Q   Of course.

24      A   I think that will let me know.  So you're

25  asking after which date?

1        Q    After you wrote your report.

2             MR. MALLISON:  April 18.

3             THE WITNESS:  On April 20th I was with

4    Mr. Steve Fernandez in Encino.  I was down there for

5    other matters, and I had some time between

6    appointments, so I stopped by to say hello and to work

7    with him on reviewing my report.  He had a question

8    about minimum wage, the same question you asked me

9    about -- about, what is it, paragraphs 20 through 22,

10   and we reviewed them, but I did not produce any work

11   product, nor did I reach any conclusions.

12   BY MR. MOLLAND:

13       Q    Let me just ask you a simple question.  Have

14   you done -- have you formed any different opinions

15   since you wrote your report --

16       A    No.

17       Q    -- that are not in your report?  Is that

18   correct?

19       A    I have no new opinions that are not contained

20   within this report that I produced.

21            MR. MOLLAND:  Then we can take a break.

22            THE WITNESS:  Okay.

23            (Recess taken.)

24            THE VIDEOGRAPHER:  Off the record at

25   11:33 a.m.

1          (Recess taken.)

2          THE VIDEOGRAPHER:  Back on the record at

3     11:49 a.m.

4     BY MR. MOLLAND:

5          Q    Okay.  Mr. Woolfson, what I would like to do

6     is now go through your report which you have it as

7     Exhibit 4 and see if we can sync it in or tie it in to

8     the electronic data that you produced so we know with

9     respect to the electronic data what you're referring

10    to in your report.  That's going to be the objective.

11    Hopefully we can get it done before lunch, but we have

12    40 minutes, let's try.

13          Let's start on page 2, please.  The first

14    sentence says:  Daily work time and piece-rate reports

15    have been provided as IBM AS-400 backup set called

16    production.zip.  Can you show us on your electronic

17    data where those -- what you refer to as daily work

18    time and piece-rate reports reside?

19          A    Sure.  This is in the Data From Sunview

20    folder.  The reports provided by Sunview are in a file

21    called Production that appeared on the DVD RAM.

22          Q    Okay.

23          A    That was converted by BVS.  There's companies

24    that I use as part of my course of work typically

25    where you run into a situation where you are asked to

1    analyze data that you're not -- you're not -- that

2    aren't in native format to the platform that you're

3    running it on.  There's companies like Brad's company

4    that will do that.

5        Q   So the production -- what's called

6    production.zip accords to what's called original

7    production?

8        A   Right.

9        Q   Or that accords to the file called

10   Production.  Is that right?

11       A   Yes.

12       Q   Okay.  And by the way, have you ever spoken

13   to Mr. Stone about the conversion?

14       A   I have.

15       Q   What have you talked about?

16       A   I asked him if there was any additional

17   information that he needed from me to convert the

18   data.  And he said that he would speak directly with

19   Mr. Mallison's firm.  And I guess -- I assume he

20   probably spoke with co-counsel since there are some

21   e-mail threads.

22          Mr. Stone was referred to me by somebody who

23   has used him before in data conversion.  Mr. Stone's

24   list of clients are pretty extensive.  And I let

25   Mr. Mallison's firm make that determination as to

1    whether they wanted to use him.

2        Q   All right.  So other than that one

3    conversation you haven't talked to Mr. Stone about

4    what he did; right?

5        A   The only conversation I had was with him

6    regarding the output format, if comma separated values

7    which would have been a direct translation from your

8    original data would be sufficient.  And I said yes.

9        Q   Okay.  Then you refer to files provided named

10   PDFs of payroll reports showing checks, check numbers

11   and earnings for each period.  Where are they on the

12   disk?

13       A   In a folder called Registers and Decoded.

14       Q   Registers and Decoded?

15       A   And Decoded.

16       Q   And there are three files in that particular

17   file; right?

18       A   You have registers.zip, registers 2.zip and

19   PR55DTLR.csv, respectively.

20       Q   Are those converted files?

21       A   They are the resulting files from BVS that

22   contain original registers in CSV or PDF format,

23   respectively.

24       Q   Is that something Mr. Stone provided to you?

25       A   That is something that is an extraction of

1     data from your original Sunview data that Mr. Stone

2     provided.  So I understand it to be a direct

3     conversion.

4          Q    And is the PR55DTLR.cvs file -- where is that

5     in the data?

6          A    The CSV file is under the folder called

7     Registers_and_Decoded.

8          Q    When you did your queries with the SQL tool,

9     what file did you use to do those queries on?

10         A    The PR55DTLR.csv file is imported into

11    Microsoft SQL 2008 Release 2.  The queries, the SQL

12    language itself is actually run against the Microsoft

13    data that contains the original CSV file.

14         Q    Okay.  Did you use the SQL queries in any way

15    on the PDFs of payroll reports showing employees,

16    check number and earnings for each period?

17         A    The PDFs were looked at but are not in a

18    format that can be used with SQL.

19         Q    What use, if any, in your report did you make

20    of the PDFs of payroll reports?

21         A    The PDFs as I have been told by counsel, of

22    which conversation was noted on page 3 of invoice

23    1103000068 which is marked as Exhibit 3.  These notes

24    are from a conversation where I was specifically told

25    that the PDFs contained the data that was in the

5/3/2011  Woolfson, Aaron

1    PR55DTLR.zip file -- I mean .csv file.  Pardon me.

2    And that those PDFs reflected what was in the data,

3    the registers, directly.

4         Q   That wasn't my question.  My question is,

5    what use, if any, did you make of the PDFs of the

6    payroll reports that are under 9 A in your report?

7         A   I did checking of the PDFs to see if sums of

8    hours and wages appearing in the CSVs were contained

9    within the detail of the CSV file.

10        Q   How did you check them?

11        A   I reviewed the CSV data and then looked for

12   individual items appearing within the PDFs themselves.

13   Now, I -- so these are -- these values here that you

14   see on the screen are contained -- oh, that's the noon

15   bell.

16             MR. MALLISON:  Tuesday --

17             THE WITNESS:  On Tuesday.  I forgot.

18             The data that's contained on these PDFs is as

19   a result of the CSV or a compilation of the CSV files

20   that contain the details.  And this was told to me by

21   the Sunview -- I don't know what to call the people --

22   IT people?  These are the notes for that conversation.

23   BY MR. MOLLAND:

24        Q   Did you talk to Sunview IT people?

25        A   I believe they were on a conference call

1    regarding the production of data at some point.

2         Q    My question is what use in your opinion in

3    your report, in your conclusions did you make of the

4    PDFs of payroll reports?  You said you checked them.

5    I'm asking -- my question is how you checked them,

6    what checks you did, if you did any, between the PDF

7    of payroll reports and any of your other work?

8         A    Well, what I'm saying is that this file was

9    represented to me as -- hear me out.  You're asking

10   questions, and I want to be very specific.

11        Q    I am asking a question I'd like you to

12   answer, which is just what use did you make of it.

13   You may have been told a lot of stuff, I don't know,

14   but what use did you make of the PDF payroll reports?

15   Did you make any use at all?

16        A    The PDFs are not in a SQL compatible format.

17        Q    Could you please answer my question.  Did you

18   make any use of the PDF reports?  Yes or no.  If you

19   did, then I'll ask you what you did.  If you didn't,

20   then we can move on.

21        A    The PDFs --

22        Q    I know what they are, okay?

23        A    Well, the PDFs have been spot-checked against

24   the CSV file --

25        Q    Okay.

1          A    -- to confirm that the data was on these

2     checks that was in the CSV files.

3          Q    Okay.  Did you make any other use?

4          A    No.

5          Q    Okay.  Thank you.

6               Paragraph 10:  "I processed the PR55DTLR.csv

7     file using Microsoft SQL to create a set of charts."

8     What charts are you referring to in paragraph 10?

9          A    The charts that are illustrated in paragraphs

10    16, 17, paragraph 18 of my declaration.

11         Q    Perfect.

12         A    Expert report.

13         Q    Paragraph 12, it says:  "Sunview produced

14    time clock files."  What -- can you show me the time

15    clock files that Sunview produced on the memory stick,

16    please?  What file are they in?

17         A    PR55DTLR.csv.

18         Q    You refer to them as time clock files.  What

19    does time clock files mean to you?

20         A     In this case, the number of hours, the pay

21    code, the block, the classification of, of work

22    whether its hourly or piece-rate, the number of hours

23    worked, pay rate.

24         Q    Okay.  You're just referring to the category

25    of code.  My question, though, you refer to something

1    called a time clock.  To me a time clock is a clock.

2    Did you just use that loosely to mean these are time

3    records?

4        A   Oh, I don't use anything loosely in here.

5        Q   Where is the clock?  What would a clock file

6    be to you?

7        A   A clock file would be a ledger of hours

8    worked and the amount of time that was paid or not

9    paid, the hourly rate where the employee worked, the

10   type of work they did, what job category they were

11   working, what block, what ranch or location.

12       Q   Okay.  I think I understand.  I get it.  So

13   you're referring to -- what you were just referring to

14   is the different categories of information that are in

15   PR55DTLR.csv, and you call those a time clock file;

16   right?

17       A   Actually, that's what counsel calls it.

18       Q   Well --

19       A   That's why I refer to it as the time clock

20   file.

21           (Interruption.)

22           MR. MOLLAND:  Thank you.

23           I have to hold this until the end of the

24   deposition to make sure you come back from lunch.

25           THE WITNESS:  I'm thinking about it.

```
1    BY MR. MOLLAND:
2        Q    You say that that, the file -- when you're
3    referring to time clock file what you're referring to
4    is the 55DTLR.csv file; right?
5        A    Right.  And that's the specific language that
6    your client used when they spoke of this was a
7    timecard file.
8        Q    Good.
9        A    So timecard file, I asked what was in it.
10   And they explained to me that it was the time clock
11   file.  So that's what I've called it.  But that's also
12   what Steve Hernandez and Tom Lynch refer to it as.
13       Q    Then, in paragraph 12 there is a box and in
14   it there is a SQL statement.  Can you tell me what
15   that is?
16       A    Four points connected by lines.  You have to
17   be more specific is what I'm getting at.
18       Q    Paragraph 12, is what you're saying is that
19   you used a SQL statement to come up with the
20   information that there were 7 billion and change rows
21   of data and 7,997 employees, that conclusion was based
22   upon a certain SQL statement which is in the box below
23   on paragraph 12.  Is that the way that works?
24       A    Yes.
25       Q    Okay.
```

1          And this goes on to say:  "Select distinct

2     reference from work data."  What -- is there a

3     particular file where work data is, resides or is?

4          A    Now you're getting into the part I love.

5          Q    Good.  I'm glad that I'm making your heart

6     beat faster.

7          A    You just did it.

8          Q    Maybe you can speed up a little bit.  We'll

9     put you on faster than the clock speed.

10         MR. MALLISON:  More coffee.

11         THE WITNESS:  Well, I've been told by, let's

12    see here, four of the five last transcriptionists or

13    court reporters that I speak too fast, so I'm trying

14    to be more articulate.

15         MR. MOLLAND:  You're breaking no records

16    today.

17         THE WITNESS:  Well, let me explain a little

18    bit about the structure of how SQL works.  SQL is a

19    big -- it's a big bucket of data.  It's a big bucket

20    of your data.  Work Data is a table name that I use

21    where I put all of the work days that an employee is

22    present and the data.  And I group it by employee

23    number which I call reference.

24    BY MR. MOLLAND:

25         Q    Okay.  Is there a place in the electronic

1    data you produced to us where the work data is?

2         A    You bet.  I -- I did.

3         Q    And can you identify it, please?

4         A    Microsoft SQL 2008 Release 2 Database.  This

5    is the backup set.  If you were to restore this to a

6    database restore point, you would see all of my work

7    product, you'd see all of the SQL tables that the data

8    is contained and you would see your data in the

9    tables.  One is called Raw Data.  One is called Work

10   Data.

11        Q    Can you do that simply by opening up that

12   file?

13        A    I wish I could.  This would require Microsoft

14   SQL 2008 at least 2 to be installed on this computer.

15        Q    You know a lot more about this than I do, but

16   I'm just making the assumption based upon what you've

17   told me that if you take that particular file which is

18   the Microsoft SQL 2008 2 Database, and it's actually

19   referred to as the SQ 2008 2 Backup Set -- I can't

20   read the last word there.

21        A    Would you like to see it in its reconstituted

22   format?  I could show it to you.

23        Q    But just -- we'll get there.

24        A    Okay.

25        Q    The particular file that we're looking at

```
1      right now, and I -- can you just read the file?  I
2      can't read it.
3          A   Yeah, the focus is a little bit off on your
4      overhead, but it's called SQL 20 -- oh, here, let's do
5      this.  Control-insert.  Where did the document go?
6      It's still opening.  Just a second, please.
7      Shift-insert.  I think there is an N there.  Insert
8      and Home, and --
9              MR. MOLLAND:  I can read that.
10             MR. MALLISON:  I can't.
11     BY MR. MOLLAND:
12         Q   So the file is called SQL 2008 r2 backup
13     set.bak.  And from that file did you do all your
14     searches and inquiries with the SQL tool that you
15     used?
16         A   I did.
17         Q   Okay.  So basically it's that file that has
18     all the set of data that you used to reach your
19     conclusions --
20         A   Yes.
21         Q   -- in this case; right?
22         A   Yes.
23         Q   Okay.
24         A   And I want to just say that any SQL expert
25     would be able to reconstitute this as a fully
```

1    searchable SQL table on Microsoft SQL and be able to

2    conduct the same searches I did and would come up with

3    the same conclusions, meaning that if you have a

4    designated expert they would be able to take this and

5    within 20 minutes be able to have this fully

6    reestablished as a native SQL --

7         Q    Okay.

8         A    -- on a SQL server in their office.

9         Q    Yeah.

10            Now, you referred to a reference point.  You

11   said that there was a reference point and that with

12   utilization of that reference point you could

13   reproduce all the different searches and conclusions

14   that you did; right?  What do you mean by reference

15   point?  And if I got it wrong --

16        A    Yeah.  Well, it's an interesting term.  Did I

17   say reference point, actually say reference point?  I

18   probably meant to say a backup, a reference or

19   establish a base- -- a reference -- or a baseline as a

20   reference point.

21        Q    Okay.

22        A    But I think that's a good term, reference

23   point.

24        Q    How would you do that?

25        A    The Microsoft SQL 2008 system itself contains

1    a mechanism called a SQL restore process.  So I would

2    take this file itself and physically put it onto the

3    hard drive of a SQL server that's running this

4    particular version of Microsoft SQL, which happens to

5    be I think the latest one.  I would then go to

6    Microsoft SQL Management Console and right click on

7    the named database instance.  I would then choose

8    Tasks and Restore Database.  I would then specify new

9    database with the restore file being the file that's

10   named and is listing on -- list is appearing on the

11   overhead.  I would click okay and within about

12   10 minutes SQL would fully reconstitute that entire

13   file.  If you would like me to provide a set of

14   printed instructions for how to do that process, I

15   would be -- it would be my pleasure.

16        Q    Okay.  I'll take you up on that.

17        A    I am happy to do that, and I could have that

18   for you this afternoon at some point.

19        Q    Good.

20        A    It's a pretty straightforward process.  But

21   I've been asked to produce it before, so I have it

22   readily available.

23        Q    Good.  Well, if you would do that, that would

24   be great.

25        A    You bet.  I will do that for you.

```
 1       Q   Paragraph 13 --

 2       A   Let me write that down to make sure that

 3   I --

 4       Q   Sure.

 5           MR. MALLISON:  He's eventually going to take

 6   a look at your notes.  Unless you have a note for

 7   yourself.  I guess you've got a copy.

 8           THE WITNESS:  I've got a copy.

 9           MR. MALLISON:  You're so smart.

10   BY MR. MOLLAND:

11       Q   Let's go to paragraph 13.

12       A   Okay.

13       Q   You say you excluded certain pay codes.  Why

14   did you do that?

15       A   I was told to.

16       Q   Who told you to?

17       A   Tom Lynch.

18       Q   Do you know why you excluded them?

19       A   Well --

20       Q   Do you have --

21       A   I mean, I could opine.

22       Q   No.  Do you have any factual basis for why

23   you excluded them?

24       A   Yes.

25       Q   What is it?
```

1          A    There is a pay code, specific pay code called

2     631 which is for vacation, and it would -- it would

3     not -- it would indicate, from my understanding of

4     what Mr. Lynch told me, that vacation days are when

5     employees are at --

6          Q    Fair enough.

7          A    -- the work site.

8          Q    Whatever understanding you have is based on

9     what Mr. Lynch told you; right?

10         A    Yes.

11         Q    And you followed his direction?

12         A    I followed his direction for which pay codes

13    to not use within my analysis.

14         Q    Okay.

15         A    The analysis itself is my work product which

16    I was hired to do as an expert.

17         Q    Paragraph 14, you come up with a database

18    contained 3 thousand, or excuse me, 3

19    million-and-change employee shifts.  When you refer to

20    the database is that the SQ12008 r2 backup set.bak

21    database?

22         A    There is a table in there called Work Data

23    and the work data is the cumulation of the

24    3,123,934 shifts that were not excluded from the

25    analysis.

1        Q    Okay.  Where is that data on the hard disk

2   you produced?

3        A    That is in one of the tables on SQL 2008 r2

4   backup set.

5        Q    Okay.  And that's where we'd go to find it?

6        A    Right.

7        Q    All right.

8        A    All of the data that we spoke of is within

9   those -- within that backup set.  It's just we're

10  looking at different tables, as you will, to -- to

11  contain the data points that I either conducted my

12  analysis on or didn't.

13       Q    What's --

14       A    So --

15       Q    What's a shift?

16       A    A shift is an employee appearing in the data

17  with a number of hours or a number of activities that

18  included piece rate -- piece-rate pay during that work

19  day.  So an employee could have -- I'm just saying as

20  an example, I'm not specifically pointing to exactly.

21  I'm just saying as an example, an employee is on

22  ranch -- Ranch 3, and then an employee is on Ranch 4

23  as in one day.  There may be multiple shift segments

24  in one day.

25       Q    So an employee may have more than one shift

1   in one day?

2       A   No.  May have more than one shift segment in

3   one day.

4       Q   Okay.

5       A   But that is -- but an employee has one -- if

6   an employee appears, I call it a shift.  That shift

7   may have taken place in multiple segments across

8   multiple locations.

9       Q   Of course.  But so to you a shift, when you

10  say there are a number of shifts, a little over 3

11  million, does that mean 3 million work days or is it

12  something different?

13      A   Well, it means one employee, one work day,

14  any number of employees on any number of days.  But if

15  you look at -- if you look at in this room there are 8

16  people and we're all working, there would be 8 shifts

17  even though they are all -- there are 8 different

18  people on one day.  Conversely, if you were in this

19  room for one day and you were one person, that would

20  be one -- I would call that one shift.  If you were in

21  this room for eight days, eight days of eight hours

22  each day you would be -- that would be eight shifts.

23      Q   Okay.  Isn't it a simple way just to say it,

24  when you say that there's under paragraph 16 3,123,934

25  total shifts, that means you took the number of days

```
1    worked at Sunview times the number of employees that
2    worked them and came up with that number?
3              MR. MALLISON:  Objection.  Misstates
4    testimony.
5              THE WITNESS:  Yeah, it's not --
6    BY MR. MOLLAND:
7         Q    That's different?
8         A    Well, it's very -- there was a distinction
9    there because any number of employees could have been
10   present or not present on any particular work day.
11        Q    Of course.
12        A    And there could have been work days skipped.
13   I underst- --
14        Q    I don't think this is very complicated.
15        A    Well, it's not.
16        Q    If one guy works at Sunview over a period of
17   time and --
18        A    Within the same day.
19        Q    No.  One guy works at Sunview for 100 days.
20        A    Okay.
21        Q    And sometimes he works 1 hour, sometimes he
22   works 12 hours or he works all kind of different hours
23   in those 100 days, in your opinion does he have more
24   than 100 shifts?
25        A    No.  He has 100 --
```

1      Q    Of course.

2      A    -- shifts made up of perhaps multiple shift

3  segments.

4      Q    Right.  So essentially a shift is a day in

5  which an employee worked, although he may have worked

6  at a whole bunch of different places or done a whole

7  bunch of different stuff; right?

8      A    Correct.

9      Q    All right.

10          Okay, let's go to paragraph 17, please.  Did

11  you look at any particular codes to determine whether

12  an employee worked less than two hours in any given

13  work day under paragraph 17?

14      A    I don't think Sunview has a -- well, there

15  are a lot of different codes Sunview uses, but I don't

16  think Sunview uses a particular code that says worked

17  for under 2 hours on any particular day of an

18  accumulation of those shift segments on that

19  particular day with respect to that employee.  So the

20  answer is I looked at the work codes that were not

21  specifically told to me by Mr. Lynch to exclude from

22  my analysis.  And if the sum of the hours on those

23  work codes using the hourly pay designator was less

24  than two, then that's what would appear in shifts less

25  than two hours in a day.

