# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTIAGOS ROJAS, et al., | ) Case No.: 1:09-cv-0705-AWI - JLT |
| Plaintiffs, | ) FINDINGS AND RECOMMENDATIONS |
| | ) GRANTING FINAL APPROVAL OF CLASS |
| v. | ) SETTLEMENT (Doc. 282) |
| MARKO ZANINOVICH, et al., | ) |
| | ) FINDINGS AND RECOMMENDATIONS |
| Defendants. | ) GRANTING IN PART PLAINTIFFS' MOTION |
| | ) FOR ATTORNEY FEES (Doc. 284) |

Plaintiffs Santiago Rojas, Josefino Ramirez, Catalina Robles, Juan Montes, Benito Espino, and Guillermina Perez seek final preliminary approval of a class settlement reached with Defendant Sunview Vineyards of California, Inc. (Doc. 282.) In addition, Plaintiffs seek an award of attorneys' fees and costs from the settlement fund and class representative enhancement payments. (Doc. 284.) Defendant Sunview Vineyards of California does not oppose these requests.

Because Plaintiffs carry their burden to demonstrate certification of the Settlement Class is appropriate under Rule 23 of the Federal Rules of Civil Procedure and that the settlement terms are fair, reasonable, and adequate, the Court recommends that Plaintiffs' request for final approval of the settlement be **GRANTED**. In addition, the Court recommends that Plaintiff's request for attorney fees be **GRANTED IN PART** in the modified amount of $1,137,500; costs be **GRANTED IN PART** in the modified amount of $80,690.37; and Plaintiffs' request for enhancement payments be **GRANTED IN PART** in the modified amount of $4,000 per class representative.

## BACKGROUND

On March 5, 2004, Arnaldo Lara, Mario Laveaga, Mirna Diaz, Paula Leon, and Raul Diaz, individually and acting for the interests of the general public, ("Lara Plaintiffs") initiated an action in the Kern County Superior Court against Rogelio Casimiro, doing business as Golden Grain Farm Labor.[1]  On September 12, 2005, the Lara Plaintiffs filed a second amended complaint and identified other employers of agricultural farm workers as defendants, including El Rancho Farms; Stevco, Inc.; Lucich Family Farms; and Castlerock Farming and Transport, Inc.  The Lara Plaintiffs never identified Marko Zaninovich, Inc. or Sunview Vineyards as defendants in the state court action.

On November 9, 2005, unnamed "Doe" plaintiffs initiated an action against table grape growers based in Kern County, including Marko Zaninovich, Inc.; Sunview Vineyards of California, Inc.; Castlerock; D.M. Camp & Sons; Guimarra Vineyards Corp.; El Rancho Farms; Stevco, Inc; and FAL, Inc.[2]  (*Doe v. D.M. Camp & Sons*, Case No. 1:05-cv-1417-AWI-SMS, Doc. 2.)  The "Doe" plaintiffs were unnamed former and current employees of the defendants.  (*Doe,* Doc. 2.)  In addition, on March 14, 2006, Catalina Robles, Juan Montes, Benito Espino, and Guillermina Perez filing a complaint against Sunview Vineyards.  (*See Robles*, Case No. 1:06-cv-00288-AWI-SMS, Doc. 1.)  On June 9, 2006, the Court found *Doe* and *Robles* were related because the cases involved the same defendant raised "identical questions of fact and law."  (*Robles*, Doc. 21.)

Defendants in the *Doe* action, including Marko Zaninovich, Inc., and Sunview Vineyards, filed motions to dismiss the operative complaint, which were granted by the Court on March 31, 2008.  The Court ordered the plaintiffs to sever the action and file amended pleadings against each defendant. (*Doe*, Doc. 168).  The Third Amended Complaint against Marko Zaninovich, Inc. and Sunview Vineyards identified Santiago Rojas and Josefino Ramirez as plaintiffs on May 29, 2008.  (*Doe*, Doc.

---

[1] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  The record of a court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records.  *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), *aff'd* 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236m 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980).  Therefore, judicial notice is taken of the original Complaint and the Second Amended Complaint filed in *Lara v. Casimiro*, case number S-1500-CV-252445-SPC.  In addition, judicial notice is taken of the state court's docket of the *Lara* action, available at http://www.kern.courts.ca/gov.

[2] For the reasons set forth above in Footnote 1, the Court takes judicial notice of the complaints filed in *Doe v. D.M. Camp & Sons*, case number 1:05-cv-01417-AWI-SMS and *Robles v. Sunview Vineyards of California*, case number 1:06-cv-00288-AWI-SMS.

171).  On March 31, 2009, the Court ordered Plaintiffs to re-file their suit in a new case number within twenty days to finalize the severance.  (*Doe*, Doc. 238).

On April 20, 2009, pursuant to the Court's order in *Doe*, Rojas and Ramirez filed a complaint alleging Sunview Vineyards was liable for: violations of the Agricultural Workers Protection Act, 29 U.S.C. § 1801, *et seq*; failure to pay wages; failure to pay reporting time wages; failure to provide rest and meal periods; failure to pay wages of terminated or resigned employees; knowing and intentional failure to comply with itemized employee wage statement provisions; penalties under Labor Code § 2699, *et seq*; breach of contract; and violations of unfair competition law.  (Doc. 1.)  Plaintiffs brought the action "on behalf of Plaintiffs and members of the Plaintiff Class comprising all non-exempt agricultural, packing shed, and storage cooler employees employed, or formerly employed, by each of the Defendants within the State of California."  (*Id*. at 6.)

On May 4, 2009, the Court observed the plaintiffs in *Robles* and *Rojas* were "suing Sunview Vineyards on largely the same legal grounds" (Doc. 7 at 1) and were represented by "two groups of allied attorneys."  (Doc. 13 at 1.)  The *Rojas* plaintiffs were represented by Mallison & Martinez; Weinberg, Roger & Rosenfeld; and Milberg LLP; while the *Robles* plaintiffs were represented by McNicholas & McNicholas; Kingsley & Kingsley; Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein & Dickinson; and the Law Offices of Marcos Camacho.  (*See* Doc. 13 at 1.) The Court consolidated *Rojas* and *Robles,* and Court arranged class counsel as follows:

    1.   Co-Lead Counsel[3]
         ▪  Mallison & Martinez
         ▪  McNicholas & McNicholas, LLP

    2.   Members of the Executive Committee[4]
         ▪  Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein, Dickinson
         ▪  Kingsley & Kingsley, APC
         ▪  Law Offices of Marcos Camacho
         ▪  Milberg, LLP
         ▪  Weinberg, Roger & Rosenfeld

---

[3] The Co-Lead Counsel were to have the "day-to-day responsibility for the conduct of the consolidated litigation; shall determine how to prosecute the case and shall initiate, coordinate and supervise the efforts of plaintiffs' counsel in the consolidated action in the areas of discovery, briefing, trial and settlement."  (Doc. 17 at 2.)

[4] The law firms of Kingsley & Kingsley and Milberg, LLP were appointed Co-Chairs of the Executive Committee. (Doc. 17 at 2.) Members of the Executive Committee were obligated to "execute the orders of the Court concerning the conduct of the litigation; formulate and draft material for plaintiffs in the Consolidated Actions, including interrogatories, document requests, pleadings, briefs and motion papers; and perform such other tasks as are delegated by Co-Lead Counsel, including, for example, the taking of depositions upon oral examination."  (*Id*.)

3

1   (Doc. 17 at 1-2.)  Thus, each of the law firms remained designated as Plaintiffs' counsel in the action.

2   On September 22, 2009, the plaintiffs filed the "consolidated complaint" that identified all named

3   plaintiffs in the action: Santiago Rojas, Josefino Ramirez, Catalina Robles, Juan Montes, Benito

4   Espino, and Guillermina Perez.  (Doc. 18.)

5         Plaintiffs filed their motion for class certification on May 17, 2011, seeking to certify several

6   classes. However, the Court certified only two classes, defined as:

7         1.  <u>Sub-Minimum Hourly Wage Plus Piece Rate Class</u>: All workers who were paid an
              hourly wage less than minimum wage (but greater than $0/hour) plus piece rate from
8             11/9/2001 to present.

9         2.  <u>Tray-Washing Class</u>: All non-supervisory harvest fieldworkers employed by Sunview
              during the 2001 and 2002 harvests who took trays home overnight and washed those
10            trays without compensation.

11  (Doc. 201 at 26.)

12        Sunview filed a motion for reconsideration, which was granted in part and denied by the Court

13  on March 29, 2013.  (Docs. 202, 213.)  The Court clarified the class definitions, and the claims upon

14  which Plaintiffs were proceeding, as follows:

15        1.  <u>The Sub-Minimum Hourly Wage Plus Piece Rate Class</u> is defined as "All workers who
              were paid an hourly wage less than minimum wage (but greater than $0/hour) plus
16            piece rate from 11/9/2001 to present." Plaintiffs may represent this class with respect to
              the following claims: violation of rest period requirements (Labor Code §226.7 and
17            Wage Order 14), violation of the minimum wage requirements (Labor Code §§1194
              and 1194.2 and Wage Order 14), violation of AWPA (29 U.S.C. §1801 et seq.), waiting
18            time penalties (Labor Code §§201, 202 and 203), wage statement penalties (Labor
              Code §226), and violation of unfair competition law.
19
          2.  <u>The Tray Washing Class</u> is defined as "All non-supervisory harvest fieldworkers
20            employed by Sunview during the 2001 and 2002 harvests who took trays home
              overnight and washed those trays without compensation." Plaintiffs may represent this
21            class with respect to the following claims: violation of minimum wage requirements
              (Labor Code §§1194 and 1194.2 and Wage Order 14), violation of AWPA (29 U.S.C.
22            §1801 et seq.), waiting time penalties (Labor Code §§201, 202 and 203), wage
              statement penalties (Labor Code §226), and violation of unfair competition law.
23

24  (Doc. 213 at 9.)  The Court approved a notice to the class members on June 26, 2013, which was to be

25  distributed to all field workers employed "during the 2001 harvest."  (Doc. 224.)

26        In the summer and fall of 2014, the parties engaged in mediation and "reached an agreement to

27  fully and completely resolve and settle the action and signed a comprehensive Settlement Agreement

28  documenting the terms of such resolution."  (Doc. 255 at 3.)

4

The Court granted preliminary approval of the proposed settlement agreement.  (Docs. 266, 268.)  The Court granted conditional certification of the Settlement Class, defined as: "All current and former non-exempt fieldworkers who were employed by Sunview in California at any time from November 9, 2001 through and including September 30, 2014."  (Doc. 259-1 at 3, Settlement § I.E.)  In addition, Plaintiffs Santiago Rojas, Josefino Ramirez, Catalina Robles, Juan Montes, Benito Espino, and Guillermina Perez were appointed the Class Representatives, and authorized to seek incentive payments up to $7,500 for their representation of the class.  (Doc. 268 at 18- 19.)  The law firms of Mallison & Martinez and Kingsley & Kingsley were appointed as Class Counsel, and authorized to seek fees that did not "exceed 33 1/3% of the gross settlement amount."  (*Id.*)  Finally, Rust Consulting was appointed the Claims Administrator.  (*Id.* at 18.)  On March 13, 2015, the Court approved the Class Notice Packet that conveyed this information to class members.  (Doc. 272.)

On March 16, 2015, the Claims Administrator mailed the Class Notice Packet to 9,824 Class Members.  (Doc. 282-2 at 3, Jenkins Decl. ¶ 10.)  The Postal Service returned 2,420 of the packets to the Claims Administrator.  (Doc. 294 at 2, Jenkins Supp. Decl. ¶ 3.)  Rust sought new addresses and performed address traces to reserve the Notice Packets, but 1,173 packets remained undeliverable.  (*Id.*)  On May 11, 2015—after the parties realized 137 individuals received Benefit Forms that overstated the benefits they would receive—the Claims Administrator mailed Amended Benefit Forms and "advised the Class Members that they could submit an Exclusion Request Form and, if needed, the Amended Benefit Form, postmarked by June 4, 2015."  (Doc. 282-2 at 5, Jenkins Decl. ¶ 20.)

In total, the Claims Administrator received 53 timely Exclusion Request Forms, 41 of which were complete.  (Doc. 294 at 3, Jenkins Supp. Decl. ¶ 7.)  The Claims Administrator did not receive any objections to the proposed settlement from Class Members.  (*Id.*, ¶ 17.)  However, the Court received a letter signed by 32 individuals objecting to the terms of the settlement, including the amount of fees and costs sought by Class Counsel and the distribution of the funds to "persons that were in no way affected by the charges."  (Doc. 273 *as translated in* Doc. 278.)

Plaintiffs filed the motion for final approval of the class settlement terms on May 8, 2015.  (Doc. 282.)  In addition, Plaintiffs filed their motion for attorneys' fees costs, and class representative enhancement payments on May 21, 2015.  (Doc. 284.)  Defendant did not oppose either motion.

**SETTLEMENT TERMS**

Pursuant to the settlement, the "Maximum Settlement Amount" totals $4,550,000.  (Doc. 283-1 at 4, Settlement § I.T.)  Sunview agreed to fund the settlement for a class including "all current and former non-exempt fieldworkers who were employed by Sunview in California at any time from November 9, 2001 through and including September 30, 2014."  (Doc. 283-1 at 3, Settlement § I.E.) Specifically, Defendant agreed to pay 20% of the settlement funds into an escrow account at Bank of America and then deposit 10% of the funds into the account every thirty days thereafter until the "Maximum Settlement Amount has been deposited or the Effective Date [is reached] whichever occurs first.[5]  (Doc. 283-1 at 21, Settlement § III.H.)

**I.       Payment Terms**

The settlement fund will cover payments to class members with additional compensation to the Class Representatives.  (Doc. 283-1 at 10, Settlement § III.B.)  In addition, the settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id.*)  Specifically, the settlement provides for the following payments from the gross settlement amount:

- The Class Representatives will receive up to $7,500 each;

- Class counsel will receive no more than 33 1/3% of the gross settlement amount for fees, and additional funds for expenses;

- The California Labor and Workforce Development Agency shall receive $15,000 from the award pursuant to PAGA; and

- The Claims Administrator will receive compensation for fees and expenses.[6]

(Doc. 283-1 at 10-11, Settlement § III.B.)  After these payments have been made, the remaining money ("Net Settlement Fund") will be distributed as settlement shares to class members, who are not required to submit a claim to receive a share.  (Doc. 283-1 at 12, Settlement § III.C.)