1        Q    Okay.  And the file you were looking at was

2    the file -- for this purpose was the data that was

3    contained in the SQL 2008 r2 backup set; right?

4        A    Actually it was the data that you provided in

5    the CSV file that's contained within the SQL tables.

6        Q    All right.  I don't understand what you're

7    talking about.  Show me the data that you used to

8    conduct these searches that resulted in the findings

9    on paragraph 17.

10       A    Right here.

11       Q    Okay.  What file, please?

12       A    The file is called PR55DTLR.csv.

13       Q    Okay.  And what was the search that you did

14   on that file?

15       A    The search was -- and I'm going to paraphrase

16   the SQL otherwise you'd be sitting here for quite a

17   long time and bored to tears, maybe more bored than

18   you already are.  Select the count of or the number of

19   shifts with the total accumulated time for hourly pay

20   of an individual on a work day equalled less than

21   120 minutes.  And the pay code was not pay code 630,

22   631, 682 or 899.

23       Q    Okay.  Then on paragraph 19 you reached a

24   conclusion that there were 300 -- or excuse me --

25   34,096 shifts where the employees were not paid hourly

1    but were paid only exclusively on piece rate.

2    Correct, that's your conclusion?

3         A    That is my conclusion.

4         Q    Then paragraph 20 you reach a conclusion with

5    respect to minimum wage; right?

6         A    Well, I reach one conclusion, two

7    conclusions, three -- three -- two conclusions there?

8    I mean how many conclusions -- which conclusion do you

9    want to know about on paragraph 20?

10        Q    Paragraph 20 and 21 you reached some

11   conclusions about minimum wage.

12        A    Yes.

13        Q    Did you verify or check any of those

14   conclusions against the payroll register data that you

15   were supplied?

16        A    I did not check all 24,225 work days against

17   your payroll register because your payroll register

18   only contains the sums of hours and does not provide a

19   detailed breakdown of those hours.

20        Q    Did you do any checking to verify your

21   conclusion, any conclusions you made with respect to

22   minimum wage against any payroll register data?

23        A    The payroll provides a sum of the hours and

24   the pay and the piece rate paid.  The payroll does not

25   contain a breakdown of the number of days and the

```
 1    number of hours, so it would have been obscurified by

 2    the fact that a payroll contains a sum.  You have to

 3    look at individual days worked.

 4         Q   Look, you know, you have an explanation, but

 5    you need to answer the question yes or no.  If you

 6    didn't do it, I'll let you explain why you didn't do

 7    it.  So just answer yes or no.  Did you verify or

 8    check in any way your conclusions with respect to

 9    minimum wage against the payroll data?

10         A   There is no way to.

11         Q   Okay.  Then the answer is no; correct?

12         A   Well, it's not no.  I think you're asking

13    me --

14         Q   The answer is no because there is no way to;

15    is that right?

16         A   There is not a way to as your data is

17    provided.

18         Q   Then the answer is no because you don't think

19    there is a way to; right?

20         A   Well, I take -- I take your output of

21    payroll --

22         Q   Look.  I'll withdraw the question.

23             I don't know how I can be any clearer.  There

24    may be all kinds of reasons why you didn't do it,

25    including the data didn't let you do it.  It's a
```

```
1    simple question.  Did you verify your minimum wage
2    opinion against any payroll register data supplied to
3    you by Sunview or Mr. Stone --
4         A    Yes.
5         Q    -- in concluding that data?
6         A    Yes.
7         Q    Okay.  What did you do?
8         A    The payroll register is an accumulation of
9    the days worked that are provided in this PR55DTLR
10   file as represented by your company, your client's
11   company.  So if the constituent components of a
12   paycheck are to be taken at face value as an
13   accumulation of hours that matches payroll, I can only
14   assume that the constituent components are correct.
15   And therefore, if a payroll paycheck says that a
16   number of hours worked and the number of hours -- or
17   the pay is in concurrence with the underlying detail,
18   I have to assume on face value that it's correct.
19        Q    So did you check your conclusions about
20   minimum wage with the payroll data register supplied
21   to you in this case?
22        A    Is the answer not sufficient what I just
23   said?
24        Q    I have no idea what you said.  I'm just
25   use -- it's for the record.  But look, people get
```

1    checks.  There are pay stubs.  Did you look at any pay

2    stub for any employee in this case?

3        A    Yes.

4        Q    Okay.  Did you look at any pay stub at all?

5        A    Yes.

6        Q    Did you find any pay stub that showed the

7    employee was not paid minimum wage?

8        A    The pay stubs --

9        Q    The answer is yes or no.  Did you look at any

10   pay stub that showed to you that the employee was not

11   paid at minimum wage?  Yes or no?

12       A    The pay stubs are in concurrence with the

13   detail that shows that the employees were not paid

14   minimum wage.

15       Q    Can you answer my question.  Did you look at

16   any pay stub that told you that employees were not

17   paid minimum wage?  Yes or no?

18       A    Yes.

19       Q    Perfect.  Thank you.

20            Let's go to lunch.

21            THE VIDEOGRAPHER:  This ends media No. 1 in

22   the deposition of Aaron Woolfson.  Off the record at

23   12:33 p.m.

24            (Lunch recess taken.)

25            THE VIDEOGRAPHER:  Back on the record at

1      1:47 p.m.  This is the beginning of media No. 2 in the
2      deposition of Aaron Woolfson.
3      BY MR. MOLLAND:
4          Q    Mr. Woolfson, I'm looking at Exhibit 3.  Does
5      Exhibit 3 contain your billing records in this case?
6          A    I'm looking at -- you are looking at
7      Exhibit 3, and I assume that it does.
8          Q    I'll give you the cover.  This is Exhibit 3.
9      That's your billing records?
10         A    Yes, that's my billing records.
11         Q    I've gone through them quickly.  It looks
12     like through the writing of your report, which
13     apparently generated the bill on April, end of April
14     or so, you spent about 20 to 25 hours on the case
15     through the end of April?
16         A    I would have to add it up.
17         Q    Well, I don't -- it doesn't have to be added
18     up to a tenth of an hour, but --
19         A    If you're satisfied with the answer being
20     yes, I trust that's the amount of hours that you
21     ballparked.
22         Q    So is that a reasonable estimate of hours
23     between the time that you were retained as an expert
24     in this case and the time you wrote your report,
25     somewhere in the neighborhood of 20-25 hours is what

1      it took you to generate this report; right?

2          A    That's pretty ambiguous because you just said

3      between the time you were retained and writing this

4      report.  I would say I put 20 to 25 hours into the

5      analysis -- the preparation, analysis, introduction of

6      data into database and writing of the report, yes.

7          Q    Okay.

8               You mentioned in the morning session that you

9      talked to somebody you thought was a representative of

10     Sunview.  Do you have notes that reference the people

11     that were on that call?

12         A    I do not have notes beyond what is attached

13     to one of these invoices as to who was on the call.  I

14     don't remember the names of the people who were on the

15     call.  I'm sorry.

16         Q    I'm giving you the notes that's attached to

17     Exhibit 3.  Does that tell you whether you ever talked

18     to any person who was employed by Sunview?

19         A    Well, I had -- I was on a call.

20         Q    Right.  You were on a call.  You said you

21     thought on a call you talked to somebody who was

22     employed by Sunview.  I want to know -- I want to be

23     able to find out who you -- well, first of all, can

24     you identify anybody you've talked to who you think

25     was employed by Sunview ever?

1        A    I cannot identify by name.  I only had one

2    very brief telephone call with their IT people on the

3    phone.  And they -- and that they stated that this is

4    a system that was developed 15 years ago, ran

5    under -- it was originally it was using Dec Alpha

6    equipment.  I believe that that is the extent

7    of -- and then of course the notes related to the way

8    that the data was structured, but I don't know the

9    name of the individual I was on the phone with.

10       Q    Okay.  Well, how do you -- why do you think

11   it was somebody who was employed by Sunview as opposed

12   to a lawyer at Morgan Lewis or anybody else?

13       A    Because they were very specific

14   computer-related terms that resonated with me as being

15   someone -- terms that someone who is very

16   knowledgeable with IT would use.  I can't say with

17   certainty that they weren't an attorney who was

18   purporting to be with the IT department at Sunview.

19       Q    Okay.  Do you know a name Eric Meckley?

20   He's an attorney.  He's not with the IT department at

21   Sunview by any stretch of the imagination, but he

22   talked to you on the phone.  Do you recall that?  Do

23   you recall Eric Meckley talked to you?

24       A    I don't recall the name, but I do recall that

25   there was a separate conversation that I was present

1    where an attorney was there when I said that I

2    couldn't read this data with a PC and that we needed

3    to have specific information as to how this data was

4    produced.

5         Q    Right.  Okay.

6         A    But that wasn't this call.

7         Q    So you think that you may have had a brief

8    conversation with somebody employed by Sunview who

9    discussed the data in some respect with you; right?

10        A    I can say with a high degree of certainty

11   that there was a discussion about an -- or a set of

12   data and how that data was structured within the

13   system.

14        Q    How long did the call last?

15        A    Oh, probably no more than 20 -- 20 minutes.

16   I mean, I can find out exactly what date --

17        Q    Who placed the call?

18        A    I believe it was a conference call that was

19   initiated by plaintiff counsel.

20        Q    Aside from that one call, can you think of

21   any time that you ever talked with anybody from

22   Sunview to have them explain data to you?

23        A    All communication after that call, to the

24   best of my knowledge, has been from plaintiff counsel

25   who would have relayed any information to me.

1        Q   Okay.  Good.  So aside from that one call,

2    all the data you got that explained to you the Sunview

3    data was and how it should be interpreted came to you

4    from plaintiff counsel; correct?

5        A   Plaintiff -- plaintiff counsel I don't think

6    played a role in how to interpret the data because the

7    methods and procedures I've used, which I've used on

8    numerous cases, are -- are formulas and SQL statements

9    that I myself have come up with.

10       Q   Good.  So I wasn't trying to suggest they

11   did.

12           So the plaintiffs' lawyers didn't tell you

13   what was in the Sunview data or tell you how to

14   interpret it; right?  Or did they?

15       A   No, they did not tell me how to interpret it.

16   They only asked me to -- well, in my report I disclude

17   that the codes that, specific codes, and I followed

18   their direction.

19       Q   How did you know how Sunview was using the

20   codes that it coded the data in that you got?

21       A   Well --

22           MR. MALLISON:  Objection.  Vague.

23           THE WITNESS:  How did I know that they were

24   encoding --

25   BY MR. MOLLAND:

1        Q    No.  The question was, how did you know what
2    the different pay codes were in the data you received
3    from Sunview?
4        A    There was a list provided to me that I
5    provided to you this morning.
6        Q    Is that on Exhibit 2?
7        A    That's Exhibit 2.
8        Q    So except for that particular list that's on
9    Exhibit 2, you had no information to know how Sunview
10   interpreted or used the pay codes in the codes you
11   got; right?  I'm not trying to confuse you.
12       A    No, no, I --
13       Q    I'm trying to understand why you think you
14   know how Sunview used the pay codes in the data you've
15   interpreted.  You've told me the plaintiffs' counsel
16   didn't tell you how to interpret it, and you've told
17   me you had a brief phone call with a Sunview person
18   you thought who was connected with the IT division of
19   Sunview for 20 minutes, and you told me that you
20   looked at Exhibit 2.  Are there any other sources that
21   told you how Sunview used the pay codes in the data
22   that they gave you?
23       A    This document is very comprehensive.
24       Q    Will you please answer my question?  You can
25   talk about Exhibit 2.  You have Exhibit 2.

```
 1        A    Okay.

 2        Q    So I'm just trying to get the list.  Okay?

 3        A    Okay.

 4        Q    Please just --

 5        A    But --

 6        Q    I'll let you explain as much as you want to

 7   once you've answered the question.

 8        A    Right.  But someone who is reading a

 9   transcript after this deposition isn't going to see a

10   simple yes or no and be able to understand that in the

11   context of what's been done.

12        Q    Well, I'll let you --

13        A    And I'd have to --

14        Q    I promise I'll let you.  But I have to know

15   this.  I don't know if I'm wasting time or not unless

16   you say yes or no to my questions.

17        A    It's really important for both your

18   defendants and for my clients to --

19        Q    Don't lecture me, please.

20        A    I'm not --

21        Q    Just answer my question.  I don't mind you

22   explaining your answer, but I don't know whether the

23   answer is yes or no given your answers to my questions

24   and I'm entitled to a yes or no, an affirmative or a

25   negative, and an explanation, and you can explain.
```

1    But I have a really simple set of questions.  It
2    shouldn't take very long.  I just want to know the
3    sources of information that told you how Sunview used
4    the pay codes in the data you used to form your
5    opinion.  And you told me you had a brief phone call
6    with somebody, you think it came from Sunview.  You
7    think that you looked at Exhibit 2.  And those are the
8    only sources of information you've told me.  Now, the
9    question is simple.  Are there any others, yes or no?
10   And if there are, tell me all about them.
11         MR. MALLISON:  I'm going to object.  This is
12   a lecture.  Let him answer your question.  I
13   understand you want to get to an answer.  It may not
14   be yes or no.  It doesn't have to be yes or no.  And
15   it may be the question doesn't make sense.
16   BY MR. MOLLAND:
17      Q    Well, that's okay.  You can say that too.
18      A    Okay.  I have to -- one of the things that's
19   really important is that --
20      Q    No, look, I'm asking you a question.  Can you
21   have the question read?  I'm going to repeat the
22   question.  I don't need a lecture.  I don't need your
23   psychoanalysis.
24      A    Hey --
25      Q    I just need to get some information.

1      A   -- listen, I'm not hired here as a

2   psychoanalyst.

3      Q   You're psychoanalyzing yourself.

4      A   No, I'm absolutely not.  I'm absolutely

5   trying to answer your question.

6      Q   Okay.

7      A   Okay.

8      Q   Did you look at any sources of information to

9   understand how Sunview uses pay codes besides

10  Exhibit 2?

11     A   Look on the whiteboard.

12     Q   Pardon me?

13     A   I'm asking you to please look at the document

14  that's on the whiteboard.  Does that explain how those

15  fields are used?

16     Q   Okay.  So you looked at that document.  What

17  document?  Can you identify that document?

18     A   It's PR55DTLRlayout.pdf.

19     Q   So you looked at that document to understand

20  how Sunview uses pay codes.  Any other documents

21  besides that document you just described and Exhibit 2

22  that you used to figure out how Sunview uses pay

23  codes?

24     A   Other than performing tests on the data

25  that's contained in the PR55DTLR.csv and comparing

1    that with the pay stubs to make sure that I was

2    interpreting those codes correctly, no.

3        Q    Thank you.

4            So, and the only person that whose words you

5    heard or testimony you have relied upon is this person

6    that you talked to and briefly in a telephone

7    conference, who you can't remember, who also told you

8    something about the pay codes, is that right, or

9    didn't they tell you anything about the pay codes?

10       A    There was no discussion what the pay codes

11   were on that.  However, I relied extensively on the

12   document marked Confidential Sunview Vineyards of

13   California, Exhibit 2, as part of my analysis.

14       Q    When you took a look at the pay stubs, and

15   you did take a look at the pay stubs that Sunview

16   actually paid their employees; right?

17       A    Yes.

18       Q    Okay.  Did you find any pay stubs that showed

19   the amount of money that any employee was ever paid

20   was below minimum wage for the hours that were

21   reported on the pay stub?

22           MR. MALLISON:  I'm going to object.  That

23   calls for a legal conclusion.  It's kind of

24   nonsensical too in a wage stub in California.

25           THE WITNESS:  Yeah, my -- the scope of my

1   analysis is to compare the data that Sunview produced,

2   your clients' data against sets of inquiries that are

3   provided by the attorneys.  One of the queries that I

4   ran was a minimum wage analysis for straight minimum

5   wage.  I will show you numerous examples of what I

6   believe to be --

7   BY MR. MOLLAND:

8       Q   Okay.  But remember, my question isn't asking

9   for numerous examples.  It's a simple question.  Did

10  you look at any pay stubs where you found that on the

11  pay stubs Sunview had not paid minimum wage for the

12  hours worked the employee?

13      A   Yes.

14      Q   Okay.  Can you show me any pay stubs which

15  illustrate that finding in your data?  Do you have any

16  data, do you have any records, do you have any

17  documents you can produce that would show me any pay

18  stub where Sunview, in your opinion, did not pay the

19  employee minimum wage for the hours worked?

20          MR. MALLISON:  I'm going to make the same

21  objection.  It calls for a legal conclusion.  Also, it

22  misses the point of his analysis which is to -- well,

23  I won't detail that any further.

24          THE WITNESS:  I could point out numerous

25  examples of where an employee was not paid minimum

1    wage.

2    BY MR. MOLLAND:

3        Q    No, that's not my question.

4        A    Okay.

5        Q    My question is -- you said you looked at pay

6    stubs, okay.  So I'm asking whether you can show me

7    any pay stub that you looked at in the data you

8    provided where Sunview didn't pay that employee

9    minimum wage in that pay stub?

10       A    I would have to look.  However, there are

11   numerous examples as such as on the board overhead

12   right now showing a 6.50 pay rate during which the

13   minimum wage was 6.75.  Now, beyond the scope of what

14   I just stated, I'm not a lawyer, I can't draw a legal

15   conclusion.  I can only say what's evidenced in the

16   data.  That file is PRREG2002.pdf.

17       Q    Okay, and you have brought something up here.

18   Just pick out -- there is a number of employees there

19   that you have brought up on the screen for purposes of

20   this deposition to illustrate why you think any one of

21   those guys wasn't paid minimum wage.  Why don't you

22   just pick one on that screen you've shown me as an

23   example and tell me why -- pick out a guy and explain

24   to me why you don't think he was paid minimum wage.

25   So just pick one out.  Mr. Lopez, Mr. Sanchez.  I'll

1    let you pick out the one you think illustrates your

2    point the best.

3        A   Mr. Sanchez is a good example.

4        Q   Okay.  Let's pick out Mr. Sanchez.  Now, you

5    have picked something out on the board that shows

6    Mr. Sanchez.  Let's see, is there a date on that?  I

7    don't see a date.  But any rate, why don't you tell me

8    why you think Mr. Sanchez wasn't paid minimum wage

9    based on the example that you showed me.

10           MR. MALLISON:  There's a check number there.

11           MR. MOLLAND:  There's a check number.  What's

12   the check number?  6726- --

13           MR. STEPHENS:  72623.

14           MR. MOLLAND:  7- --

15           MR. STEPHENS:  -- -2623.

16   BY MR. MOLLAND:

17       Q   Oh, there's two Mr. Sanchezes.  That's

18   interesting.  Which Sanchez are you talking about,

19   Jose or Luz?

20       A   Let's look at Jose.

21       Q   Okay.  Jose.  That's check number 72623, so

22   we can pick that out.  You tell me why you think

23   Mr. Jose Sanchez wasn't paid minimum wage in that time

24   period based on that information.

25           MR. MALLISON:  Objection.  It's not a pay

```
 1   period.  This is a day.
 2              MR. MOLLAND:  I don't know what it is.  He
 3   can tell me.
 4        Q    Why do you think Mr. Sanchez wasn't paid
 5   minimum wage?
 6        A    My instructions were simply to look at --
 7        Q    No, I'm just asking you why.
 8        A    I mean --
 9              MR. MALLISON:  Objection.  It calls for a
10   legal conclusion.
11              THE WITNESS:  It doesn't matter what I
12   think --
13   BY MR. MOLLAND:
14        Q    I'm not asking for your instructions.  I am
15   asking for the reason that you believe Mr. Sanchez
16   wasn't paid minimum wage.
17        A    I am not an expert in minimum wage.  I am an
18   expert in database analysis.  All right?  So you have
19   to let me answer the question related to database
20   analysis because if my testimony isn't good then
21   you're not getting the benefit of the money your
22   defendants are paying me to be here today.
23        Q    Believe me, I don't think I'm getting the
24   benefit of the money that I'm getting paid to take
25   your deposition today simply because you're not
```

1    answering my question.

2          So my question is this:  Tell me all the

3    reasons, the reasons why you think based upon the data

4    and the payroll stub 726 -- 72623 -- you think

5    Mr. Sanchez wasn't paid minimum wage.  And I know

6    you're not an expert in minimum wage --

7          A    Right.

8          Q    -- but you are expressing an opinion in your

9    report about it, so I need to find out what it is.

10          MR. MALLISON:  Objection.  Objection.  You're

11    misstating his testimony.  He is expressing what he

12    found in the data and what his SQL searches are.  The

13    conclusion as to whether they are paid minimum wage

14    for a day or a week is not in here.  And you're asking

15    for a legal conclusion.