The shares for class members will be calculated with "a formula that weights shares for pre-

---

[5] The phrase "Effective Date" is defined in the settlement agreement. (Doc. 283-1 at 4, Settlement § I.O.)
[6] Rust Consulting estimated the fees and costs for claim administration to be $64,529. (Doc. 256-1 at 17.)  For purposes of preliminary approval of the Settlement and notice to the class members, Plaintiffs increased the estimate to $70,000.  (*Id.*)  However, Ms. Jenkins reports Rust faced additional duties and responsibilities that were not previously anticipated, including "processing … an unexpectedly high number of undeliverable Class Notices" and having to process Amended Benefit Forms.  (Doc. 294 at 3, Jenkins Supp. Decl. ¶ 8.)  As a result, Rust now expects the costs to total more than $100,000.  (*Id.*)

6

1   existing certified claims (2001-2004) at a much higher rate than previously uncertified claims (2005-

2   present)."  (Doc. 282-1 at 6, citing Settlement § III.C.)  Thus, the class members are divided into two

3   groups: "Funding Group A" encompasses "[a]ll Workshifts worked by persons who are within the

4   classes certified by the Court that occurred between November 9, 2001 and July 4, 2003," while

5   "Funding Group B" includes "[a]ll Workshifts worked by all current and former non-exempt

6   fieldworkers who were employed by Sunview in California that occurred between July 5, 2003 and

7   September 30, 2014."  (Doc. 283-1 at 4, Settlement § I.Q.)  The settlement explains:

> The initial Settlement Distribution for each Participating Class Member will be calculated as follows: (a) the portion of the Net Settlement Amount allocated to Funding Group A shall be divided by the aggregate number of Workshifts in Funding Group A to arrive at the Funding Group A Workshift value, (b) the Participating Class Member's total number of Workshifts in Funding Period A (if any) shall be multiplied by the Funding Period A WorkShift value, (c) the portion of the Net Settlement Amount allocated to funding Period B to arrive at Funding Period B value, (d) the Participating Class Member's Total number of Workshifts in Funding Period B (if any) shall be multiplied by the Funding Period B Workshift value, (e) the sum of each calculation shall be added together to equal the Participating Class Member's initial Settlement Distribution.[7]

14   (Doc. 283-1 at 12, Settlement § III.C.)  Plaintiffs report that $4,000,000 of the gross settlement fund

15   has been allocated to Funding Group A, while $550,000 has been allocated toward Funding Group B.

16   (Doc. 282-1 at 23.)

17   **II.     Releases**

18          The settlement provides that Plaintiffs and Class Members, other than those who elect not to

19   participate in the settlement, shall release Sunview from the claims arising in the class period at the

20   time final judgment is entered.  Specifically, the release for class members includes:

> [A]ll federal, state, and local law claims, rights, demands, liabilities, and causes of action, whether known or unknown, arising from, or related to, the allegations that were made or reasonably could have been made based on the facts alleged in the operative Consolidated Complaint in this Action (filed on September 22, 2009), for the period from November 9, 2001 through September 30, 2014 (except for claims under Labor Code§ 203 premised upon an alleged failure to pay wages that is based upon any allegations or theories in the Consolidated Complaint, for which the release of claims shall extend through the date by which an Election Not to Participate in Settlement must be submitted to the Claims Administrator). The Released Claims include claims based on the following categories of allegations: (a) all claims for unpaid overtime pursuant to California Labor Code §§ 510, 1194, and 1198; (b) all claims for unpaid minimum wages pursuant to California Labor Code §§ 1185, 1194, 1194.2, 1197, and 1197.1; the Fair Labor

---

28          [7] A "Workshift" is defined by the parties as "each calendar day on which, according to Defendant's records, a Class Member reported for work and worked at least 3.5 hours."  (Doc. 259-1 at 8.)

Standards Act ("FLSA"); the Industrial Welfare Commission ("IWC") Wage Orders 8, 13 and 14; and 29 U.S.C. § 1832(c); (c) all claims for and related to the failure to provide meal periods and rest periods pursuant to California Labor Code §§ 226.7 and 512 and 29 U.S.C. § 1832(e); (d) all claims for failure to provide and maintain accurate and itemized wage statements pursuant to California Labor Code §§ 226, 226.3, 1174, 1175 and 29 U.S.C. § 1831(c); (e) all claims for failure to reimburse business expenses (including but not limited to reimbursement for tools) pursuant to California Labor Code §§ 1182.11, 2800 and 2802 and 29 U.S.C. § 1832(c); (f) all claims for failure to compensate split shifts pursuant to California Labor Code §§ 1197 and 1198 and California Code of Regulations Title 8, § 11070 Subdivision 4(C); (g) all claims for reporting time pay pursuant to California Code of Regulations Title 8, § 11070 Subdivision 5 and the California Labor Code §§ 1185, 1194, 1194.2, 1197 and IWC Wage Orders 8, 13 and 14 and 29 U.S.C. § 1832(c); (h) all claims for failure to timely pay wages upon tem1ination, pursuant to California Labor Code §§ 201, 202 and 203; (i) all claims for the failure to timely or otherwise pay wages during employment pursuant to California Labor Code §§ 204, 205.5, 206, and 221; (j) all incorporated or related claims asserted pursuant to California Business and Professions Code §§ 17200, et seq.; (k) all claims for interest, penalties, attorneys, fees, costs and any other monetary relief based upon the claims described in this section and including but not limited to, claims pursuant to Labor Code §§ 210, 218.5, 218.6, 225.5, 226.3, 256, 1174.5, 1197.1, 2699(g), 2802 and Code of Civil Procedure § 1021.5 and the FLSA; (l) all claims for penalties or monetary relief based upon the claims described in this section pursuant to Labor Code § 558; (m) all claims for penalties pursuant to the Private Attorneys' General Act ("PAGA"), California labor Code §§ 2698, et seq., based upon violations of any of the Labor Code sections described in this section; (n) all claims for breach of contract based upon the failure to pay wages owed and the failure to comply with the promised terms and conditions of employment, including any alleged violations of Labor Code §§ 223 and 225 and IWC Wage Orders 8, 13 and 14; and (a) all claims for actual and statutory damages, penalties, monetary or injunctive relief based upon the above-described claims pursuant to the Migrant & Seasonal Agricultural Worker Protection Act, 29 USC §§ 1801, et seq.

(Doc. 283-1 at 6-7, Settlement § I.BB.)  The release for Plaintiffs is broader than the release for Class Members, and encompasses any claims that could have arisen during the course of their employment with Sunview.  (Doc. 283-1 at 22-23, Settlement § III.K.1.)  Specifically, Plaintiffs' release provides:

As of the date of the Judgment, Plaintiffs and their Counsel hereby fully and finally release Defendants, and their partners, owners, subsidiaries, employees, officers, directors, agents, attorneys, stockholders, fiduciaries, other service providers, and assigns, from any and all claims, known and unknown, including but not limited to claims arising from or related to their employment or claimed employment with Defendants, their compensation while employed as Defendants' employee, under federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law. . . The Plaintiffs' Released Claims include, but are not limited to, all [] federal, state and local law claims, rights, demands, liabilities, and causes of action, whether known or unknown, arising from, or related to, the allegations that were made or reasonably could have been made in the operative complaint in this Action, through the Response Deadline (the date on which opt outs must be submitted to be valid)…

(*Id.*, emphasis added.)  Thus, the claims released by Plaintiffs, but not Class Members, include any claims arising under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, 42

1    U.S.C. § 1981, and the Employee Retirement Income Security Act.

2    **III.    Service of the Notice Packets and Responses Received**

3           The Court ordered Rust Consulting to mail the Class Notice Packet to the class members.  (Doc.

4    268 at 19.)  The Class Notice Packet—including the Class Notice, Benefit Form and Exclusion Request

5    Form—explained the nature of the action, the class definition approved by the Court, the claims and

6    issues to be resolved, the deadlines applicable to Class Members, and the binding effect of a class

7    judgment.  Each class member received an estimate of his or her settlement share on the Benefit Form.

8    (*See* Doc. 275 at 3.)  In addition, the Class Notice Packet explained individuals may object to the

9    settlement or elect to be excluded from the class, and the time and method to file objections or return

10   the Exclusion Request Form to the Claims Administrator.  (*See* Doc. 272.)

11          According to Jessica Jenkins, Senior Project Manager for Rust Consulting, the Class Notice

12   Packets were mailed via First Class Mail to the 9,824 Class Members identified by Defendant on

13   March 16, 2015.  (Doc. 282-2 at 3, Jenkins Decl. ¶ 10.)  After the Class Notice Packets were mailed,

14   the parties determined that 137 individuals received incorrect settlement share estimates because they

15   were employed by Sunview during Funding Period B rather than Funding Period A.  As a result, their

16   expected settlement shares were "likely substantially lower than that stated."  (Doc. 275 at 4.)  The

17   Court held a telephonic conference with the parties to address the notice to be given to these class

18   members. (Doc. 281.) Thereafter, the Claims Administrator mailed Amended Notice Packets to the 137

19   Class Members on May 11, 2015, including corrected settlement share estimates and advising "Class

20   Members that they could submit an Exclusion Request Form and, if needed, the Amended Benefit

21   Form, postmarked by June 4, 2005."  (Doc. 282-2 at 5, Jenkins Decl. ¶ 20.)

22          Ms. Jenkins reports that the United States Postal Service returned 2,420 Class Notice Packets as

23   "undeliverable" to the Claims Administrator.  (Doc. 294 at 2, Jenkins Supp. Decl. ¶ 3.)  The Claims

24   Administrator performed address traces and located "more current addresses" for members, but "350

25   Class Notices were returned to Rust as undeliverable a second time."  (*Id*.)  Ms. Jenkins reports that a

26   total of 1,173 packets remained undeliverable.  (*Id*.)

27          Following service of the Class Notice Packet and the Amended Benefit Forms, the Claims

28   Administrator received 41 timely and complete Exclusion Request Forms.  (Doc. 294 at 3, Jenkins

9

Supp. Decl. ¶ 7.)  No objections to the settlement terms were mailed to the Claims Administrator.  However, on April 27, 2015, the Court received a letter signed by 32 individuals who "worked from 2001 to 2005," objecting to the terms of the settlement, including the amount of fees and costs sought by Class Counsel and the distribution of the funds to "persons that were in no way affected by the charges."  (Doc. 273 *as translated in* Doc. 278.)  The parties did not object to the $4,550,000 total offered by Sunview in settlement.  (*See id.*)

## APPROVAL OF A CLASS SETTLEMENT

### I.      Legal Standard

When parties reach a settlement agreement prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

### II.      Certification of a Class for Settlement[8]

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all."  Fed. R. Civ. P. 23(a).  Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

Here, Plaintiffs argue that "[e]very requirement of Rule 23 is satisfied with respect to the

---

[8] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

proposed Settlement Class," which includes "all current and former non-exempt fieldworkers who were employed by Sunview in California at any time from November 9, 2001 through and including September 30, 2014." (Doc. 282-1 at 24; Doc. 283-1 at 3, Settlement § I.E.)

### A.      Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982) (citing *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980)). Rule 23(a) requires:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156.

#### 1.      Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and imposes no absolute limitations." *EEOC*, 446 U.S. at 330. Although there is no specific numerical threshold, joining more than one hundred plaintiffs is impracticable. *See Jordan v. county of Los Angeles*, 669 F.2d 1311, 1319 & n.10 (9th Cir. 1982) (finding the numerosity requirement was "satisfied solely on the basis of the number of ascertained class members" and listing thirteen cases in which courts certified classes with fewer than 100 members), *vacated on other grounds*, 469 U.S. 810 (1982). Here, the settlement Class includes 9,824 individuals. (Doc. 282-1 at 14; Doc. 282-2 at 3, Jenkins Decl. ¶ 10.) Therefore, the numerosity requirement is satisfied.

#### 2.      Commonality

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "does not mean merely that [class members] have all suffered a violation of the same pro-vision of law," but "claims must depend upon a common contention." *Wal-Mart Stores*, 131 S. Ct. at 2551. In this case, Plaintiffs argue that "Defendant's alleged failure to pay Class Members minimum wage, overtime, and rest and meal period violations create common issues." (Doc. 282-1 at

26.)  Accordingly, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.    Typicality

The typicality requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to be identical, but rather "reasonably co-extensive" with those of the absent class members. *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (typicality is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Here, Plaintiffs report that "[e]ach of the Class Representatives has claims similar and typical of the rest of the Class since they suffered similar injuries and have the same interest in redressing them." (Doc. 282-1 at 25.)  Because Plaintiffs and the putative class members were subject to the same policies and practices at Sunview, the typicality requirement is satisfied.

### 4.    Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to have a binding effect. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

#### a.    Class counsel

As the Court noted previously, the lawyers at Mallison & Martinez and Kingsley & Kingsley have extensive experience litigating wage and hour class action cases and in serving as class counsel. (*See* Doc. 262 at 2-6, Kingsley Decl. ¶¶ 2-3; Doc. 256-3 at 2-9, Mallison Decl. ¶¶ 4-16.)  There are no known personal affiliations or familial relationships between the plaintiffs and proposed class counsel.

(*See* Doc. 256-3 at 2-9, Mallison Decl. ¶ 17.)  Thus, Class Counsel satisfy the adequacy requirement.

*b.     Class representatives*

All named plaintiffs seek appointment as class representatives of the Settlement Class.  (Doc. 282-1 at 25-26.)  Each of the plaintiffs report they "had no conflicts of interest that interfered with [the] duty to serve the entire class."  (Doc. 282-3 at 2, Rojas Decl. ¶ 3; Doc. 282-4 at 2, Ramirez Decl. ¶ 3; Doc. 282-5 at 3, Espino Decl. ¶ 3; Doc. 282-6 at 3, Perez Decl. ¶ 3; Doc. 282-7 at 3, Montes Decl. ¶ 3; Doc. 282-8 at 3, Robles Dec. ¶ 3.)  Further, Defendant does not identify any conflicts between Plaintiffs and Class Members.  Because it appears the interests of the named plaintiffs are aligned with those of the class—to maximize their recovery— Plaintiffs will fairly and adequately represent the interests of the Settlement Class.

**B.     Certification of a Class under Rule 23(b)**

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266. Plaintiffs assert that for settlement purposes, class certification is appropriate under Rule 23(b)(3), which requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  These requirements are generally called the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 131 S. Ct. at 2559 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

1.     Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  The Ninth Circuit explained, "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).  In this case, Plaintiffs argue the predominance requirement is satisfied because "the issues

of Defendant's alleged failure to pay Class Members minimum wage, overtime, and rest and meal period violations create common issues that predominate over individual questions." (Doc. 43 at 26.)