16    BY MR. MOLLAND:

17          Q    Go ahead.  What's your reason why you think

18    that the example you have on the board shows us that

19    Jose Sanchez wasn't paid minimum wage?

20          A    Well, this is a good question.  How do you

21    know that I don't think he was paid minimum wage?  It

22    doesn't matter what I think.  I was asked to do a

23    query.  The query was to say number of hours at a

24    particular hourly rate as a -- as a function of how

25    many shifts on a straight hourly rate were paid a

```
1    certain hourly rate.
2         Q    Okay.  So how does Mr. Sanchez's pay factor
3    into that?
4         A    It says right here 6.50 an hour.  I'm not
5    looking at anything but the pay rate at that
6    particular time.
7         Q    So your opinion is because apparently you
8    think that the pay rate of 6.50 an hour was not
9    minimum wage at the time; right?
10        A    Well, I don't think.  I'm just telling you
11   that that's what I was told.
12        Q    Okay.
13             And does the entry there show payment by a
14   day or payment by a week?
15        A    Well, the paychecks appear to be -- well,
16   it's irrelevant.  It just says -- it just says a pay
17   rate 6.50.  I mean, that's not -- if they were being
18   paid by the week or by the day or by the month it
19   still says 6.50.
20        Q    Okay.  I think I'm getting this now.
21             So go to your opinion on page 6 which is item
22   20.  Your opinion is that 12.52 percent of the shifts
23   show a pay rate below minimum wage.  That's based upon
24   the fact that you see data that these guys weren't
25   paid on a particular day minimum wage 12.5 -- excuse
```

1   me -- 12.52 percent of the time.  Right?  Is that your

2   opinion?  Is that what that's based on?

3       A   What this says is that -- I can read it

4   exactly.  My testimony is that 24,225 or 6.1 percent

5   of -- of the 39 -- 391,276 shifts worked that had an

6   hourly rate below minimum wage still did not meet

7   minimum wage, as it was expressed to me that minimum

8   wage should be, even if the piece rate is applied to

9   the worker's day.

10      Q   I got you.  So you calculated this by the

11  day, right, by the shift per day?

12      A   By the day.

13      Q   Okay.  Did you make any attempt to see what

14  Sunview paid these people by the week?

15          MR. MALLISON:  Objection.  It calls for a

16  legal conclusion.

17  BY MR. MOLLAND:

18      Q   I don't know, how is that a legal conclusion?

19  Did you make an attempt to figure out how much these

20  guys were paid by Sunview per week as opposed to per

21  day?

22          MR. MALLISON:  Objection.  It misstates the

23  testimony as well.

24          THE WITNESS:  I was not asked to look at

25  shifts like a group of, say, 7 shifts on an entire

1    week.  I was asked to look at daily shifts as data was

2    provided by, and I was asked by counsel to look at

3    that, so --

4    BY MR. MOLLAND:

5        Q   Now, let's go back to my question.  Do you

6    know how Sunview actually paid these guys?  Did they

7    pay them every day, did they pay them some money?  Or

8    did they pay them by a pay period?

9        A   I don't know if they paid them by check or by

10   direct deposit or otherwise.  I don't know if they

11   paid them by what period.  I'm just looking at days

12   and the shifts that occurred on those days.  That's

13   what I was asked to look at.

14       Q   So when I asked you a question about a pay

15   stub, what do you think a pay stub is?  Don't you

16   think that's a stub that's attached to a check for

17   payment over a certain period for an employee?

18       A   But you see I'm not -- I'm not -- I'm looking

19   at what your data says they were paid on an hourly

20   rate.  That's a -- it's a -- it's not saying what they

21   were paid over, you know, a period of time as an

22   average hourly rate.  What it says right here, it

23   says, I mean, I just highlighted it on the screen,

24   6.50.

25       Q   That's great.

```
1        A   I mean, it doesn't --
2        Q   So do you have any idea of how any of the
3   workers were actually paid at Sunview?  Do you know
4   how they were paid?
5        A   I wasn't asked to look at and analyze how
6   they were paid.
7        Q   So the answer is no; right?
8        A   Well --
9            MR. MALLISON:  Objection.  Vague.  I mean, it
10  doesn't make sense what you're asking him.  How
11  they're paid, what does that mean?
12  BY MR. MOLLAND:
13       Q   Do you have any idea whatsoever of how
14  Sunview workers were paid in any respect, either by
15  period or by mechanism?
16       A   It was not part of my analysis.
17       Q   So the answer is no; correct?
18           MR. MALLISON:  Objection as to how.
19  BY MR. MOLLAND:
20       Q   It's not part of your analysis, and you
21  didn't do it; right?
22       A   Well, you're asking me if I am aware of or if
23  it was part of my analysis.  I'm not telling you what
24  I'm opining about.  I'm telling you what I testified
25  to and wrote in my expert report.
```

1        Q    My question is a different question.  See if

2    you can answer it.

3        A    Okay.

4        Q    Do you know how -- the pay period for any

5    Sunview employee?  Do you know what the pay period was

6    for any Sunview employee?  Do you know what the pay

7    period was for any Sunview employee?  Do you know

8    that?

9             MR. MALLISON:  Is that compound or just

10   multiple times?

11            THE WITNESS:  It would be very easy to

12   extrapolate.

13   BY MR. MOLLAND:

14       Q    Do you know that?  Was that part of your

15   assignment?  Did you do that in your report?

16       A    It was not part of my assignment to write a

17   report on pay periods or duration of work that appears

18   on a particular paycheck.

19       Q    So it would be fair to say you don't know

20   whether Sunview paid minimum wage to their employees

21   during any particular pay period.  You didn't do that

22   analysis, did you?

23            MR. MALLISON:  Objection.  Misstates

24   testimony.

25            THE WITNESS:  My task was very specific to

5/3/2011   Woolfson, Aaron

1   analyzing the daily pay -- the daily time data that

2   your clients provided to my clients.  That's it.

3   BY MR. MOLLAND:

4        Q   Did you analyze that data for any particular

5   pay period for any particular employee?  Yes or no?

6        A   It was not within the scope of what I was

7   asked to do.  The answer then is no.

8        Q   So the answer is -- how can you not say no to

9   that?  It's just incredible.

10       A   Because you're asking --

11           MR. MALLISON:  Objection.  You're misstating

12   his testimony, and you're missing the point.

13           MR. MOLLAND:  I'm not misstating his

14   testimony at all.

15           MR. MALLISON:  Absolutely.

16   BY MR. MOLLAND:

17       Q   The deposition is going to go so much

18   quicker.  There are some things you did and some

19   things you didn't do.  Just admit what you didn't do,

20   it's no big deal.  The stuff that you did I'll ask you

21   questions about.  The stuff you didn't do you can't

22   testify about, but we'll save a lot of time, so just

23   tell me no.

24       A   Okay.  But I can testify about the things

25   that I did do.  And I really want this to be --

1      Q    Absolutely you can.  You can.

2      A    And this is -- and we're on the same -- we're

3   on the same -- as a data expert we are on the same

4   team.  If I do a good job, I am doing just as much of

5   a good job for you as I am for him.  That's the cool

6   thing about being a data expert because if the data

7   shows there's nothing here, then the data shows

8   there's nothing here.  I'm not trying to play hide the

9   ball from you.  I think you think I'm trying to play

10  hide the ball.

11     Q    Of course you are.

12     A    I'm not.  I'm not playing hide the ball.

13  This is my 47th case that I've worked on.  I've been

14  down this road before.  I've been to this dance.  I

15  understand.

16     Q    I'm not asking how many cases you've worked

17  on.

18     A    Okay.

19     Q    I'm just trying to get some answers to my

20  questions, not answers to other issues that I'm not

21  asking about.

22          So, we've established now you haven't looked

23  at any particular pay period, okay, to analyze minimum

24  wage.  I asked you earlier if you have looked at any

25  pay stubs from checks given to Sunview employees,

1    okay.  The answer to that question is no, you haven't,

2    have you?

3         A   I've looked at reports that have been

4    generated by Sunview that are based upon the

5    underlying data that Sunview provided in that CSV

6    file.

7         Q   So show me something in the data that you

8    looked at that is a report of a pay period for any

9    employee by Sunview where Sunview issued a check to

10   that employee.  Can you?

11        A   This is a -- on the screen is a report of the

12   pay stubs.

13        Q   Oh, I get it.  You think that's a pay stub.

14   Is that what you think?

15        A   No, I think it's a report showing the

16   paychecks and the summary of the checks.

17        Q   Okay, we're fine.  So basically --

18        A   This is just a sum of the data that appears

19   in that CSV file.

20        Q   That's exactly what I want to get from you.

21   So you think if you sum up the data that appears,

22   that's on the board right now, you put it in a pay

23   period, it will just be the sum.  So you take the sum

24   of all those days and you can calculate minimum wage;

25   is that your opinion?

1          A    No, I'm calculating minimum wage based upon

2     what you guys put in that CSV file based upon pay rate

3     that was being paid on that particular date.

4          Q    Mr. Woolfson, you don't know that -- there

5     was a pay period in there that was a accelerator for

6     minimum wage so Sunview would be sure to pay minimum

7     wage in that payroll period.  You don't even know

8     where it is, do you?

9          A    There is an accelerate in there?  Is there a

10    field called Accelerator?

11         Q    Do you know that there's a pay code that was

12    designed to make sure everybody would be paid minimum

13    wage in any pay period?

14         A    Well, it doesn't manifest in your data here.

15         Q    Look at the pay codes.  Do you have the pay

16    codes in front of you?

17         A    Yeah.

18         Q    Can you pick out the pay code that Sunview

19    used to make sure they would pay minimum wage to all

20    their employees in any given pay period?

21              MR. MALLISON:  Objection.  It assumes facts

22    not in evidence.

23              THE WITNESS:  So any particular pay period

24    versus on a daily basis which is the -- which the pay

25    period is the sum of the data that appears in that

```
1      CSV.

2      BY MR. MOLLAND:

3           Q    Yes.

4           A    You just said pay period.

5           Q    That's correct.

6           A    But you guys gave us the daily pay logs.  So

7      is there another file that I don't have?

8           Q    No.

9           A    There's not.  So where would this appear

10     because --

11          Q    In other words, you don't know where it would

12     appear.

13          A    Well, no.

14               MR. MALLISON:  It doesn't exist is what he's

15     saying.

16               THE WITNESS:  What I am saying is that you

17     guys, you guys are saying there is a pay period --

18     there's a pay code -- I'm going to state back exactly

19     what you told me.  There's a pay code that ensures

20     that an employee on a paycheck as an aggregate of all

21     their daily time worked is an accelerator, a

22     multiplier, to make sure that they receive as an

23     aggregate more than minimum wage over that pay period.

24     I'm not here to define the legal requirements of what

25     makes minimum wage, if that can be over a pay period
```

1    or if it's on a daily basis.  I don't know.  I'm asked

2    to look at daily time logs.  And it seems to me that

3    if there is an accelerator that should be in there,

4    and it's not here, then you guys didn't produce data.

5    BY MR. MOLLAND:

6        Q    So can you turn to paragraph 19?

7        A    Sure.

8            MR. MALLISON:  Actually, I'd like to get that

9    straightened out.  Have you failed to produce some

10   data?

11           MR. MOLLAND:  No.  You failed to interpret it

12   correctly, but we haven't --

13           MR. MALLISON:  I don't think that's correct

14   actually.

15           MR. MOLLAND:  Well, we'll find out.

16           MR. MALLISON:  I guess we will.

17   BY MR. MOLLAND:

18       Q    Let's go to paragraph 19.  You say that there

19   were 34,096 shifts where employees were paid

20   exclusively piece rate -- exclusively on a piece rate

21   basis.  Right?

22       A    Yes.

23       Q    Can you show me any data that you produced

24   that would back up that statement that there is even

25   one employee who was paid at any one time exclusively

1    on a piece-rate work basis?

2        A   I could show you if I had SQL loaded on one

3    of these machines and in front of me, sure.

4        Q   Can you do it based on the data that you have

5    supplied?

6        A   I think there is a spreadsheet that shows

7    that.

8        Q   Okay, good.  Why don't you see if you can

9    find the data.

10        A   Where is -- there we go.  Okay, let's see

11   here.  Let's see if I can find it here.  No, there is

12   a number of subminimum.  Well, I don't have

13   the -- here's the formulas that I found that actually

14   -- here's the formulas that actually would identify

15   that.  This is just a summary sheet, but would show

16   that on January 22, 2002, there were 26 employees who

17   were paid exclusively on piece rate.  You know, it

18   goes on.

19        Q   What file do you have there, please?

20        A   It's called Minimum Wage At Or Above Versus

21   Subminimum Versus Piece Rate Only.  This was an ad hoc

22   report that I did for Mr. Steve Fernandez.

23        Q   Okay.  Can you go back to -- go back just a

24   little bit so we can identify that file so we can take

25   a look at that.

1      A    Sure.

2      Q    This doesn't look like original Sunview data.

3    It looks like something that you generated from

4    Sunview data.  Right?

5      A    Well, it's Sunview -- it's Sunview data

6    that's just stated in a summary, in a summarized

7    manner so that someone who is an attorney can read it.

8    But this is called An Interesting Study.  The reason I

9    named it that was because that's what Steve -- that's

10   what Mr. -- was it Hernandez or was it Tom Lynch?  Let

11   me just check and see.  Yeah, it would have been Steve

12   Hernandez.  He said, "Let's run an interesting study."

13   That was his words, not mine.  So I said let's just

14   name it that.  And that was produced on April 20,

15   2011, and this is a summary that's attached to that

16   e-mail, it's on the CSV drive, and it's called At Or

17   Above Minimum Versus Subminimum Wage Versus Piece Rate

18   Only.

19     Q    Okay.  Well, if someone was going to say, and

20   someone probably will, that you misinterpreted the

21   data to -- somehow made the mistake to think that some

22   people at Sunview were paid by piece rate only when in

23   fact that never occurred, is there anything in Sunview

24   data that you would rely upon to show that you were

25   right and the people that were saying that was wrong?

```
 1        A    There's codes in your data that show that
 2   somebody was paid on piece rate and that there is no
 3   corresponding hourly rate or there's hours with a $0
 4   per hour rate.
 5        Q    Can you pick out one example of that in the
 6   Sunview data?  Just one example.
 7             MR. MALLISON:  You need to provide him with a
 8   copy of SQL because you keep asking for examples, and
 9   that's the only way he's going to find it.
10             MR. MOLLAND:  I don't know.  I mean --
11             THE WITNESS:  Yeah, you don't know?
12   BY MR. MOLLAND:
13        Q    I believe what you're saying is you --
14        A    I've got a -- I've got a --
15        Q    -- that I can't give you an example because
16   we don't have any.  All right.
17        A    Really?
18        Q    You're just wrong about it.  So --
19        A    Well, I beg to differ.
20        Q    So I'm interested to know whether you have
21   any examples that would show the contrary.
22        A    Let me -- let me -- if you're so
23   confident -- I mean, I'm just producing a report that
24   a fact-finder, a judge or jury can find and say this
25   is or this isn't.  I could certainly demonstrate.  I
```

```
 1     have a computer here that has a 65,000 row limit in

 2     Excel in front of me.  I don't have SQL here.  I don't

 3     have -- the file that you guys have produced, this

 4     .csv that contains detail has millions of rows in it.

 5     I could spend a couple of hours finding you all the

 6     examples.  I could also send you exactly where it

 7     happened.

 8         Q    All right.  That's fair enough.

 9         A    I mean, the point is it's there.  This isn't

10     my first experience doing data analysis.  And I've

11     done a lot more complicated data analysis as well, so

12     this is a fairly -- this is a fairly straightforward

13     set of data compared with a lot I've done.  And those

14     have certified.

15         Q    Let me ask you this.  If you are just flat

16     wrong on the minimum wage analysis that you did, would

17     that cause you to have concerns about the other

18     analysis that you did for other work in your report?

19         A    No.  No.

20         Q    How about if you were just flat wrong on

21     interpreting the data and --

22         A    I would tell you.

23         Q    -- and there were people -- and you realized

24     that there wasn't anybody at Sunview who worked on

25     piece rate only exclusively, would that cause you to
```

1    question your judgment as to how you interpreted this

2    data?

3         A    Well, if your data is showing that there is

4    no piece rate only employees, and I calculated that

5    there are employees who were working on piece rate on

6    a per day basis, I'd want to know about it, and I'd

7    want to make it -- I'd want to supplement a dec- --

8    supplemental -- provide a supplemental declaration to

9    either redact or to adjust.  But that's a big if.  I

10   don't --

11        Q    And let's assume that your overtime

12   calculation, we could demonstrate conclusively your

13   overtime calculation is flawed because you just didn't

14   interpret the Sunview data correctly, would that cause

15   you to reanalyze your entire report?

16        A    Not my entire report.  I think that's a big

17   if because I think you're asking for me to make legal

18   qualifications based upon things that are beyond my --

19   the expertise for which I was hired.  My expertise is

20   in database analysis.  I'm only analyzing the data

21   that you provided.

22             MR. MOLLAND:  Could you mark the next

23   exhibit, please?

24             (Deposition Exhibit 5 marked by the

25             court reporter.)

```
1              MR. MOLLAND:  It's Exhibit 5.

2              THE WITNESS:  Okay.

3    BY MR. MOLLAND:

4         Q   This is a --

5              MR. MALLISON:  Can I get a copy of that?

6              MR. MOLLAND:  Of course.  I'm sorry.

7         Q   By the way, is this the first time you have

8    ever analyzed data that came to you in a format of IBM

9    AS-400?

10        A   No.  The data that comes to me is typically

11   generated on any number of systems in any number of

12   formats, but typically defendants will always provide

13   it to me in a CSV format that makes it consistent with

14   an IBM PC compatible computer that I can easily open

15   and import into Microsoft SQL.

16        Q   My question is, is this the first time you've

17   dealt with data that in its native format was on a IBM

18   AS-400 format?

19        A   No.

20        Q   So how many other times have you done that?

21        A   Probably three or four.

22        Q   Can you list the cases, please, or list the

23   attorneys?

24        A   I don't know which cases off the top of my

25   head, but I have worked with -- I mean, in 20 years of
```

1    working with data I have definitely dealt with data

2    that was in an AS-400 format.

3        Q    Okay.  I'm going to give you an example of

4    one.  This is a -- first of all, do you recognize this

5    as a printout from the Sunview payroll database?

6        A    Well, I --

7             MR. MALLISON:  Objection.

8             THE WITNESS:  I mean, I'm just going to trust

9    that you are showing me data that's in a Sunview

10   database.  I can't authenticate it in any way.

11   BY MR. MOLLAND:

12       Q    Well, does the format of this look different

13   to you in some respect?

14       A    Well, when I show it on my computer -- I

15   mean, if I look at it right here on this laptop that

16   you have graciously provided for our use today, it

17   looks a little bit different, sure.

18       Q    I'll represent to you this is data from the

19   Sunview database concerning one employee with a social

20   security number that is there for one work week.

21   Okay?

22       A    Okay.

23       Q    How does your program define shifts for this

24   data?

25       A    Well, this --

```
1                 MR. MALLISON:  I'm going to object.  There is
2       no indication this is actually true and correct data
3       or it's complete.  I don't see any of the indicators
4       here necessary to do this.  Why don't we just use the
5       real data, we have it right here.  We have these
6       sheets right here.
7                 MR. MOLLAND:  Yeah.
8                 MR. MALLISON:  Is that agreed?  Are you
9       agreeing to that?
10                MR. MOLLAND:  If you have an objection, make
11      it.
12                MR. MALLISON:  I do have an objection.  I'm
13      objecting to the use of this.  It's not authenticated.
14                MR. MOLLAND:  I hear you.  It's on the
15      record.
16                THE WITNESS:  This to me looks like 5 --
17      3-4-5-6-7 -- 3-4-5-6-7 -- 5 consecutive days of work.
18      BY MR. MOLLAND:
19          Q   So it would be five shifts.
20          A   That would be -- well, the way you have them
21      listed it's actually listed as six shift segments
22      which becomes five -- what I would call five shifts
23      with one of the shifts being worked at two different
24      blocks.
25          Q   What use do you make of pay code 21?
```

```
 1        A    Well, pay code 21 is not in this list here.

 2    However, if I'm served correct from what Tom Lynch

 3    told me, 21 is a piece-rate activity that defines

 4    a -- let's see if there is a job here -- Ardeen

 5    (phonetic) block -- that defines something as paid per

 6    item.

 7        Q    Okay.  Let's go to Exhibit 6.

 8             (Deposition Exhibit 6 marked by the

 9             court reporter.)

10             MR. MALLISON:  I have the same objection to

11    this exhibit.  It's not authenticated.  And we have

12    the actual data here.  There is no use in -- reason to

13    be using this.  This is misleading.

14    BY MR. MOLLAND:

15        Q    So I have the same question for this.  How

16    many shifts are in this data?

17        A    Well -- do you mind if I take the staple out

18    to align this?

19        Q    I don't.

20        A    Okay.

21             Don't drink out of that cup.

22             I'm going to move this a little bit.  Let's

23    see here.  Why are these different?  Yeah, I want to

24    say that -- you asked me what pay code 21 is earlier

25    on Exhibit 5.
```

1      Q    Sure.

2      A    Pay code 21, it's really pay type that one

3  should be looking at.  "I" for individual piece rate

4  rather than the pay code.  Pay type is -- pay type H

5  is hourly, pay type I is piece rate according to Tom

6  Lynch.

7      Q    Mr. Lynch is the plaintiffs' attorney; right?

8      A    I hope so.

9      Q    And Mr. Lynch told you how to interpret the

10  pay codes; right?