### 2. Superiority

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023 (citation omitted). This tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Pursuant to Rule 23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior method of adjudication, including (1) the class members' interest in individual litigation, (2) other pending litigation, (3) the desirability of concentrating the litigation in one forum, and (4) difficulties with the management of the class action.

#### a. *Class members' interest in individual litigation*

This factor is relevant when class members have suffered sizeable damages or have an emotional stake in the litigation. *See In re N. Dist. of Cal., Dalkon Shield, Etc.*, 693 F.2d 847, 856 (9th Cir. 1982)). Here, the Claims Administrator received only 41 timely and complete requests to be excluded from the litigation. (Doc. 294 at 3, Jenkins Supp. Decl. ¶ 7.) This represents approximately 0.6 % of the 8,651 class members who received the Class Notice Packets. Although 32 individuals signed the letter to the Court regarding the settlement, it does not appear they object to the settlement with Sunview but only as to how the funds will be distributed. (*See* Doc. 273 *as translated in* Doc. 278.) There is no evidence that the class members who seek exclusion or objected to the distribution methods of the settlement funds are interested in pursuing their own actions. Therefore, this factor does not weigh against class certification.

#### b. *Other pending litigation*

The parties have not identified any other pending litigation for wage and hour violations against Sunview. As a result, this factor weighs in favor of certification.

#### c. *Desirability of concentrating litigation in one forum*

Because common issues predominate on Plaintiffs' class claims, "presentation of the evidence in one consolidated action will reduce unnecessarily duplicative litigation and promote judicial

1   economy." *Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, at *37 (C.D. Cal. Oct. 25, 2011).

2   Moreover, because the parties have resolved the claims through the settlement, this factor does not

3   weigh against class certification.

d.      *Difficulties in managing a class action*

5           The Supreme Court explained that, in general, this factor "encompasses the whole range of

6   practical problems that may render the class format inappropriate for a particular suit." *Eisen v.*

7   *Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  However, because the parties have reached a

8   settlement agreement, it does not appear there are any problems with managing the action.  Therefore,

9   this factor weighs in favor of class certification.

10          Because the factors set forth in Rule 23(b) weigh in favor of certification, the Settlement Class

11  is maintainable under Rule 23(b)(3).  Accordingly, it is recommended that Plaintiffs' request to certify

12  the Settlement Class be **GRANTED.**

13  **III.     Approval of the Settlement**

14          Settlement of a class action requires approval of the Court, which may be granted "only after a

15  hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

16  Approval is required to ensure the settlement is consistent with Plaintiffs' fiduciary obligations to the

17  class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The Ninth Circuit

18  identified several of factors to evaluate whether a settlement meets these standards, including:

19          the strength of plaintiff's case; the risk, expense, complexity, and likely duration of
            further litigation; the risk of maintaining class action status throughout the trial; the
20          amount offered in settlement; the extent of discovery completed, and the stage of the
            proceedings; the experience and views of counsel; the presence of a governmental
21          participant;[9] and the reaction of the class members to the proposed settlement.

22  *Staton*, 327 F.3d at 959 (citation omitted).  Further, a court should consider whether settlement is "the

23  product of collusion among the negotiating parties."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at

24  458 (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).  In reviewing settlement

25  terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law

26  which underlie the merits of the dispute."  *Class Plaintiffs*, 955 F.2d at 1291(internal quotations and

27

28          [9] This factor does not weigh in the Court's analysis because the government is not a party in this action.  However,
    the Settlement provides a payment of $15,000 to the California Labor and Workforce Development Agency because the
    PAGA claim authorizes Plaintiffs to act as "private attorney generals" on behalf of the State.

citation omitted).

**A.   Strength of Plaintiffs' Case**

When evaluating the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp 1379, 1388 (D. Az. 1989)).

In this action, there are several disputed claims the fact-finder would be required to determine related to the alleged wage and hour violations for piece-rate workers and the off-the-clock tray washing.  Plaintiffs acknowledge that "there are clear uncertainties surrounding Plaintiffs' ability to prove their claims given the unpredictability of a lengthy and complex jury trial."  (Doc. 282-1 at 17.) Because the parties have conducted thorough investigations and discovery allowing them to assess the strengths and weaknesses of the case, this factor weights in favor of final approval of the settlement.

**B.   Risk, Expense, Complexity, and Likely Duration of Further Litigation**

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the settlement were to be rejected, the parties would have to engage in further litigation, including re-certification of a class and discovery on the issue of damages.  Previously, Plaintiffs asserted

> Counsel for Plaintiffs carefully considered the risks of trial and other normal perils of litigation, including the merits of the affirmative defenses asserted by Defendant, the difficulties of complex litigation, the lengthy process of establishing specific damages, the difficulty in fully analyzing and utilizing the evidence at issue in this case, new legal decisions affecting pivotal issues in the case, class decertification issues, and other various possible risks and delays. [citation.] Plaintiffs' counsel realizes that no matter how good the facts and law, every trial retains inherent risk while the proposed settlement provides a certain recovery for Class Members.

(Doc. 256-1 at 6, citation omitted.)  Further, Plaintiffs note observe the "case has been pending for 10 years," which "is a long time for any class member to wait."  (Doc. 282-1 at 17.)  On the other hand, the settlement provides for the immediate recovery for the class, with the average payment estimated to be $718.07 for class member awards from Funding Group A and $39.54 for class member awards from Funding Group B.  (Doc. 293 at 2, Jenkins Supp. Decl. ¶¶ 4-5.)  Given the risks and uncertainties faced by Plaintiffs, this factor weighs in favor of approval of the settlement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    Maintenance of Class Status throughout the Trial

Plaintiffs acknowledge there is a "risk that the case may not survive a contested decertification proceeding." (Doc. 282-1 at 18, citing Doc. 283, Mallison Decl. ¶¶ 66, 69.)  If the classes were to be decertified by the Court, the class members would not recover any awards.  Thus, this factor supports final approval of the settlement.

### D.    Amount offered in Settlement

The Ninth Circuit observed that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  Thus, when analyzing the amount offered in settlement, the Court should examine "the complete package taken as a whole," and the amount is "not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators."  *Id.* at 625, 628.

In this case, the proposed gross settlement amount is $4,550,000.  (Doc. 283-1 at 4, Settlement § I.T.)  Plaintiffs report they "obtained almost full value of the class wage claims, which Plaintiffs estimated were worth between $5,000,000 and $6,000,000.  (Doc. 282-1 at 18, citing Mallison Decl., ¶¶41, 68)  Notably, of the gross settlement fund, "approximately $2,803,333.33 will be paid out to Participating Class Members."[10] (Doc. 293, Jenkins Decl. re Estimated Class Awards ¶ 3.)  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998).  Rather, as noted by the Ninth Circuit, "parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value."  *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Based upon the parties' agreement that this amount provides adequate compensation for the class claims against Sunview, the Court finds the amount offered supports approval of the class settlement.

---

[10] This estimate assumes the maximum award of attorney fees and class representative enhancements.  (Doc. 293, Jenkins Decl. re Estimated Class Awards, ¶ 3.)

### E.       Extent of Discovery Completed and Stage of the Proceedings

The Court is "more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Adoma*, 913 F. Supp. 2d at 977 (quoting *DIRECTV, Inc.,* 221 F.R.D. at 528). Here, Plaintiffs report:

> Plaintiffs conducted substantial discovery spanning a ten-year period including propounding and responding to many sets of special interrogatories and document requests, taking and defending numerous twenty-nine (29) depositions, reviewing thousands of documents including payroll and timekeeping information, and extensive expert analysis of time clock files containing 7,266,238 rows covering 7,997 Sunview employees who worked between 11/02/2001 and 1/16/2011. [Citation.] Further, Plaintiffs' counsel and their staff conducted hundreds of interviews of witnesses and class members. [Citation.] For example, in support of their Motion for Class Certification, Plaintiffs submitted in-depth declaration from forty-nine (49) fieldworkers. [Citations] Plaintiffs' litigation and mediation of this case were informed by a thorough review of Defendant's document production, astute expert and non-expert review and analysis of vast amounts of electronic data, interviews with hundreds of witnesses and twenty-nine (29) depositions.

(Doc. 282-1 at 19-20, citations omitted.) Given the amount of discovery performed by the parties, it appears that the parties made informed decisions, which lead to resolution of the matter with the assistance of a mediator. Consequently, the settlement agreement "is presumed fair," and this factor supports final approval of the settlement. *See Adoma*, 913 F. Supp.2d at 977.

### F.       Experience and Views of Counsel

As addressed above, Class Counsel are experienced in class action litigation. Class Counsel believe "believes that the settlement distribution is fair and reasonable given the circumstances of these cases and the strength and weaknesses of the various claims." (Doc. 283, Mallison Decl. ¶ 52.) Doc. 49 at 10.) Defendants agree that the settlement "reflects a fair, reasonable, and adequate settlement of the Action." (Doc. 283-1 at 28, Settlement § III.M.16.) Given counsels' experience and familiarity with the facts, their recommendation that the settlement be approved is entitled to significant weight. *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation"); *see also Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("In considering the adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.") Thus, the views of counsel support final approval of the

settlement.

### G. Reaction of Class Members to Settlement

The reaction of the class has been primarily positive.  The Class Representatives each have indicated they "are strongly in support of the settlement."  (Doc. 282-1 at 21, citing Ramirez Decl. ¶6; Rojas Decl. ¶6; Robles Decl. ¶9; Montes Decl. ¶8; Espino Decl. ¶8; Perez Decl. ¶8.)  Although 8,651 class members received the Class Notice Packet, only 63 Exclusion Request Forms were returned to the Claims Administrator.  (Doc. 294 at 3, Jenkins Supp. Decl. ¶ 7.)  In addition, although 32 individuals signed the letter to the Court regarding the settlement agreement, they did not object to the *fact* of the settlement.  The objectors assert, in relevant part:

> The injustice begins with our attorneys that are charging us more than was agreed on. They did not[11] inform us from the beginning that they would charge 30%. And they are not keeping their word. They are charging 33%. We questioned them and they tell us that it is for their expenses. What expenses? We didn't even go to trial. We waited ten years for this pittance of an agreement. Another objection we have is that the money is pittance. It is poorly distributed. We are in utter disagreement that the money be distributed among persons that were in no way affected by the charges that according to what the attorneys informed us were accepted by the judge. We the workers are the affected party. We worked from 2001 to 2005. We are never going to accept that money is paid to persons that were never affected by these charged. We believe that it is an injustice against us.

(Doc. 273 *as translated in* Doc. 278.)  Thus, it appears the objections concern the amount of fees and expenses that may be awarded, and the distribution of the money between Funding Group A and Funding Group B.[12]  (*See id.*)

On the other hand, the evidence submitted demonstrates that the objectors were informed that counsel would seek up to one-third of the settlement proceeds in fees but admit an understanding that the attorneys could receive as much as 30%.  (Doc. 284-2 at 20-21)  As discussed more fully below, the Court recommends that attorneys' fees be awarded in the out 25% of the settlement proceeds.  Thus, the objection on this point is **MOOT**.

Finally, "the absence of a large number of objections to a proposed class action settlement raises

---

[11] It appears that this is a typo.  When read in context, it appears the objectors *agree* the attorneys may receive up to 30%.

[12] To the extent the individuals object to the distribution to two groups of workers, the objection is **OVERRULED**.  Plaintiffs sought to represent a class of workers from 2001 through the present for the alleged wage and hour violations.  Distribution between the two funding groups to encompass the workers with $4,000,000.00 designated for Funding Group A—which includes the objectors who worked for Sunview beginning in 2001—is appropriate.

a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529.  Because the number of requests for exclusion and objections received are vastly outweighed by the remaining class members who have indicated their consent to the terms of settlement, this factor weighs in favor the settlement.

### H.   Collusion between Negotiating Parties

The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  Plaintiffs assert that "the Settlement was reached after nearly exhaustive discovery, certification of two classes, [and] six years of considerable motion practice." (Doc. 282-1 at 24.)  In addition, the parties engaged in "extensive arms-length negotiations during numerous mediation sessions with Steven Vartabedian, former appellate justice."  (*Id.*)  Given the duration of the negotiations, it appears the agreement is the product of non-collusive conduct.

## IV.   Conclusion

The factors set forth by the Ninth Circuit weigh in favor of final approval of the settlement, which appears to be is fair, reasonable, and adequate as required by Rule 23.  Therefore, the Court recommends that Plaintiffs' motion for final approval of the Settlement Agreement be **GRANTED**.

### REQUEST FOR ATTORNEYS' FEES AND COSTS

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h).  Under the settlement, Class Counsel may request attorneys' fees that total "no[] more than one-third of the Maximum Settlement Amount."  (Doc. 283-1 at 11, Settlement § III.A.2.)  Class Counsel are also authorized under the settlement to seek litigation expenses in "an amount to be determined."  (*Id.*)  Here, Class Counsel requests the maximum of 33 1/3% of the gross settlement fund in fees totaling $1,516,665.15 and expenses in the amount of $100,000.[13]  (Doc. 284 at 1)  In support of these requests, a representative from each law firm has filed a declaration setting forth the hours worked and hourly rates, as well as the firm's expenses.  (Docs. 284-2; Docs. 285-291.)  As noted above, 32 class members object to the amounts requested.  (*See* Doc. 278.)

---

[13] Mr. Mallison attests that their actual costs were $105, 396.41. (Doc. 284-2 at 27-28)

1    **I.      Legal Standards**

2         "[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class

3    action settlement agreement" to determine whether it is "'fundamentally fair, adequate, and reasonable'

4    Fed.R.Civ.P. 23(e)." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003)).  To do so, the Court

5    must "carefully assess the reasonableness of a fee amount spelled out in a class action settlement

6    agreement." *Id.*

7         A court "may not uncritically accept a fee request," but must review the time billed and assess

8    whether it is reasonable in light of the work performed and the context of the case.  *See Common Cause*

9    *v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d

10   248, 254 n.5 (9th Cir. 1995) (noting a court may not adopt representations regarding the reasonableness

11   of time expended without independently reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743

12   F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request where

13   "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing

14   party wholesale" and explaining a court should not "accept[] uncritically [the] representations

15   concerning the time expended").