11      A    Well, Mr. Lynch told me that was -- that was

12  one of the codes that you guys used.

13      Q    Okay.  So your knowledge about at least pay

14  code 11 and 21 come from Mr. Lynch; right?

15      A    No, pay type, H and I.  You asked me earlier

16  how I interpreted pay codes and I -- or not pay codes

17  but the job -- the job codes.  I told you I used this.

18  Pay codes -- types -- pay types are information that I

19  got from Mr. Lynch.

20      Q    All right.

21      A    Okay.  So I want to make it real clear where

22  we got those different things.

23      Q    So how many shifts -- let's just start --

24  start from the beginning.  How many shifts in example

25  2?

```
 1                MR. MALLISON:  I'm going to object these are
 2      out of order.  This is a needless puzzle the way it is
 3      laid out.
 4                THE WITNESS:  Yeah, this is really puzzling.
 5                MR. MALLISON:  Why did you resort these?
 6                THE WITNESS:  Yeah, this is puzzling to the
 7      extent that you resorted them and put them out of
 8      chronological order, date order.  I will --
 9      BY MR. MOLLAND:
10          Q   I will represent to you these are -- this is
11      a work period for a particular employee.
12          A   It doesn't matter.  What you're showing me
13      here is in chronological date order.  What you're
14      showing me here is out of chronological date order.  I
15      will just say that I think that's -- I don't think
16      it's above board, I'll just say that.
17          Q   Why do you think it's out of chronological
18      order?
19          A   Because the date that these appear in is the
20      third column from the right is out of order.  You
21      know, I don't -- yeah, I --
22          Q   How is it out of order?  It looks to me like
23      it's actually in order.
24          A   Okay, that's -- I'm just going to let you --
25          Q   3rd, 4th, 5th, 6th, 7th, 8th.  Excuse me.
```

```
1    3-4-5-6-7 --
2        A   What are you -- I think you're looking at the
3    previous.  No?
4            MR. MALLISON:  Are you looking at Example 2?
5    BY MR. MOLLAND:
6        Q   Oh, excuse me.  I mean, they don't -- I don't
7    get it.  They look chronological to me.  They start at
8    15 and they end at 26.
9        A   Yeah.
10       Q   All right.  So how is this not chronological?
11       A   What's after 3924?  317 -- 3917.
12       Q   That actually gets to one of my questions,
13   sir.
14       A   Okay.
15       Q   You're anticipating one of my questions.
16       A   Well, let's --
17       Q   With the exception of that one date they are
18   in chronological order; right?  We're going to get
19   to --
20       A   Yeah, I --
21       Q   Sir, we're going to get to --
22       A   You know what, I'm amazed.  I'm really,
23   really amazed.  I think that's -- I think that -- I
24   don't know.  Okay.  It doesn't matter what I think.
25   You're deposing me, and I'll answer your question.
```

1        Q    Well, the question that's pending is how many

2   shifts are there?

3        A    I would feel most comfortable looking at

4   these in chronological order.

5        Q    Sir, how can they not be in chronological

6   order?

7        A    You just told me that they're not, and that's

8   one of your questions.  And now you're asking me how

9   they can't be in chronological order.  You've got to

10  play -- you can't play it both ways, man.  You're just

11  not --

12       Q    You start with the 15th; right?

13       A    Okay.  Let's go down item by item here.

14       Q    Sure.

15       A    Okay.  15, next is 16.

16       Q    Right.

17       A    17, 18, 19, 23 -- ah -- 22, 24, 17, 25.

18       Q    Okay.  And does that -- what does that tell

19  you, that there is some basic problem in interpreting

20  how many shifts there are in that data?

21       A    No, what it tells me is that you're providing

22  me something that is in a printed form that

23  programmatically it certainly is not an issue because

24  we sort and we paginate things according to shift

25  order, and the way that SQL works it just deals with

```
1     it.  But what I'm saying is that if you're -- you're
2     putting data in front of me and you're saying it's not
3     out of chronological order, and then you're saying it
4     is, and that gets to another question, and you're
5     saying it's not.  I'm just -- I'm not following what
6     you're getting at here.  Do you want me to provide you
7     with an answer on how many shifts I think occurred on
8     each day?
9         Q   Yes.
10        A   Okay.  So let's see here.  H on the 16th.  H
11    on the 17th, H on the 18th, H on the 19th -- this is
12    215.  Paul Aves (phonetic).
13            THE REPORTER:  May I go off the record for
14    just a moment while he is doing this, because I think
15    he is just kind of talking to himself.
16            THE WITNESS:  Oh, I'm not even -- I'm sorry.
17    I wasn't even --
18            MR. MALLISON:  Mumbling.
19            THE WITNESS:  -- talking.  Was I mumbling?
20            THE REPORTER:  Yes.
21            THE WITNESS:  Sorry, guys.
22            MR. MALLISON:  Are you going to be a while?
23            THE WITNESS:  I am going to be a while.  I
24    have to sit here and look.
25    BY MR. MOLLAND:
```

1      Q   Basically it's difficult for you to come up

2  with a number of shifts without adding up numbers

3  here?

4      A   Well, without having a SQL database I'm not

5  as a -- I could do it.  I could certainly do it.

6      Q   I'll withdraw the question, then.

7         I'm going to ask you this:  How did you

8  understand pay code 10?  What's pay code 10?

9      A   Well, pay type H and job 215 would mean that

10  they were paid 2 hours for pulling leaves.

11      Q   Pardon me?

12      A   Two hours for pulling leaves on the date of

13  the 17th, 9-17-2003.

14      Q   Okay.  So let's just go down that line where

15  it starts at row 5727.  That's row 5727; right?

16      A   Um-hm.

17      Q   We have a social security number of the

18  employee; right?

19      A   Right.

20      Q   We have a crew number; right?

21      A   Right.

22      Q   We have a pay code 10.

23      A   Yes.

24      Q   And what do you understand pay code 10 to be?

25      A   Well, I -- I used job code 215 and the number

1    of hours of 2.

2        Q    Job code, so --

3        A    But pay code -- pay code 10 is not how I -- I

4    didn't group these by pay code.  I grouped these --

5        Q    So pay code 10 means nothing to you?

6        A    Well, it doesn't mean nothing to me.

7        Q    Well, what does it mean?

8        A    But by itself it doesn't -- so you have to

9    take -- to do this import you have to take pay code in

10   conjunction -- in relationship to job in relationship

11   to transaction date in relationship to pay type in

12   relationship to hours or units in relationship to

13   original input rate.

14       Q    So what does it mean for you that this

15   employee was on pay code 10 and units or hours are 2

16   in that particular job on that particular day?  What

17   does that mean?

18       A    In my opinion -- without SQL I can't tell you

19   what I did from SQL standpoint.

20       Q    All right.

21       A    But from what you just gave me here it would

22   look like pay code 10 in conjunction with 2 hours of

23   job type 215 in block 9 on the 17th would infer that

24   that individual was paid for 2 hours pulling leaves on

25   the 17th.

1         Q    Okay.  Now, you also interpreted whether
2    certain employees would work two hours or less, that
3    was part of your -- at any given shift; right?
4         A    Right.  That would not count as 2 hours less
5    because on the 17th, if you look above, they also
6    worked for -- they worked for 1-2-3-4-5-6 -- they
7    worked for 6 hours.  So to me that looks like 8 hours
8    of work.  There is no -- there is no 2-hour shift
9    problem there according to my analysis.
10        Q    Do you know how Sunview used pay code 10 in
11   paying its employees?
12        A    Well, since it's out of chronological dates
13   here, my -- my suspicion is that this is time that was
14   added several days after the fact that had not
15   previously been put into the program.  But I can't say
16   that because I'm -- I would have to opine as to how
17   procedurally things were done at Sunview.
18        Q    And you don't know?
19        A    And I don't know how procedurally things were
20   done, but I assume -- or I assume this is just an
21   artifact of something being out of order and there
22   was a -- I just don't really -- I just don't really
23   know on that particular circumstance what happened at
24   the work site.
25             MR. MOLLAND:  Let's turn to Example 3 which

1      will be Exhibit 7.

2                (Deposition Exhibit 7 marked by the

3                court reporter.)

4           MR. MALLISON:  The same objections.  This is

5      not authenticated.  It misrepresents the underlying

6      database.

7      BY MR. MOLLAND:

8        Q   I'll represent that Example 3 represents rows

9      411238-411248 of the Sunview payroll database and

10     covers the employee in here for one work week.

11               MR. MALLISON:  Same objection.

12     BY MR. MOLLAND:

13       Q   First of all, do you know whether your

14     analysis looked at the Sunview payroll database for

15     this and to calculate how minimum wage over a work

16     week?

17       A   Well, I was specifically told to look at the

18     minimum wage related to the number of hours worked on

19     a work day.  And so that's -- I understand what you're

20     showing me here is something that you think I was

21     tasked to do, but I want to make it really clear that

22     if I was tasked to do this then I would tell you this

23     is what I understand this to be.

24       Q   So you're telling me that you weren't asked

25     to do this calculation?

1          A    I wasn't tasked to look at the number of

2     hours over a work week based upon a ten-hour work day

3     amortized over a seven-day work week or what have you.

4     I just was not tasked with that.

5               MR. MALLISON:  I'm going to object this

6     misstates the law as well.  This is totally irrelevant

7     to this case.

8               THE WITNESS:  I mean, this is not -- this

9     isn't what I'm tasked to do.  I could do this for you,

10    for your clients, you know, I'm working, working for

11    everyone here, but I wasn't tasked to.

12    BY MR. MOLLAND:

13         Q    Okay.  Do you understand -- do you have any

14    understanding what pay code 31 is or how it was used

15    at Sunview?  Any understanding at all of what pay code

16    31 is?

17         A    I would have -- well, on the left-hand side

18    of Example 3, Part 2, you show a list of -- oh, well,

19    no, it's not even on here.  You show a list of pay

20    codes.

21         Q    On Exhibit 2; right?

22         A    No, I was talking about on Exhibit 6.  I was

23    hoping that this --

24         Q    Excuse me.  Okay.

25         A    I'm sorry.  I was hoping that this would

1    match up with this.

2            What this does tell me, so there is enough

3    columns in here missing that I can't necessarily

4    authenticate this, but 411238 to 411248, what this

5    tells me --

6        Q   You're referring to example -- you're

7    referring to Exhibit 7.  What this tells you is what?

8        A   What this tells me is that -- well, what this

9    tells me is that there is not a -- there is not a pay

10   period on here -- or there's not a -- I'm sorry -- a

11   pay type on here, and it also tells me there is no job

12   type, and I also don't see dates on here.  So I'm not

13   really sure how to interpret this.

14           MR. MALLISON:  I object.  This is a really

15   incomplete hypothetical at this point.

16           THE WITNESS:  This is really bizarre, but

17   this is good knowledge to have.

18           MR. MALLISON:  Give him the full exhibit with

19   all the information.

20   BY MR. MOLLAND:

21       Q   My question, though -- I thank you for your

22   answer -- so you don't know how Sunview used or what

23   pay code 31 was in the Sunview database; right?

24       A   Not in the context of the exhibit you gave to

25   me because this is extremely limited showing of data.

1      Q    Right.  Okay, let's forget about Exhibit 3 --
2    or excuse me -- Example 3 which is Exhibit 7.
3           Do you have any knowledge whatsoever from any
4    source, your data, anybody's data, about what pay code
5    31 represented or how it was used at Sunview?
6      A    Well, you're representing it here as some
7    sort of adjustment on Exhibit 7 which you just told me
8    to forget.
9      Q    You can use any source of information you get
10   including what I've just told you --
11     A    Okay.
12     Q    -- and what you've assumed right now.  I want
13   to know whether in doing your report you had any
14   knowledge whatsoever of pay code 31 at Sunview or how
15   you would use 31.
16     A    I would have to look at the SQL, but I think
17   to understand what these pay codes mean you really
18   have to use them in the context of pay type, job, date
19   worked, units or hours and adjusted rate -- or not
20   adjusted rate, but the -- but the input rate.
21     Q    All right.  So --
22     A    I don't think that -- you know, you're asking
23   me something completely hypothetical.  I don't --
24     Q    I'm not.  You know pay code 31 exists in the
25   Sunview database, don't you?

1      A   Well, I have a list of all of the pay codes

2    that -- or all of the codes that exist in every

3    single -- in every single context.  But this is

4    very --

5      Q   Where is your list?  Let's see your list in

6    the data.

7      A   Codes appearing in data.  Here we go.  No,

8    let's see, that's a different.  Let's look at this

9    here.  Hold on.  What is this?  Local cannot connect

10   to a -- well, that's strange.  Just a second.

11       Do you see it?  I don't.  No, I don't think

12   that's it.  No, just a second here.

13       This is --

14     Q   Can you find in what you produced the pay

15   code that Sunview uses --

16     A   You know what's really interesting about this

17   is that -- codes appearing -- let's see here, codes

18   appearing in data.

19     Q   Can you --

20       MR. MALLISON:  He's looking.

21   BY MR. MOLLAND:

22     Q   Just focus for a minute.  I'm asking you to

23   find any document that you produced or you used in

24   your expert report that identifies the pay codes used

25   by Sunview in its payroll data.  Okay, do you have the

1    question in mind?  Go ahead.

2        A    Okay.

3        Q    What's pay code -- those are the pay codes

4    you used --

5        A    No.  You used.

6        Q    Okay.  Those are the pay codes you used for

7    purposes of determining your conclusions and opinions

8    based on the Sunview payroll data; right?

9             MR. MALLISON:  Objection.  Misstates

10   testimony.

11            THE WITNESS:  No, it's not.

12   BY MR. MOLLAND:

13       Q    You didn't use, okay.

14       A    So this is -- this is -- remember, we have to

15   use -- void code -- so if there's a pay code and there

16   is a void code that may not be a valid entry.  If

17   there is a misappropriation of hours job code with --

18   or misidentified hours job code in conjunction with a

19   pay code of 11, for instance, or 21 and a -- there's a

20   lot of combinations that could mean one thing or

21   another.  What's interesting is this whole list was

22   provide --

23       Q    I have a real simple question.

24       A    No, I've got to say this for the record.

25       Q    Did you --

```
1         A    I said --

2              MR. MALLISON:  Wait.  Let him finish his

3    answer.

4              MR. MOLLAND:  An answer to what?  There is no

5    question pending.

6              MR. MALLISON:  He said he has something to

7    say.

8              THE WITNESS:  You've asked me a question --

9    BY MR. MOLLAND:

10        Q    And you're not answering it.

11        A    Well, yes, I am.

12             MR. MALLISON:  You can't interrupt him.  Let

13   him finish.

14             THE WITNESS:  So here's the thing.  I asked

15   Tom and Steve what these codes were.

16   BY MR. MOLLAND:

17        Q    Okay, good.  Tom being Tom Lynch and Steve

18   being Steve Hernandez, and they are plaintiffs'

19   lawyers, and you asked them what the Sunview pay codes

20   meant; right?

21        A    Should I have called you instead?

22        Q    You asked Tom Lynch and Mr. Hernandez what

23   the Sunview pay codes meant; right?

24        A    You're still not letting me finish.

25        Q    Is that correct?
```

1          A   Mr. Molland, I would appreciate the

2     opportunity to express --

3          Q   The record doesn't reflect who first names

4     are.  You talked to Tom --

5          A   Mr. Tom Lynch and Mr. Steve Hernandez, I sent

6     them this exact list that you have on the screen.  I

7     said, "Please find out..."

8          Q   On pay codes?

9          A   This exact list that you have on the screen.

10         Q   The record is not going to show this.

11         A   On pay codes.

12             MR. MALLISON:  Oh, I have the file number.

13             THE WITNESS:  Yeah, it's Codes Appearing In

14     Data.doc.  I said, "Please find out what all of these

15     mean from defense counsel so that I can conduct as

16     thorough of an analysis as possible."  There's some

17     e-mails -- there are e-mails to that extent.  This is

18     what your company sent -- your client sent back.

19     BY MR. MOLLAND:

20         Q   Okay.  You're referring to Exhibit 2?

21         A   There are some very --

22         Q   You are referring to Exhibit 2; right?

23         A   You can raise your voice all you want,

24     but this is--

25         Q   Well, the record has to be clear.  You say,

```
1         "This is what you sent back."  You are referring to
2    Exhibit 2; correct?
3         A    Yes.
4         Q    Thank you.
5         A    So Exhibit 2 is right here.  Your company,
6    your clients didn't include pay code 10, 11, 21, 31,
7    400, 412, 413.  Interesting.  Very interesting.
8    So --
9         Q    I don't know what you're answering, but
10   you're making a speech.
11        A    I'm answering --
12        Q    Are you done?
13        A    I am answering your question.  You asked me
14   if I know what these codes are.
15        Q    You are not remotely answering my question.
16        A    Well, I -- okay, so -- just so fact-finders
17   can figure it out.
18        Q    You have a list of pay codes that are now
19   being shown on the screen.
20        A    Right.
21        Q    And what file are they from again?
22        A    Codes Appearing In Data.doc.
23        Q    What's your understanding of how Sunview used
24   pay code 31 which appears in the document you have on
25   the screen?
```

1    A   Well, according to your Exhibit 7 it's called

2    adjustment.

3    Q   Did you use it to adjust anything in your

4    review of the data?

5    A   I would have used the job code.

6    Q   Did you use pay code 31 to adjust anything in

7    your review of the data in forming your conclusions

8    and opinions in this case?

9    A   If pay code 31 would have appeared in the

10   data alongside the job codes that I used, the units or

11   hours and the date, then those would have been applied

12   toward my analysis as being applied against -- hear me

13   out -- against the date that they appeared on.  So if

14   a shift had a 31 appearing on April 11th, it would

15   have been applied against that.  I was looking at

16   hours worked in a day, not on a paycheck basis.  So I

17   hope that answers your question.

18   Q   That is actually very clear.

19   A   Okay.

20   Q   And I thank you very much for that.

21   A   You're welcome.

22   Q   I see what you did.  If you made an

23   adjustment, you made it on the work day --

24   A   Right.

25   Q   -- for which that accorded.

1        A    Right.

2        Q    Right.  Perfect.

3             Okay.  Now, what about pay code 412, how did

4    you think Sunview used that?

5        A    If it would have appeared on a particular day

6    alongside units or hours and the pay type and the job

7    code, it would have been applied on that day that it

8    appeared in the data.

9        Q    Let's assume there was a pay code, any one of

10   those pay codes, and in the field that accorded to it

11   on that day it had units or hours.  What would you

12   have done with that pay code and the units or hours?

13   Would you have assumed that the employee worked those

14   hours?

15       A    Well, that's a hypothetical.

16       Q    Right.

17       A    But I would have used the date that appeared

18   in your data that it occurred on or the -- I think you

19   guys call it trans date -- trans date?

20       Q    Um-hm.

21       A    Okay.  I would have applied what appeared

22   there against the spreadsheet of hours that

23   were -- how would I say? -- against the work date for

24   which that date corresponded.

25            So if there is, you know, like I see -- I see

1    on Exhibit 7 how you would have said pay code 31

2    applies on a -- just hear me out here, I think I'm

3    going to answer your question -- on a group of days

4    against that paycheck that contained that group of

5    days, if I'm hearing you correctly.

6         My analysis and my understanding of the data

7    was that the date code applied to what happened on

8    that day, not against the final check that was cut

9    that contained that day and every other day that

10   appeared on that paycheck.  So your pay codes are

11   applied toward the shift on the particular day that

12   that pay code is associated with.

13        MR. MALLISON:  I'm going to object generally

14   on the fact it appears that these codes were withheld

15   from plaintiffs improperly and that this entire

16   process of hiring this expert has been -- you've

17   been -- we've been highjacked by your attempt to both

18   mislead the expert and mislead this court.

19        MR. MOLLAND:  Good luck with it.  I mean, I

20   think you probably are going to have --

21        MR. MALLISON:  If you are going to call to

22   the defense the job codes, the stuff you failed to

23   provide is a basis for your defense -- and by the way,

24   it's a federal average and you're in trouble there

25   anyway -- then I think the judge needs to get

1    involved.

2         MR. MOLLAND:  Okay, you've made your

3    objection.

4         Q    I think the record is clear you don't have

5    the slightest idea what any of these pay codes mean,

6    do you?

7         A    I have a very good idea what they mean in

8    conjunction with the job codes and the dates they

9    appeared on in relation to what your clients told

10   plaintiffs' counsel via you.