16        The party seeking fees bears the burden of establishing that the fees and costs were reasonably

17   necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th

18   2000).  Therefore, a fee applicant must provide time records documenting the tasks completed and the

19   amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins.*

20   *Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the

21   district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

22        Significantly, when fees are to be paid from a common fund, as here, the relationship between

23   the class members and class counsel "turns adversarial."  *In re Washington Pub. Power Supply Sys.*

24   *Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

25        [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has
          become a claimant against the fund created for the benefit of the class. It is obligatory,
26        therefore, for the trial judge to act with a jealous regard to the rights of those who are
          interested in the fund in determining what a proper fee award is.

27

28   *Id.* at 1302 (internal quotation marks, citation omitted).  As a result the district court must assume a

21

fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

The Ninth Circuit determined both a lodestar and percentage of the common fund calculation "have [a] place in determining what would be reasonable compensation for creating a common fund." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund cases be reasonable under the circumstances."  *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also Staton*, 327 F.3d at 964 (fees must be "fundamentally fair, adequate, and reasonable").

### A.    Lodestar Method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate."  *Florida* , 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  Next, the court may adjust the lodestar upward or downward using a "multiplier" considering the following factors adopted by the Ninth Circuit in a determination of the reasonable fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  However, the Court has since determined that the fixed or contingent nature of a fee and the "desirability" of a case are no longer relevant factors.  *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citing *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992)).

### B.    Percentage from the common fund

As the name suggests, under the "common fund" method, attorneys who create a common fund

22

1    for a class may be awarded their fees and costs from the fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v.*

2    *Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of

3    persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a

4    whole").  An award from the common fund "rests on the perception that persons who obtain the benefit

5    of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense,"

6    and as such application of the doctrine is appropriate "when each member of a certified class has an

7    undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his

8    behalf."  *Boeing Co.*, 444 U.S. at 478.

9           In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 30% of the total

10   settlement value, with 25% considered the benchmark.  *See Vizcaino v. Microsoft Corp.,* 290 F.3d

11   1043, 1047 (9th Cir. 2002); *Hanlon*, 150 F.3d at 1029 (observing "[t]his circuit has established 25 %

12   of the common fund as a benchmark award for attorney fees"); *In re Pacific Enterprises Securities*

13   *Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district

14   courts should award in common fund cases"). The percentage may be adjusted below or above the

15   benchmark, but the Court's reasons for adjustment must be clear.  *Paul, Johnson, Alston & Hunt v.*

16   *Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

17          To assess whether the percentage requested is reasonable, courts may consider a number of

18   factors, including "the extent to which class counsel achieved exceptional results for the class, whether

19   the case was risky for class counsel, whether counsel's performance generated benefits beyond the

20   cash settlement fund, the market rate for the particular field of law (in some circumstances), the

21   burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work),

22   and whether the case was handled on a contingency basis."  *In re Online DVD-Rental Antitrust*

23   *Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (internal quotation marks omitted).

24   **II.     Evaluation of the fees requested**

25          "The district court has discretion to use the lodestar method or the percentage of the fund

26   method in common fund cases." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re*

27   *Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*., 109 F.3d 602, 607 (9th Cir.

28   1997)).  Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at

70; *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55.  Further, the Court may "appl[y] the lodestar method as a crosscheck" to determine whether the percentage requested is reasonable. *Vizcaino*, 290 F.3d at 1050, n.5.

### A.      Results obtained for the class

Courts have recognized consistently that the result achieved is a major factor to be considered in making a fee award.  *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  Class Counsel assert they "recovered $4,550,000.00 on behalf of the class, that the class members would likely not have recovered independent of this action."  (Doc. 284-1 at 13.)  According to Ms. Jenkins, the recovery for class members ranges from $5.45 to $2,722.38 in Funding Group A, with an average award of $718.07.  (Doc. 293 at 2, Jenkins Decl. ¶ 4.)  For Funding Group B, the awards range from $0.08 to $252.71, with an average award of $39.54.  (*Id.*, ¶ 5.) While, as a whole, these are acceptable results, they are not exceptional and do not support an increase above the benchmark.[14]

### B.      Risk undertaken by counsel

The risk of costly litigation and trial is an important factor in determining the fee award. *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).   As a result, the Ninth Circuit approved an award slightly above the benchmark in *Vizcaino* where the case was "extremely risky for class counsel" and the "plaintiffs lost in the district court – once on the merits, once on the class definition – and twice counsel succeeded in reviving their case on appeal."  *Id.*, 290 F.3d at 1048.

Here, Class Counsel asserts, "Given the risks . . .  involved in a class action contingency work, [they] believe a request of 33 1/3%  – even though it is above the standard benchmark – is therefore

---

[14] Though counsel argued at the hearing that this litigation was groundbreaking in that it changed how farmer-employers treated their employees –specifically as this relates to tray washing off-the-clock—there was no evidence provided to support this claim.  Notably, this litigation was not initiated until 2006 when the Robles complaint was filed. (*Robles*, Doc. 1.) In light of the fact the Court found here that the evidence was mixed whether tray-washing occurred off-the-clock after 2002, the Court in not convinced that there is a causal relationship between this litigation and farmer's decision to have trays washed on-the-clock.

justified." (Doc. 284-1 at 13.)  In addition, Class Counsel assert "there are clear uncertainties surrounding Plaintiffs' ability to prove their claims given the unpredictability associated with lengthy and complex jury trials and the possibility of decertification" (*Id*.)

Significantly, the risks identified by counsel are not unique to this action, but rather apply to any class action litigation.  Mr. Mallison even reports that "100% of Mallison & Martinez's legal practice involves legal work that is on a contingency fee basis." (Doc. 284-2 at 24, Mallison Decl. ¶ 81.) Further, the Ninth Circuit has suggested that the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) (observing "whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55 (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund).  Although Mr. Mallison asserts his firm "would not have agreed to represent plaintiffs in this case other than on a contingency fee basis unless it would have been confident that it would be awarded a contingency fee approximately 1/3 of the potential recovery if we were successful in our efforts" (Mallison Decl. ¶ 81), he admits also that "[t]he firm chose the proposed class representatives" in this action. (*Id.* ¶ 20).

Despite the fact that this case was taken on a contingency basis, Class Counsel do not identify any evidence that demonstrates they bore an atypical risk such that the Court should award fees above the benchmark.  For example, there is no evidence that the case was "extremely risky" for counsel and, in fact, Defendant's motion to dismiss was denied and the motion for class certification was granted. *Compare with Vizcaino*, 290 F.3d at 1048.  Consequently, this factor does not weigh in favor of the request for a higher award.

### C.   Skills of counsel

The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award. *See, e.g., Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289 at *14-15 (E.D. Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund, the Court observed the case involved "complex issues of constitutional law in an area where considerable deference is given to jail officials," and the action "encompassed two categories of class

25

members"); *see also In re Heritage Bond Litig.,* 2005 U.S. Dist. LEXIS 13555 at *66 (C.D. Cal. June 10, 2005) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award").

Here, Class Counsel assert their skills and "the quality of work" support an award greater than the benchmark in this action.  (Doc. 284-1 at 13-14, emphasis omitted.)  According to Class Counsel, they "showed great skill, thoroughness, and conscientiousness in investigating and developing the claims, liability theories, and estimated possible recoveries in the Litigation."  (*Id.* at 13.)  Specifically, they report:

> Plaintiffs' counsel and their staff collected forty-nine (49) declarations from Sunview fieldworkers in support of the Motion for Class Certification. Mallison Decl. ¶41; See Docs. 54-56. Plaintiffs' counsel also took or defended twenty-nine (29) depositions in this case, including nineteen (19) class member declarants, six named Plaintiff (6) depositions, two (2) expert depositions, and two (2) depositions of Defendant's managers. Plaintiffs' counsel and their experts reviewed a substantial amount of electronic time clock files (7,266,238 rows covering 7,997 Sunview employees who worked between 11/02/2001 and 1/16/2011). Mallison Decl. 41, 42; See Doc. 39. From this data, Plaintiffs' counsel and Plaintiffs' expert analyzed over three (3) million employee shifts. Mallison Decl. ¶42; See Doc. 39.

(Doc. 284-1 at 14.)

On the other hand, a review of the record indicates Class Counsel engaged in several key missteps.  For example, Class Counsel developed declarations from individuals who they could not confirm actually worked for Defendant and, despite this, submitted them as evidence for consideration by the Court.  (*See* Doc. 80; Doc. 89 at 3.)

In addition, the motion for class certification failed to demonstrate Plaintiffs had standing for each of the classes they sought to certify.  (Doc. 192 at 24 & n.9)  This is notable in that counsel *selected* the persons who would act as the named plaintiffs.  (Mallison Decl. ¶ 20). Likewise, though they sought to certify a class related to the claim that employees were denied reimbursement for purchasing tools, only one declarant supported this claim and, as a result, this class was not certified due to a lack of evidence related to numerosity, commonality and typicality. (Doc. 192 at 28-29)  Also, there was significant conflicting evidence whether the trays were washed off-the-clock during the period from 2003 to 2005 and, therefore, the class was certified only for 2001-2002. (Doc. 192 at 32-34)  These evidentiary failures likely had an impact on the number of people who were entitled to a

recovery in this litigation.

Likewise, Class Counsel maintained tight control over the data provided to the expert, Mr. Woolfson, and failed to provide him with the needed information to prepare his report and to be prepared for his deposition.  (Doc. 158.)   This resulted in the Court finding the opinions were unreliable and struck them from consideration when evaluating the motion for class certification.  (*Id.*) Class Counsel then spent more than 80 hours on a motion for reconsideration of the issue—which totals about 5% of the time Mallison & Martinez expended on this action—which was denied.  (Doc. 182.) Moreover, though Class Counsel point to the data reviewed by the attorneys, the hours reported for this activity do not support that a significant amount of data review occurred.

Finally, when this action was initiated in 2005, many of the lead attorneys had been practicing for less than 10 years, demonstrating that exceptional skill and experience was not needed to pursue this litigation.  Because the Court does not find this matter required exceptional skills and Class Counsel displayed skills that were consistent with those of attorneys with comparable experience and because it does not find that exceptional results were achienved, this factor supports an award equal to the Ninth Circuit benchmark.

   **D.**   **Length of professional relationship**

Class Counsel do not address the length of the professional relationships with their clients. Catalina Robles, Juan Montes, Benito Espino, and Guillermina Perez filed their complaint against Sunview on March 14, 2006.  (*Robles*, Doc. 1.)  In addition, Santiago Rojas and Josefino Ramirez were identified as plaintiffs in the Third Amended Complaint against Marko Zaninovich, Inc. and Sunview Vineyards on May 29, 2008.  (*Doe*, Doc. 171).  Though counsel have spent several years on this action, this factor does not weigh in favor of departure from the benchmark. *See Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

   **E.**   **Awards in similar cases**

Notably, as discussed above, 25% of a common fund is "benchmark award for attorney fees" in the Ninth Circuit.  *Hanlon*, 150 F.3d at 1029; *see also Vizcaino,* 290 F.3d at 1047 (9th Cir. 2002). Previously, this Court observed that "[t]he typical range of acceptable attorneys' fees in the Ninth

Circuit is 20 percent to 33.3 percent of the total settlement value." *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013). Thus, the amount requested by Class Counsel is at the very highest point in this range. *See id.*

Class Counsel acknowledge that "courts in the Eastern District have awarded Class Counsel attorneys' fees of 30% of the net settlements in recent class action cases on behalf of fieldworkers employed in the tablegrape industry." (Doc. 284-1 at 15, citing *Rodriguez v. D.M. Camp & Sons*, Case No. 1:09-cv-00700 and *Morales v. Stevco*, Case No. 1:09-cv-00704). However, Class Counsel argue *Rodriguez* and *Morales* "are distinguishable in a number of ways" that support a higher fee award. (*Id.*) Class Counsel report that "the amount of discovery in this case was substantially greater than in [the] *Rodriguez* and *Morales* matters," including the number of documents reviewed, interviews performed by Counsel, and 29 depositions. (*Id.* at 15-16.)

On the other hand, the results obtained in the *Rodriguez* and *Morales* settlements were much more beneficial to the class members than the estimated awards for class members in this action. In *Morales,* the average award for class members was "over $4,300" for each class member. *Morales*, 2013 WL 1222058 at *2 (E.D. Cal. Mar. 25, 2013). The Court found this was "a significant recovery" that weighed in favor of a higher award. *Id.* Similarly, in *Rodriguez*, the average award was approximately $2,200 award per worker, and "the highest award [was] estimated to be approximately $17,300." *Rodriguez*, 2013 WL 2146927 at *13 (E.D. Cal. May 15, 2013). The Court determined such results were significant and weighed in favor of an award higher than the benchmark. *See Morales*, 2013 WL 1222058 at *2; *Rodriguez*, 2013 WL 2146927 at *13. In contrast, here, the average award for class members in Funding Group A is $718.07, and the average for class members in Funding Group B is $39.54. Given the disparity in the awards, the Court does not find this case does not compare favorably to *Morales* and *Rodriguez* such to support an award above the benchmark.

**F.    Lodestar Crosscheck and Market Rate**

Class Counsel provided a list of each legal professional who worked on this action and report they worked at total of 3,959.71 hours, which resulted in a lodestar calculation of $2,020,778.47 . (*See* Doc. 284-2 at 25-28.) Generally, when the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours." *See Schiller*,

1  2012 WL 2117001 at *20 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir.2005); *In re*

2  *Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D. Cal. 2007)).  However, in light of the

3  objections filed by class members to the fees requested, the Court has performed a detailed review of

4  the records, which revealed Class Counsel's lodestar calculation suffers significant flaws.

5              **1.**       **Hourly rate**

6         As an initial matter, the hourly rates sought by counsel and the professional staff are not in

7  accord with the market rate for the relevant community.  *Blum v. Stenson*, 465 U.S. 886, 895-96 and

8  n.11 (1984).  In general, the "relevant community" for purposes of determining the prevailing market

9  rate, is the "forum in which the district court sits."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973,

10  979 (9th Cir. 2008).  Thus, when a case is filed in the Fresno Division of the Eastern District of

11  California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish

12  the lodestar hourly rate . . ."  *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal.

13  2011).