11        Q    Well, just so we're clear, what does pay code

12   413 mean?  Do you have any idea?

13        A    I'm not sure what pay code 413 means without

14   the context of a job code and a void code and a

15   date -- and what else? -- pay type.

16        Q    And you don't know what pay code 412 means

17   either?  And before -- I'm just going to say the same

18   reservations; right?

19        A    It has to be -- yeah, it has to be used in

20   conjunction with other indicators in the data.  It's

21   not -- in my findings it's not a standalone -- it's

22   not a standalone code that can be used.  There's --

23   there's other things that have to be joined with that

24   to make it work.

25        Q    And you don't have any idea what pay code 400

1    means, right, subject to the same reservations?

2       A   Well, I don't think it's -- well, without the

3    context of the other codes it's not something that I

4    can establish as meaning something that it doesn't, or

5    conversely, something that it does.  If it happened on

6    that day and it had a pay type and it had a job type,

7    then it would be applied toward that day's hourly or

8    piece -- piece-rate work calculation.

9       Q   All right.  I read your report.  And the data

10   that was provided to you didn't have any reference to

11   lunch breaks, right, none of the data; right?

12      A   There is no evidence of time clock data in

13   the data that was provided; that is correct.

14      Q   For lunch breaks?

15      A   For lunch periods or meal breaks.

16      Q   Right.

17      A   Did I just say the same thing, lunch breaks

18   or meal breaks?  Pardon me.  Meal periods -- meal

19   periods or rest breaks.

20      Q   Okay.  Now, and that's good, I understand

21   what you mean.  I'm not trying to trick you.

22      A   That's fine.

23      Q   I am going to restate this.  I honestly

24   believe you will say yes to this, but maybe you won't.

25      A   All things considered.

5/3/2011  Woolfson  Aaron

1    Q    The Sunview data doesn't have -- that you
2    looked at -- doesn't have any data at all about lunch
3    breaks; correct?
4    A    The data that I --
5    Q    See, I knew you couldn't say no.
6    A    The data that I have does not have any codes
7    in it pertaining to a lunch or a meal break.
8    Q    The data that you have doesn't have any
9    reference codes mentioned, data, you name it, that
10   pertained in any way to lunch breaks; right?
11   A    That is correct, there is no evidence of
12   lunch breaks in this data.
13   Q    And the same true -- the same is true, there
14   is no evidence of rest breaks in the data you looked
15   at; right?
16   A    That is -- that is correct.
17   Q    And there is no reference in the data that
18   you looked at and were provided that have any
19   reference to when, when, the time that any employee at
20   Sunview started work; correct?
21   A    Well, I don't -- did I -- did I state that in
22   my testimony?
23   Q    No, you didn't, but I --
24   A    No.  So you are just anecdotally asking me if
25   I saw evidence of that beyond my report?  I'll just

1    tell you, yeah --

2         Q    Yes, it's a question.

3         A    -- I didn't see -- I didn't see start or -- I

4    didn't see start or end times in the data.  I just saw

5    a gross sum of hours.

6         Q    Right.  So just to make sure the record is

7    clear because this record is going to get pretty

8    confusing, all right?

9         A    Sure.

10        Q    The data that you looked at, the electronic

11   data that you were provided and analyzed didn't have

12   any evidence of start time for any employee; correct?

13        A    That is correct.

14        Q    And it didn't have any evidence of end times

15   for any employees; correct?

16        A    That is correct.

17        Q    And it didn't have any evidence about whether

18   any employee had ever paid for or been reimbursed for

19   a tool that they used at work at Sunview; right?  No

20   evidence of that one way or the other; right?

21        A    Let me just make sure -- standby.  You know,

22   I --

23             MR. MALLISON:  I object.  It goes beyond the

24   scope of his expert testimony in this case.

25             THE WITNESS:  I mean, if you're just

```
1    asking -- I -- I don't know if there were tool
2    reimbursements.
3    BY MR. MOLLAND:
4        Q    That's because the data doesn't show, have
5    any evidence of that one way or the other; right?
6        A    Well, last standing --
7        Q    To your knowledge.
8        A    My lack of having been tasked with analyzing
9    specific data that contained a equipment code -- there
10   are equipment codes in here.  Those were not -- those
11   were specifically excluded from my analysis, but there
12   are equipment codes.  I don't know what they mean.  I
13   don't know what a, you know, a front loader from a
14   back loader or anything like that.  I don't know what
15   those codes mean.  I believe there are equipment
16   codes.  I don't know what they mean.  I don't know if
17   there were ever any reimbursements.
18       Q    Okay, let me --
19       A    Work in conscription, yeah.
20       Q    A couple of things that I can just tell you
21   you are way off in your report about, and at least
22   I'll represent you are way off.  We think you're way
23   off.
24       A    Okay.  I understand.
25       Q    But I just -- I've got to figure out how you
```

```
1      did it.  And that is the one thing, the shifts less
2      than two hours per day you come up with a total.  Can
3      you tell me how you did that to come up with this
4      total?  Okay?
5           A    Sure.
6           Q    Or maybe you can just give me the specific
7      query that you used that came up with that total.
8           A    Well, the queries are within the SQL.
9      There's a text file that has the SQL.  But I think I
10     could actually -- if I may refer back to one of these,
11     I'd be happy to explain it to you.
12          Q    The inaccurate misrepresenting exhibits that
13     we gave you that didn't seem to be in accordance with
14     the data?
15          A    It's the one I didn't want to look at, now I
16     want to look at?
17          Q    Over the objection of your counsel.
18          A    He's not here.  He's not my counsel.  I'm
19     not -- he's not representing me, by the way.  I am not
20     represented here today by anybody.  I'm just -- he's
21     representing his own interests.  I just want to say
22     that for the record.  He's occasionally my counselor,
23     but not my counsel.
24          Q    Okay.  And, yeah, feel free to use any
25     exhibit that you have or the electronic data that you
```

1    have to explain how you came up with the numbers

2    for --

3         A    No, I appreciate it.

4         Q    -- the work less than two hours per work day.

5         A    I appreciate the opportunity.

6              So back in your first example, okay, yeah,

7    let's use this Exhibit 6 which is out of order

8    chronologically, but it makes a very interesting

9    point.  Okay.

10             Now, Exhibit 6, row 5727, pay code 10, job

11   215.  This employee appears to work 2 hours on the

12   17th, but that in fact is not the case.  If you look

13   at line 5718, you saw that -- you can see that that

14   particular employee also worked for 6 hours on the

15   17th.

16             The way that I did my analysis was I would

17   have created a row where I summed the two of those

18   together to create 8 hours.  All right.  6 plus two is

19   8.  And that would have been 1 shift, 2 segments,

20   combined 8 hours.

21             So to come up with 2 hours, well, less than

22   2 hours, I would have summed up all the hourly time

23   worked by an employee on a particular day, and I would

24   have looked for all of the instances where the sum of

25   those hours worked the segments was less than 2 hours.

1   So --

2       Q    Okay, I think I get that.  I'm getting that.

3       A    Yeah.

4       Q    So in this example on Exhibit 6 where you

5   have 2 hours under pay code 10 for this employee on

6   the 17th, would that -- would that then enter into

7   your data as a shift less than 2 hours in a day?

8       A    No.

9       Q    Okay.  When would you ever find an employee

10  who worked a shift less than 2 hours a day?  What sort

11  of data would you need to find in the payroll database

12  for you to come to a determination that there was a

13  day or a shift where an employee worked less than

14  2 hours?

15      A    Well, it could have been time keeping

16  database or time clock database, this CSV file.  I

17  would have done a select sum of the instances -- or

18  count.  We call it count, select count.

19      Q    Select account.  Okay.

20      A    Not account.  I'm sorry.  Select space count,

21  c-o-u-n-t --

22      Q    Select space count.

23      A    -- of the shifts where the actual time worked

24  as a sum of the total time worked for that employee on

25  that day is less than 120 minutes.

1        Q    Okay.  And you would have used -- for that

2    purpose you wouldn't have excluded any pay codes?

3        A    I would have not excluded any pay codes.

4        Q    Okay.  That's closed.

5             And I bet you remember because you're a smart

6    guy --

7        A    Well --

8        Q    -- that there was a pay code that was an

9    adjustment pay code.  Remember that?

10       A    Yes, pay code --

11       Q    31.

12       A    -- 31.

13       Q    Right.  So you would have used that pay code

14   too and any hours that would have been reflected in

15   that pay code would also have reflected a -- work less

16   than 2 hours if it was less than 2 hours?

17       A    Well, I don't know, is pay code 31 -- does it

18   have a -- well, let me just look at a snapshot of your

19   data here because I want -- that really -- that's a

20   really interesting question.  And once again, I love

21   interesting questions.  So just let's look at the CSV

22   file here.

23            That's a fast little laptop.

24            Okay.  So I'm just -- you're just going to

25   have to trust me on this here.  I'm looking at data ad

1    hoc.

2         Q    Okay.

3         A    So I don't --

4         Q    Do the best you can with the question.

5         A    I will do the best I can.  I will.  And

6    expertly so.

7              Okay.  So what I see here is this pay code 31

8    shows 6-and-a-half units, hours, would have been added

9    to the work on 12-12-2001.  Now, what's interesting --

10   let's see, what is 257?  Code 257 -- I'm

11   looking -- oh, here it is, 257.  Let me make sure 257

12   was not excluded from my -- yeah, it's not excluded.

13             So they would have gotten 6.5 times 7.3, or

14   in this case 6.5 hours added to their work day on

15   12-12-2001.

16        Q    Let's identify where you're looking here.

17   You're on which document?

18        A    I'm on it looks to be the 308th row of

19   PR55DTLR.csv.

20             Is that the right column?  That is, right?

21   Let's see here.  Um-hm, the fourth column.  1-2-3-4.

22   Yes.  It is.  Okay.

23        Q    Okay.  That's I think very clear.

24        A    Okay.

25        Q    Before we break can I ask you one other

 1    subject, and then we'll take a break?

 2        A    Sure.

 3        Q    I'm going to ask about your overtime opinion.

 4    And we've touched on it basically.  So paragraph 24.

 5        A    Okay.

 6        Q    You know, I think I get how you came up with

 7    8,246 based upon what you've testified about.  You

 8    looked at all the shifts, you made a query about in

 9    which of those shifts were over 10 hours, you didn't

10    exclude any pay codes, and you took the total and came

11    up with 8,246, or --

12        A    No, I mean, I like your summary.  I'm just

13    thinking about it.  Well, we would have taken out pay

14    codes --

15        Q    There are some pay codes you excluded, but

16    you put them up front.

17        A    -- 630, 631, 682 and 899.

18        Q    I don't think they are pay codes, but that's

19    okay.  Whatever they are you took them out.  They are

20    job codes.

21        A    Job codes.

22        Q    You call them pay codes, but they're job

23    codes.  It's all right.

24        A    Well, it's probably better if I would have --

25        Q    That's okay.  There's a lot of stuff that's

1    wrong, but, you know --

2              MR. MALLISON:  Objection.

3              THE WITNESS:  No, I don't -- I don't agree

4    with that.  I don't agree that there's lots of stuff

5    wrong.  I mean, you know --

6    BY MR. MOLLAND:

7         Q   Well, it's just -- I shouldn't -- there was

8    some stuff that you thought a job was a pay code --

9         A   We don't have a meeting of the minds.  And

10   you will have your own experts, I'm sure, and your own

11   replies that will --

12        Q   The truth of the matter, you didn't exclude

13   any pay codes, but you excluded some job codes.  And

14   looking at your report now you know that's what you

15   did; right?

16        A   There would have been -- well, there would

17   have been a type 31 pay codes included --

18        Q   Sure.

19        A   -- in that.  I think that's accurate to say.

20   Yes.

21        Q   All I'm trying to get at is in paragraph 13

22   where you say you excluded the following pay codes,

23   you now know that's wrong.  You didn't exclude any pay

24   codes.  What you did is excluded some job codes.

25        A   Well, I mislabeled this based upon a

1    conversation with Tom Lynch.  There is obviously the

2    SQL will set the -- the SQL statements would set the

3    record straight.  You'd see exactly what that means

4    from a SQL standpoint.  And this is just a, a mis- --

5    a mistype based upon information --

6         Q    No problem.

7         A    -- provided by Tom Lynch.

8         Q    So no problem.

9              But let's go to paragraph 24, the overtime,

10   because I'm trying -- I'm just trying to figure out

11   how you got those numbers.  So first you came up with

12   the number of shifts that are over 10 hours; right?

13        A    Right.

14        Q    And the way -- that seems pretty

15   straightforward.  You look at the shifts you counted

16   to figure out which ones are 10 hours.  You don't

17   exclude any pay codes, and there you go, right, you

18   get 8,000-something?

19        A    Well, right.  But even more, I think, central

20   is that if I had the information on these pay codes,

21   if I had most everything we asked for I could

22   certainly go back and with an errata I could correct

23   that.

24        Q    Well, I'm not saying there is anything to

25   correct here.  I'm not suggesting that there is --

```
1          A    Okay.

2          Q    -- on the number of the shifts over 10 hours.

3    There might be; there might not be.  I just don't

4    know.  But it seems to me a pretty straightforward way

5    of getting that, you just look at the shifts that are

6    over 10 hours, you don't exclude anything, and you

7    come up with 8,246.

8          A    We don't exclude type 31.

9          Q    I got you.

10              So, but then what I really don't understand

11   is where you say that there were of these 8,246 there

12   was no overtime paid for 4500.  A couple of questions

13   about that.  First, your chances are about one in

14   4500, I guess, of coming up with that number --

15         A    Yeah.

16         Q    -- out of -- it's an even number.

17         A    I don't --

18         Q    Is that an exact number or is that an

19   approximate number?

20         A    No, that's an exact number from SQL.  I'm

21   very careful.  I wouldn't want to put anyone in a bad

22   spot.

23         Q    Okay.  Well, tell me how -- tell me how you

24   got that number that's saying that there was no

25   overtime pay, how you made that decision for those
```

1      8,246 shifts.

2         A    I looked at the base pay for employees who

3      worked -- regardless of how long they worked --

4      irregardless of how long they worked.  The -- I then

5      looked at the number of employees who worked for more

6      than 10 hours, granted with pay code 31 in there,

7      which you allege is an adjustment and is not actual

8      work.  And then you look at the number of those

9      employees who are not paid in excess of their hourly

10     rate at 1-and-a-half times.  Of those 8246 number,

11     4500 of them experienced -- the shifts -- experienced

12     no overtime.  Now --

13        Q    Does that mean they weren't paid above their

14     nominal rate that's designated as the input rate?

15        A    I -- well, I wouldn't -- I don't understand

16     the term nominal rate, but I will say --

17        Q    I think it is input rate is what you --

18        A    Yeah.  So the general -- if you work for

19     6 hours in a day and you are paid 6.75 an hour, you're

20     not able to see if someone is paid at a higher rate or

21     a lower rate based upon the rate that's inputted,

22     input on this sheet.  And so it was easy for me to see

23     where overtime was -- you know, where the hours were

24     overtime after 10 hours in a day.

25        Q    Here's the critical point.  You did this on a

1    daily basis.  You didn't do it on a pay period basis;

2    right?

3         A    I was told to look on a daily basis.

4         Q    And I think that --

5         A    Yeah, and that's -- that is -- you know, I

6    think that is a, a distinction obviously that, you

7    know, I'm not -- I'm not an attorney.  I have no idea

8    why it would be done one way or another.

9         Q    You certainly were capable of looking at it

10   on a periodic rate if you'd been instructed to do

11   that.

12        A    If I had been.

13        Q    Yeah, and you just didn't do it because you

14   were told not to.

15        A    I wasn't told not to.  I was just told they

16   want to see it on a -- everything on a daily --

17        Q    Got you.

18        A    -- basis.

19             Now, knowing pay code 31 and knowing what you

20   just showed me in Exhibit 7, yeah, I would love to

21   have the opportunity to go back and do this.  I don't

22   think your clients or my client here want to pay for

23   that.  But I could certainly do it.  And I wish that I

24   had that particular -- had been given that task.

25        Q    Now, you know that the data that Sunview gave

1    you was susceptible to analysis on a pay period basis

2    as opposed to just a daily basis; right?

3           MR. MALLISON:  Objection.  It calls for a

4    legal conclusion.

5           THE WITNESS:  Yeah, I'm not aware of any one

6    way or another that you would have or plaintiffs'

7    counsel would have preferred to look at that.

8    BY MR. MOLLAND:

9       Q    Okay.  You're aware that Sunview produced the

10   actual payment -- pay records -- weekly pay records of

11   its employees to plaintiffs' counsel?  Did they tell

12   you that?

13      A    Well, I see them in here as -- as PDFs.  So I

14   am aware that there's weekly, what would you call it,

15   pay stubs?

16      Q    Pay statements?  Payroll records?

17      A    Pay records.

18      Q    Right.

19      A    Yeah.

20      Q    And fair enough.

21      A    So.

22      Q    I mean, you didn't look at that because you

23   understood that wasn't your assignment.

24      A    I understood my assignment to be limited in

25   scope to what I had been tasked to do, and that

1    was -- that was all that I had been asked to do.

2         Q    Right.

3         A    Yeah.  But I would have gladly analyzed it

4    both ways had I been asked to do that.

5         Q    Got you.

6         A    And I'm capable as an expert to analyze both

7    ways, and in fact in many cases I have.  And there was

8    actually a case, I attach it to here, it's the KFC

9    case where we had looked at it where I had been tasked

10   to analyze it both ways.  And I'm not sure how that

11   decision was made on certification and whether it was

12   based upon a weekly or a biweekly paycheck and

13   overtime or was it, you know, just straight hourly

14   work.  I'm not really sure, but --

15        Q    Do you have any idea why plaintiffs' counsel

16   here didn't ask you to look at the data on a payroll

17   periodic basis on the actual period in which employees

18   were paid?

19             MR. MALLISON:  Objection.  It calls for

20   speculation.  Nonsensical.

21             THE WITNESS:  Yeah, I'm not really sure what

22   they had in mind when they asked.

23   BY MR. MOLLAND:

24        Q    When you went through the data did you see

25   something that was called a system date on the data?

1        A    There is a date to the right of trans D.

2    And, you know, let me just -- I can just tell you what

3    fields there were.  That's best.  Let me just look and

4    see what this is.  Yeah, there is a system date and a

5    system time there, sure.

6        Q    Did you have any understanding whether by

7    looking at the data and sorting it by system dates you

8    could figure out what the payroll periods were pretty

9    easily?

10       A    Well, you know, I've done 49 cases now, and

11   I've seen data in every possible manner and form.  I

12   had -- I had just a basic understanding that there's a

13   transaction date cc and a transaction date year to

14   year, month to month, day to day, and that was what I

15   was instructed to use.

16       Q    Fair enough.  You can only do what you're

17   instructed to do.

18            Let's take a little break.  Thank you.

19       A    Okay.

20            THE VIDEOGRAPHER:  This is the end of media

21   No. 2 in the deposition of Aaron Woolfson.  We're off

22   the record at 2:34 p.m. -- I'm sorry -- 3:34 p.m.

23            (Recess taken.)

24            THE VIDEOGRAPHER:  Back on the record at 4:09

25   p.m.  This is the beginning of media No. 3 in the

1   deposition of Aaron Woolf-  I'm sorry -- Woolfson.

2   BY MR. MOLLAND:

3       Q   Mr. Woolfson, could we go back to the exhibit

4   you were showing me to explain your minimum wage

5   analysis per day that pertained to Mr. Sanchez?  Do

6   you recall that exhibit?  I think I was asking for

7   examples of how you calculated your minimum wage.

8       A   Yes.

9       Q   And you brought -- you looked at a file and

10  brought it up on the screen.

11      A   Sure.  You must be talking about this

12  particular?

13      Q   Exactly.  That's exactly it.  No, that's a

14  different one.  This is the one for minimum wage.

15  This is the one that --

16          MR. STEPHENS:  Payroll registers.

17  BY MR. MOLLAND:

18      Q   Payroll registers.  And I was asking about

19  stubs, and I was asking what you reviewed to

20  corroborate your opinion.