14         The fee applicant bears a burden to establish that the requested rates are commensurate "with

15  those prevailing in the community for similar services by lawyers of reasonably comparable skill,

16  experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  The applicant meets this burden by

17  "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested

18  rates are in line with those prevailing in the community for similar services by lawyers of reasonably

19  comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11; *see also Chaudhry v. City of*

20  *Los Angeles*, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and

21  other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the

22  prevailing market rate.")  Here, though several attorneys practiced regularly within the District, they

23  offer no evidence that the rates they seek in this motion are typical for attorneys practicing in this

24  District.  (Doc. 287 at 7)  Remarkably, despite this lack of justification, nearly all of the hourly rates

25  sought by the attorneys and staff exceed those regularly awarded in the Fresno Division of the Eastern

26  District of California.

27                 a.      Attorneys

28        The hourly rates sought by counsel range from $275 to $850.  (See Doc.  284-2 at 25-28.)  In

support of these rates, several attorneys refer the Court to their fee awards in other district courts.  (*See, e.g.,* Doc. 286 at 405, Gottlieb Decl. ¶¶ 8-11; Doc. 288 at 5-6, McNicholas Decl. ¶¶ 11, 13.)   Mr. Kingsley provided the Court with a survey conducted by the *National Law Journal*, which indicates five California law firms "regularly charged in excess of $500 [per hour] for their partners," and "four of these firms charge as high as $600, $620, $650 and up to $850 per hour."  (Doc. 285 at 3, Kingsley Decl. ¶ 9.)  In addition, Mr. Kingsley filed an article from the *Wall Street Journal* entitled "Lawyers Gear Up Grand New Fees," which "states that hourly fees are expected to rise following the trend that began in New York where the top lawyers are now billing hourly at upwards of $1,000.00." (*Id.* at 5, ¶ 15.)  However, this information is not helpful in the Court's analysis regarding fees in the Fresno Division of the Eastern District.[15]

Mr. Mallison reports that "recently, fee awards for [his] work in the wage and hour class action context have been approved at $650 per hour."  (Doc. 284-2 at 6, Mallison Decl. ¶ 10) (citing *Ontiveros v. Zamora*, Case No. 2:08-657-WBS, 303 F.R.D. 356 (E.D. Cal. 2014)).  Significantly, however, in *Ontiveros,* the Court *declined* to calculate the lodestar with the requested hourly rate of $650 for Stan Mallison and Hector Martinez.  *Id.*, 303 F.R.D. at 373-74.  Rather, the Court noted that the hourly rates were "high for even the most experienced attorneys in the Eastern District."  *Id.* at 374 (citing *Johnson v. Allied Trailer Supply,*, 2014 WL 1334006, at *5 (E.D. Cal. Apr. 3, 2014); *Joe Hand Promotions, Inc. v. Albright*, 2013 WL 4094403, at *2 (E.D. Cal. Aug. 13, 2013).  Consequently, the Court calculated the lodestar with using $400 as the hourly rate for the partners at Mallison & Martinez and $175 as the rate for associates.  *Id.*  Although *Ontiveros* was filed in the Sacramento Division of the Eastern District, it demonstrates that the hourly rates requested here do not align with those in the Eastern District.

Recently, this Court has reviewed the billing rates for the Fresno Division and concluded that "hourly rates generally accepted in the Fresno Division for competent experienced attorneys [are] between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience."  *Silvester v. Harris*,

---

[15] The law firms identified in the National Law Journal survey are located in Los Angeles, California (Doc. 285-1), which lies within the Central District.

2014 WL 7239371 at *4 (E.D. Cal. Dec. 2014).  For attorneys with "less than ten years of experience . . . the accepted range is between $175 and $300 per hour."  *Id.* (citing *Willis v. City of Fresno*, 2014 WL 3563310 (E.D. Cal. July 17, 2014); *Gordillo v. Ford Motor Co*., 2014 WL 2801243 (E.D. Cal. June 19, 2014)).  With these parameters in mind, the hourly rates for counsel must be adjusted to calculate the lodestar.

Hours for each of the attorneys who have been in practice 20 years or more—including Thomas Lynch, Marcos Camacho, David Rosenfeld, William Sokol, Chris Raisner, Emily Rich, Suzanne Murphy, Roberta Perkins, Ira Gottlieb, Jeff Westerman, and Elizabeth Lin—will be calculated at the rate of $380 per hour.[16]  For attorneys who have been in practice between 15 and 20 years—including Stan Mallison, Hector Martinez, Eric Kingsley, Mario Martinez, Erica Deutsch, Sabrina Kim, Nicole Duckett, Catherine Schmidt, and Matthew McNicholas—the hourly rate is adjusted to $350 per hour.  Further, for attorneys who have been in practice between 10 and 15 years—including Alegria de la Cruz, Darren Cohen, Steve Hernandez, Linelle Mogado, Manjari Chawla, Erin Smith, Holly Boyer, Mitra Torabi and Robert Wargo—the rate is adjusted to $300 per hour.[17]  The hours worked by attorneys who have been admitted to practice between 5 and 10 years—including Joseph Sutton, Jessica Juarez, Kelsey Szamet, Kerianne Steele, Yuri Gottesman, and Marissa Nuncio—the lodestar will be calculated at a rate of $225 per hour.  Finally, for attorneys who have been in practice for less than five years, the rate is adjusted to $175 per hour.  Based upon the prior survey of the attorney fees in the Fresno Division and the Court's own knowledge, these hourly rates are reasonable.  *See Silvester*, 2014 WL 7239371 at *4; *see also Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).

///

---

[16] Class Counsel failed to provide any information regarding how long William Sokol and Roberta Perkins have been practicing law. However the Court "may take judicial notice of the State Bar of California's website regarding attorneys' dates of admission to the Bar." *Davis v. Hollins Law*, 25 F.Supp.3d 1292, 1298 n. 5 (2014). The website indicates William Sokol was admitted to practice in 1976, and Robert Perkins was admitted in 1991.  Thus, the Court takes judicial notice of these facts.  *See id.;* Fed. R. Evid. 201(b).

[17] Class Counsel failed to provide any information regarding the admission dates of Linelle Mogado and Majari Chawla. The California Bar website indicates Linelle Mogado was admitted in 2005 and Majari Chawla was admitted in 2001.  Judicial notice is taken of their admission dates.  *Davis*, 25 F.Supp.3d at 1298, n. 5; Fed. R. Evid. 201(b).

b.      Non-attorney staff

Class Counsel calculated their lodestar using hourly rates ranging from $95 to $325 for non-attorney staff.  (See Doc. 284-2 at 25-28.)  Generally, paralegal rates within the Fresno Division of the Eastern District range between $75 to approximately $150.00.  *See Moreau v. Daily Independent*, 2013 WL 796621 at *3 (E.D. Cal. Mar. 1, 2013) (observing that "$75 for paralegals [is] reasonable for litigation performed in this district"); *Spence v. Wells Fargo Bank, N.A.*, 2012 WL 844713 at *5 (E.D. Cal., Mar. 12, 2012) (approving "paralegal or other support rates" of $125.00, $145.00 and $155.00); *Silvester* 2014 WL 7239371 at *4 ["The current reasonable hourly rate for paralegal work in the Fresno Division ranges from $75 to $150, depending on experience."].

Here, Class Counsel request hourly rates of $95 per hour for Joel Salas, Mirella Lopez, and Dyvienne Martinez.  (*See* Doc. 284-2 at 25.)  Because these rates are within the range generally awarded in the Fresno Division, no adjustment is required.  In addition, the requested hourly rate of $150 is appropriate for Dawn McGuire, who has been a paralegal since 1986.  (*See* Doc. 288 at 6, McNicholas Decl. ¶ 16.)  On the other hand, Class Counsel offer no support that higher rates per hour are appropriate for Aida Sotelo, David Rodriguez, Hector Hernandez, Jan Spring, "Grisat," Eleanor Natwick, Teresa Oviedo, or Cecille Chaffins. Given the lack of information regarding their experience, the Court adjusts their hourly rates to $100 per hour.  *See Willis*, 2014 WL 3563310 at *14 (setting the hourly rate for a paralegal at $100 where the plaintiffs did "not offer[] any reason" to support a rate "set at the highest level in this district").  Accordingly, the hourly rate for these individuals is adjusted to $100 to be in line with the rates in the Fresno Division.

Further, Class Counsel apply an hourly rate of $200 per hour for the law clerk who worked on this action.  (Doc. 28402 at 27.)  However, because the award for *attorneys* begins at $175, the Court has determined that an appropriate rate for law clerks is $125.  *See Beecham v. City of West Sacramento*, 2009 WL 3824793, at *4 (E.D. Cal. 2009) ("As for the market rates requested for the work performed by the paralegals ($150 per hour) and law clerks ($125 per hour), the Court finds the rates are reasonable.").  Therefore, the rate for Yvonne Garcia is adjusted to $125 per hour for purposes of the lodestar calculation.

///

32

2.      **Hours expended**

A representative from each of the law firms designated as Plaintiffs' counsel has provided a declaration including the hours worked in support of the request for attorney fees.  Accordingly, the Court has reviewed the hours reported by each firm to determine whether they are reasonable.

a.      Mallison & Martinez

Stan Mallison reports that his law firm worked **1,666.19** hours in the course of this action since 2005.  (Doc. 284-2 at 25-26, Mallison Decl. ¶ 82.)  However, this total includes several duplicative entries and work related to other cases.

i.      *Duplicative entries*

As an initial matter, all hours reported by Marco Palau between June 3 and June 9, 2011 were erroneously recorded twice.  (*See* Doc. 284-3 at 18-24.)  Given the obvious error, only one set of the time entries for these dates should be counted, which results in a deduction of **14.65 hours**.

ii.      *Work related to Lara claims*

The total hours reported by Mallison & Martinez includes work performed on the *Lara* action in the state court action.  Significantly, the *Lara* plaintiffs never identified Sunview as a defendant in the state court, even through the filing of their second amended complaint on September 12, 2005.  Despite this, Mallison & Martinez seeks an award of 1/6 of the hours for work completed in *Lara* beginning in April 2005, including preparing for and appearing at hearings such as the case management conference, performing legal research related to filing an amended complaint, and preparing the plaintiffs' second amended complaint.  (*See* Doc. 294-3 at 89-102.)  The law firm also seeks time related to investigating claims against other defendants in *Lara*—such as Giumarra, Lucich Farms, and Castlerock—and reviewing their responses to discovery.  (*See, e.g., id.* at 83, 86-87, 99.)  Further, Mallison includes time related to settlement discussions with Castlerock.  (*Id.* at 85.)  There is no evidence that the lawyers at Mallison & Martinez worked on claims related to Sunview prior to November 5, 2005—when Hector Martinez had a meeting with an investigator and "contact[ed] witnesses regarding Giumarra, Sunview, and DM Camp."  (*Id.* at 82.)  Accordingly, no time prior to November 5, 2005 should be included in the calculation of work performed by the law firm of Mallison & Martinez. *See Gauchat-Hargis v. Forest River, Inc.*, 2013 U.S. Dist. LEXIS 128508 at *11 (E.D. Cal. Sept. 9, 2013) ("Time spent on

33

tasks that are not relevant to the case at issue should be eliminated from the lodestar analysis.")  This results in a deduction of **136.78 hours**.[18]

In addition, Mallison & Martinez include work related to responding to demurrers in *Lara*, after the filing of the complaint in *Doe*.  Specifically, Mr. Mallison reports time related to reviewing the demurrer filed by Lucich Farms, performing legal research, and preparing responses to the demurrers by the defendants. (Doc. 284-3 at 73, 78-79.)  Similarly, Hector Martinez reports having discussions regarding hearing dates for the demurrer by Castlerock, editing the response, and performing legal research.  (*Id.* at 73, 78.)  Because these tasks did not relate to the claims against Sunview, the time related thereto should not be awarded from the class settlement fund.  Therefore, the Court reduces the time reported by **2.6 hours**.

Finally, Mallison & Martinez also requests that 1/6 of the time related to work on the bankruptcy proceeding filed by Rogelio Casimiro, doing business as Golden Grain, and the related adversary proceedings initiated by the *Lara* plaintiffs in the bankruptcy court.[19]  For example, Mr. Mallison reports time conducting legal research related to bankruptcy several times in November and December 2005. (Doc. 284-3 at 76, 78-79, 81.)  Mr. Mallison reports he reviewed the bankruptcy documents on January 10, 2006, and made a telephonic appearance in the Bankruptcy Court on February 2, 2006.  (*Id.* at 64, 69.)  Mr. Mallison also had several conversations with co-counsel regarding to the bankruptcy proceedings.  (*See, e.g., id.* at 38-40, 57, 60.)  Further, several individuals report contacting Casimiro/Golden Grain employees and conducting interviews:

| 4/19/2006 | Martinez, H. | Telephone … calls to Lara, Paula, Mario re Casimiro Facts | 0.42 |
| 6/6/2006 | Hernandez | Case discussion about declaration of workers that work for Rogelio Casimiro; Revise and comment on declaration | 0.17 |
| 7/15/2006 | Martinez, D. | Telephone Call to former Golden Grain workers to schedule appointments | 0.67 |
| 7/15/2006 | Martinez, H. | Contact Former workers from Employee list provided by Casimiro | 0.67 |
| 7/16/2006 | Martinez, D. | Telephone Call to former Golden Grain workers re case update and scheduling for appointment | 1.38 |

[18]  This includes 40.92 hours for Hector Martinez, 49.94 hours for Stan Mallison, 7.5 hours for Alegria De La Cruz, 4.1 hours for Jan Spring, 3.25 hours for Mirella Lopez, and 1.17 hours for Deborah Vanore.