21      A   Is it this one here?  Probably.

22      Q   No, I don't think so.

23      A   Yeah, it is.

24      Q   Is that it?  No, I think it was for

25  Mr. Sanchez.  Maybe if you scroll up you'll find it.

```
1        A    Scroll up.

2        Q    Do you see it there?  It doesn't look --

3        A    Let me see if I can find it.

4        Q    Here we go.  At least that's Sanchez.  Is it?

5             MR. STEPHENS:  72623.

6             MR. MOLLAND:  7- -- what was the number

7    again?

8             MR. STEPHENS:  Check No. 72623.

9             THE WITNESS:  Okay.

10            MR. MOLLAND:  There you go.  That's exactly

11   it.

12            (Interruption.)

13            THE WITNESS:  I'm sorry.  Ignore that.  Let

14   me turn off my phone.  Sorry, guys.

15            My phone is silent.  Okay.

16   BY MR. MOLLAND:

17       Q    As I understand, now we're going to be

18   talking about check 72623.

19       A    Okay.  Yes.

20       Q    It's for Jose Sanchez.  And what's the total

21   paid for this whatever pay period you're looking at?

22       A    Well, the total paid for the 8 hours worked

23   on this pay period is 56.80.

24       Q    56.80.

25       A    Right.
```

```
 1        Q   And how many -- and you're using this example
 2   as an example of why you believe, based on everything
 3   you've told me and instructions from counsel and all
 4   that, that Mr. Sanchez wasn't paid minimum wage; is
 5   that right?
 6             MR. MALLISON:  Objection.  It misstates the
 7   testimony.
 8             THE WITNESS:  No.  What I'm just saying is
 9   that the amount of hours here for the pay rate -- if
10   you're looking at just straight pay.  I'm not talking
11   about piece rate amortized over the number of hours
12   that they worked.  I'm talking about just straight
13   pay.
14   BY MR. MOLLAND:
15        Q   You're just saying whether there is a 6.5 up
16   there rather than a 6.75; is that what you're saying?
17        A   That's all I'm saying.
18        Q   Okay.  Well, so then you basically
19   acknowledge that if you take what Mr. Sanchez was paid
20   in gross pay for that day and you divide it into the
21   number of hours that Mr. Sanchez worked that day that
22   that's more than the minimum wage; right?
23        A   Well, I -- I agree with that.  But I'm not --
24   and I acknowledge that in my declaration as well where
25   I talked about minimum wage -- let's see.  Just a
```

```
1    second.  I'll find it for you.  Thanks for your
2    patience.  Just a moment.  Okay.  Yeah.  Pardon me.
3            In paragraph 20 and 21 I speak to that.  I
4    state the percentage of overall shifts that as
5    straight pay fall below minimum wage.
6        Q   Oh, okay.
7        A   But --
8        Q   I'm sorry.  I'm sorry.  I get this.
9        A   Yeah.
10       Q   You know, your report is actually -- now I
11   understand it.
12       A   Yeah, I'm not saying that people -- I did it
13   both ways.  I did it both ways because I was
14   instructed to look at straight pay and also as the
15   piece rate amortized over the number of hours worked.
16       Q   So the people who told you to do this report
17   for them said they want you -- they wanted you to
18   calculate how many payroll register entries there were
19   where there was a pay rate that was below a certain
20   minimum wage for a particular period of time.
21       A   Well, that's --
22       Q   That's what they told you to do?
23       A   Well, not pay rate, but number of shifts
24   worked where the number of -- the number of shifts
25   worked, not pay rate --
```

1        Q    Right.

2        A    -- as it appears on a paycheck, but the

3   number of shifts --

4        Q    Worked?

5        A    -- where the pay rate was below what I was

6   provided as minimum wage.  So --

7        Q    Okay.  Who provided you with the minimum wage

8   numbers to use?

9        A    Mr. Mallison.  But actually those --

10       Q    Where are those documents?

11       A    Sorry.  Well, it was a reference to --

12            (Interruption.)

13  BY MR. MOLLAND:

14       Q    Go ahead.

15       A    Sure.  Do you want me to go ahead or do you

16  want to take a --

17       Q    No, go ahead.

18       A    Okay.  Those came from the -- there's a

19  website that we -- that I went to, California State

20  Minimum Wage -- I don't remember the exact name of the

21  website.

22       Q    Sure.  In Mr. Mallison's office was there a

23  website --

24       A    Mr. Mallison --

25       Q    We can't --

1     A    Yeah.

2     Q    -- both talk at the same time.  It's going to

3  drive her crazy.

4     A    I'm sorry.

5     Q    Very soon she's going to knock one of us in

6  the jaw.  So don't talk over me.  I'll try not to talk

7  over you.  I know it's difficult.  It's hard for me

8  too.

9          But essentially Mr. Mallison told you what --

10  or his office told you what website to go to for

11  purposes of getting whatever the minimum wage numbers

12  or pay rates that you were going to be using in your

13  report for a given period of time?

14     A    Mr. Mallison's office showed me the

15  information on the website and told me to use those

16  particular numbers.  It was California Department of

17  Labor -- something.  I don't remember the exact

18  website.

19     Q    Okay.  And is that website either the website

20  or the pages you looked at in the data you supplied

21  us, the memory stick?

22     A    It's certainly noted in the SQL on the memory

23  stick, yes.

24     Q    Okay.

25          Now, I think what I initially asked you to

1    do, and maybe it wasn't very clear, I asked you to

2    come up with any data, any payroll data that you had

3    that supported your opinion that any worker was paid

4    less than minimum wage at Sunview.  So in the example

5    that we have here, check 72623, I guess you would

6    agree with me that Jose Sanchez on that particular

7    entry, check 72623, was in fact when you add up what

8    he was paid and divide it by the hours he worked he

9    was paid more than the pay rate that you believe was

10   minimum wage; right?

11       A   Well, the paycheck -- and I think that you

12   stated that the paycheck was a 7-day work period.

13       Q   I'm just asking you for the document that you

14   have in front of you that we're just looking at now

15   and your data for that period, and I don't know what

16   period that was, probably just a day, but anyway, you

17   say 56.80 that date; right?

18       A   Well, this paycheck period covers several

19   days; right?

20       Q   Can I ask you whether 56.80 was what

21   Mr. Sanchez was paid in that pay period on your data

22   that you're showing me?

23       A   Well, this is Sunview data.  This isn't my

24   data.  This is Sunview data.

25       Q   The data you picked out to show us to

1     illustrate your opinion on minimum wage; right?  This

2     is data you picked out.  I didn't pick this out.

3     Mr. Sanchez's payment, the data you picked out.

4         A   Did I make up this data or is this your data?

5         Q   Did you pick -- you selected this data.

6         A   It was a random selection ad hoc selected

7     right here for this particular demonstration.

8         Q   Okay.  Look at it.  It says Mr. Sanchez was

9     paid 56.80; right?

10        A   Well, it does say he was paid 56.80.

11        Q   And he worked 8 hours, right --

12        A   I don't know.

13        Q   -- in this pay period?

14        A   Did he work in -- is this 2 days of work at

15     4 hours apiece or 7 hours?

16        Q   I don't know.  You tell me.  It's your data.

17        A   It's not my data.  It's your data.

18        Q   I'm reading the data that's up there that you

19     selected.  It says he worked 8 hours a day.  Is that

20     8 hours or not in your data?

21           MR. MALLISON:  It misstates the testimony.

22           THE WITNESS:  It misstates the evidence,

23     yeah, on this data.

24     BY MR. MOLLAND:

25         Q   So you tell me -- look, I'm not misstating

1    anything.  I'm just trying to get some clear testimony

2    here.  You picked up some data for Jose Sanchez, check

3    No. 72623, do you see that up on the board on the

4    screen?  Do you see that data?

5        A    Sure, I see the data.

6        Q    This is data that's in your file that you

7    gave me; right?

8        A    This is data in your file that I gave back to

9    you, yes.

10        Q    Okay.  You randomly selected this to

11    illustrate your opinion about minimum wage today at

12    the deposition; right?

13             MR. MALLISON:  Objection.  That was an

14    entirely different point.

15    BY MR. MOLLAND:

16        Q    Did you?

17        A    We're just looking at some data that's on the

18    screen.  I don't remember if I picked it or if someone

19    just said a check number here.  I don't -- I don't

20    know.

21        Q    Well, if you can't remember, you have a very

22    short memory because you picked it out.  Okay?

23        A    Well, okay, so let's assume that I picked it

24    out.  What's the question?

25        Q    The question is how many hours did Jose

1     Sanchez work in this particular pay period that's on

2     the screen?

3          A    In this particular pay period he worked for

4     8 hours.

5          Q    How much was he paid?

6          A    56 -- 56.80.

7          Q    And when you divide 8 into 56.80 what do you

8     get?

9          A    Point-something.  It should be -- do you mean

10    56.80 into 8?

11         Q    You divide 8 hours, you divide that into

12    56.80, what's the number that you get?

13              MR. MALLISON:  Objection.  I think you're

14    missing the math here.

15              THE WITNESS:  .140845.

16    BY MR. MOLLAND:

17         Q    I don't know --

18         A    Switch the denominator.

19         Q    If you're intentionally mis- -- I don't know

20    what you're doing here, but he made $56.80; right?

21         A    You just directed me to divide 8 into 56.80.

22         Q    I'll withdraw the question if it confused

23    you, sir.

24         A    No, I want to understand what you're asking

25    me.

```
 1        Q   I withdraw the question.
 2            How much did he make per hour in that pay
 3    period?
 4        A   56.80 divided by 8 is $7.10 per hour.
 5        Q   Is that more or less than the minimum wage
 6    you believe existed during that period of time?
 7        A   But that is --
 8        Q   Is it more or less than the minimum wage you
 9    believe existed during that period of time?
10        A   You are asking me --
11        Q   Is $7.10 more or less than the minimum wage
12    you believe existed at that time?
13            MR. MALLISON:  Objection.  Vague as to time.
14    BY MR. MOLLAND:
15        Q   Will you answer my question, please?
16        A   No, not as you're asking it.
17        Q   Okay, good.
18            Mark that.  Mark that.  Mark the transcript,
19    please.
20            (Request to mark the record.)
21            THE WITNESS:  The reason --
22    BY MR. MOLLAND:
23        Q   I'm going to ask another question.
24            MR. MALLISON:  No, he needs to finish his
25    answer.
```

```
1              MR. MOLLAND:  I'm withdrawing.  I'm

2        withdrawing the question.

3              THE WITNESS:  I need to understand why you're

4        force -- I can't categorically say that these 8 hours

5        took place in 1 day or over 4 days of 2 hours each

6        day.  I don't know without looking at your underlying

7        data.  This doesn't provide a picture.  If -- I'm

8        going to answer your question.  If that 8 hours were

9        worked on one day, that individual did not receive

10       less than minimum wage.

11       BY MR. MOLLAND:

12          Q    Okay.

13               Do you have any examples of individuals in

14       the data that you looked at that in any way represent

15       your opinion that anybody at Sunview wasn't paid

16       minimum wage, since Mr. Sanchez was in that particular

17       sample that you picked out.  Any?

18          A    I would need to use SQL and a SQL database to

19       show you that, but I could show you if I had SQL

20       available to me.

21          Q    Now we're on to overtime.

22               MR. MALLISON:  Do you have SQL available?  I

23       mean, he said he can show you, and you're refusing to

24       take the examples.

25               MR. MOLLAND:  I'm not refusing to do
```

5/3/2011  Woolfson, Aaron

1   anything.  I asked whether he had an example.  He says

2   he can't do it without some manipulation on the

3   software that we don't have with us.  We'll move on.

4          MR. MALLISON:  He provided you everything he

5   needed to do except the software, and you refused to

6   do it.

7   BY MR. MOLLAND:

8      Q   I don't know, do you have everything you need

9   to answer my question?

10     A   I gave you everything on this stick.  If I

11  had access to SQL and we had a SQL viewer, I could

12  certainly show you examples of that.

13     Q   Okay.  Did you bring SQL with you?  Did you

14  bring a SQL Viewer with you?

15     A   SQL Viewer is a Microsoft licensed product.

16  I don't have a SQL Viewer with me, I mean, just like

17  you don't have an AS-400 with you.

18         MR. MOLLAND:  Anything else you'd like to do,

19  Mr. Mallison?

20         MR. MALLISON:  I'd like to get that smirk off

21  your face.

22         MR. MOLLAND:  Well, I'm --

23         MR. MALLISON:  You really -- you really -- he

24  told you he could do it, and you're just purposefully

25  avoiding all the examples.

1              MR. MOLLAND:  How can he do it if he doesn't

2      have the tool with him?

3              MR. MALLISON:  Everybody has SQL.  Your

4      office has SQL.

5              MR. MOLLAND:  I don't carry it in my desktop

6      and so -- that's fine.

7              MR. MALLISON:  If you walk down the hall,

8      there is a copy of SQL down here.  It's just like

9      there's a copy of Microsoft Word.

10             MR. MOLLAND:  You should have brought one

11     with you, then.

12             MR. MALLISON:  It is not our responsibility

13     to supply him with the tools you need to provide

14     answers to your questions.

15             MR. MOLLAND:  Perfectly -- and your position

16     is well stated.

17        Q    Okay.  Let's go to your overtime opinion.  I

18     would like you to go to your data and see if you can

19     pick out anybody that falls into this 4500 that you

20     believe weren't paid overtime.

21             MR. MALLISON:  The same objection.

22     BY MR. MOLLAND:

23        Q    Can you do that?

24        A    Are you asking me about straight overtime or

25     are you asking me about overtime plus piece rate

1    amortized over the hours that they worked equalling

2    more -- equalling to or more than overtime -- minimum

3    wage?

4         Q    Right now I would be satisfied with anybody

5    that you can -- any employee that you can point out in

6    the data that you provided or brought with you to the

7    deposition that illustrates your opinion there was any

8    human being in the world that Sunview didn't pay

9    overtime to that he was entitled to.

10        A    If I had SQL available to me, I could show

11   you.

12        Q    Without -- since I don't have that program

13   with me and you don't have it with you, is there any

14   way in the data that you brought with you that you can

15   point to the identity or any record that would

16   illustrate there was anybody that Sunview hasn't paid

17   overtime that they should have paid overtime to?

18        A    I wouldn't be able to do it without SQL to

19   illustrate.  Let's see here, if there is an example of

20   it in here.  I would not be able to do it without a

21   SQL database to query it directly, but I can assure

22   you there are examples of it.

23        Q    How did Sunview pay overtime, do you know?

24        A    How did Sunview pay overtime?

25        Q    Right.

```
 1        A    I assume that if somebody worked for more

 2   than 10 hours they got time and a half.  And there

 3   were circumstances, I believe, in the database where

 4   they did in fact do that.

 5        Q    Now, did you identify all the instances in

 6   the database that showed that Sunview was paying

 7   people time and a half, to your understanding?

 8        A    I identified where they were and where they

 9   weren't, to my -- to the best of my ability to recall

10   my SQL.

11        Q    How could you tell -- was there any field

12   that you used to determine whether Sunview paid people

13   overtime or didn't pay people overtime?

14        A    There's a field called original input rate,

15   and that would be 1.5 times the rate that it was in

16   previous shifts where there was not less than

17   10 hours.  I guess, let's see, 10 hours or less.

18        Q    So can you describe the process by which you

19   then used that data and any other data that Sunview

20   provided or Mr. Stone provided -- is his name Stone?

21   --  Mr. Stone --

22        A    Bradley.  Brad Stone.

23        Q    -- provided to you --

24        A    Yes.

25        Q    -- that you used to calculate your overtime
```

1    numbers that are reported on paragraph 24 of your

2    report?

3         A    Well, I don't -- there is not a specific

4    overtime code that your client uses that I'm aware of.

5              MR. MOLLAND:  Excuse me just a second.

6              (Discussion off the record.)

7              THE WITNESS:  Sure.  Is this a good time to

8    go off the record for just a second while I can hit

9    the restroom?

10             MR. MOLLAND:  Of course.

11             THE WITNESS:  I just drank all this water.

12             Thank you.

13             THE VIDEOGRAPHER:  Going off the record.  The

14   time is 4:31 p.m.

15             (Recess taken.)

16             THE VIDEOGRAPHER:  Back on the record at

17   4:34 p.m.

18   BY MR. MOLLAND:

19        Q    Okay.

20        A    Okay.  So to restate my answer about

21   overtime.  You're asking me about BVS and the data

22   that I used.  There is a -- there is a code, it is

23   called overtime code.  But just to be certain, if

24   there was time listed that was time-and-a-half times

25   the normal rate that an individual is paid for the

1   normal hourly rate, even if it wasn't necessarily

2   marked overtime, although it normally was, as an O

3   appeared in the overtime code field, I used that to

4   designate overtime.  And I was careful to make sure

5   that that was used in my analysis.

6       Q   So it would be consistent with that, then,

7   that there were 4,500 times exactly where when you

8   looked at the data the individual was paid time and a

9   half to your understanding?

10      A   Well, I want to -- you know, this goes back

11  to your question about our discussion, our friendly

12  discussion about pay codes.  The pay code 31, which

13  you call adjustment on here, may have been added to

14  those hours and counted as improperly not paid

15  overtime when in fact that pay code should have been

16  not applied to any particular day's work, but the

17  aggregation of all those hours at the end per paycheck

18  production.

19      Q   Would that have increased the number of

20  shifts that you believe that where Sunview didn't pay

21  overtime or would that have decreased the number of

22  shifts?

23      A   It would have decreased the number of shifts

24  that I believe I demonstrated Sunview having not paid

25  overtime.  Because of the way that this code manifests

```
1     in the data, I was looking, I was applying that code
2     toward the day's work where it appears in trans date
3     rather than the date that the check was issued.
4           This is -- during the break I had a chance to
5     speak with Marco Palau and Tom Lynch, and they read me
6     the PMK deposition of your -- I don't know what the
7     title was of the individual who was deposed.
8        Q    Don Gallegos perhaps?
9        A    Well, I'll take your word for it.  And his
10    description of pay codes was that No. 10 was a manual
11    makeup code as I had identified in one of your
12    exhibits where the individual -- on Exhibit 6; Example
13    2, Exhibit 6 -- where the individual had worked and
14    had been manually given hours.  Do you remember that,
15    we had referenced that?
16       Q    Um-hm.
17       A    According to the PMK gentleman who was
18    deposed said that 31 was a computer-generated makeup.
19    But, in fact, as I just learned today, it is an
20    adjustment to be applied at the end of the payroll.
21    So I would like to have the opportunity to recast that
22    and provide an errata.  And I'm sorry.
23       Q    Are you done?
24       A    Well, yeah.  I mean, I apologize for having
25    been given wrong information from the PMK on that
```

```
 1    particular adjustment code.  And so I would like the
 2    chance to recast that because I think it will reduce
 3    that particular overtime issue.
 4         MR. MALLISON:  In other words, here is my
 5    objection on this entire line of testimony.  You guys
 6    screwed up.  You gave the wrong PMK testimony, and
 7    that's why if his numbers are wrong his numbers are
 8    wrong and incurred an incredible amount of cost to
 9    plaintiffs' counsel and defense counsel for that
10    matter --
11         MR. MOLLAND:  Yeah.
12         MR. MALLISON:  -- in this case, and the court
13    for that matter in dealing with this issue.  And it
14    will be raised with the court.  That's the end of my
15    objection.
16         THE WITNESS:  But regardless, and this
17    is me --
18         MR. MALLISON:  If you're correct on this
19    whole point about the adjustment, which we still
20    haven't gotten resolved except for the fact that you
21    allege it now at this particular juncture in his
22    deposition for the very first time --
23         MR. MOLLAND:  I'm not alleging anything.
24         MR. MALLISON:  You absolutely are.
25         MR. MOLLAND:  I am not.
```

1        MR. MALLISON:  You're inserting it in this

2    deposition transcript.  It's the first time it's come

3    up, and it's contrary to your PMK deposition.

4        THE WITNESS:  Okay.  Well, regardless, I'm

5    sorry that whatever happened manifested in the numbers

6    showing that overtime had been -- this may require an

7    adjustment on my part.

8        MR. MALLISON:  And I want to continue my

9    objection that you're smirking about the fact that I

10   just spent thousands of dollars getting an analysis

11   done --

12       MR. MOLLAND:  I'm not smirking.

13       MR. MALLISON:  -- based upon your error,

14   based upon your client's representation.

15       MR. MOLLAND:  If I'm smiling, it is only

16   because of the direction in which your finger keeps

17   being pointed.  And I feel --

18       MR. MALLISON:  You're the one who did it.

19       MR. MOLLAND:  I'm not --

20       MR. MALLISON:  You're the one who started

21   this litigation.

22       MR. MOLLAND:  I've never had somebody point

23   their finger as much as you have in this deposition,

24   and it is a little entertaining I have to say --

25       MR. MALLISON:  I'm glad I'm entertaining you.

1          MR. MOLLAND:  Well, you -- yeah, anyway,

2    Mallison finger will be noted.

3          MR. MALLISON:  Thank you.

4          THE WITNESS:  It's a nice finger.  No --

5          I just want to say, you know, because I want

6    to do a good job for everyone, and, you know,

7    I just -- it's unfortunate that occasionally I'm

8    operating on information that is, you know, I wouldn't

9    have known that adjustment should be only applied at

10   the -- not on the day worked, but on the check that

11   that work day appears on.  So I will recast that and

12   provide an errata as soon as possible.

13   BY MR. MOLLAND:

14     Q   All right.  You referred to a PMK

15   deposition --

16     A   Yes.

17     Q   -- just now.

18         And before you did your report you didn't

19   read any transcript you said; right?

20     A   I hadn't.  I had counted on summaries of

21   codes and this document here.