[19]  On October 12, 2005, Casimiro filed Chapter 13 bankruptcy in the United States Bankruptcy Court, Eastern District of California, Case No. 05-19558-B-13.  In January 2006, the *Lara* Plaintiffs initiated Adversary Proceeding No. 05-01401 in the Bankruptcy Court, and sought withdrawal of reference from the Bankruptcy Court. (Case No. 1:06-cv-0028-AWI, Doc. 1-4 at 2.)  Plaintiffs again sought withdrawal of reference in August 2007, *In re Rogelio A. Casimiro, et al.*, Case No. 1:07-cv-01218-AWI.

| 7/17/2006 | Martinez, D. | Telephone Call to former Golden Grain workers to make initial contact and schedule appointments | 1.37 |
|---|---|---|---|
| 7/17/2006 | Martinez, H. | Telephone Call to Golden Grain former employer; explained status of case; scheduled appoitments [sic]; discussions… | 1.00 |
| 7/18/2006 | Martinez, D. | Telephone Call to former GG workers to conduct initial contact and schedule interviews | 0.95 |
| 7/18/2006 | Martinez, H. | Contacting class members re GG violations; explaination [sic] of case status' scheduled appointments. | 0.67 |
| 7/19/2006 | Martinez, D. | Telephone Call to former GG workers to provide[] update and schedule appts in Bakersfield | 0.65 |
| 7/20/2006 | Martinez, H. | Contact former GG workers and explaining status of case; scheduled appointments | 0.50 |
| 7/20/2006 | Martinez, D. | Telephone Call to former GG workers to update and schedule appts in Bakersfield | 0.65 |
| 7/20/2006 | Martinez, D. | Prepare for trip to Bakersfield; Travel | 0.85 |
| 7/20/2006 | Mallison | Factual investigation and Preparation for [travel] to Bakersfield; database work | 0.71 |
| 7/20/2006 | Martinez, H. | Supervise DM and advise regarding calls to GG former workers | 0.33 |
| 7/20/2006 | Martinez, H. | Prepare for trip to Bakersfield; Travel time | 0.83 |
| 7/21/2006 | Mallison | Prep; travel to' attendance at witness interviews | 1.83 |
| 7/21/2006 | Martinez, H. | Meeting with witnesses and clients to obtain declarations | 1.83 |
| 7/22/2006 | Mallison | Preparation for; attendance at interviews of witnesses in [Bakersfield] | 2.00 |
| 7/22/2006 | Martinez, H. | Meeting with former Casimiro workers; Telephone Call to witnesses; review documents from Sara. Travel | 1.83 |
| 8/2/2006 | Martinez, H. | Telephone Call to Golden Grain [w]itnesses regarding meeting in Arvin to obtain declarations | 0.50 |
| 8/3/2006 | Martinez, H. | T/Cs to Golden Grain former workers to advise of meting in Arvin on Sunday | 0.33 |
| 12/13/2006 | Mallison | Review of settlement documents for GG case; declaration of Hector Martinez for appointment as lead counsel | 0.29 |

(Doc. 294-3 at 41, 47-49, 52, 56.)  Significantly, there is no evidence that the claims against Golden Grain were intertwined with the claims against Sunview.  Because Class Counsel fail to explain how the legal research related to the bankruptcy proceedings was relevant here, or how the evidence gathered against Golden Grain was used to support Plaintiffs' claims against Sunview, the tasks related to the adversarial proceedings and class certification in the Bankruptcy Court should not be compensated here.  This results in a total deduction of **29.83 hours**.

iii.	*Work related to the "Doe" action prior to severance*

Because the *Doe* action was severed into six actions including *Rojas*, Mr. Mallison requests that 1/6 of the hours attributed to the "Consolidated Cases" be awarded here.  (*See* Doc. 284-3 at 35-103.) However, review of the time sheets indicates that many of the hours reported clearly did not relate to class claims against Sunview, but rather exclusively to other employers named in *Lara* and *Doe*,

35

1   including the following examples:

| 11/10/2005 | Mallison | Composition of new Giumarra description; [W]estlaw and internet research | 0.46 |
|---|---|---|---|
| 11/21/2005 | Mallison | Composition of Client/witness database ([G]iumarra) | 0.50 |
| 12/6/2005 | Mallison | Telephone discussions with Amy Barks, counsel for El Rancho Farms; granted two-week extension of time; discussed informally resolving issues with comlaint [sic]; consultation with co-counsel | 0.17 |
| 12/9/2005 | Martinez, H. | Legal research re joint employer issue in DM Camp | 0.42 |
| 12/11/2005 | Martinez, H. | Travel to Bakersfield and investigation of Golden Grain Defendants witnesses and clients; meet with investigators | 1.00 |
| 12/29/2005 | Martinez, H. | Travel to Bakersfield; meet with clients Hermelinda Ramirez, Carmen Hernandez, Maria Cruz, Eugenio Hernandez. Did intake and explained class rep responsibilities. | 1.67 |
| 12/30/2005 | Martinez, H. | Travel to client's home[.] Meeting with client Yanet Hernandez, Edgar Palma, and Carmen Hernandez; travel back. | 1.33 |
| 1/3/2006 | Martinez, H. | Contact with Giumarra clients[;] Travel to Bakersfield from Ventura; Meeting with clients, Yanet Hernandez and Edgar[] Palma . . . | 1.00 |
| 1/3/2006 | Martinez, H. | Telephone calls to local contacts, i.e., Maria Cruz, Julio Hernandez and Pancho; discussions re Giumarra. Review notes. | 0.33 |
| 1/5/2006 | Martinez, H. | Telephone call to Silvestre to scedule [sic] meeting. Travel and Meeting with Silvestre Sot[a] and his wife. Intake and execution of retains. Travel back. | 0.50 |
| 1/17/2006 | Martinez, H. | Meeting with Maria Valdovinos who worked at DM Camp potato packing shed… | 0.33 |
| 1/19/2006 | Martinez, H. | Review and edit declaration and reply brief. Travel to meet with Domingo and Elvira Garcia. Conduct interview of work history at Giumarra; Travel to Lafayette | 2.33 |
| 2/28/2006 | Mallison | Composition of Giumarra complaint | 0.79 |
| 3/4/2006 | Mallison | Preparation for; travel to and attendance at Giumarra investigation in Bakersfield; consultation with co-counsel | 2.00 |
| 4/19/2006 | Mallison | Legal strategy with co-counsel re: brief and filing issues surrounding DM [C]amp | 0.33 |
| 4/24/2006 | Martinez, H. | Discussion with client regarding joint employer facts re DM Camp and Jesusa Cantorna | 0.17 |
| 5/5/2006 | Martinez, H. | Legal research re Giumarra brief; composition of brief | 1.67 |
| 6/19/2006 | Mallison | Contact with investigation re: giumara [sic] | 0.03 |
| 6/22/2006 | Martinez, H. | Look up address for Golden Grain/El Rancho workers; travel to worker's address in Bakersfield to interview | 0.50 |
| 6/23/2006 | Martinez, H. | Stop by Rafael Munoz' family home in an effort to locate client; spoke to daughter named Gaby; obtained contact informatin [sic] for client in New Mexico; in town visiting | 0.33 |
| 6/23/2006 | Martinez, H. | Telephone Call to Rafael Munoz; meeting with Rafael Munoz; provided updated; confirmed contact information in New Mexico; discussed employment at Sun World; willing to have us file agains[t] Sun World; discussion with SM regarding client contact | 0.17 |

(Doc. 284-3 at 51, 55-56, 59, 62, 67-69, 71-72, 75-76, 79, 81.)  Because it is clear these actions relate

to the claims of individuals who were not employed by Sunview, they were not relevant to the claims

36

at issue and should not be included in the lodestar calculation. *See Gauchat-Hargis*, 2013 U.S. Dist. LEXIS 128508 at *11. This results in a deduction of **16.03 hours**.

> iv.    *Work related to Valenzuela, Case No. 1:05-cv-01600-AWI-SMS*

On December 16, 2005, Santos Valenzuela, Trinidad Ruiz, Marta Rincon De Diaz, Ramon Cervantes Perales, and Hugo Perez Rios filed a class action complaint against Giumarra Vineyards.[20] On December 21, 2005, Plaintiffs' counsel filed a motion to consolidate the action with *Doe.* (*See Valenzuela*, Doc. 5.) In addition, Mr. Mallison reports he attended several meetings regarding Valenzuela and Giumarra, and Hector Martinez prepared documents related to consolidation of the claims with *Doe*. (Doc. 284-3 at 51, 54, 71, 73.) Because the claims brought by the *Valenzuela* plaintiffs related only to their employment by Giumarra Vineyards (*see Valenzuela*, Doc. 1), the work completed in that action was not related to the class claims here and should not be compensated. Thus, the lodestar is reduced by **6.88 hours**.[21]

> v.    *Work related to claims against Stevco, Inc.*

Mallison & Martinez erroneously included work related to *Morales v. Stevco, Inc.*, Case No. 1:09-cv-00704-AWI-JLT in their time report. Specifically, Hector Martinez reports that he spent 4.5 hours on September 1, 2009 to "prepare for Status Conference and attend in person in Fresno." (Doc. 284-3 at 34.) The Court's records indicate that the parties in *Morales* had a status conference on September 1, 2009; the parties in *Rojas* did not. (*See Morales* Doc. 16.) Further, Hector Martinez reports that on November 7, 2011 he spent 1.25 hours reviewing "Brief re Prelim Approval." (Doc. 284-3 at 12.) No such document was filed in the matter now pending before the Court until January 28, 2015. (Doc. 256.) However, in *Morales*, Mallison & Martinez filed a motion for preliminary approval of the class settlement on November 7, 2011. (*Morales* Doc. 34.) Similarly, Mr. Martinez reports he spent 0.75 hours related to the stipulation filed by the parties in *Morales* on December 20, 2011. (*See* Doc. 284-3 at 12; *Morales* Doc. 40.) Because the time reported by Mr. Martinez related to the *Morales* action should not be included in the lodestar, the total is reduced by **6.5 hours**.

---

[20] Because the accuracy of the court's docket cannot reasonably be questioned, the Court takes judicial notice of the docket and documents filed in *Valenzuela v. Giumarra Vineyards Corporation*, Case No. 1:05-cv-1600-AWI-SMS. *See Mullis*, 828 F.2d at 1388 n.9.

[21] This includes 5.72 hours for Stan Mallison and 1.16 for Hector Martinez.

b.      McNicholas & McNicholas, LLP

Matthew McNicholas reports that his law firm spent a total of 162 hours on the action.  (Doc. 288-1 at 11.) Notably, the minimum time recorded was 0.25 hours, which is a practice that has been criticized because it inflates the time billed. *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 949 (9th Cir. 2007) (affirming a reduction after finding the billing practice inflated the time recorded); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1100-01 (D. Haw. 2010) (applying a 20% reduction for billing in quarter-hour increments); *Prudential Ins. Co. v. Am. v. Remington*, 2014 U.S. Dist. LEXIS 9209 at *9 (E.D. Cal. Jan. 24, 2014) (also applying a 20% reduction where counsel billed in 15 minute-increments).

In *Welch*, the district court "imposed a 20 percent across-the-board reduction on [the] requested hours" because the law firm "billed in quarter-hour increments."  *Id.*, 480 F.3d at 948.  The district concluded the "practice of billing by the quarter-hour resulted in a request for excessive hours . . . because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time."  *Id.* The Ninth Circuit also reviewed the time sheets, and noted: "Our own review of the time sheet confirms that it is replete with quarter-hour or half-hour charges for the drafting of letters, telephone calls and intraoffice conferences."  *Id.*  Therefore, the reduction for quarter-hour billing was affirmed.  *Id.*

Here, associate Catherine B. Schmidt logged 90.5 hours, and billed 15 minutes on several occasions for reading brief minute orders from the Court, emailing to confirm a meeting, and reviewing the calendar regarding the scheduling conference.  (*See* Doc. 288-1 at 3-10.)  In *Remington*, this Court noted that "15-minute billing for reading the three-sentence Minute Order, which should have been read in 30 seconds or less time, obviously inflated the time spent performing that task, and causes concern that other unverifiable tasks likely took a fraction of the time billed to complete." *Prudential Ins. Co. v. Am. v. Remington*, 2014 U.S. Dist. LEXIS 9209 at *9.  Similarly, Ms. Schmidt's billing for reading minute orders such as those issued on September 5, 2006 (*Robles*, Doc. 36); March 16, 2007 (*Robles*, Doc. 37); and January 15, 2008 (*Robles*, Doc. 40) suggests that the reported time *was* inflated significantly by the quarter-hour billing minimum on other tasks such as reviewing emails, leaving a telephone message, and conferences with co-counsel.  *See id; Welch*, 480 F.3d at 948-49.

38

1   Consequently, the time reported by Ms. Schmidt is reduced by 20% for purposes of the lodestar

2   calculation, to 72.4 hours.

3                 **c.**    **Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein, Dickinson**

4        Ira Gottlieb reports that members of his firm spent a total of 114.0 hours on actions related to

5   this litigation, including opposing motions to dismiss, meeting with class members, preparing their

6   declarations, appearing at the depositions of the class representatives, and working on the motion for

7   class certification.  (Doc. 286-1 at 1-5.)  Review of the timesheets indicates clerical tasks have not

8   being included, and all the reported time appears to relate to the class claims against Sunview.  Further,

9   the time expended by the law firm appears reasonable, and no deductions are required.

10                **d.**    **Kingsley & Kingsley, APC**

11        According to Eric Kingsley, his law firm worked a total of 732.4 hours on this action.  (Doc.

12   285 at 7, Kingsley Decl. ¶ 23.)  He reports that attorneys at Kingsley & Kingsley, APC spent time

13   conducting discovery in this action including: "reviewing documents produced in discovery (payroll

14   records, policies, etc.)"; "interviewing and obtaining declarations from Class Members;" "drafting and

15   responding to discovery, both requests to produce and interrogatories;" and investigating "job

16   functions, duties, compensation, policies, and procedures."  (*Id.* at 8, ¶ 24.)  In addition, Mr. Kingsley

17   asserts his firm was responsible for drafting pleadings including "Complaints, Motions to Compel

18   discovery responses, Motion for Preliminary Approval, various documents related to Preliminary

19   Approval, Motion for Final Approval, various documents related to Final Approval, etc."  (*Id.*, ¶24(g).)

20   Finally, Kingsley & Kingsley assisted with mediation preparation, "negotiating the terms of the

21   Settlement;" "reviewing and making changes to the Settlement Agreement;" and "coordinating and

22   overseeing all aspects of the administration of the Settlement (review documentation, approv[ing] form

23   and content, etc.)."  (*Id.* at 8-9, ¶23(s)-(w).)

24        Review of the timesheets does not reveal overbilling or inflated hours.  Further, clerical tasks

25   have not been included in the lodestar calculation.  Because the time expended by the law firm on the

26

27

28

tasks above appears reasonable, no deductions are required from the hours expended by Kingsley & Kingsley, APC.[22]

e.       Law Offices of Marcos Camacho

Mario Martinez, who "was previously employed as an attorney with Marcos Camacho, A Law Corp.," filed a declaration on behalf of the law firm, explaining that after Mr. Camacho became a judge in the Superior Court of Kern County, he and two partners formed Martinez Aguilascocho & Lynch APLC.  (Doc. 287 at 2, Martinez Decl. ¶ 1.)  Mr. Martinez reports that the Law Offices of Marcos Camacho spent 759.57 hours on this action, including 599.57 hours by attorneys and 160 hours by paralegals.  (*Id.* at 6, ¶ 20.)