22     Q   You're referring to Exhibit 2?

23     A   Yes, Exhibit 2.

24     Q   Did you -- when you did your report on

25   April 18, were you aware that the deposition of

```
 1    Sunview through its person most knowledgeable had been
 2    taken?
 3         A   I was not aware.
 4         Q   Don't you think that would have been a good
 5    thing for you to know?
 6         A   That's a -- I can't -- I'm not hired to opine
 7    in that area.  I think -- I think that any information
 8    that I can get from anyone to most effectively assert
 9    my expertise as a database analyst is important.  So I
10    think that it would have been extremely helpful to
11    have that piece of information.  If I had had this
12    list that I just -- this list along with this list --
13    I think this exhibit, which is Exhibit 7, would have
14    been not a point of contention.
15         Q   Okay.  Could I see the -- you just referred
16    to as this list, a list on green paper.  Could you
17    show that to me?
18         A   Of course.
19         Q   Thank you.
20         A   Here you go.
21              MR. MOLLAND:  And we'll mark this as the next
22    exhibit, please.
23              (Deposition Exhibit 8 marked by the
24              court reporter.)
25    BY MR. MOLLAND:
```

1          Q    Exhibit 8 has on it a list that you said you

2     wish you would have seen; right?

3          A    Yes.

4          Q    I'm going to read.  There is a list, in

5     addition to having frappuccino flavors on it, which I

6     will ignore as I read it, has handwritten 10 - -- can

7     you read --

8          A    Sure.

9          Q    -- what that reads?  In fact, why don't you

10    read the list you wrote on it.

11         A    Sure.  And I'm going to write it down right

12    here for myself.  10 is a manual makeup - hourly.

13         Q    Okay.

14         A    11 is regular hours.  21 is piece rate.  31,

15    computer generated makeup - hourly.  400, vacation.

16    412 is a bonus of some sort.  413 is a bonus on hours.

17    Now --

18         Q    Is that the sum total of what you wrote on

19    that page?

20         A    That is the sum total.  I wrote it down here

21    in real clear form, and I also -- I will give this

22    back to you now.

23         Q    Okay.

24         A    Do you want a copy of this as an exhibit

25    right now?

1        Q    We'll take care of it in due course.

2        A    Okay.

3        Q    And I guess your testimony is if you had

4   known that information before you wrote your report

5   you would have done your analysis a little

6   differently; right?

7             MR. MALLISON:  Objection.  Misstates

8   testimony.

9             THE WITNESS:  If I would have been provided

10  with the information that pay code 31 was an

11  adjustment that is to be applied on the paycheck on

12  which the hours, the accumulation of the daily hours

13  were created into a paycheck to give to the employee

14  and that that was a single line item not related to a

15  particular day but to a paycheck for a sum of hours, I

16  would have --

17  BY MR. MOLLAND:

18       Q    You would have done what?

19       A    I would have certainly excluded 31, pay code

20  31 from my daily analysis, and it would have changed

21  the numbers related only to employees where pay code

22  31 would have been apparent associated with a trans

23  date rather than a paycheck date.  And that's the

24  only -- so far that's the only thing that it appears

25  that I should have done differently.

1        Q    Okay.

2        A    And I will provide an errata.

3        Q    So, so far that's the only error you think

4    you've made in your report; right?

5        A    I hope so.

6             MR. MOLLAND:  Okay.  We'll mark as the next

7    Exhibit 9.

8             (Deposition Exhibit 9 marked by the

9             court reporter.)

10   BY MR. MOLLAND:

11       Q    I'll represent to you that Exhibit 9 is an

12   exhibit that was marked and at least testimony was

13   offered to be given on this.  I'm not sure what the

14   plaintiffs' lawyers did about it.  But this exhibit

15   was marked at the deposition of Mr. Dan Gallegos on

16   behalf of Sunview Vineyards, which you referred to as

17   the PMK deposition.

18       A    Okay.  Did I refer to that wrong?

19       Q    No.

20       A    Oh, okay.

21       Q    But it's the same deposition that apparently

22   you just had a phone call with Mr. Palau and maybe

23   some others, and they --

24       A    Yeah, Mr. Palau and Mr. Tom Lynch.

25       Q    And they gave you the information that was on

1    Exhibit 8; right?

2         A    Yes, sir.

3         Q    And if you -- why don't you turn through

4    this.

5         A    Okay.

6         Q    And if you go about the middle of the

7    document there will be a list of pay codes.  Are those

8    the pay codes that you said that you weren't supplied?

9         A    These are the pay codes that I was not -- or

10   these are pay codes that were -- well, in particular,

11   the pay code 31 says "makeup hours (computer generated

12   rate to bring earnings to minimum wage)," but really

13   it's an adjustment.  And there's -- I don't know the

14   nuances between "makeup hours (computer generated rate

15   to bring earnings to minimum wage)" and adjustment,

16   but I would have probably -- if --

17        Q    You'd probably have figured it out if you had

18   seen this; right?

19        A    Yeah, I would have definitely made a -- I

20   would have asked for further clarification if I had

21   understood what 31 was.  I thought that it was

22   specifically tailored similar to No. 10 --

23        Q    Sure.  I know you did.

24        A    -- except I thought it applied on that day's

25   work, not on the overall paycheck.

1          Q    I understand that completely.

2          A    Yeah.

3          Q    But if you'd seen this list of pay codes with

4     the notation that actually 31 was for makeup hours to

5     bring earnings to a minimum wage, you would have at

6     least known enough to say what the heck's going on

7     here, and not do what you did; right?

8          A    No, no.  I would say that I -- if I

9     understood what this was meaning to the detail that I

10    do today as we sit here right now, I would have used

11    it in a different context.  But just reading this

12    description, this description, if you look at No. 10

13    and No. 31, there isn't a basis in No. 31 to state

14    that this is on a check level rather than an

15    individual work day level.  I would have read this to

16    be -- I would have treated this the same way as I did

17    in today's based upon the description.

18         Q    So let's go -- my question to you was, the

19    list of pay codes that are on -- this is Exhibit 9 of

20    your deposition.  The list of pay codes that are on

21    this page are the same pay codes that are listed on

22    Exhibit 8; right?

23         A    Oh, I'm sorry.  They appear to be.

24         Q    And so they are the same pay codes that you

25    learned about for the first time from Mr. Palau and

1    Mr. Lynch in that phone call that you had this

2    afternoon; right?

3        A    They are not the --

4            MR. MALLISON:  Objection.  Misstates the

5    testimony.

6            THE WITNESS:  I didn't learn about these pay

7    codes.  These pay codes have to be used in conjunction

8    with other things.  For instance, if you get a regular

9    hours 11, but you get a job description of 899, you

10   wouldn't use it anyway.  So there's certain things

11   that I was aware of and how to use them, but the

12   description here and the way that I was told to use it

13   is different than what I had been led to understand it

14   to mean.

15   BY MR. MOLLAND:

16       Q    Who told you how to use pay code 31?

17       A    Well --

18       Q    The answer is -- who told you how to use pay

19   code 31?

20       A    Oh, okay.  Tom Lynch.

21       Q    Who told you how to use pay code 10?

22       A    Well, it's --

23       Q    Who told you how to use pay code 10?  Who?

24       A    It's -- well, Tom Lynch.

25       Q    Tom Lynch --

```
1        A    Tom Lynch told me how to use all the pay
2    codes, except they were to apply specifically not to
3    certain job codes.
4        Q    Okay.  Mr. Lynch took the PMK deposition,
5    didn't he?
6        A    I don't know who did.  I -- I assume that's
7    where that -- did he?
8        Q    When did you find that out?  Do you know that
9    for a fact?
10       A    No.  I'm just asking, did he?  I don't know.
11       Q    Well, are you the kind of expert that just
12   takes anybody's word for how to use a pay code?  Don't
13   you think they should have some personal knowledge
14   about the subject so you could verify that when they
15   tell you something that they know what the heck
16   they're doing?
17            MR. MALLISON:  Objection.  Badgering the
18   witness.
19   BY MR. MOLLAND:
20       Q    I don't think I'm badgering at all.  You're
21   an expert.  Do you rely --
22       A    I'm an expert in database analysis.
23       Q    Right.  Do you rely upon the lawyers to tell
24   you how to use the different pay codes and the data
25   that you analyze?
```

```
 1        A    Who else do I have to rely upon?
 2        Q    Well, you could take a look at the PMK
 3   deposition yourself and see what the witness said and
 4   look at the documents he produced, but you didn't do
 5   that, did you?
 6        A    Those documents were not made available to
 7   me.
 8        Q    Did you -- did you do that?
 9        A    If those documents had been made available to
10   me, I certainly would have.
11        Q    Well, the PMK deposition was taken weeks
12   before, at least days before your expert report came
13   out, wasn't it?
14        A    I was not aware of it.
15        Q    Why not?
16        A    Because I'm not intimately involved in the
17   nuances of the calendarings of my -- of my clients.
18        Q    Well, you've worked for the Mallison &
19   Martinez firm for many times, you said 30 percent of
20   all the work you do.  That must be over ten of these
21   class actions that --
22        A    30 percent, where did you get that from?
23   Hold on a second here.
24        Q    I think you said 30 percent of your income
25   from your lawyers comes from the Mallison firm.
```

1      A    I said 20 -- 20 percent of my

2    income -- 20 percent of that income comes from doing

3    expert work.

4      Q    Right.

5      A    Okay.

6      Q    And of that 20 percent, 30 percent comes from

7    the Mallison firm; right?

8      A    Is that what I said in my testimony?

9      Q    Yes, it is.

10     A    Okay.

11     Q    So I'm guessing that they must have given you

12   at least ten class actions to work on as an expert

13   over the past years.  Right?

14     A    Well, you're talking percentage of income or

15   percentage of work?  I mean, you can't -- you've got

16   to use a baseline that's the same.  You can't --

17     Q    Is this the way it works when you work for

18   the Mallison & Martinez firm, they tell you how to use

19   the pay codes, and you just do what they tell you to

20   do?  You don't do any independent analysis of how the

21   company itself actually uses pay codes?

22         MR. MALLISON:  I need to make an objection.

23   Tom Lynch doesn't work for the Mallison & Martinez

24   firm.

25         MR. MOLLAND:  Actually, that's a good

```
 1   objection.  I'm sorry.  I forgot about that.
 2            MR. MALLISON:  And the second thing, Tom
 3   Lynch was at the deposition.  You might as well make
 4   that clear to him.
 5            MR. MOLLAND:  He took it.
 6            MR. MALLISON:  He took it.  And I think that
 7   he just -- he just heard what the transcript said.
 8   And the question really ought to be does it match what
 9   he was told.
10            MR. MOLLAND:  I don't know.  I mean, he
11   certainly was on inquiry as to what those documents
12   said, and he either asked questions about them or he
13   didn't, I can't remember, but he definitely should
14   have.
15            MR. MALLISON:  You have the transcript here.
16            MR. MOLLAND:  And whether he did or not, I
17   just don't know.
18            MR. MALLISON:  He did.
19   BY MR. MOLLAND:
20       Q    Let's go back to this.  Is it your custom and
21   practice when working for the lawyers that you work
22   for that when they give you data that has codes in
23   them you rely upon them to tell you how to use the
24   codes?
25       A    Well, I rely upon them to ask defendants what
```

1    codes mean, and I trust the defendants are going to

2    provide a full and accurate description of those

3    codes.

4         Q    Okay.  If you had known before you wrote your

5    report that 31, code 31 referred to makeup hours and a

6    computer generated rate to bring earnings to minimum

7    wage, would you have done your minimum wage

8    calculations differently?

9         A    I would have eliminated --

10        Q    Can you just answer me yes or no, and then

11   I'll ask you what you did.

12        A    Yes, sure.  If I understood -- if I had

13   understood that what was written on the list of pay

14   codes of Exhibit 9 was not in fact the way that it was

15   used by Sunview on Exhibit 7, I would have done things

16   differently.

17        Q    Sure.  And if you had known that pay code 412

18   referred to bonus pay, would you have done your

19   overtime calculations differently?

20        A    412, bonus pay.  Bonus pay was marked with an

21   overtime code of -- I'm sorry.  Overtime was marked

22   with an overtime code of O as far as I'm aware in all

23   circumstances.

24        Q    So my question is different.  That is, if you

25   had known that pay code 412 referred to bonus pay paid

1    in units, would you have done your overtime

2    calculations differently?

3         A    Does that say overtime pay or bonus pay?

4         Q    It says bonus pay.

5         A    How am I supposed to know what bonus pay is?

6         Q    Well, would you have wanted to know what the

7    bonus -- what the overtime -- excuse me -- what the

8    pay code related to bonus pay meant before you did

9    your calculations?

10        A    When you have a field in here called overtime

11   code, I mean --

12        Q    I'm not referring to overtime code.  I'm

13   referring to a pay code referring to Bonus-Inc,

14   No. 412.  If you have a pay code referring to bonus

15   pay, would you have wanted to know how Sunview applied

16   bonus pay in its payroll data before you did your

17   work?

18             MR. MALLISON:  Objection.  It calls for a

19   legal conclusion.

20             THE WITNESS:  Yeah.  I don't have any

21   jurisdiction over what you guys use bonus pay for.  I

22   mean, if you guys had some other code for, for

23   overtime pay that's in here or not in here, I have to

24   go by what your data has been provided.  I count on

25   you to provide me accurate data and accurate

1    descriptions.  If you guys don't provide accurate

2    descriptions and accurate information, and a judge

3    looks at this and says:  Wow, Mr. Woolfson you showed

4    this, and a fact-finder shows that you guys haven't

5    been doing something right, that you guys have been

6    doing right because I have bad information, and he

7    certifies this case, who is the bad guy?  Am I the bad

8    guy or are you the bad guy?

9    BY MR. MOLLAND:

10       Q   I'm asking you some questions, and I would

11   like you to answer my questions, please.

12       A   This is important.

13       Q   Take a look, please.  It's a simple question.

14   Exhibit 27, you didn't know about this list of pay

15   codes and their explanations at the time you did your

16   report.  I'm not blaming you, but you just didn't know

17   about it; right?

18          MR. MALLISON:  Objection.  It misstates the

19   testimony.

20          THE WITNESS:  I know about these pay codes.

21   The way that I'm -- that I'm using them is in

22   conjunction with a job description because if there's

23   a job description in here that says vacation, all

24   right, but your code in here says regular units, and

25   there are circumstances where your data is mislabeled,

1     would you want me to use that as a basis?

2     BY MR. MOLLAND:

3         Q   I'm not asking -- I'm asking the questions.

4     I'm not answering them, sir.

5         A   Well --

6         Q   Would you please answer my question.  I'm

7     just asking you, you didn't see this page on

8     Exhibit 27 which is titled List Pay Codes before you

9     did your report, did you?

10        A   I was not provided with this page.

11        Q   Okay.  And you would have done your report

12     differently had you been provided with this page or

13     you would have asked some questions that would have

14     allowed you to do it differently; right?

15        A   I would have asked some questions about

16     why -- what -- I would have asked for further

17     clarification.  But the way that these explanations

18     are written, I would not have done my report

19     differently because these descriptions are wrong.

20        Q   Okay.

21        Now, there is an overtime code, right, in the

22     Sunview database?

23        A   Correct.

24        Q   Do you have the slightest idea how Sunview

25     used that?

1      A   If --

2      Q   No, I'm not saying if.  Do you have the

3  slightest idea?

4          MR. MALLISON:  Objection.  Let him answer the

5  question.  The answer may start with an if, but that's

6  a word.

7  BY MR. MOLLAND:

8      Q   If is a word, but it suggests that I'm going

9  to get another speech and perhaps some questions

10  directed to me.  I don't need to answer your

11  questions.  I am asking them.

12         MR. MALLISON:  Do you have a question?

13  BY MR. MOLLAND:

14     Q   Do you know how Sunview used the overtime

15  code marked O?

16     A   Based upon my experience as an expert in

17  49 cases that I've been retained on, an overtime pay

18  code on data, if there is an overtime column and there

19  is an O there -- see how I just shifted the if to the

20  part of the sentence in a different part and you're

21  not objecting?  Amazing.

22     Q   Well, it is marveling to me, yeah.  I'm

23  aghast myself.

24     A   It's just amazing.

25         But if there was a -- if there was --

1          Q    Let me remind you of the question again in

2     case you --

3          A    No, I am answering the question right now as

4     you asked me.

5          Q    Do you know how Sunview used the overtime

6     code?  Just to remind you it's a nice simple question.

7     Go ahead.  Do you know how Sunview used the overtime

8     code O?  Do you know?  Yes; no.  If yes, I'll ask you

9     how.  If no, we'll move on.

10         A    Yes.

11         Q    Good.  So tell me how you know Sunview used

12    the overtime code O?

13         A    First of all, to answer your question I did

14    not rely upon the overtime code of O to determine if

15    someone was paid overtime.

16         Q    Okay.  Do you -- but that's not my question.

17    You say you do know --

18         A    Well, I mean --

19         Q    -- how they used it.  How did they use it?

20         A    They marked records O if they considered them

21    overtime.  However, overtime was marked with a pay

22    rate of 1.5 times their normal rate if they had worked

23    a shift that was less than 10 hours.  So a shift of

24    greatest -- where the number of hours exceeds 10 is

25    marked at 1.5 times the regular rate.  If there is an

5/3/2011  Woolfson, Aaron

1    O there or not, I didn't rely upon the O.  I relied

2    upon the actual rate paid.

3        Q   Okay.  That's good.

4            Would you take a look at the CVS file, the

5    data file which you are calling the CVS file?

6        A   Sure.

7            MR. MALLISON:  I don't think that's going to

8    open.

9    BY MR. MOLLAND:

10       Q   Can you turn to where the overtime field is

11   in the CVS file?

12       A   There's no headers on the CVS file itself, so

13   let me see here.  Okay.  1-2-3-4-5-6-7-8, 8 in.  Okay.

14   1-2-3-4-5-6-7-8.  Okay.  All right.

15       Q   So do you see any files that -- in which

16   Sunview used the overtime code?

17       A   Well, they are -- they did use it within the

18   data because I pulled up a, this list, and I provided

19   you with a -- with a list of all of the values that

20   appear as possibilities within that.  So there are

21   cases where they used it.

22       Q   Can you point out any one?

23           MR. MALLISON:  Again, same objection.  If you

24   provide him the SQL database, he will be able to do

25   it.

5/3/2011  Woolfson  Aaron

1          THE WITNESS:  Yeah, I think that it would

2   require me to use a SQL database.

3          MR. MALLISON:  You've had seven hours now to

4   get one together.

5          THE WITNESS:  But as to, you know, overtime

6   what I used was -- if the rate was there, it was 1.5

7   times their standard hourly rate for 8 hours.  That's

8   what I used.  So even if it wasn't marked with an O, I

9   used it.  I showed it as an O.  I used it.  So we're

10  only looking at -- we are only looking at 65,000 rows

11  approximately out of millions and millions and

12  millions of rows.  I really need SQL.

13  BY MR. MOLLAND:

14      Q   However you calculated overtime, did you do

15  it on a daily basis or for a payroll period?

16      A   I looked at it purely on a daily basis.

17      Q   Okay.  That's good.

18          And is there a file that you can point to

19  that if somebody wanted to say, "I want to see what

20  Aaron Woolfson did to make his overtime calculations

21  that appear on paragraph 24," is there a file that you

22  produced that we would go to that would show your work

23  on that subject?

24      A   Yeah.  So what I did for each employee on

25  each work day is I established their regular rate and

1    their overtime rate.  And then I calculated the number

2    of minutes that appeared in their -- in their data as

3    hourly work.  And then if it had -- if it met the rate

4    that was 1.5 times their base pay, then it was

5    considered overtime.  And if it was not, then it was

6    considered regular.

7        Q    Got you.

8             And the file that you -- that collects the

9    way you did this is called?

10       A    Work Data.  It's not a file.  It's a table

11   within SQL.

12       Q    And how would you -- how would you find that

13   table in the data you supplied?  How would you

14   enter -- what name would you enter?

15       A    Select star from Work Data.

16       Q    Select star from Work Data?

17       A    Yeah, with an asterisk.  I'm sorry.  Select

18   asterisk from Work Data.

19       Q    And what would that -- if you put select

20   asterisk from Work Data what does that bring up?  What

21   files do those bring up?