Mr. Martinez reports he was "the primary attorney coordinating the gathering, preparation and signing of class member declarations . . . used in support of Plaintiffs' Motion for Class Certification." (Doc. 287 at 6, Martinez Decl. ¶ 11.)  According to Mr. Martinez, he spent "over 175 hours identifying class issues, interviewing class members, and drafting and reviewing draft declarations from class members in support of Plaintiffs' Motion for Class Certification;" and "approximately 46.5 hours researching, reviewing and providing input into the Motion for Class Certification."  (*Id.*)  Thomas Lynch spent approximately 12 hours interviewing class members and drafting declarations in support of Plaintiffs' Motion for Class Certification; approximately 58 hours preparing named plaintiffs' and/or class members for depositions and defending depositions; approximately 20 hours on Rule 30(b)(6) depositions of Defendants; [and] more than 50 hours involved in discovery and records analysis on class claims."  (*Id.* at 7, ¶ 12.)  Further, "Marcos Camacho spent more than 40 hours interviewing class members and drafting class member declarations in support of Plaintiffs' Motion for Class Certification." (*Id.* at 7, ¶ 13.)  A review of the time sheets provided by Mr. Martinez indicates the time expended by the attorneys appears reasonable, and no deductions are required.

On the other hand, many hours reported by the paralegal staff are purely clerical in nature and should be excluded from the lodestar calculation.  *See Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10

---

[22] A significant number of hours related to emails or conferences with co-counsel.  However, Kingsley & Kingsley was appointed as a co-chair of the Executive Committee and charged with the responsibility of formulating and drafting materials, documents, and motions. (*See* Doc. 17 at 2).  In light of these obligations, the hours related to keeping other attorneys apprised of the actions taken and litigation planning do not appear unreasonable.

(1989).  Courts have discounted paralegal billing entries for "clerical tasks" such as "filing, transcript, and document organization time."  *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *see also Harris v. L & L Wings, Inc.*, 132 F.3d 978, 985 (4th Cir. 1997) (approving the court's elimination of hours spent on secretarial tasks from the lodestar calculation); *Jones v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 1016, 1027 (N.D. Cal. 2012) (discounting time for "filing or retrieving electronic court documents or copying").  Here, Aida Sotelo recorded 11 hours for actions coded as "File Mgmt," including "updating files and index;" downloading, saving, and copying documents; organizing files; and preparing documents for mailing.  (Doc. 287-2 at 2, 4, 7.)  Similarly, Claudia Bautista reported spending 0.5 hours in an "[a]ttempt to locate file."  (*Id.* at 9.) Given the clerical nature of these tasks, **11.5 hours** are deducted from the lodestar calculation.

### f.        Milberg, LLP

David Azar submitted a declaration on behalf of Milberg LLP, reporting: "The total number of hours expended on this litigation by [the] firm is 110.46 hours.  The total lodestar for [the] firm is $90,576.00, consisting of $70,901.5 for attorneys' time and $19,684.50 for professional time."  (Doc. 298 at 2, ¶ 6.)  Importantly, however, numerous hours were billed that related to the other defendants in *Doe* and for clerical tasks.

### i.        *Tasks related to other defendants*

Like Mallison & Martinez, Milberg LLP represented the *Doe* plaintiffs in the action initiated in November 2005.  Therefore, the law firm also seeks an award of 1/6 of the time related to the litigation.  However, through a simple word search in the time sheets reveals several tasks that did not relate to Sunview.  For example, Sabrina Kim noted that she prepared for a hearing and appeared at a "Mandatory Scheduling Conference in El Rancho and DM Camp." (Doc. 289 at 11.) Nicole Duckett indicated that she assisted with the "discovery exchange for D.M. Camp and El Rancho." (*Id.* at 12.) Further, Ms. Duckett and Jeff Westerman worked on settlement of the claims against Castlerock.  (*Id.* at 13.)  Counsel spent a total of 20.5 hours on claims that clearly do not relate to Sunview.  Because they seek an award of 1/6 of this time, **3.45 hours** is deducted from the lodestar calculation.  *See Gauchat-Hargis,* 2013 U.S. Dist. LEXIS 128508 at *11 ("Time spent on tasks that are not relevant to the case at issue should be eliminated from the lodestar analysis.").

41

1

                              *ii.     Clerical tasks*

2          The lodestar calculation by Mr. Azar includes 40.08 hours of work by document clerks, Jessica

3   Ortiz and Ray Velazquez.  (Doc. 289 at 4.)  Ms. Ortiz and Mr. Valazquez were responsible for

4   docketing documents, copying, printing and "monitoring" the case.  (*See, e.g. id.* at 14-16.)  Given the

5   clerical nature of these tasks, the time attributed to a "document clerk" should not be included in the

6   lodestar calculation.  *See Missouri*, 491 U.S. at 288 n. 10; *Nadarajah,* 569 F.3d at 921.  This results in

7   the deduction of **40.08 hours**.

8          Further, many of the tasks performed by Cecille Chaffins were clerical in nature.  For example,

9   Ms. Chaffins reported prepared courtesy copies of documents, calendared deadlines, and updated

10  charts regarding the case.  (*See* Doc. 289 at 8-15.)  In total, Ms. Chaffins spent 35.5 hours on tasks that

11  are clerical in nature.  Because Milberg seeks 1/6 of the time, this results in a deduction of **5.92 hours**.

12                          g.     Weinberg, Roger & Rosenfeld

13         Emily Rich, a shareholder with the law firm of Weinberg, Roger & Rosenfeld, reports that "the

14  firm expended 1557.23 hours in attorney and paralegal time" prior to the severance of *Doe*, and seek

15  1/6 of this time, or 259.54 hours.  (Doc. 290 at 6, Rich Decl. ¶ 12.)  In addition, Ms. Rich reports they

16  spent 85.60 hours on *Rojas* after the *Doe* action was severed into six separate actions.  (*Id.*, ¶ 13.)

17                      *i.     Work related to other grape growers*

18         Importantly, it is clear that many tasks reported relate to the claims of individuals who were not

19  employed by Sunview.  For example Chris Raisner recorded having several telephone conferences with

20  attorneys who represented El Rancho Farms, Stevco, and DM Camp.  (*See, e.g.,* Doc. 290-2 at 8, 27.)

21  In addition, Mr. Raiser and Ms. Rich worked on the proposed consolidation with *Valenzuela*—which

22  only raised claims against Giumarra Vineyards—with *Doe*.  (*Id.* at 9-10.)  Further, Linelle Mogado

23  interviewed DM Camp workers while Kerianne Steele "[i]nterviewed putative class members and

24  collected declarations from them re Casimiro's violations of labor code."  (*See id.* at 12, 22.)  In total,

25  the attorneys at Weinberg, Roger & Rosenfeld worked 247.68 hours on actions that clearly did not

26  relate to claims of individuals who were not employed by Sunview.  As such, even 1/6 the time for

27  these tasks should not be included in the lodestar calculation.  *See Gauchat-Hargis*, 2013 U.S. Dist.

28  LEXIS 128508 at *11 ("Time spent on tasks that are not relevant to the case at issue should be

1  eliminated from the lodestar analysis.")  Consequently, the lodestar must be reduced by **41.28 hours**.[23]

2                                   *ii.    Clerical tasks*

3          Notably, Class Counsel's lodestar calculation included time for clerical tasks performed by

4  Eleanor Natwick such as filing; "[d]ocument organization;" and downloading, printing, and saving

5  documents from PACER. (*See, e.g.,* Doc. 290-2 at 20-21, 23-25.)  Given the clerical nature of these

6  tasks, the time expended should be deducted from the lodestar calculation.  *See Missouri,* 491 U.S. at

7  288 n. 10; *Nadarajah,* 569 F.3d at 921.  Because Class Counsel seeks 1/6 of the time and Ms. Natwick

8  recorded at total of 28.25 hours in clerical tasks, this results in a deduction of **4.71 hours**.

9          **3.      Lodestar Calculation**

10         With the hourly rates and time adjustments set forth above, the lodestar in this action is

11 $**1,073,872.75**:

| LAW FIRM | LEGAL PROFESSIONAL | ADJUSTED HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| **Mallison & Martinez ($409,274.25)** | Stan Mallison | 348.61 | $350 | 122,013.50 |
| | Hector Martinez | 259.93 | $350 | 90,975.50 |
| | Marco Palau | 335.52 | $225 | 75,492.00 |
| | Joseph Sutton | 479.85 | $225 | 107,966.25 |
| | Alegria de la Cruz | 0.00 | n/a | 0.00 |
| | Jessica Juarez | 55.50 | $225 | 12,487.50 |
| | Jan Spring | 2.07 | $100 | 207.00 |
| | Hector Hernandez | 0.85 | $100 | 85.00 |
| | Joel Salas | 0.50 | $95 | 47.5 |
| | Mirella Lopez | 0.00 | n/a | 0.00 |
| | Deborah Vanore | 0.00 | n/a | 0.00 |
| | Dyvienne Martinez | 0.00 | n/a | 0.00 |
| | | | | |
| **Kingsley & Kingsley ($214,472.50)** | Eric Kingsley | 229.00 | $350 | 80,150.00 |
| | Darren Cohen | 9.50 | $300 | 2,850.00 |
| | Kelsey Szamet | 101.30 | $225 | 22,792.50 |
| | Steve Hernandez | 319.80 | $300 | 95,940.00 |
| | Allison Callaghan | 40.60 | $175 | 7,105.00 |
| | David Winston | 32.20 | $175 | 5,635.00 |
| | | | | |
| **Law Offices of Marcos Camacho** | Mario Martinez | 379.57 | $350 | 132,849.50 |
| | Thomas Lynch | 150.00 | $380 | 57,000.00 |

27

28         [23] This total includes 21.48 hours for Mr. Raiser, 12.46 hours for Ms. Rich, 2.79 hours for Ms. Mogado, and 4.55 hours for Ms. Steele.

| ($230,370.00) | Marcos Camacho | 65.50 | $380 | 24,890.00 |
|---|---|---|---|---|
| | Edgar Auilasocho | 4.50 | $175 | 787.50 |
| | Aida Sotelo | 140.00 | $100 | 14,000.00 |
| | David Rodriguez | 8.50 | $100 | 850.00 |
| | Claudia Bautista | 0.00 | n/a | 0.00 |
| | | | | |
| **Weinburg, Roger & Rosenfeld ($99,390.70)** | David Rosenfeld | 3.28 | $380 | 1,246.40 |
| | Bill Sokol | 1.54 | $380 | 585.20 |
| | Chris Raisner | 72.70 | $380 | 27,626.00 |
| | Emily Rich | 92.47 | $380 | 35,138.60 |
| | Linelle Mogado | 73.32 | $300 | 21,996.00 |
| | Majari Chawla | 5.17 | $300 | 1,551.00 |
| | Kerianne Steele | 13.66 | $225 | 3,073.50 |
| | Suzanne Murphy | 1.75 | $380 | 665.00 |
| | Grisat | 6.38 | $100 | 638.00 |
| | Eleanor Natwick | 0.08 | $100 | 8.00 |
| | Teresa Oviedo | 1.33 | $100 | 133.00 |
| | Roberta Perkins | 3.50 | $380 | 1,330.00 |
| | Yuri Gottesman | 24.00 | $225 | 5,400.00 |
| | | | | |
| **Bush Gottlieb ($32,100.00)** | Ira Gottlieb | 35.00 | $380 | 13,300.00 |
| | Erica Deutsch | 15.40 | $350 | 5,390.00 |
| | Marissa Nuncio | 54.60 | $225 | 12,285.00 |
| | Yvonne Garcia | 9.00 | $125 | 1,125.00 |
| | | | | |
| **Milberg LLP ($41,962.80)** | Sabrina Kim | 28.46 | $350 | 9,961.00 |
| | Jeff Westerman | 3.75 | $380 | 1,425.00 |
| | Nicole Duckett | 65.00 | $350 | 22,750.00 |
| | Elizabeth Lin | 15.96 | $380 | 6,064.80 |
| | Cecille Chaffins | 17.62 | $100 | 1,762.00 |
| | "Document Clerks" | 0.00 | n/a | 0.00 |
| | | | | |
| **McNicholas & McNicholas ($46,302.50)** | Catherine Schmidt | 72.40 | $350 | 25,340.00 |
| | Erin Smith | 13.75 | $300 | 4,125.00 |
| | Holly Boyer | 42.00 | $300 | 12,600.00 |
| | Mitra Torabi | 9.50 | $300 | 2,850.00 |
| | Matthew McNicholas | 0.75 | $350 | 262.50 |
| | Robert Wargo | 2.00 | $300 | 600.00 |
| | Dawn McGuire | 3.50 | $150 | 525.00 |
| | | | | |
| **TOTAL** | | | | **$1,073,872.75** |

Significantly, there is a strong presumption that the lodestar is a reasonable fee. *Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978. The benchmark award of 25% of the common fund amounts to $1,516,666.67—which is more than $440,000.00 above the lodestar as calculated above. Thus, the

44

1  lodestar crosscheck supports an award equal to the benchmark, and does not support an increase to a

2  third of the common fund.  Accordingly, Class Counsel's request for attorney fees is **GRANTED** in

3  the modified amount of 25% of the gross settlement fund, or $1,137,500.

4                                  **REQUESTS FOR COSTS**

5  **I.      Litigation Expenses**

6          Reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil

7  Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying

8  clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Here,

9  Plaintiffs' counsel seeks a total reimbursement of $100,000 for costs incurred in the course of this

10  action. (Doc. 284-1 at 19.)   As noted above, 32 class members object to the requested expenses.

11  (Doc. 273 *as translated in* Doc. 278.)  However, Class Counsel assert:

12          [T]he costs incurred are reasonable for a document-intensive wage and hour case and
        as such Class Counsel should be reimbursed. Mallison Decl. ¶84. Plaintiffs propounded
13      extensive document requests demanding all of the critical payroll and timekeeping
        information at issue in this case and the names and contact information for Defendant's
14      former and current employees. Mallison Decl. ¶¶41-45. Defendant's timekeeping system
        is both computer and "paper-based" consisting of a database for payroll and paper time
15      records. *Id.* This required Class Counsel to retain experts to review and analyze the Daily
        Work Time, Piece-Rate Reports, and other relevant documents in order to properly
16      analyze and negotiate a settlement in this case. *Id.*; Doc.162-3.