22       A    Well, that would bring up all the data that I

23   worked on.  If you wanted to provide filters --

24       Q    That's okay.  Basically, go to the Work Data

25   file which is that data file you identified before.

```
 1    And what was the name of that again?  It was SQL --

 2         A    Backup set.

 3         Q    Backup set.  You go to that file first?

 4         A    Yeah, you would restore that to a SQL

 5    database restore point, and then you would do select

 6    star from Work Data.

 7         Q    Then you go select asterisk or star --

 8         A    Yeah.

 9         Q    -- Work Data, and that would bring up the

10    files?

11         A    It would bring up all of my -- all of my

12    data.  You could apply filters similar to how you can

13    do it in Excel where you do a sort -- or you do a --

14    you know, you sort, and then you eliminate -- by

15    process of elimination you can go and see certain

16    attributes.

17         Q    So if you -- but if you go to the SQL data

18    file backup --

19         A    Right.

20         Q    -- and then enter select asterisk Work

21    Data --

22         A    Select asterisk from Work Data.

23         Q    -- select asterisk from Work Data, you will

24    bring up all your files in the memory stick that you

25    supplied?
```

```
1          A    Yes, from Work Data.

2               MR. MALLISON:  You may not want to change --

3               THE WITNESS:  Excuse me.

4               MR. MALLISON:  You are on the same page?

5               THE WITNESS:  Yeah.  This is a copy.

6               MR. MALLISON:  He just modified the copy.  Is

7     that okay?

8               THE WITNESS:  I didn't modify it, Stan.  I

9     didn't modify it.

10              MR. MALLISON:  Well, you did and then you

11    undid, so --

12              THE WITNESS:  I did not save changes.  Those

13    are -- these are exact copies.

14              MR. MALLISON:  All right.

15              THE WITNESS:  There's no changes.

16              MR. MALLISON:  I don't care as long as they

17    are cool with whatever the result is.

18              THE WITNESS:  Yeah, I did not.

19              MR. MALLISON:  That's all.

20              THE WITNESS:  Okay.

21              MR. MALLISON:  I want to make sure there is

22    not a problem there.

23    BY MR. MOLLAND:

24         Q    Did anybody from, that you understand, and

25    also for the plaintiffs ask you for assistance in
```

```
 1    asking questions at the PMK deposition of Mr. Gallegos
 2    in this case?
 3         A   I don't think so.
 4         Q   Were you involved in any way in preparing
 5    for -- yourself -- the deposition, the corporate
 6    deposition of Sunview through Mr. Gallegos?
 7         A   Did I --
 8              MR. MALLISON:  Objection.  Vague.
 9              THE WITNESS:  I'm not -- I'm not sure.  You
10    used a couple of words I'm not familiar with.  I'm
11    sorry.  Clarify?
12    BY MR. MOLLAND:
13         Q   To your understanding, did you assist in the
14    preparation of anybody for the deposition of --
15    corporate deposition of Sunview?
16              MR. MALLISON:  Objection, vague.
17              THE WITNESS:  Yeah, I didn't -- I wasn't
18    involved in any -- anything regarding any depositions
19    of anyone.  I wasn't aware of any depositions taking
20    place.
21    BY MR. MOLLAND:
22         Q   Okay.  Until today you weren't aware that the
23    corporate deposition of Sunview did take place; right?
24         A   I wasn't aware.  I'm only -- like I say, I'm
25    only vaguely aware of things.  Just I have a lot of --
```

1    a lot of -- I count on my clients to provide things

2    like this a lot and to relay information to me, so.

3        Q   Do you have any advanced degrees in either

4    database management, statistics, computer science, you

5    name it, that relates in general to electronic data

6    and its interpretation?

7        A   Well, I've been working with SQL databases

8    since they were -- before they were widely available

9    on Windows.  And I've been using databases since I've

10   been 14 years old.  My first full-time job was with

11   the University of Illinois to work on a complex

12   database project when I was 15.

13       Q   My question goes to degrees.  Are you getting

14   there?

15       A   Yeah, but my experiences have been almost

16   exclusively related to realtime involvement with

17   databases through work experience.

18       Q   That wasn't my question.  My question is, do

19   you have any degrees, educational degrees from any

20   institution relating to databases, computer science,

21   statistics, you name it?

22       A   I do not have a degree in the aforementioned

23   fields.

24       Q   Do you have any degree at all from any

25   recognized institution, accredited institution?

```
 1        A    I went to college for four years, but did not

 2   apply for any degree, as I stopped to create a

 3   business called TelSwitch that specializes in

 4   databases for telecommunications carriers --

 5   specialized at the time in telecommunications

 6   databases.

 7        Q    So the answer is no, I don't have any degrees

 8   from any accredited institution?

 9        A    I don't have a degree.

10        Q    From any educational institution whatsoever;

11   right?

12             MR. MALLISON:  Objection.  Vague.

13             THE WITNESS:  I don't have a degree in the

14   areas that you have asked me about.

15   BY MR. MOLLAND:

16        Q    Do you have a degree from any educational

17   institution in anything, and field of endeavor, any

18   field of science, any field of anything?

19        A    I do not have a college degree.  All my

20   experience is through work.

21        Q    Okay.  Now, in some places there will be a --

22   people can go get training, it's not a college degree,

23   and they end up with some kind of certification or

24   degree either in a particular computer science or

25   particular application of computer science or a
```

1    particular type of database management.  Do you have

2    any certifications or degrees like that?

3         A   I am -- no.  No, I do not.

4         Q   Do you know of anybody who is Microsoft

5    certified?  Have you heard the term or have you ever

6    heard the term "Microsoft certified"?

7         A   I have heard the term.  I know people who are

8    both Microsoft certified, Oracle certified, Cisco

9    certified, MySQL certified, Sybase certified.  The

10   list goes on.

11        Q   Are you certified in any of those or in fact

12   anything at all?  Any sort of training or science or

13   discipline?

14        A   Other than 20-plus years of work experience,

15   no.

16        Q   Okay.  Are you certified in SQL?

17        A   I never took a certification course in SQL.

18        Q   Have you taken any courses in SQL?

19        A   Nothing that has been part of any institution

20   of learning.

21        Q   Have you taken any kind of certification that

22   has not been a part of an institution or it has just

23   been some kind of certification or training in SQL

24   that a third party gave you so you basically --

25        A   That a third party gave me.

1          Q    A third party gave you.

2          A    Well, I think as part of my work experience I

3     read SQL manuals and those types of articles related

4     to SQL all the time.  I mean, I'm always looking at

5     books on SQL and SQL efficient database design.  But

6     nothing that I used specifically related to this case.

7          Q    Has any third party ever taught you a course

8     on SQL?

9          A    Third party taught me a course?  There is

10    no -- I have not taken a formal course that was within

11    the construct of a curriculum.

12         Q    Have you ever taken and passed a test on SQL?

13         A    I have never taken a test on SQL.

14         Q    Have you ever taken a test and passed it on

15    any aspect of database management?

16         A    I have not taken courses; however, I am often

17    consulted by and hired by companies that engage in

18    those activities to tutor them in such aspects.

19         Q    Okay.  Have you ever taken a test and passed

20    it on SQL?

21         A    I have never taken any test on SQL.

22         Q    Have you ever taken a test on anything that

23    relates to database management and passed it?

24         A    I have not taken tests on database

25    management.

```
 1           Q    Have you ever worked for anybody who had a
 2      business in database management other than your
 3      current company?  I can't -- I'm sorry.  I should
 4      remember the name of it.  It's not coming to me.  What
 5      is it again?
 6           A    TelSwitch.
 7           Q    TelSwitch.  I'm sorry.  Yeah, TelSwitch.
 8                Have you worked for anybody besides TelSwitch
 9      as an employee in the field of database management?
10           A    The University of Illinois.
11           Q    Okay.  Anybody else?
12           A    My CV contains a vast amount of technical and
13      industry experience.  Consulted, is that employed by?
14           Q    No.
15           A    Would you consider consulting --
16           Q    I did take a look at your CV.  I just want to
17      know whether you've actually been employed as an
18      employee by anybody doing database management?
19           A    Not as database management except for the
20      University of Illinois.
21           Q    Okay.  Fine.
22                MR. MALLISON:  I guess I'm retroactively
23      objecting on the vagueness of the phrase database
24      management.
25      BY MR. MOLLAND:
```

```
1        Q    I took a look at -- you attached a couple of
2   these cases where you have reported decisions where
3   you have functioned as an expert that were attached to
4   your resume.  Do you remember that?
5        A    What are you -- are you talking about this
6   document here?
7        Q    No, actually I'm talking about your expert
8   report.
9        A    Okay.
10       Q    And I think it's Exhibit 4.  I think you have
11  it in front of you there.  Do you see it there?  Is it
12  Exhibit 4?
13       A    Okay.
14       Q    Just look at the front page, please, and see
15  what exhibit number it is.  It's 4, is it not?
16       A    I'll look.  Yeah, I have a list of the
17  exhibits, just a second.
18       Q    Mr. Woolfson, can you look at the front page
19  of that and just tell what exhibit number it is?
20       A    Exhibit 4.
21       Q    4.  Okay.
22       A    I'm sorry.  I thought you meant Exhibit 4 to
23  my Exhibit 4.
24       Q    Could you look at the -- there's a couple of
25  cases, case analyses that are attached, one being the
```

```
1    KFC analysis.  As I understand it, you were at least
2    excluded as part -- in part -- as an expert in that
3    case; right?  As a --
4        A    Well, I don't know if I was or not.  There
5    were probably parts in there that the judge didn't
6    feel that my -- the allegations were substantial
7    enough by the plaintiff, and therefore my testimony
8    may have been irrelevant during those parts.  But I
9    don't think I was specifically excluded as an expert.
10       Q    Putting aside the KFC case, is there any
11   other case where you've testified as an expert where
12   you have been excluded by the court as an expert whose
13   opinion the court will not rely upon?  Do you know
14   what I'm talking about?
15       A    I don't believe that that's -- can you show
16   me where the judge specifically said that my testimony
17   is being excluded?
18       Q    Let me just ask you this.  Can you think of
19   any case where a judge has excluded your testimony as
20   an expert because they didn't believe you had
21   sufficient expertise?
22            MR. MALLISON:  Objection.  Vague as to
23   excluded.
24            THE WITNESS:  Yeah, I can't think of a case
25   where the judge specifically said my expertise wasn't
```

1    sufficient.  I don't think that's what you're asking,

2    but I'm not sure what you are asking.

3    BY MR. MOLLAND:

4        Q   Have you ever been -- has a court, to your

5    understanding, ever made any determination that you

6    were not qualified as an expert in any way?

7        A   No.

8        Q   Except in the KFC case; right?

9        A   Well, I don't -- I'm not aware that the

10   KFC --

11           MR. MALLISON:  Objection.  Misstates

12   testimony.

13           THE WITNESS:  -- case states that I'm not an

14   expert.

15   BY MR. MOLLAND:

16       Q   Well, it included, at least in part, that

17   you're not a qualified expert to offer opinions on

18   statistical analysis; right?

19       A   Well, I'm not a statistician.

20       Q   So you would not -- you are not an expert

21   statistician; right?

22       A   Well, why would I make myself out to be an

23   expert in statistician -- or an expert in statistics?

24   I'm not claiming to be an expert in statistics.  I'm a

25   database analyst.  You know, in that particular

1    circumstance I think -- I think defendants stated that

2    I'm not qualified because I'm not an expert in

3    statistics.  And I think that both the judge and I

4    agree I'm not an expert in statistics.  I'm an expert

5    in database analysis.  And I think the judge makes

6    that very clear, If you think that you can state to

7    the contrary.

8        Q   I know what I was going to ask you.  Bear

9    with me, I'm almost finished here.

10           There is a number of data arrays, number

11   arrays, attached to your report, and I think it's in

12   exhibit -- I think it's Exhibit 1.  Can you turn to

13   that, please?

14       A   Exhibit 1 to my Exhibit 4, is that what

15   you're talking about?

16       Q   No, it's -- the first page of it -- it's

17   attached to your expert report.  The first page says

18   "Exhibit 1.  List of employees provided by Sunview and

19   the Number of Shifts worked by each employee."  And

20   then after it is a long document with a bunch of

21   numbers.  I would say it's over 100 pages or near 100

22   pages.  Do you see that?

23       A   Yes.

24       Q   Okay.  What is that?  What is that intended

25   to represent?

1      A    Well, that's just a list of the employees and

2   their start and stop date, number of shifts that they

3   worked during that time, and then the number of

4   minutes -- the number of shifts with the number of

5   minutes, respective to the totals.

6      Q    Okay.  How did you compile this?

7      A    It's done in SQL.  The first thing to do is

8   create a list of employee number, the number of shifts

9   appearing, then the start and the finish, so you just

10   say:  Look -- attach the first date that appears in

11   the data and the last date that appears in the data.

12        So a shift can be -- you know, there are

13   shifts in here where people are paid exclusively on

14   piece rate.  There's no hours listed.  So that will

15   appear in shifts, but it won't appear in the columns

16   to the right because there's no number of minutes

17   associated with some of those.  There's a few of

18   those, it's not many, but there are some of those,

19   so --

20      Q    So what you're saying is -- I don't think I

21   quite follow that.  So you've got the employee, you

22   have the number of shifts, you have the start and

23   finish times; right?  And then you have a bunch of

24   shifts that are arrayed between hours I guess in the

25   day, how long they worked?

1        A    Number of minutes --

2        Q    Number of minutes.

3        A    -- as an accumulation of the shift segments

4    for that employee that day.

5        Q    So shifts 1 -- 0 to 1, 1 to 2, 2 to 3, what

6    does that mean?

7        A    Shifts 0 to 1 hour, shifts 1 to 2 hours, and

8    the number of minutes above it.

9        Q    And I think I wouldn't quite get it, but if

10    you add up all the numbers on the right-hand side of

11    the finish date, should that total the shifts there on

12    the left-hand side of the start date?

13        A    Not in all cases because there are shifts

14    that show just the piece rate in a day, you know, an

15    amount for, you know, working a certain amount of

16    days -- I'm sorry -- an amount for working on a

17    certain number of items, and there is no time element

18    there.  So you'll see on the left-hand side

19    occasionally where there's more shifts and the sum of

20    the shifts, of segments by hours.

21        Q    Okay.  Let's take an easy example here

22    because it looks like there's no numbers in it.  It's

23    down the page about 12 times.  There's an employee

24    548515117.  Do you see that?  Do you see that?

25        A    I'm looking right now.

```
1          Q    I'm sorry.  And I know it's kind of busy
2     here.
3          A    5485 -- yeah.
4          Q    About No. 13?
5          A    Yeah, on the right-hand side it shows under
6     shifts 8 to 9 it shows 3.
7          Q    Exactly.
8          A    There is actually 4 shifts.
9          Q    There is 4 shifts.
10         A    Yeah.
11         Q    And the one that doesn't appear there would
12    be a piece --
13         A    Piece.
14         Q    -- piece rate.
15         A    Yeah.
16         Q    Now, if you total up all the shifts that you
17    have, and there's a lot of pages, I guess --
18         A    Yes.
19         Q    -- all those numbers should tabulate -- if
20    you -- can you add up all the numbers and come out
21    with the totals?  I don't see -- you didn't do it.  If
22    you total the numbers, would you know -- for instance,
23    if you total all the numbers in the first column all
24    the way down, would you have the total number of
25    shifts which were less than one hour for all the
```

5/3/2011  Woolfson Aaron

```
 1    employees?  Is that the way it works?

 2        A   You should, yes.  Well, I shouldn't say less

 3    than 1 hour, right, because it's really 1 hour or

 4    less.  So up to 1 hour would be 59 minutes.

 5        Q   Yeah.

 6            Okay.  I don't think I have anything more

 7    other than to give you your check.  Thank you.  I know

 8    that we had a little difficult time communicating on

 9    some of these questions.

10        A   Hey --

11        Q   I thank you for bearing with me.

12        A   -- it's not my first dance.

13        Q   Now, let me ask you this.  Do you need copies

14    of anything that were marked as exhibits that you'd

15    like to keep -- oh, I guess we should mark -- you took

16    some notes here --

17        A   Yes.

18        Q   -- that you referred to.

19        A   You can have those.

20        Q   Let's mark those as Exhibit 10.  You can get

21    a copy of those.

22            MR. MALLISON:  If I could get a copy of that,

23    I'll make sure he gets a copy.  How's that?

24            MR. MOLLAND:  When you refer to "that" I

25    don't know what you mean.
```

1          MR. MALLISON:  The exhibits.

2          MR. MOLLAND:  We'll mark the witness's notes.

3     Q    These are the notes you took during the

4  deposition; is that right?

5     A    Yes.

6     Q    Or did you take them some other time?

7     A    I just took those during the deposition, sir.

8          MR. MALLISON:  Do you want to do a Southern

9  California stipulation or --

10         MR. MOLLAND:  You're way beyond me.

11         So just for recordkeeping purposes, before we

12  go off the record let's make sure we have all the

13  exhibits so the court reporter will have them because

14  I tend to walk off with them and sometimes witnesses

15  do too.

16         MR. MALLISON:  Speaking of.  Here's 9.

17         THE WITNESS:  Yeah, let's see here.

18         (Deposition Exhibit 10 marked by the

19         court reporter.)

20  BY MR. MOLLAND:

21     Q    You told me that you would supply, as I

22  recall, a list, I can't remember if it was codes or

23  dates, remember in the morning?

24     A    For the SQL implementation?

25     Q    Yes.

5/3/2011 Woolfson Aaron

```
1          A    Yes.
2          Q    Were you able to do that during the lunch
3     hour?
4          A    I didn't look it up.  I didn't have
5     Internet --
6               MR. MALLISON:  We can do that.
7               THE WITNESS:  -- access.
8     BY MR. MOLLAND:
9          Q    You can do that later.
10         A    I will do it.  I will make sure that you get
11    it --
12         Q    And we'll mark that --
13         A    -- from Mr. Mallison.
14         Q    Okay.
15              And we'll mark that Exhibit 11 to the
16    deposition.  When it comes, I'll just send it to the
17    court reporter, and we will agree that it will be
18    marked as Exhibit 11.
19              (Deposition Exhibit 11 to be sent to the
20              court reporter and marked.)
21              THE WITNESS:  And you'll be receiving an
22    errata with the adjustments for the overtime before
23    much longer because I want you guys to have that to be
24    accurate.
25    BY MR. MOLLAND:
```

1        Q    Okay.  And we'll just kind of reserve our

2    rights on that.

3        A    Yeah, of course.

4        Q    And we'll just see if that's going to require

5    any additional deposition or whether it's going to

6    require anything at all, but if it does we'll --

7        A    Thank you.

8        Q    -- make a record on it.  And I'm not saying

9    you can't do it, and if you'd like to, you will, and

10   I'm not making you, but you'll do whatever you are

11   going to do.

12       A    I want to do it so it reflects the correct

13   overtime hours.  I think it will reduce the number of

14   overtime.

15            MR. MALLISON:  Shall we stipulate to that

16   we'll hold the original at our offices so he can

17   review them, relieve the court reporter of her

18   obligation to do so?  SoCal stipulations I'm talking

19   about.

20            MR. MOLLAND:  So we're going to go outside

21   the code and have a stipulation that you'll keep the

22   original of the deposition?

23            MR. MALLISON:  He can review it at our

24   offices and make any adjustments, if any.

25            MR. MOLLAND:  Okay.  I always don't like to

```
 1     do that, but this is an expert deposition --

 2               MR. MALLISON:  I don't want to travel.

 3               MR. MOLLAND:  -- and I can see there may be

 4     some reason for you to do that.  As long as -- no

 5     reflection on your office because my office is just --

 6     has just as many problems keeping the original intact

 7     and ensuring that it's going to be in good condition

 8     whenever we need it.  But as long as you'll assure me

 9     you'll do your best to do that --

10               MR. MALLISON:  I will.

11               MR. MOLLAND:  -- in this situation because

12     it's an expert deposition I understand how you're

13     requesting it, and so be it.

14               Thank you.

15               THE VIDEOGRAPHER:  Okay.  Are you ready to go

16     off?

17               MR. MOLLAND:  Yeah.

18               MR. MALLISON:  So stipulated.

19               MR. MOLLAND:  So stipulated.  Yeah.

20               THE VIDEOGRAPHER:  This ends today's

21     deposition of Aaron Woolfson and the end of media

22     No. 3.  Off the record at 5:36 p.m.

23               THE REPORTER:  Mr. Mallison, are you ordering

24     a copy?

25               MR. MALLISON:  Let me get your card.
```

5/3/2011  Woolfson, Aaron

```
1            MR. MOLLAND:  We'd like to get a rough of

2    this.  The actual original it makes no difference when

3    we get it, but we'd like a rough as soon as we can get

4    it, please.

5            THE REPORTER:  Thank you.

6    (5:32 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5/3/2011  Woolfson, Aaron

1

2

3

4

5

6

7

8            I, AARON WOOLFSON, do hereby declare

9    under penalty of perjury that I have read the

10   foregoing transcript; that I have made such

11   corrections as noted herein, in ink, initialed by me,

12   or attached hereto; that my testimony as contained

13   herein, as corrected, is true and correct.

14            EXECUTED this _____ day of _____,

15   2011, at _____ ,_____.

             (City)                     (State)

16

17

18            _____

                       AARON WOOLFSON

19

20

21

22

23

24

25

5/3/2011  Woolfson  Aaron

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11        Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [X] was [ ] was not requested.

15        I further certify I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: Monday, May 16, 2011

22

23

                    _____

24                  ELAINE A. DELLINGES

                    CSR No. 5049

25