17  (Doc. 284-1 at 18-19.)  Further, Class Counsel report they "incurred more than $105,396.41 in costs."

18  (*Id.* at 19.)

19          Previously, this Court noted costs "including filing fees, mediator fees . . . , ground

20  transportation, copy charges, computer research, and database expert fees . . . are routinely reimbursed

21  in these types of cases." *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17,

22  2011).  However, Class Counsel fail to show the costs related to copying and their expert analysis are

23  appropriate in this action.

24          **A.      Copying**

25          "[T]he costs of making copies of any materials where the copies are necessarily obtained for use

26  in the case" may be taxed pursuant to 28 U.S.C. §1290.  As a result, "[c]opying costs for documents

27  produced to opposing parties in discovery, submitted to the court for consideration of motions, and

28  used as exhibits at trial are recoverable." *McCarthy v. R.J. Reynolds Tobacco Co.*, 2011 WL 4928623

                                            45

at *6 (E.D. Cal. Oct. 17, 2011) (citation omitted).  On the other hand, "recoverable copying costs do not include extra copies of filed papers, correspondence, and copies of cases since these are prepared for the convenience of the attorneys." *Id.*; *see also Rodriguez v. General Dynamics Armament & Tech. Prods.,* 775 F.Supp.2d 1217, 1219 (D. Haw. 2011) (declining to award costs totaling $20,750.52 for copying where "counsel state[d] only that they copies for trial exhibits and list[ed] the per item cost," but "the vast majority of those documents were never used or even referred to at trial").

Here, Class Counsel seek $3,567.20 for costs related to copying.  This total includes $1,525.00 from Mallison & Martinez (Doc. 284-4 at 1); $918.40 for Kinsley & Kingsley (Doc. 291-1 at 6); $1,058.05 for Milberg LLP (Doc. 298 at 20); $3.75 for Gottlieb (Doc. 286-1 at 5); and $62.00 for the law firm of Weinberg, Roger & Rosenfeld (Doc. 290-3 at 9.)  Significantly, only Ms. Rich explains that the photocopies were necessary for the service of the Third Amended Complaint.  (*See* Doc. 290-3 at 9.)  The other law firms fail to explain the purpose of the copies such that the Court may determine the copies were necessary for the course of the litigation, and were not, in fact, merely copies for their convenience. *See McCarthy,* 2011 WL 4928623 at *6; *Rodriguez,* 775 F.Supp.2d at 1219. Accordingly, this results in a deduction of $3,505.20 from Class Counsels' costs.

## B.    Expert Costs

Mallison & Martinez report expert fees in the amount of $21,200.84, with $19,474.80 attributed to "Data Analysis."  (Doc. 284-4 at 1.)  Other than the two entries on the "cost sheet" related to the expert, there is no showing how the expert spent his time or when his effort was expended.  (*Id.*)  This is significant here because, as discussed above, the Court struck the opinion of the expert, Mr. Woolfson, when it was offered in support of the motion for class certification.  (Doc. 158)

The basis for granting Defendant's motion, was counsel's failure to comply with the Federal Rules of Civil Procedure related to submitting a proper supplemental expert report and their failure to provide complete information to him so he could properly evaluate the data.  As a result, the Court found that Defendant was deprived of a "full and complete expert deposition." *Id*. at 9-10.  The Court found in conclusion,

> [C]onsidering Woolfson's admitted error regarding the pay code 031, his failure to
> conduct any expert investigation or analysis into the meaning of Defendant's pay
> codes, [and] his apparent willingness to offer conclusions about ultimate issues, i.e.
> lack of meal and rest breaks, without adequate foundation and given that he failed to

conduct a holistic verification of his results by comparing them against Defendant's payroll register, the Court lacks any confidence in the reliability of Mr. Woolfson's findings. **Thus, in performing its gatekeeper function, that Court concludes that Mr. Woolfson's methodology is so inherently flawed that it cannot permit the use of his opinions rendered thus far.**

*Id.* at 15, emphasis added.  In light of this determination and in light of the failure of Plaintiff's to offer any evidence or argument that Mr. Woolfson's efforts in any way benefited the Class, the Court has no basis to award costs related to the expert.

### C.    Amount of Costs Awarded

Given concerns over set forth above, the Court recommends Class Counsel be awarded $80,690.37[24] for the expenses reasonably incurred in this litigation.

## II.    Costs of Settlement Administration

The settlement authorizes the reimbursement of expenses for the Claims Administrator. (Doc. 283-1 at 10-11, Settlement § III.B.)  Rust Consulting initially estimated the fees and costs for claim administration to be $64,529.  (Doc. 256-1 at 17.)  For purposes of preliminary approval of the Settlement and notice to the class members, Plaintiffs increased the estimate to $70,000.  (*Id.*) However, Ms. Jenkins reports that Rust faced additional duties and responsibilities that were not previously anticipated, including "processing … an unexpectedly high number of undeliverable Class Notices" and having to process Amended Benefit Forms.  (Doc. 294 at 3, Jenkins Supp. Decl. ¶ 8.)  As a result, "Rust has incurred $49,957.65 in fees and costs and expects to incur additional fees and costs in the amount of $54,569.46 to conclude the duties and responsibilities pursuant to the terms of the Settlement Agreement."  (*Id.*)

This Court has awarded a 25,000 settlement administration in wage and hour case involving approximately 170 potential class members. *See Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 483-84 (E.D. Cal. 2010).  Given that this class involves more than fifty times the number of class members in *Vasquez*, the Court finds the administrative expenses are reasonable, and recommends the request of $100,000 for the Claims Administrator be **GRANTED**.

///

---

[24] Given counsel demonstrate costs expended in the amount of $105,396.41, the Court makes the deduction from this amount, rather than from the $100,000 in costs sought.

### PLAINTIFFS' REQUEST FOR AN INCENTIVE AWARD

The settlement provides that Plaintiffs may apply to the District Court for a class representative enhancement up to $10,000, to be paid from the gross settlement amount. (Doc. 283-1 at 10-11, Settlement § III.B.) In the Ninth Circuit, a court has discretion to award class representatives reasonable incentive payments. *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463. Incentive payments for class representatives are not to be given routinely. In *Staton*, the Ninth Circuit observed,

> Indeed, '[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

*Id.* at 975. In evaluating a request for an enhanced award to a class representative, the Court should consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation." *Id.* at 977. Further, incentive awards may recognize a plaintiff's "willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

### A.    Actions taken to benefit the class

The class representatives report they assisted counsel with the discovery associated with this action by having their depositions taken and responding to written discovery. (Doc. 282-3 at 2, Rojas Decl. ¶ 4; Doc. 282-4 at 2, Ramirez Decl. ¶ 4; Doc. 282-5 at 3, Espino Decl. ¶ 4; Doc. 282-6 at 3, Perez Decl. ¶ 4; Doc. 282-7 at 3, Montes Decl. ¶ 4; Doc. 282-8 at 3, Robles Decl. ¶ 4.) In addition, the class representatives report they helped organize and participated in several meetings with Sunview workers "to inform the class on the status of the case." (Espino Decl. ¶6; Perez Decl. ¶ 6; Montes Decl. ¶ 6; Robles ¶ 6.) Ms. Robles also reports that she "took time out of work to attend the mediation session" in September 2014. (Robles Decl. ¶ 7.) Notably, Plaintiffs would have likely submitted to depositions and assisted with discovery whether or not the action was brought on behalf of the class. On the other hand, by organizing meetings and answering questions, their actions undoubtedly

benefitted the class such that they weigh in favor of an incentive payment.

**B.     Time expended by Plaintiffs**

The class representatives estimate they each spent between 36 hours and 95 hours related to this action.[25]  (*See* Rojas Decl. ¶¶ 4-5; Ramirez Decl. ¶¶ 4-5; Espino Decl. ¶7; Perez Decl. ¶7; Montes Decl. ¶ 7; Robles Decl. ¶ 8.)  Thus, it appears Plaintiffs spent a number of hours on this action by providing assistance with discovery, submitting to depositions, and assisting counsel by organizing worker meetings. Therefore, this factor weighs in favor of incentive payments to Plaintiffs.

**C.     Fears of workplace retaliation**

Plaintiffs do not contend they feared retaliation for their connections to this action.  Thus, this factor does not support incentive payments to Plaintiffs.

**D.     Reasonableness of Plaintiff's request**

Considering the actions taken by Plaintiffs, an incentive award is appropriate.  In determining the amount to be awarded, the Court may consider the time expended by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive.  *See, e.g., Ontiveros*, 303 F.R.D. at 366 (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 U.S. Dist. LEXIS 72250, at *5 (E.D. Cal. July 6, 2011) (observing that the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).

1.     Time expended

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation."  *Id.*, 2011 WL

---

[25]It is unclear why the estimate from Mr. Montes differs so greatly from the other class representatives.  For example, Ms. Robles estimates she spent 23 hours attending the Sunview meetings in the Delano area, and Ms. Perez estimates the meetings—for which she traveled 110 miles roundtrip— took 25 hours. (Robles Decl. ¶ 6; Perez Decl. ¶ 6. However, Mr. Montes reports he spent 40 hours related to these same meetings.  (Montes Decl. ¶ 6.)

1883188 at *11.  Further, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant."  *Id.*  In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.

Here, Plaintiffs seeks an award equal to the incentive awards approved in *Alvarado*.  Because the actions taken by Plaintiff are similar to those by the plaintiff in *Alvarado*, this factor supports authorizing the requested enhancement.

### 2.     Fairness of the hourly rate

Recently, this Court criticized a requested award of $20,000 where the plaintiff estimated "he spent 271 hours on his duties as class representative over a period of six years," because the award would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D. at 366. The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk . . . for example, for time they could have spent at their jobs."  *Id.* at (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

Plaintiffs estimate they spent between 36 hours and 95 hours on this action. Thus, the requested award of $7,500 would compensate the plaintiffs at rates ranging from $75.95 to $208.33 per hour. Because these rates are excessive, this factor supports an enhancement lower than that requested. *See Ontiveros*, 303 F.R.D. at 366.

### 3.     Comparison of the award to those of the Class Members

*In Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011 U.S. Dist. LEXIS 72250, at *5.  The Court found the amount reasonable, in part because "the sum is reasonably close to the average per class member amount to be received."  *Id.*

Here, the recovery for class members ranges from $5.45 to $2,722.38 in Funding Group A, with an average award of $718.07.  (Doc. 293 at 2, Jenkins Decl. ¶ 4.)  For Funding Group B, the awards range from $0.08 to $252.71, with an average award of $39.54.  (*Id.*, ¶ 5.) Thus, Plaintiffs request enhancement payments that are more than 10 times the average award for Funding Group A, and nearly $5,000 more than the highest amount to be paid.  Thus, this factor weighs in favor of a lower incentive.

**E.      Amount to be awarded**

Given the hourly rate sought by the class representative related to the incentive and the total incentive requested, are significantly out of proportion to the average awards anticipated by class members, the Court finds the requested incentives of $7,500 is inappropriate.  However, Plaintiffs clearly expended efforts on behalf of the class by assisting with discovery and organizing meetings of Sunview workers.  As such, the Court finds an incentive award is appropriate, and recommends the request be **GRANTED** in the modified amount of $4,000 per plaintiff.

## FINDINGS

1.   Plaintiffs' original complaint was brought under the Agricultural Workers Protection Act, 29 U.S.C. § 1801 et seq., and related California wage and-hour laws.  The Court has original jurisdiction over the federal law claims and supplemental jurisdiction over the state-law claims given they arise from the same alleged transactions and occurrences as the federal-law claims. Thus, the Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1367;

2.   The action meets all of the requirements for certification of the class for settlement purposes;

4.   The settlement is within a range of possible outcomes which are fair, adequate and reasonable. It appears to be the product of arm's-length and informed negotiations and it appears to treat all Class Members fairly;

5.   The Class Notice Packet was adequate and sufficient to inform Class Members of the terms of the Settlement; their rights under the Settlement; their rights to object to the settlement; their right to receive a Settlement Share or elect not to participate in the Settlement; the processes for receiving a Settlement Share, electing not to participate in the Settlement or Objecting to the Settlement; and the date and location of the final approval hearing. Individual notices were mailed to all class members whose identities and addresses are reasonably known to the parties, and such notice was the best notice practicable. Therefore, the Court finds the Parties' notice procedures were completed and were constitutionally sound;

51

6.     Class Members were provided with the opportunity to comment on, or object to, the Settlement, as well as to elect not to participate in the Settlement. Certain Class Members filed written objections to the Settlement.

## RECOMMENDATIONS

Based upon the foregoing, **IT IS HEREBY RECOMMENDED**:

1.     The objections (Doc. 278) be **OVERRULED**;

2.     Plaintiff's motion for final approval of the Settlement Agreement be **GRANTED**;

3.     Plaintiffs' request for certification of the Settlement Class be **GRANTED** and defined as follows:

> All current and former non-exempt fieldworkers who were employed by Sunview in California at any time from November 9, 2001 through and including September 30, 2014.

4.     Plaintiffs' request for class representative incentive payments be **GRANTED IN PART** in the modified amount of $4,000;

5.     Class Counsel's motion for attorneys' fees is **GRANTED IN PART** in the modified amount of $1,137,500, which is 25% of the gross settlement amount;

6.     Class Counsel's request for costs be **GRANTED IN PART** in the modified amount of $80,690.37;

7.     The request for fees for the Claims Administrator be **GRANTED** in the amount of $100,000;

8.     The California Labor Code Private Attorney General Act payment to the State of California be **APPROVED** in the amount of $15,000;

9.     The action be **DISMISSED WITH PREJUDICE** with each side to bear its own costs and attorneys' fees except as otherwise provided by the settlement and ordered by the Court;

10.    The Court order the escrow holder, Bank of America, to disburse/release the settlement funds to the Settlement Administrator Rust Consulting for processing and distribution in accordance with the terms of the Settlement Agreement and the addenda thereto; and

11.    The Court retain jurisdiction to consider any further applications arising out of or in

1    connection with the settlement.

2          These Findings and Recommendations are submitted to the United States District Judge

3   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local

4   Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days

5   after being served with these Findings and Recommendations, any party may file written objections

6   with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and

7   Recommendations."  The parties are advised that failure to file objections within the specified time may

8   waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991);

9   *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

10

11  IT IS SO ORDERED.

12      Dated:   **June 11, 2015**                    **/s/ Jennifer L. Thurston**

13                                              UNITED STATES MAGISTRATE JUDGE